UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

HENRY NARANJO and
MARLENE RAMIREZ,

CASE NO. 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Plaintiff,

vs.

STEPHEN BYRON SMITH
and PALMER JOHNSON, INC.,

Defendants.
_____/

## MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANT STEPHEN SMITH

Defendant Stephen Byron Smith (hereinafter "Smith"), by and through his undersigned attorneys,, moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P, and in support thereof would show that there is no genuine issue of material fact as to the liability of Smith and that final judgment should therefor be entered as a matter of law.

I. NATURE OF THE ACTION

The plaintiff Henry Naranjo was injured on July 7, 1997 while employed as a welder at Bradford Marine in Ft. Lauderdale. At the time of the accident, he was performing welding work on the SOUVENIR, an 82' Palmer Johnson vessel owned by defendant Smith. Specifically, Naranjo was tack welding an aluminum plate (doubler) to the deck (or subfloor) of the lazarette[1] located below the aft cockpit deck of the vessel when an explosion occurred. As a result of the injuries sustained in the accident, Naranjo received

---

[1] A lazarette is generally a storage space located between decks.



compensation and medical benefits through his employer Bradford pursuant to the Longshore and Harbor Workers Compensation Act, 33 USC 901, et. seq.

Plaintiff has sued defendant Smith pursuant to the LHWCA, 33 USC 905 (b), which specifically provides for a "third party" cause of action for damages against the vessel owner within the following parameters:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party ... and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies available under this chapter.

The plaintiff alleges and contends that Smith was negligent by reason of his (or his captain's/ agent's) failure to (1) exercise reasonable care to turn over the vessel in a reasonably safe condition (3) warn of a latent or concealed peril (3) discover a dangerous condition, and (4) otherwise maintain the vessel in a safe manner. See, paragraphs 17-20 of plaintiff's amended complaint.

II. <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

The following undisputed material facts are based on the deposition testimony of the plaintiff, John "Jack" Bredbeck (the captain of the SOUVENIR), Peter Rimmel (a

2

marine chemist hired by Bradford), and various Bradford personnel, Paul Engle, David Henderson, Mark Tortora, and Tony Watson.[2]

1. The vessel as originally constructed by Palmer Johnson in 1994 was 72' long. The vessel was subsequently lengthened by 10' by extending the aft cockpit (the "cockpit extension"). A lazarette was built into the cockpit extension below the aft cockpit deck. The deck (or subfloor) of the lazarette was a thin aluminum sheet, estimated to be between 1/4" and 3/16" thick. Under this aluminum deck was a "void space",[3] created by the aluminum deck above, and concrete ballast below. This was the layout when the vessel was purchased by Smith from the previous owner in February, 1997.

2. After Smith purchased the vessel, he decided to have it completely repaired, renovated, and outfitted, and he contracted with Bradford to do the work. The vessel was brought into the Bradford yard sometime in April 1997. (Bredbeck, pp. 14-19).

3. Repairs and renovations were still ongoing at the time of plaintiff's accident on July 7, 1997.

4. One of the "projects" involved the installation of hydraulic steering pumps in the lazarette. Smith, through his captain, purchased the pumps from an independent contractor

---

[2] Engle is the general manager, Henderson the yard superintendent, Tortora the project manager and safety director, and Watson the (former) welding foreman. References to the witness' deposition testimony will be by name and page number.

[3] The existence of this "void space" is the basis of the plaintiff's claim against co-defendant Palmer Johnson, that it constituted an unreasonable defective and dangerous condition. However, as to defendant Smith, this is not a "material" fact since a claim against the vessel owner based on negligent design or design defect is deemed to be a claim for unseaworthiness for which the vessel owner cannot as a matter of law be liable to the injured worker. See, Salvato v. Hakko Maritime Corp., 1989 AMC 1014 (ND Cal. 1989), and cases cited therein.

who was also going to install the pumps. This was not going to be a Bradford job as part of their contract with Smith. (Bredbeck, pp. 23-25).

5. The independent contractor was not able to install the pumps as planned because the lazarette deck was too thin. (Bredbeck, pg.25).

6. On the morning of July 7, 1997, it was decided that it would be necessary to fabricate aluminum (doubler) plates which would be thick enough to hold the pumps. The doublers would be welded to the lazarette deck and the pumps bolted onto the doublers. This work was to be done by Bradford, not by the independent contractor hired by the captain. (Bredbeck, pp. 25-28).

7. The captain discussed this idea with Tony Watson who was the welding foreman at Bradford. Watson inspected the lazarette and specifically, the area where the doublers were to be welded onto the deck for placement of the pumps and approved the job. (Bredbeck, pp. 27,28,70,97,98; Watson, pp. 18, 53-55).

8. Watson assigned to the plaintiff the job of fabricating the doublers and then welding them to the deck.

9. The plaintiff completed the fabrication of the doublers in the welding shop sometime early in the afternoon. (According to the plaintiff, it took about 3-4 hours to do the fabrication work). (Naranjo II, pp.6,7).

10. Sometime before starting to weld the doublers to the lazarette deck, the plaintiff asked the captain what was underneath the deck. According to the plaintiff, the captain

told him that there was concrete "flush" to the aluminum, no fuel tanks or fuel lines; that it was "safe" to weld.[4] (Naranjo, pp. 44,45).

11. However, the plaintiff did not proceed to weld because the captain said it was "safe" to do so. According to the plaintiff, he would not have started to weld had he not known that his foreman Tony Watson had previously inspected the lazarette, had he not seen a "gas free" certificate posted on the vessel, and had he not inspected the space himself to make sure it was safe. (Naranjo, pp. 18,19,25,72,119,122; Naranjo II, pp. 7,8,13,25,26).

12. The "gas free" certificate that the plaintiff saw on the vessel was not a permit for "hot work" in the lazarette certifying it to be "gas free". Rather, the certificate would have related only to "hot work" previously performed on another part of the vessel, likely the engine room. (Rimmel, pp. 7,8,71-73,118).

13. No testing was done in the lazarette by Bradford, the plaintiff, or Rimmel to determine whether the space was "gas free".[5]

---

[4]The captain disputes that he ever told the plaintiff that the concrete below was "flush" against the aluminum deck or that it was "safe" to weld. (Bredbeck, pp. 66,67,107,117,118). Regardless, the plaintiff candidly admitted that he didn't know whether it was safe to weld because he did not have a "gas tester". (Naranjo, pg. 41). Further, it is undisputed that the plaintiff did not ask the captain about the possible presence of any gas, fumes, or vapors. (Naranjo, pp. 120,121).

[5]A multi-gas tester ("sniffer") which would detect the presence of explosive fumes, vapors or gas was not utilized simply because Bradford did not own one, even though one had been previously requested by Bradford's safety director based upon the recommendation of Peter Rimmel, the marine chemist regularly used by Bradford. (Tortora, pp. 49,50; Rimmel, pp. 105-107). Further, the lazarette space was not inspected by Rimmel, prior to the plaintiff starting to weld, even though this was required by the governing OSHA regulations. (Rimmel, pp. 29-32; 34-36,109-110).

14. The plaintiff proceeded to tack weld one corner of the doubler onto the lazarette deck. This took no more than one second to accomplish.

15. He then started to tack weld another corner of the doubler onto the lazarette deck when an explosion occurred. (Naranjo, pp. 54,55).

16. At the time of the explosion, the plaintiff was the only person in the lazarette.

17. The captain was in the engine room at the time as he had no reason to supervise or oversee the work being performed by the plaintiff. (Bredbeck, pg. 22). Indeed, other than having initially advising Bradford of the work he wanted done in the lazarette, it was thereafter up to Bradford to determine the method, manner and safest way to perform the work[6]

    a. The "chief welder" (Watson) monitors and instructs him to make sure the work is done properly and safely. (Naranjo, pg.114).

    b. It was up to Naranjo to do the work correctly. (Naranjo, pg.123).

    c. It was up to Naranjo to do the work safely. (Naranjo II, pg.24).

    d. It is company (Bradford) policy that before any welding work is done, both the welder and his foreman make the decision whether it is safe. (Naranjo II, pg. 25).

    e. Regardless of what the captain says, he won't weld until he and the foreman decide that it is safe. (Naranjo II, pg. 25).

---

[6]This is consistent with Bradford's protocol and the marine industry in general. The captain does not direct the yard's employees, this is the job of the yard superintendent and/or foreman. (Engle, pp.28, 29). The reasons for this are two-fold. First, it is Bradford, not the captain, who is responsible for the employee's safety. (Henderson, pp.92, 94). Second, Bradford, not the captain, is the "expert" when it comes to repairs, modifications, etc, which is why the vessel is brought into the yard to begin with. (Bredbeck, p.118).

      f. It is the employee's responsibility to make sure it is safe to weld, regardless of what the captain says. (Tortora, pp.59,60,71, 100,101; Rimmel, pp. 42,43). After all, the captain does not work for Bradford and the extent of his "welding" knowledge may be unknown. In this case, the plaintiff did not know whether the captain knew anything about welding (Naranjo, pg. 122), and indeed, the captain had no knowledge. (Bredbeck, pp. 115, 117, 118).

      g. The ultimate decision to do the work was Watson's (the welding foreman); that's not the captain's decision. If it's unsafe, the work won't be done. (Watson, pp. 51, 52).

      h. It is Bradford's responsibility to make sure the vessel is gas free, not the captain's. Whether or not the space should be inspected first by a marine chemist is the decision of Bradford, not the captain. (Henderson. pp 77, 97, 112, Tortora, pp. 42,43; Watson, pg. 91; Engle, pp. 33,34 ).

18. From all accounts, the explosion was caused as a result of the welding apparatus or heat generated from it igniting some vapor, gas or fumes below the deck of the lazarette. The actual vapor, gas or fume that was ignited is unknown. The source of the vapor, gas or fume is also unknown.

19. Bradford's marine chemist was called in to investigate the next day. Although initially he came up with three possible explanations he could not determine with any degree of certainty or probability either the nature of the gas that exploded or its source. (Rimmel, pp. 13,14,18,19). However, he was certain of the cause of the explosion and whether it could (and should) have been prevented.

a. The explosion would not have occurred had Bradford used a multi-gas tester prior to the plaintiff starting to weld.

b. Bradford had an obligation to inspect and test the lazarette space for the presence of vapors, gas and fumes prior to the welding and had they done so, the explosion would have been avoided. (Rimmel, pp. 108-110).[7]

### III. MEMORANDUM OF LAW

In 1972, Congress amended the LHWCA as a result of which the liability of the vessel to an injured longshoreman or harbor worker based on the doctrine of unseaworthiness was eliminated. "Congress intended to make the vessel answerable for its own negligence and to terminate automatic, faultless responsibility for conditions caused by the negligence of ... the stevedore." *Scindia Steam Navigation Co. v. De Los Santos*, 451 U S 156,168 (1981). Under Section 905 (b), " no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel ..."

Section 905 (b) does not specify the acts or omissions of the vessel owner that constitute negligence. However, the Supreme Court in *Scindia* set forth three general principals to govern the duties of the vessel owner toward the stevedore's employees (in the context of cargo operations):

> The first, called the "turnover duty", relates to the condition of the vessel upon the commencement of stevedoring operations. The vessel owner must exercise care to make safe the parts of the vessel it turns over to the stevedore. The vessel owner

---

[7] The lazarette is considered a "confined space" by OSHA, 29 CFR 1915.4(p) and before "hot work" is performed in a "confined space", it must be tested for the presence of gas. (Rimmel, pp. 26,27,29-32).

> may rely on the stevedore's performing the work with reasonable care and safety, but, the vessel owner must also warn the stevedore of hidden unsafe conditions on the vessel which are known to or should be known by the owner. 451 U.S. at 167.
>
> The second duty, applicable once the stevedore begins working, provides that the vessel owner has no general duty to supervise the work unless custom, contract, or law imposes such a duty on the vessel owner. The vessel owner is entitled to rely on the stevedore's expertise and reasonableness.
>
> Third, the vessel owner will have a duty to intervene once the work commences but only if the vessel owner becomes aware during the course of the work that the vessel or it's gear poses a danger to the longshoreman, and, if the vessel owner also knows that the stevedore is acting unreasonably in failing to protect the longshoreman against the danger. 451 U.S. 177-178.[8]

The **Scindia** principles apply not just to cargo operations (to stevedores and their employees /longshoremen), but also to any independent contractor and its employees covered by the LHWCA. However, in the context of repair operations the vessel owner's duty to the worker is "subtly altered":

> The courts have long recognized that the vessel owner has no duty to deliver his ship to the shipyard in a hazard-free condition, when the requested repairs would remedy the hazards which cause the injury. **Stass v. American Commercial Lines, Inc.**, 720 F.2d 879, 882 (5th Cir. 1983).

In **Stass**, the plaintiff was a shipyard employee injured on board a barge that had been brought in to his employer's yard for repairs. During the course of this work, the plaintiff slipped and fell on some loose cargo which had not been cleaned-up from the last

---

[8]The second and third "duties" are not applicable here absent "custom, contract or law" to the contrary and given the almost instantaneous circumstances under which the accident occurred.

9

voyage prior to the barge being brought into the yard for repairs. The plaintiff contended that the barge owner breached it's duty to make sure the barge was "safe" prior to the commencement of the repair operations. The court disagreed.

> Cleaning the areas to be repaired on incoming barges was a "necessary fist step in doing the work" and the slippery footing was a risk inherent in the carrying out of the contract for repairs. 720 F.2d at 884.

. In adopting and following a long line of pre-*Scindia* cases, the court held that it was the employer's responsibility, not the barge owner's. to avoid exposing the worker to unreasonable hazards and the barge owner had the right to rely on the employer carrying out this duty. Had the employer done what was required, the plaintiff would not have been injured. Id. For example, in **Hess v. Upper Mississippi Towing Corp.**, 559 F.2d 1030 (5th Cir. 1977). the plaintiff worked for a "gas freeing" facility and was burned in an explosion that occurred while he was performing repairs on board a barge. In exonerating the barge owner from liability for the accident, the court found that the danger and consequences associated with removing gasoline and fumes from the barge were risks for which the plaintiff (and his employer) were "best able to appreciate". The responsibility to do the work correctly and safely was that of the employer, not the barge owner.

As the Supreme Court explained in **West v. U.S.**, 361 U.S. 118, 123 (1959):

> It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The [shipowner] having hired [the contractor] to perform the overhaul and reconditioning of the vessel - including the testing - was under no duty to protect the plaintiff from risks inherent in the carrying out of the contract. Although some of [the shipowners] employees were on board the ship here, this would not attach any liability since they gave no orders and did not participate

in the work or supervise its progress, but were simply inspectors or observers.

Since **Scindia**, courts have consistently held that where the accident is caused by the risks and hazards associated with the repairs that the independent contractor has been hired to perform, the vessel owner has no liability.

In **Hill v. Texaco, Inc.** 674 F.2d 447 (5th Cir. 1982), the plaintiff was injured when he slipped and fell from a ladder due to the rusted out and wet condition of the ladder and its rungs, conditions present when the vessel owner brought it into the yard for repairs. The court noted that the vessel owner was not required to "clean" the vessel before turning it over to the yard for repairs, that the risk faced by the plaintiff - a rusty, wet ladder - was one inherent in the carrying out of the repair contract. The vessel owner was entitled to rely on the expertise of the repair facility to perform the work with reasonable precautions.

Similarly, in **Duplantis v. Zigler Shipyards, Inc.**, 692 F.2d 372 (5th Cir. 1982), the plaintiff was injured in an explosion while welding on board a barge that had been brought into his employer's yard for repairs. As here, the area of the barge where the welding occurred had not been "gas freed", and as a result, the explosion occurred when gas or fumes were ignited by the welding arc. Gas-freeing was a necessary first step in doing the work (welding) that the contractor had agreed to perform. Concluding that the barge owner was entitled to rely on the fact that the contractor, in carrying out the work, would do so in a workmanlike manner, the court stated as follows:

> Although gas-freeing the barge was not the only function that Zigler was to perform, this work was critical to its ability to repair the pinhole. It was, in short, one of the "dangers which the contractor was hired to correct." Triangle was not required to gas-free the barge itself in order to satisfy Scindia's requirement that it turn the vessel over to Zigler "in such a condition

> that an expert and experienced [contractor] will be able to carry on its ... operations with reasonable safety to persons and property".

692 F.2d at 374, 375.

The instant case is no different. Obviously, the presence of gas, vapors or fumes was a risk and hazard inherent in performing the welding work. OSHA regulations make this clear in setting forth detailed and specific requirements to be followed by the shipyard and the welders before any such work is performed. Thus, making sure that the lazarette space was "gas free" was a "necessary first step" not only for OSHA purposes but also a common-sense safety measure before the plaintiff should have started welding. Undeniably, the responsibility for seeing that the lazarette was "gas free", either by use of a multi-gas tester or the intervention of a marine chemist, was Bradford's, not the captain's. The captain had every reason and right to rely on the fact that Bradford (and their employees) would perform the work correctly and safely.

There is no dispute that the plaintiff was an excellent welder, he knew his craft, and knew his company's procedures. He knew not to start the welding job simply because the captain said he should, or that the captain said it was safe to proceed. Indeed, the plaintiff did not rely on whatever the captain told him. Rather, he relied on the "fact" that (1) his foreman had adequately inspected the space and found it safe to proceed, the "fact" that (2) the space had been certified by the marine chemist as being "gas free", and the assumption that the space was in fact "gas free". Unfortunately for the plaintiff, his "facts" and assumption were wrong and his reliance misplaced. The consequence, while devastating to the plaintiff, should not be borne by the vessel owner, in this case,

defendant Smith. Simply stated, had Bradford (and/or the plaintiff) done what was required of them, the plaintiff would not have been injured. **Stass, supra; Hill, supra.**

> **Scindia** teaches that the ship is entitled to assume that the independent contractor aboard ship will act reasonably with a view towards the safety of its employees. 101 S.Ct. At 1624. Were this not so, the LHWCA's imposition of a negligence standard rather than a seaworthiness standard on the vessel's conduct towards the harbor workers would mean nothing.

**Hill, supra,** 674 F.2d at 452.

Applying the negligence standard to the undisputed material facts in this case, defendant Smith is not and cannot be liable.

## IV. CONCLUSION

Based upon the foregoing argument and citations of authorities, defendant Smith is entitled to summary judgment as a matter of law.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been mailed to all attorneys of record on the attached service list, this _16_ day of April, 2001.

BADIAK, WILL & KALLEN
Attorneys for Defendant
17071 West Dixie Highway
No. Miami Beach, Florida 33160
Tel: 305-945-1851
Fax: 305-944-8780

By: _____
John D. Kallen
Florida Bar No. 277428

C:\WP\00\108\MSJ.wpd

13

## SERVICE LIST

CASE NO. 00-60022-CIV-LENARD/TURNOFF

F. David Famulari, Esq.
Blanck & Perry, P.A.
Attorneys for Plaintiffs
5730 SW 74th Street
Suite 700
Miami, FL 33143
Tel: 305-663-0177
Fax: 305-663-0146

Manuel Valdes, Esq.
9910 Madrid Street
Coral Gables, FL 33134
Tel: 305-529-5428

Frank J. Sioli, Esq.
Valle & Craig, P.A.
Attorneys for Palmer Johnson
80 SW Eighth Street, Suite 2520
Miami, FL 33130
Tel: 305-373-2888
Fax: 305-373-2889

David L. Weber, Esq.
Pinkert Law Firm LLP
Co-counsel for Palmer Johnson
454 Kentucky Street
P.O. Box 89
Sturgeon Bay, WI 54235