UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

HENRY NARANJO and
MARLENE RAMIREZ,

      Plaintiffs,

vs.

STEPHEN BYRON SMITH,

      Defendant/

_____/

CASE NO. 00-6022-CIV-LENARD



**NOTICE OF FILING**

Defendant STEPHEN BYRON SMITH, by and through his undersigned counsel,

herewith gives notice of filing the deposition transcript pages referred to in his Motion for

Summary Judgment dated April 16, 2001.

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been mailed

to all counsel of record listed on the attached service list,. this _17_ day of April, 2000.

           BADIAK, WILL & KALLEN
           Attorneys for Smith
           17071 West Dixie Highway
           No. Miami Beach, Florida 33160
           Tel: 305-945-1851
           Fax: 305-944-8780

           By: _____
             John D. Kallen
             Florida Bar No. 277428

C \WP\00\108\NFILING.wpd



## SERVICE LIST

CASE NO. 00-60022-CIV-LENARD/TURNOFF

F. David Famulari, Esq.
Blanck & Perry, P.A.
Attorneys for Plaintiffs
5730 SW 74th Street
Suite 700
Miami, FL 33143
Tel: 305-663-0177
Fax: 305-663-0146

Manuel Valdes, Esq.
9910 Madrid Street
Coral Gables, FL 33134
Tel: 305-529-5428

Frank J. Sioli, Esq.
Valle & Craig, P.A.
Attorneys for Palmer Johnson
80 SW Eighth Street, Suite 2520
Miami, FL 33130
Tel: 305-373-2888
Fax: 305-373-2889

David L. Weber, Esq.
Pinkert Law Firm LLP
Co-counsel for Palmer Johnson
454 Kentucky Street
P.O. Box 89
Sturgeon Bay, WI 54235

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 00-6022 CIV-LENARD/TURNOFF

HENRY NARANJO and
MARLENE RAMIREZ,

    Plaintiffs,

vs.



STEPHEN BYRON SMITH, PALMER
JOHNSON EXPORT SALES, INC.,
PALMER JOHNSON DISTRIBUTORS,
INC., and PALMER JOHNSON, INC.,

    Defendants,

----------------------------X


LOCATION:   LAW OFFICE
              80 SW 8TH STREET
              SUITE 2520
              MIAMI, FLORIDA  33160

DATE:       JANUARY 11, 2001 - THURSDAY

TIME:       10:30 P.M. - 4:45 P.M.


- - - - - - - -

DEPOSITION

OF

HENRY NARANJO



- - - - - - - -


*Hi-Tech Court Reporting, Inc.*

PROFESSIONAL REPORTERS

707 SOUTHEAST THIRD AVENUE • SUITE 202 • FORT LAUDERDALE, FL 33316
(954) 523-0915 / FAX (954) 523-0916

```
 1        Q.  Did Mr. Rimmell, to your knowledge, certify that
 2   this particular area was gas free before you began welding on
 3   the day that this accident happened?
 4        A.  I suppose so because if the ship was certified as
 5   gas free it meant that work would we done.
 6        Q.  You are saying that, "I suppose so"; you're going to
 7   get in trouble.  If you know you can say yes; if you don't
 8   know, say that you don't know?
 9        A.  The boat was certified gas free and the job could be
10   done.
11        Q.  Mr. Rimmel did that?
12        A.  He did.
13        Q.  Did you see him on the job site?
14        A.  No, I did not see him on the job site.
15        Q.  How do you know that he certified the vessel gas
16   free or are you assuming that he did?
17        A.  I don't know how to answer that.
18        Q.  Okay.  Do you have personal knowledge that Mr.
19   Rimmel came aboard that boat and declared that boat gas free
20   before you did the welding?
21        A.  No, I do not have knowledge.
22        Q.  Did Bradford Marine post any sign or give any
23   indication that the area has been inspected and found to be
24   gas free on the vessel where you have done your work?
25        A.  Yes.
```

1    Q.  What type of sign or what type of indication is

2    there to you when you go aboard a vessel that it has been

3    inspected and found to be gas free at Bradford Marine?

4    A.  They post a sheet of paper that has his signature on

5    it that certifies that the area is gas free.

6    Q.  Was there such a paper posted on this particular

7    ship before you performed your welding?

8    A.  Yes.

9    Q.  Before you began your welding did you ventilate or

10   air out the area that you were going to be welding in before

11   you began?

12   A.  Yes, I used air extractors; and the area was free

13   for several hours before I started working there.

14   Q.  What do you mean "Air extractors"?

15   A.  An air extractor is always used with a hose to

16   remove smoke or gas or fuel odors.  It's to prevent anything

17   from accumulating in the work area.

18   Q.  If this vessel was certified as gas free already,

19   why did you do that?

20   A.  Because the captain told me to do the job.

21   Q.  But if the vessel was certified as gas free and you

22   had been working aboard the vessel for a month, why did you

23   find it necessary to use air extractors in the area where you

24   welded on the day that the accident happened?

25          Do you want her to read it back?

```
 1          I assume the engine room is larger than the lazarette.

 2   BY MR. VALLE:

 3       Q.  Who makes the decision as to when it is safe to

 4   light up the torch?

 5           THE INTERPRETER:  What do you call the "torch"?

 6           MR. DAPENA:  Tell him the welding torch.

 7           THE INTERPRETER:  I want to tell him but I don't

 8       know if that was the right word.

 9           MR. VALLE:  Okay.

10           THE WITNESS:  The person doing the job makes that

11       decision depending on the instruction received from the

12       person giving the job.

13   BY MR. VALLE:

14       Q.  You agree with me there are a lot of gases,

15   inflammable gases, that you can't smell and that you can't

16   tell that are present in an area?

17       A.  Yes.

18       Q.  My last question before lunch is going to be:  How

19   do you know before you light your torch, how do you know that

20   it's safe to light the torch and that the gases have been

21   evaporated?

22       A.  I wouldn't know because I don't have a gas detector.

23           (WHEREUPON, a brief lunch recess was had.)

24           MR. VALLE:  Ready to go.  Read back the last

25       question and answer.
```

1    hall.  I worked in the part where the top part - where the
2    instrument panel is, the bridge.  That's all.
3         Q.  Please forgive me.  I don't mean to keep going back
4    to this but I want to clear something up in my mind.  You
5    have told me that you always use the air evacuation system
6    before you began welding?
7         A.  Yes, sir.
8         Q.  How did you know for how long to use the air
9    evacuation system before you began welding in the different
10   areas where you worked?
11        A.  One does not decide the time.  The first thing that
12   you do is install.  One does not determine the time.
13        Q.  Well, you installed the air evacuation system,
14   correct?
15        A.  Yes.
16        Q.  How would you know how long to keep it running
17   before you lite your torch so to be sure the area is safe?
18            THE INTERPRETER:  He says a minimum or maximum?
19            THE WITNESS:  There is no minimum.  I don't know.
20   BY MR. VALLE:
21        Q.  How do you know when you light your torch you know
22   that you're not going to blow up?
23        A.  Because if they send me to do the job there I was
24   sure what I was doing because the captain told me.  Because
25   he told me there was no - I asked the captain before starting

1    work, if there were any tanks or fuel lines there, and he

2    told me, no.  The only thing that he told me was there was

3    concrete and an aluminum sheeting plate.

4         MR. VALLE:  He used the word "flush."

5    A.  Right on top of the concrete.

6         MR. KALLEN:  Would you mind repeating that answer?

7    Because I'm not sure of what was - it was broken up.

8         (WHEREUPON, the testimony requested was read back by

9         the reporter as recorded.)

10        THE INTERPRETER:   Aluminum sheet or not sheeting.

11        He said there was a "no" in there that he said.  He

12        asked the captain if the fuel line on the tanks; the

13        captain said, no.  The only things is --

14        MR. KALLEN:  Was concrete and aluminum sheets or

15        plates on top.  Okay.

16   BY MR. VALLE:

17   Q.  Let's just for the moment forget this accident.

18   A.  Okay.

19   Q.  Let's go back to when you were welding in the engine

20   room.  You said that the engine room was certified gas free,

21   correct?

22   A.  Yes.

23   Q.  Did you still use the air evacuation system in the

24   engine room before you started welding?

25   A.  Yes.

1    deck and put a hole in the deck plate when you welded that

2    first point?

3         A.  No.

4              MR. FAMULARI:  You don't know?

5              MR. VALLE:  He doesn't know.

6              THE WITNESS:  No, I don't know.

7    BY MR. VALLE:

8         Q.  Do you know whether or not your torch penetrated the

9    deck plate when you were beginning to weld the second point?

10        A.  I don't know.

11        Q.  Give me your best estimate in seconds or minutes as

12   to how long that you were welding at the second point before

13   the explosion occurred?

14        A.  It was fast.  It was here and there.  Very fast.

15        Q.  You know I don't know about welding.  Tell me how

16   long that it takes?  How long did it take to weld the first

17   point?

18        A.  It's seconds.

19        Q.  Five or ten?

20        A.  One second - One second or less.

21             MR. FAMULARI:  When you tack something -

22             MR. VALLE:  I need to know.

23             A couple of seconds?

24             MR. FAMULARI:  One second?

25             THE WITNESS:  It's very fast.

1    BY MR. VALLE:

2        Q.  Was it just as quick when you welded the second

3    point before the explosion?

4        A.  Yes, sir.

5        Q.  So you welded the first point; and then you went to

6    the second point on the plate, the second corner; and you

7    welded it for a second before the explosion?

8        A.  More or less, a second, yes; is the accident

9    happened.   That's what one usually does on these jobs.

10       Q.  You were holding your torch in direct contact with

11   the deck plate or in direct contact with the bracket that you

12   were going to weld on the deck or were you - Strike all that.

13          When you're welding a point, as you were on this

14   particular incident, tell me in detail how that you go about

15   doing that?

16          MR. FAMULARI:  Pretend this is the plate and that

17       this is the deck (indicating).

18          MR. VALLE:  Fine.

19          MR. FAMULARI:  Here is your torch.

20       A.  This is my hand (indicating).  This is the plate.

21   Up there it is aluminum (indicating).  When I aim the torch

22   here, that comes up, so I have to hold it down with my hand

23   (indicating).  So I weld it here and just like that

24   (indicating).

25          MR. KALLEN:  Does the gun touch the plate?

1    the deck in the lazarette as to whether or not any other

2    workers had drilled holes through the deck before you began

3    your work?

4         A.  No.  No, I checked in the area.

5         Q.  When you checked the area, did you see any holes

6    drilled through the deck in the area where you were about to

7    weld?

8         A.  No, sir.

9         Q.  Is that something that you customarily do as part of

10   your job; that you check to see if there are any holes or any

11   possible gas ventilation or gas access fittings or fixtures

12   before you begin your welding?  Forget the question - Strike

13   the question.

14        Is it part of your customary preparation to examine

15   the area where you are going to weld and determine if there

16   are any perforations in the area where you are going to weld?

17        MR. DAPENA:  "Perforation" is a problem.

18        MR. VALLE:  How about holes?

19        A.  Yes, for safety reasons I have to do it; and, also,

20   not to damage any other area.

21        Q.  What is the safety aspect of checking for holes or

22   perforations in the area where you are about to be welding?

23        A.  First of all I have to be sure that I have a clean

24   area where I have to work.  Because if the area is

25   contaminated with other elements or oil or liquid or

1        A.   No.

2        Q.   Did you get along well with Tony Watson?

3        A.   Yes, sir.

4        Q.   What was the job of chief welder?  What did a chief

5   welder do?

6        A.   He is in charge of supervising all the welders,

7   including me; and to give work orders to each employee; and

8   to see what everyone was doing.

9        Q.   When you say "Supervising other welders," tell us

10  what that means in real terms?  What does that mean

11  "Supervise"?

12       A.   When there is a group there has to be a boss.

13       Q.   Would that include being instructed?

14       A.   To monitor and to instruct.

15       Q.   To make sure the jobs are being done properly?

16       A.   Yes, sir.

17       Q.   And safely?

18       A.   Yes, sir.

19       Q.   And to instruct, if necessary?

20       A.   Yes, sir.

21       Q.   You felt that you were qualified to do all that in

22  1997?

23       A.   Yes, I was hoping for an opportunity for some help.

24  One always starts as an assistant to the chief.

25       Q.   Does the chief welder do welding jobs too?

```
 1         I didn't see any danger in the area around there.

 2         Q.  Mr. Naranjo, this will go quicker if you just answer

 3    my question, okay?  So let's be clear:  Your boss was Tony

 4    Watson, correct?

 5         A.  Yes.

 6         Q.  You were paid by Bradford Marine, correct?

 7         A.  Yes.

 8         Q.  Did you discuss with Tony Watson, your boss, the job

 9    that you were going to do:  That is weld these two aluminum

10    plates onto deck in the lazarette; yes or no?

11         A.  Yes.  He sent me to do it.  I knew I was going to do

12    it and the captain knew also.

13         Q.  Mr. Watson knew what jobs you were going to do that

14    day?

15         A.  Yes.

16         Q.  Where was this piece of paper that certifies that

17    the lazarette was gas free?

18         A.  On the boat.

19         Q.  Where on the boat?

20         A.  At the entrance of the boat (indicating).  You come

21    in over here and walk this way and the paper is facing you as

22    you come on.

23         Q.  Did you read that piece of paper that day?

24         A.  No.  All of us that work there know that is a gas

25    free certificate.
```

120

1      Q.   Did you ever read that certificate?

2      A.   No, sir.

3      Q.   Do you know if the lazarette, specifically, had been

4   inspected to make sure it was gas free?

5      A.   Only the captain and the person that does the gas

6   free inspection would know that.

7      Q.   Mr. Naranjo, answer my question, please?

8      A.   Yes.

9      Q.   Did you know if the lazarette was inspected to be

10  certified to be gas free?

11     A.   No, I do not know.

12     Q.   Did you just assume that it was inspected and

13  certified to be gas free before you started welding there?

14     A.   No, I don't assume.  I know that on every ship where

15  this work is done it is certified to be gas free.

16     Q.   But you don't know because you did not read the

17  certificate, did you?

18     A.   I never read it.

19     Q.   Did Captain Bredbec tell you this space in the

20  lazarette is gas free?  Did he use those words?

21     A.   Captain Bredbec?

22     Q.   Captain Jack?

23     A.   I asked if there were a tank or fuel lines; and he

24  said, no.

25     Q.   You did not ask Captain Jack, did you, whether this

1    lazarette was inspected and certified to be gas free, did

2    you; yes or no?

3         A.   No.  No, I did not ask him at that time if it was

4    gas free; but I did ask him for my safety if there were a

5    tank or gas lines.

6         Q.   You knew where the fuel tanks were because you had

7    welded on them before, had you not?

8         A.   Yes.

9         Q.   Where are the fuel tanks, looking at the diagram,

10   and put an "X" - If you don't mind, Larry?

11             MR. VALLE:  Go ahead.

12        Q.   Put an "X" on the diagram where the fuel tanks are?

13        A.   In the engine room, I don't know.  In the engine

14   room, but I did not work on fuel tanks.

15        Q.   But the fuel tanks are in the engine room?

16        A.   No, I don't know.

17        Q.   You don't know?

18        A.   Sometimes they put them here and sometimes they put

19   them there (indicating).  I can't say exactly where they

20   were.

21        Q.   You know what a multi-gas tester machine is?

22        A.   No.

23        Q.   Do you know what a gas tester is?

24        A.   I have heard it spoken but I have not seen one.

25        Q.   You know what that machine does?

122

```
 1        A.  I saw once but I don't know the procedure.

 2        Q.  I'm not saying how to operate, but you do know that

 3   a gas tester is testing for the presence of flammable gases

 4   and vapors, correct?

 5        A.  Probably, yes.

 6        Q.  Would you have welded in the lazarette if you did

 7   not think that certificate, that piece of paper, referred to

 8   the lazarette being gas free?

 9            Can you translate that term or I can rephrase?

10            THE INTERPRETER:  I would appreciate it.

11        Q.  Let me rephrase it.  You knew there was a gas free

12   certificate, a piece of paper, on that boat, right?

13        A.  Yes.

14        Q.  As far as you knew that piece of paper said this

15   boat is gas free?

16        A.  Yes.

17        Q.  If that piece of paper was not on that boat would

18   you have welded that day?

19        A.  No.

20        Q.  Do you know what Captain Jack's welding knowledge

21   consisted of?

22        A.  I don't know if he knows anything about it.

23        Q.  Between you and him you are the expert, right?

24        A.  He may also be because he is the captain.

25        Q.  You didn't ask Captain Jack to tell you what setting
```

1    to put the welding machine on, did you?

2       A.   That is true, I did not.

3       Q.   That's your decision?

4       A.   Because I know what temperature to put it on.

5       Q.   That's right.  Captain Jack told you what he wanted

6 welded, right; but it was up to you as to how to do it

7 correctly, correct?

8       A.   Yes.

9       Q.   Do you know what an air extractor does?

10      A.   Yes.

11      Q.   What is the purpose of it?  What does it do?

12      A.   It specifically is to blow out the smoke and bad

13 odors; and especially smoke so that it does not cause health

14 problems to someone.

15      Q.   Is the blower, the air extractor that you're talking

16 about, has nothing to do with telling you whether there is

17 gas or vapor in the space where you welded, correct?

18          MR. FAMULARI:  Object to form.

19      A.   Repeat the question.

20      Q.   Does that blower tell you if there is vapors or

21 flammable gas in the space where you are welding?

22      A.   In the - no.

23      Q.   Does that blower blow away the flammable gas or

24 vapor that may be in the space that you're welding?

25      A.   No.  It is for smoke.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 00-6022 CIV-LENARD/TURNOFF

HENRY NARANJO and
MARLENE RAMIREZ,

      Plaintiffs,

vs.

STEPHEN BYRON SMITH, PALMER
JOHNSON EXPORT SALES, INC.,
PALMER JOHNSON DISTRIBUTORS,
INC., and PALMER JOHNSON, INC.,

      Defendants,

------------------------------X

COPY

LOCATION:  LAW OFFICE
             80 SW 8TH STREET
             SUITE 2520
             MIAMI, FLORIDA  33160

DATE:      JANUARY 16, 2001 - TUESDAY

TIME:      2:30 P.M. - 4:00 P.M.

- - - - - - - -

CONTINUATION DEPOSITION

OF

HENRY NARANJO

- - - - - - - -

*Hi-Tech Court Reporting, Inc.*

PROFESSIONAL REPORTERS

707 SOUTHEAST THIRD AVENUE • SUITE 202 • FORT LAUDERDALE, FL 33316
(954) 523-0915 / FAX (954) 523-0916

1    Q.   In order to fabricate the aluminum plates that you

2    did that day, where did you get the aluminum material from?

3    A.   The aluminum is always in stock at the welding shop.

4    Q.   So you did not have to get the aluminum from the

5    materials department or materials shop?

6    A.   They just provide that there, right from the very

7    shop.

8    Q.   What shop?

9    A.   The welding shop.

10   Q.   In order to get this aluminum to make the plates,

11   did you have to sign a work slip or a materials order?

12   A.   Yes.

13   Q.   You do make out a sheet of paper where you are

14   ordering the materials, the materials that you are going to

15   use on the boat; did you do that?

16   A.   Yes.

17   Q.   Don't you or would you put your Employee ID number

18   on that; correct?

19   A.   Yes.

20   Q.   Do you know for sure whether when you first started

21   to work on the aluminum plates that day of the explosion or

22   whether you started a day before or two days before?

23   A.   It was the same day of the explosion.

24   Q.   How many hours did it take you to fabricate the two

25   aluminum plates?

1    A. Several hours. I don't know exactly how many at

2 that time. I don't know how to tell you exactly what it was,

3 several hours.

4    Q. Do you think at least three hours?

5    A. I believe it was longer.

6    Q. Other than - Let's call it the "lazarette job" - do

7 you understand what I mean by the "lazarette job"; that you

8 were doing?

9        I'll be more specific: On the day of the explosion

10 other than fabricating the two aluminum plates; take the

11 plates on board the boat and into the lazarette; and

12 beginning to weld, did you do any other welding job on that

13 boat that day?

14    A. No.

15    Q. So the only welding job that you do on this boat on

16 the day of the explosion is what we just discussed?

17    A. Yes, that's what it was on that day.

18    Q. And if I recall your testimony before, when you

19 showed up at work that morning your boss, Tony Watson, told

20 you this was the job that you were doing; is that correct?

21    A. That is correct.

22    Q. Did you know that Tony Watson had inspected the

23 lazarette space before you started to weld later that day?

24    A. Yes.

25    Q. Do you know why Tony Watson inspected the lazarette

1    space before you started to weld?

2        A.   Can you repeat that again?

3        Q.   Do you know why Tony Watson inspected the space

4    before you started to weld there?

5        A.   He would always inspect all of the jobs before he

6    would order someone.

7        Q.   To weld?

8        A.   Yes.   In order to do the work that has to be done in

9    there, he would go first.

10       Q.   And that is because it's part of his job to make

11   sure that it's going to be safe for you to weld before you

12   start; is that right?

13       A.   Yes.

14       Q.   You rely on that before you will start a welding

15   job, right?

16       A.   Correct.

17       Q.   You will not begin a welding job if your supervisor

18   has not inspected the space first, correct?

19       A.   That's correct.

20       Q.   And you also will inspect the area or space as well,

21   correct?

22       A.   Yes.

23       Q.   I believe that you testified before in this case

24   that you did inspect the space; is that right?

25       A.   Yes, that is correct.

1   space before you started to weld?

2        A.  Can you repeat that again?

3        Q.  Do you know why Tony Watson inspected the space

4   before you started to weld there?

5        A.  He would always inspect all of the jobs before he

6   would order someone.

7        Q.  To weld?

8        A.  Yes.  In order to do the work that has to be done in

9   there, he would go first.

10       Q.  And that is because it's part of his job to make

11  sure that it's going to be safe for you to weld before you

12  start; is that right?

13       A.  Yes.

14       Q.  You rely on that before you will start a welding

15  job, right?

16       A.  Correct.

17       Q.  You will not begin a welding job if your supervisor

18  has not inspected the space first, correct?

19       A.  That's correct.

20       Q.  And you also will inspect the area or space as well,

21  correct?

22       A.  Yes.

23       Q.  I believe that you testified before in this case

24  that you did inspect the space; is that right?

25       A.  Yes, that is correct.

1      A.  The plates that I made were — The purpose for that

2    was in order to put the jacks so that the jacks would be able

3    to use enough force because it was large and heavy.

4      Q.  I'm not sure that I understand.

5         Why not just install the jacks right on the deck?

6      A.  I don't know how to answer that.

7      Q.  Did the captain tell you that they had tried to do

8    that first without the plates?

9      A.  No.  No, I don't have any knowledge about that.

10     Q.  Did you read, what you referred to as "The piece of

11   paper," that was on the boat?

12     A.  The only thing that I read was that "Gas Free."  It

13   is in large letters.

14     Q.  That told you it was safe to weld in the lazarette,

15   as far as you know?

16     A.  Yes.

17     Q.  If you did not see that gas free certificate you

18   would not have welded, correct?

19     A.  That is correct.

20     Q.  Did you ever attend any safety meeting before this

21   explosion occurred?

22     A.  Several months before there was a safety meeting,

23   but I don't recall it exactly.

24     Q.  Do you remember what was discussed in this safety

25   meeting?

1    and where I was working; and where I was able to do the work,

2    I believe.

3         Q.   Isn't that why you looked and your foreman looked?

4         A.   Well, to be more brief the first thing that I saw is

5    that my boss told me to go and see the captain.  The captain

6    showed me what I had to do.  And my boss also knew what I had

7    to do in there.

8         Q.   When you say the "Captain showed you what he wanted

9    you to do" what you mean by that is that he told you that he

10   wanted two aluminum plates made; and he told you the area

11   where he wanted it - where he wanted the plate put on the

12   deck?

13        A.   Exactly.

14        Q.   He did not tell you how to do your job, correct?

15        A.   No, he told me to put the plate in this position and

16   that's the way that he wanted them.

17        Q.   That's right; but it was up to you do that job

18   safely, correct?

19        A.   Correct.

20        Q.   Was there something that the captain told you to do

21   which he should not have said?

22        A.   He was not very specific when I asked him if there

23   was any danger in there; and he said, no.  The only thing

24   that he said was concrete and then aluminum plate and then

25   flush.

1       Q.   The captain used the word "flush"?

2       A.   Yes.

3       Q.   How many times in the year that you were working for

4    Mark Watson did he explain to you - Tony Watson - did he

5    explain to you that before you were to start a job you were

6    to ask Tony about the job so that he could review it with

7    you?

8            MR. DAPENA:   Object to form.

9       A.   He would always check; that is he would go and look

10   at the job that has to be done; and look at the people that

11   were available to do that.

12      Q.   Right, because you know from working at Bradford

13   Marine that it was their policy that before any welding work

14   was done the welder and foreman who makes the decision that

15   it was safe to do?

16           MR. DAPENA:   Object to form.

17      A.   Yes.

18      Q.   So regardless of what the captain may say to you, if

19   your boss says, This is not safe; you're not doing it,

20   correct?

21      A.   Correct.

22      Q.   The same thing even if the captain says, It's safe;

23   you don't do the work until you and your boss, the foreman,

24   say, It's safe?

25      A.   Yes.

1          MS. BARKER:   I think that I'm done.

2                    CROSS-EXAMINATION

3    BY MR. WEBER:

4          Q.   Just a couple of questions.  I think that you stated

5    earlier that you were aware that Tony Watson had inspected

6    the area before you did your work?

7          A.   Yes.

8          Q.   Did you speak with Tony Watson about his inspection?

9          A.   No.  No, just to go and do the job.  He had gone and

10   seen the captain to see what has to be done.  He told me also

11   what had to be done.

12         Q.   Did Tony Watson tell you what he did to inspect the

13   area?

14         A.   No, he didn't say.

15         Q.   Did you observe Tony Watson inspect the area?

16         A.   No.

17         Q.   Do you know when Tony Watson inspected the area

18   prior to your working in the area?

19              THE INTERPRETER:   I'm sorry - When?

20              MR. WEBER:   Prior to his doing the work.

21         A.   No.

22         Q.   Do you have a valid Florida driver's license?

23         A.   Yes, sir.

24         Q.   Does it have any restrictions on it?

25         A.   No.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI, DIVISION

HENRY NARANJO and                      CASE NO.  00-60222-CIV
MARLENE RAMIREZ,                       LENARD/TURNOFF

        Plaintiffs,

vs.

STEPHEN BYRON SMITH, PALMER            **COPY**
JOHNSON EXPORT SALES, INC.,
PALMER JOHNSON DISTRIBUTORS
INC., AND PALMER JOHNSON INC.

        Defendants.
_____/

APPEARANCES:

PINKERT LAW FIRM, LLP.,          VALLE & CRAIG, P.A.,
DAVID L. WEBER, ESQUIRE,         FRANK J. SIOLI, ESQUIRE,
P.O. Box 89                      80 S.W. 8th Street,
Sturgeon Bay, WI.                Suite 2520,
CO-COUNSEL FOR THE DEFENDANT,    Miami, Florida,
Palmer Johnson.                  ATTORNEYS FOR:
                                 Palmer Johnson, Inc.


BLANCK & PERRY, P.A.,            BADIAK, WILL & KALLEN,
F. DAVID FAMULARI, ESQUIRE,      JOHN D. KALLEN, ESQUIRE,
5730 S.W. 74th Street,           17071 W. Dixie Highway,
Suite 700,                       North Miami Beach, Fl.,
Miami, Florida,                  ATTORNEY FOR:
CO-COUNSEL FOR PLAINTIFFS.       Stephen Byron Smith.

                FOWLER, WHITE, BURNETT, HURLEY,
                  BANICK & STRICKROOT, P.A.
                   BRIAN P. HILL, ESQUIRE,
                   Bank of America Tower,
                  100 S.E. Second Street,
                       17th Floor,
                     Miami, Florida,
              ATTORNEY FOR BRADFORD MARINE, INC.

              * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                         DEPOSITION
                             OF
                        MARK TORTORA

HI-TECH REPORTING (954) 523-0915

1      A.    Yeah, Jack.  Don't tell him I said that.

2            So it wasn't really - it wasn't the place that we

3      would normally be working on that boat at the time so --

4      Q.    Maybe I'll follow-up with that in a minute.  Maybe I

5      can talk about the general situation.

6            Let's suppose one encounters a confined space.

7      A.    Uh-huh.

8      Q.    That's a yes, you're with me?

9      A.    Yes.

10     Q.    Who makes a determination in the first instance

11     whether a shipyard competent person has to inspect that

12     confined space?

13     A.    I would say the foreman of the welding shop or the

14     safety director.

15     Q.    In the case of welding?

16     A.    Well, the foreman the welding shop.

17     Q.    How about the employee himself?  The welder himself?

18     A.    Absolutely.

19     Q.    So they have a responsibility too.  If a foreman is

20     not around, for example, they should go to somebody like

21     yourself?

22     A.    Correct.

23     Q.    Before working in a confined space?

24     A.    Correct.

25     Q.    We're talking about a general sense?

1       A.    Yes.

2       Q.    Let's suppose that happens.  Let's suppose that the

3   worker, again I'm taking generally in this case, let's say

4   it's a welder.  A welder goes to his foreman and says, I'm

5   going to be working in this confined space.

6           What happens then if the foreman is not a shipyard

7   competent person?  What does the foreman do?

8       A.    You would find a shipyard competent person to check

9   the area for no gases.  If we had a detector at the time of

10   the accident, we did not have a detector back then.

11           If it was a questionable area, we could call marine

12   chemist.  We are not chemists.  If there's a confined space

13   or explosive atmosphere, we would call in a marine chemist

14   and have that area certified safe for hot work.  That's the

15   name of it, certified safe for hot work.

16       Q.    Would a shipyard competent person make the

17   determination as to whether a chemist would have to be

18   brought in or not?

19       A.    Yes.  That's what the shipyard competent person's

20   job would be, to be bring the chemist in because a shipyard

21   competent person could not certify it safe for hot work;

22   only marine chemists can do that.

23       Q.    Tell me, do you mean you call a chemist in every

24   instance?

25       A.    When it comes to a confined space for welding, yes;

1    completed?

2    A.    Correct.

3    Q.    Now, why didn't Bradford have a multi-gas tester

4    back in July of 1997, if you know?

5    A.    I don't really know.

6    Q.    Well, certainly you had paid good money to have a

7    consultant, right?

8    A.    Yes.  I believe I had asked to buy one.  I was told

9    that we were going to have a marine chemist to take care of

10   the hot work situation; that's why we didn't buy one at the

11   time.

12   Q.    And the marine chemist was Mr. Rumell.  Is there --

13   you as the Director or Head of the Safety Department

14   appreciated the need for having a multi-gas tester; is that

15   a fair statement?

16   A.    Yes.

17   Q.    And you asked for one?

18   A.    Yes.

19   Q.    And they're response, someone's response was, well,

20   we've got a marine chemist for that?

21   A.    Yes.

22   Q.    The marine chemist is Peter Rumell?

23   A.    Yes.

24   Q.    When did you request the multi-gas tester?

25   A.    Not long after I was crowned Bradford Marine Safety

1    Director.

2        Q.    And that was before the accident which forms the

3    basis of this case?

4        A.    Yes.

5        Q.    Mr. Rumell, is he actually employed by Bradford

6    Marine?

7        A.    No.

8        Q.    He's an independent contractor?

9        A.    Yes.

10        Q.    The space wherein this accident occurred on the

11    Souvenir, you said earlier you thought it was a confined

12    area?

13        A.    Yes.

14        Q.    Do you know, Mark, if that area had been inspected

15    by a shipyard competent person?

16        A.    No.

17        Q.    You don't know?

18        A.    I don't know.  I don't believe it had.

19        Q.    What makes you say that?

20        A.    Because I did the accident investigation.

21        Q.    And your accident investigation revealed what?

22        A.    In particular, that in that particular area, I don't

23    know how to answer that.

24            What's the question.  Tell me what the question was

25    again, please.

1      A.    If what the captain is asking him to do is going to

2     run into more money or if it's a quote job, when it comes to

3     money; if we quoted it one particular way to do the job and

4     the captain says, no, I want this done this way; well, then,

5     that employee should go to the foreman and most likely would

6     go to the foreman to just say, well, listen the captain is

7     telling me to do it this way.

8          But when you're on the vessel, you, the employee,

9     should always go to the foreman although when you're in

10    close quarters with the person who's running the vessel and

11    it's his kingdom and he says, I want to you do it this way;

12    the employee is going to do it that way as long as he deems

13    it safe or -- it's not like we have -- not every time is the

14    employee instructed to say, sorry, captain, I'm not going to

15    do it this way.   We all have to get off the boat and find

16    my foreman.

17     Q.    I understand that but you said something there that

18    I want to follow-up on.

19          It's okay as long as the employee deems it safe,

20    correct?

21     A.    Yes.

22     Q.    The employee still has the responsibility of making

23    sure or making that determination, does he not?

24     A.    Yes.

25     Q.    No matter what anybody says, a captain, or the owner

1    or the man on the moon, in every instance that employee has

2    to make a determination as to whether or not the task

3    requested of him is safe, true?

4        A.    True.

5        Q.    This whole business about checking confined spaces;

6    recognizing what is a confined space and going and getting a

7    shipyard competent person; no matter what anybody else says,

8    whether it's the captain or the owner, doesn't negate the

9    duty that you have as a particular employee of following

10   protocol, does it?

11       A.    No.

12       Q.    My statement is correct?

13       A.    Correct.

14       Q.    Doesn't the yard have an interest in keeping track

15   of job numbers and so on?

16       A.    Yes.

17       Q.    So, I mean, what if a welder is walking the deck and

18   the owner calls him and says, I want to you do X, Y, or Z.,

19   it has no job number or anything else.

20            Are you saying it happens all the time, that welders

21   are doing it?

22       A.    That's not what I mean when I say it happens all the

23   time.    I mean, it happens that the captain or engineer will

24   direct you on how they want you to you do a particular job

25   because a lot of the time it's their vessel; they feel close

1    Q.    I take it the person that he should ask or the

2    appropriate person he should ask is his foreman?

3    A.    Yes, the next in chain of command.

4    Q.    Sure.    If he can't find the foreman, he could look

5    for you?

6    A.    Correct.

7    Q.    Or the assistant foreman?

8    A.    Exactly.

9    Q.    He shouldn't rely on what the captain tells him, if

10    he says it's safe?

11    A.    He shouldn't rely on what the captain says if he

12    says it's safe.

13    Q.    Yeah.    In lieu of that he should ask his foreman if

14    he has safety questions?

15    A.    Yeah, if it's a safety questions, he should talk to

16    his foreman.

17    Q.    A safety question would include whether or not

18    there's the possibly presence of flammable, ignitable vapors

19    or gas fumes in the space you're utilizing; would you agree?

20    A.    Yes.

21    Q.    Were you part of the project team that put together

22    the bid for this project?

23    A.    I coordinated getting the bids together, following

24    up on everybody to make sure it was okay.    I did not write

25    any bids.

100

1    Marine, yes.

2        Q.    Were there any recommendations not followed or

3    adopted properly?

4        A.    Most likely, yes.

5        Q.    We'd have to find that   --

6        A.    You had have to close your business if you want to

7    follow every O.S.H.A. regulation.

8        Q.    That's true.

9                          DIRECT EXAMINATION

10   BY MR. FAMULARI:

11       Q.    I have a follow-up question and I'll ask this

12   hypothetically so John doesn't give me the predicate

13   objection and all the other type of objections.

14              If you were going to weld, and I'm asking you this

15   as a welder.

16       A.    Yes.

17       Q.    If you were going to weld in a space like what we

18   had here on the Souvenir, and you asked what was under

19   there, if any fuel lines were there or asked if any fuel

20   lines or hydraulic lines were under there and you were told

21   no, and you were told that it was filled with cement to the

22   top and then the plate was laid on top and welded around it;

23   if, assuming that you asked that and that's what you were

24   told, would you think it would be safe to weld then?

25       A.    No.

1    Q.   What should you do then?

2    A.   At least cut some kind of hole and get multi-gas to

3    check the void.

4    Q.   But what if you were told it was filled with cement

5    to the top and a plate was laid directly on the cement and

6    you were told there wasn't a void space.  It was filled with

7    cement and had a plate on it?

8    A.   It should have been checked.  It should be checked

9    because you're putting your life into somebody else's hands.

10        MR. FAMULARI:  I have nothing further.

11        MR. KALLEN:  For the record, I'm going to retain the

12        original or the last color copies of the photo exhibits

13        because they're my set.

14        (Whereupon, the deposition was concluded.)

15                        STIPULATION

16        It is hereby stipulated to by and between appearing

17        counsel and the witness, that the notice, reading and

18        signing of said deposition be, and the same are hereby

19        waived.

20        And further deponent saith not.

21

22

23

24

25

1
    UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF FLORIDA
2
      MIAMI DIVISION

3
HENRY NARANJO and     CASE NO. 00-60222-CIV.
MARLENE RAMIREZ,      LENARD/TURNOFF
4
   Plaintiffs,
5
vs.
6
STEPHEN BYRON SMITH, PALMER
7
JOHNSON EXPORT SALES INC.,
PALMER JOHNSON DISTRIBUTORS
8
INC., AND PALMER JOHNSON INC.,  COPY
9
   Defendants.
_____/
10

APPEARANCES:
11

PINKERT LAW FIRM, LLP.,   VALLE & CRAIG, P.A.,
12
DAVID L. WEBER, ESQUIRE,  FRANK J. SIOLI, ESQUIRE,
P.O. Box 89,      80 S.W. 8th Street,
13
Sturgeon Bay, WI,    Suite 2520,
CO-COUNSEL FOR DEFENDANT: ATTORNEYS FOR:
14
Palmer Johnson Inc.    Palmer Johnson Inc.

15
RIVKIND & PEDRAZA, P.A.,  BADIAK, WILL & KALLEN,
MANUEL VALDES, ESQUIRE,  JOHN D. KALLEN, ESQUIRE,
16
66 West Flagler Street,  17071 W. Dixie Highway,
Suite 600,      N. Miami Beach, Florida,
17
Miami, Florida,     ATTORNEY FOR:
COUNSEL FOR PLAINTIFFS.  Stephen Byron Smith
18
   FOWLER, WHITE, BURNETT, HURLEY,
19
    BANICK & STRICKROOT, P.A.,
    BRIAN P. HILL, ESQUIRE,
20
    Bank of America Tower,
    100 S.E. Second Street,
21
     17th Floor,
    Miami, Florida,
22
  ATTORNEY FOR BRADFORD MARINE, INC.

23
  ***************************************
     DEPOSITION
24
      OF
     PAUL ENGLE
25

```
 1     A.    Yes.

 2     Q.    What issue is it?

 3     A.    I have 1600 ton all oceans captain's license.

 4     Q.    Have you every used it recently?

 5     A.    Not since I've been here working at the yard.

 6     Q.    Did you ever have the occasion to take the federal

 7   ship or Highlander into a yard for retro fitting in your

 8   capacity as a captain?

 9     A.    Yes.

10     Q.    What yard?

11     A.    Meryl Stevens.

12     Q.    So you understand the process involved as far as a

13   captain dealing with the Yard Super and things like that?

14     A.    Yes.

15     Q.    Because you did it yourself?

16     A.    Yes.

17     Q.    Yes?

18     A.    Yes.

19     Q.    Is there a protocol at Bradford that in your

20   experience is different from other yards, such as Meryl

21   Stevens, as far as who the captain's to deal with, as far as

22   requesting work, seeing that the work is done to his

23   satisfaction; any complaints, that type of thing?

24     A.    I think it's pretty similar.

25     Q.    Describe the protocol for me?
```

1      A.    I think generally once the captain's and owner's get

2    to know the upper management, such as myself, upper

3    management, they go to the Superintendent and foreman and

4    the people actually doing the work.

5      Q.    So if, for example, if the captain wants a certain

6    item of work done, the protocol is to go to either the yard

7    superintendent or the foreman of the particular department

8    to make that request?

9      A.    That's correct.

10      Q.    And then once that request is made and there's some

11    agreement as to what the work is, the foreman then directs

12    his individual workers to do the work?

13      A.    That's correct.

14      Q.    That's protocol?

15      A.    I think so, yes.

16      Q.    That was Bradford's protocol back in 1997?

17      A.    Uh-huh. Yes.

18      Q.    In your experience that's common marine practice?

19      A.    Yes.

20      Q.    When you say a "major refit", I think we all have

21    some understanding of what that means, but in the event your

22    deposition has to be read to somebody that doesn't

23    understand that; what do you consider it to be, a major

24    refit?

25      A.    I think it's something that goes beyond your normal

1      Q.   Why does Bradford Marine use Pete Rumell, or any

2   other marine chemist for?

3      A.   We need to use a marine chemist whenever we're going

4   to do hot work.

5      Q.   Why?

6      A.   For safety reasons and O.S.H.A. too; that's required

7   by law.

8      Q.   So Bradford takes it upon itself to call a marine

9   chemist out?

10      A.   Absolutely.  Yes.

11      Q.   And that's opposed to a vessel owner or a captain?

12      A.   That's right.

13      Q.   That's common practice?

14      A.   Yes.

15      Q.   And that's your experience and certainly at

16   Bradford?

17      A.   Yes.

18      Q.   Who pays for that?

19      A.   We pay for it.

20      Q.   Initially -- let me ask you this --

21      A.   Uh-huh.

22      Q.   Who pays for Pete Rumell?

23      A.   We sub-contract it out and pass the bill on to the

24   customer.

25      Q.   You pass it through to the customer?

1       A.    Yeah.

2       Q.    You pay Pete and then you pass through the charges

3   to the customer?

4       A.    Sure.  Yes.

5       Q.    And it's Bradford's decision whether or not to call

6   out a marine chemist to begin with; is that right?

7       A.    Yes.

8       Q.    That was shown to you before, but I think your

9   testimony is, you're not sure, that you're not sure you got

10  that, sitting here today you don't recall?

11      A.    If I was to read it, it would refresh my memory.

12  I'm sure if I looked at it it would come to me.

13      Q.    We've heard testimony so far in this case that some

14  time prior to this explosion occurring that a recommendation

15  had been made that Bradford purchase a multi-gas testing

16  machine and my first question to you is there is now a

17  multi-gas tester there correct?

18      A.    Yes.

19      Q.    It's used to detect the presence of flammable or

20  combustible fumes, vapors, and gases in various spaces?

21      A.    That's right.

22      Q.    That's right?

23      A.    Uh-huh.  Yes.

24      Q.    Is that your recollection also, that prior to this

25  incident a request had been made to purchase one of these

1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF FLORIDA
                MIAMI DIVISION

3   HENRY NARANJO and                CASE NO. 00-60222-CIV.
    MARLENE RAMIREZ,                  LENARD/TURNOFF
4
           Plaintiffs,
5
    vs.
6
    STEPHEN BYRON SMITH, PALMER
7   JOHNSON EXPORT SALES, INC.,            COPY
    PALMER JOHNSON DISTRIBUTORS
8   INC., AND PALMER JOHNSON INC.

9          Defendants.
    _____/
10

11  APPEARANCES:

    PINKERT LAW FIRM, LLP.,          VALLE & CRAIG, P.A.,
12  DAVID L. WEBER, ESQUIRE,         FRANK J. SIOLI, ESQUIRE,
    CO-COUNSEL FOR DEFENDANT:        80 S.W. 8th Street,
13  Palmer Johnson,                  Suite 2520,
    P.O. Box 89,                     Miami, Florida,
14  Sturgeon Bay, WI.                ATTORNEYS FOR DEFENDANT:
                                     Palmer Johnson, Inc.
15
    BLANCK & PERRY, P.A.,            BADIAK, WILL & KALLEN,
16  F. DAVID FAMULARI, ESQUIRE,      JOHN D. KALLEN, ESQUIRE,
    CO-COUNSEL FOR PLAINTIFFS,       ATTORNEYS FOR:
17  5730 S.W. 74th Street,           Stephen Byron Smith,
    Suite 700,                       17071 W. Dixie Highway,
18  Miami Florida.                   N. Miami Beach, Florida.

19            FOWLER, WHITE, BURNETT, HURLEY,
                BANICK & STRICKROOT, P.A.,
20                  BRIAN P. HILL,
                Bank of America Tower,
21              100 S.E. 2nd Street,
                    17th Floor,
22                Miami, Florida,
           ATTORNEY FOR BRADFORD MARINE INC.
23
        *************************************
24                  DEPOSITION
                       OF
25               DAVID HENDERSON

        HI-TECH REPORTING (954) 523-0915

1    this and I'll move on.

2              The determination whether to use the tester to get

3    the reading about the presence of toxic gases or combustible

4    gases, that the foreman's duty?

5        A.    Yes.

6        Q.    Is it the worker's duty, in your opinion?

7        A.    Yes.

8        Q.    It's both of their duties?

9        A.    Yes.

10             MR. FAMULARI:   Object to the form.

11   BY MR. WEBER:

12       Q.    That's part of the foreman's job description or job

13   -- I understand it's not written, but that's part of his job

14   duties?

15       A.    That's correct.

16       Q.    That's part of welder's duties too; isn't that

17   correct?

18       A.    That's correct.

19       Q.    If somebody were to tell a welder, somebody, not a

20   foreman, somebody not associated with the yard, that it's

21   okay to weld, in your experience should a welder just

22   believe that?

23       A.    No.

24       Q.    They should make an independent investigation,

25   shouldn't they?

1    A.    That's correct.

2    Q.    Is that fair to say?

3    A.    That's correct.

4    Q.    But under no circumstances would the captain tell a

5    worker what to do?

6    A.    You're exactly right in your statement.  Did it

7    happen?  I don't know if it happened or didn't.

8    Q.    But your workers are also told by their supervisors:

9    You don't take orders from the owners or captains?

10        If you are told or asked to do something by the

11    owner or captain, you go speak to your foreman because

12    you've got to fill out a work order.

13        MR. FAMULARI:  Object to the form.

14    BY MR KALLEN:

15    Q.    Is that fair to say?

16    A.    It's fair to say.

17        MR. SIOLI:  Just to interject really quick.

18        Off the record.

19        (Whereupon, a conversation was held off the record.)

20    BY MR. KALLEN:

21    Q.    Let me rush.

22        Was this a system or policy that Bradford had in

23    place with it's workers and foreman and supervisors that the

24    workers are not to have direct contact with the owners and

25    or captains as far as work to be done written anywhere?

1     Q.    Another reason for that policy, I would assume,

2     excuse me, it would be for safety reasons?

3     A.    That's correct.

4     Q.    There maybe a request made by the owner or captain

5     which may involve some risk to the worker, to the property

6     or premises?

7     A.    That's correct.

8     Q.    And that certainly is something that the foreman

9     needs to know about, and you, as the superintendent,

10    absolutely needs to know about?

11    A.    That's correct.

12    Q.    And when you say at the outset part of the yard

13    superintendent's job is to see that the work gets done in a

14    safe manner; that's what you're talking about?

15    A.    That's correct.

16    Q.    So it's not merely a ministerial function, as far as

17    the work order being written out and passed on to your desk,

18    typed out and to make sure that the work described is

19    correctly on it; there's some review involved to make sure

20    of that and you can say, okay, Number One, we can do this

21    work as requested.

22          Number two, here's what it's going to take to make

23    sure that work is done safely; is that fair to say?

24    A.    Yes.

25    Q.    Because I would assume, again, and correct me if I'm

1    obviously called for the intervention of a marine chemist.

2          So would you agree that certainly you as the

3    superintendent and perhaps to the same degree, the foreman,

4    should have a working knowledge of the O.S.H.A. regulations

5    that's required and the intervention of a chemist.

6          A.   Yes.

7          Q.   So when a particular job request comes in, you know,

8    whether a marine chemist is required or be able to request

9    it?

10         A.   Yes.

11         Q.   Are there instances where you're not sure whether,

12   for example, whether a marine chemist should come in or not?

13         A.   Yes.

14         Q.   What do you in that situation?

15         A.   First of all the question is asked where exactly is

16   the welding taking place?  My next question is:  What is in

17   that area; woodwork, panelling?  Things like that.

18          If that be the case, the marine chemist is not

19   necessary and not within the new regulations; if it's 25

20   feet away from any fuel tank, it doesn't need a marine

21   chemist but you need an inspection and safety for removal of

22   rugs, wood, things like that.

23         Q.   Who would do that inspection in that instance?

24         A.   The foreman.

25         Q.   Would he do that in conjunction with the welder

112

1    A.   Pete Rumell.

2    Q.   And maybe I missed this but, what's the purpose of

3  having a quote, competent person, end quote, at the yard?

4    A.   To double check -- a competent person, first of all,

5  can inspect the area to see if you do need a marine chemist,

6  if it's not obvious.

7         Once a marine chemist has certified there's nothing

8  in the yard, a competent person has to make daily check of

9  that area.

10   Q.   To make sure it remains gas free, for example?

11   A.   That's correct.

12   Q.   I take it in using this project as an example, the

13  difference between the vessel owner or captain and the yard,

14  that being Bradford, the responsibility for making sure that

15  the vessel is gas free, if it needs to be, is that of the

16  yard?

17   A.   That's correct.

18   Q.   Now you said in this case that the lazarette where

19  Henry was welding was open?

20   A.   That's correct.

21   Q.   Was it basically an open space as opposed to an

22  enclosed space?

23   A.   That's correct.

24   Q.   You say it is or was an open space because why?

25   A.   The hatches were removed off the top of the deck.   A

1

2                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
3

4                  CASE NO. 00-6022 CIV-LENARD

5

6    HENRY NARANJO and
     MARLENE RAMIREZ,
7
                 Plaintiffs,
8
     vs.
9
     STEPHEN BYRONS SMITH and
10   PALMER JOHNSON, INC.

11               Defendants.
12   _____

13

14                          Badiak Will & Kallen
                            17071 W. Dixie Highway
15                          N.M. Beach, Fla.
                            Feb. 7th, 2001 2:20 p.m.
16

17

18

19             DEPOSITION OF JOHN BREDBECK

20

21   taken before JULIO A. MOCEGA, R.P.R. and Notary

22   Public in and for the State of Florida at Large,

23   pursuant to Notice of Taking Deposition filed in

24   the above case.

25


         JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1    charge of it back in those days.  Torch was

 2    around.  Mark Tortora, we spoke with him.

 3    First day I can't remember, you know.

 4         Q.    Did Henry Naranjo work on that job

 5    at all, if you remember?

 6         A.    No, like I said, that was a

 7    fiberglass boat, so there wasn't much welding to

 8    be done on that particular boat.

 9         Q.    That was in what year?

10         A.    From '94 to '97.

11         Q.    And what happened to the boat in

12    1997?

13         A.    That is when he bought the palmer

14    Johnson and he sold the Alexander and bought the

15    Palmer Johnson in February of that year, of '97,

16    Miami Boat Show.

17         Q.    Do you remember if he took delivery

18    of the boat in February of '97?

19         A.    Yes.

20         Q.    Approximately?

21         A.    I am sure that he did.  I think the

22    deal closed about a week after the Miami Boat

23    Show, so --

24         Q.    How long after it closed was it

25    before it went into Bradford?
```

1          A.    Two months.

2          Q.    Did you operate the boat during

3    that time period?

4          A.    Yes.

5          Q.    What places did you go to?

6          A.    We took delivery of the boat in

7    Fort Lauderdale.  We took it to Key West by way

8    of Marathon and from Key West back to Naples and

9    we were in Naples the Saturday before Easter of

10   '97 there, whatever date that would have been.

11              That is when we took a ride with

12   the cruise or whatever, people on board and

13   while he was in the middle of showing his new

14   boat off we took it up to crew speed or past

15   crew speed.

16              You know, he wanted to show

17   everybody how fast his boat would go and that

18   lasted about a minute half and we blew the

19   starboard engine.

20         Q.    Was that the catalyst to do a refit

21   on the vessel?

22         A.    Yes, it was.

23         Q.    Who decided what was going to be

24   done on the refit?

25         A.    Well, Mr. --

1       Q.    Who was involved in it?

2       A.    Well, what do you mean by that?

3       Q.    Who helped make the decisions on

4   all of the work that was going to be done?

5       A.    Well, Mr. Smith had his plans, what

6   he wanted and then the rest of it was pretty

7   much up to me to make it happen however we could

8   make it happen.

9       Q.    Okay, what kind of things did he at

10  least initially want done to the boat on the

11  refit?

12      A.    Well, we -- once they -- When the

13  engine blew, it was a Detroit and they were

14  going to rebuild it.

15            When they went to rebuild it the

16  whole inside of it was rusted out, so they

17  decided to do a, to do it properly they were

18  going to have to take the engines out of the

19  boat and bore them and dip them and all of these

20  other things.

21            And we were like, if we are going

22  do that, we have to take these engines out we

23  are not going to put Detroits back in here.  So

24  we went out and bought brand Mans, new Northern

25  Lights generators and that pretty much went on

1    from there.

2              And the main thing my boss wanted

3    at the time was to make the top deck bigger

4    because it had a really small seating area and

5    then no boat deck and he wanted more of a boat

6    deck for putting more toys up on the fly

7    bridge. And we had to make the arch hydraulic

8    so we could make it to Chicago in the summer.

9              Q.   Did somebody design that work, the

10   changes in the, on the fly bridge and the -- was

11   that something that yard did or --

12             A.   Pretty much the yard, yes.

13             Q.   Were you involved in any of the

14   decisions on how to put that together?

15             A.   Well, we'd say we are going to need

16   this space here for a Seadoo and we need to, we

17   want to move the seats up and make the mast

18   hydraulic. And you go from there.

19             Q.   When the boat first went to

20   Bradford was it taken out of the water?

21             A.   Yes, it was.

22             Q.   And how long was it out of the

23   water, if you can remember?

24             A.   It came out of the water I would

25   say third week of April and I am sure that you

18

1    can get a haul out schedule from one of these

2    documents.

3              Q.    Uh-huh.

4              A.    And we were -- We had just gone

5    back in the water three or four days before the

6    accident took place.

7              Q.    What work was done on the vessel

8    while it was out of the water?

9              A.    While it was out of the water?

10   Well, they cut a five and a half foot square

11   hole in the side of the starboard side of the

12   boat, starboard side of the boat, removed the

13   port and starboard engines, the port and

14   starboard generator.  All of the isolation

15   transformers, basically gutted the engine room

16   down to just bare walls and then we reinstalled

17   the new generators and the new main engines and

18   they welded the side back up.

19              During all of this time we had to

20   change the underwater exhaust from a ten inch

21   hole to a twelve inch hole because we were

22   upgrading the horsepower of the engines and we

23   had to redo struts, four on the bottom of the

24   boat.  We had to increase the size of the

25   shafts, new propeller because of the increased

19

1  horsepower and all of this was going on while we

2  were putting new hawse eyes in the cockpit and

3  the whole upper deck reconstruction.

4          As well as pulling all of the

5  windows out of the boat, too, because they were

6  like sand and we put glass back in.

7          Q.   When the vessel was put back in the

8  water what was the state of completion of the

9  engine installation?

10         A.   They were -- engines were installed

11 and they had been put in their spot, bolted down

12 and the shaft had been coupled up to them.

13 Other than that they weren't, there was no fuel

14 lines hooked up to them.  They were just

15 basically in the boat.

16         Q.   Was the exhaust system hooked up?

17         A.   The exhaust system was hooked up.

18 All of the underwater welding and everything had

19 already taken place.  The idea was to take it

20 back into the water because we had to go into a

21 spray shed so they could finish doing the paint

22 job.

23         Q.   Were the propellers on the vessel

24 at that time?

25         A.   Yes.   There were no batteries on

22

```
 1              Q.    Working, but it was during that
 2    time period?
 3              A.    Yes, it was, it was back in the
 4    water.
 5              Q.    At the time of the explosion were
 6    you on the vessel?
 7              A.    Yes, I was.
 8              Q.    And where were you?
 9              A.    I was in the engine room.
10              Q.    And what did you observe when all
11    of this happened?
12              A.    Well, I was down with the mechanic
13    and the electrician in the engine room and I
14    heard this massive explosion because there was,
15    you know, the air boxes were still fairly open
16    to the outside and we were inside of a tent, so
17    it echoed very nicely and you could feel the
18    whole boat shake.
19              Q.    Just prior to the explosion taking
20    place and by just prior I mean, you know. The
21    two or three days before, what kind of work was
22    being done in the lazarette?
23              A.    That I couldn't tell you because I
24    was on vacation the week before and I had just
25    returned the day before it happened.
```

1          Q.   Was there a project going on down

2     there that was putting a new hydraulic steering

3     system on?

4          A.   Yes.

5          Q.   What was your involvement in that

6     project, that part of the project?

7          A.   That part of the project?  Well, it

8     was decided amongst the hydraulic people that we

9     had a, we used to have a steering pump that was

10    in the engine room and we were running hydraulic

11    lines from the engine room all the way aft to

12    the steering and we decided that we needed to do

13    away with all of that hydraulic hose running

14    through the boat in case something broke.  So

15    they decided to put the steering pumps in the

16    lazarette in the cockpit which were right on the

17    other side of the, basically the old transom of

18    the boat where the running gear was, underneath

19    the owner's stateroom bed.

20         Q.   Who designed that project, do you

21    know?

22              MR. KALLEN:   Which.

23    BY MR. FAMULARI:

24         Q.   The project of putting the new

25    steering, hydraulic steering units in?

JULIO A. MOCEGA & ASSOC. (305) 374-0181

24

```
 1              MR. KALLEN:  Let me object to the
 2       form of the question when you say designed.
 3  BY MR. FAMULARI:
 4         Q.    I mean who -- Let me ask you this.
 5  Who came up with the idea to move the pumps back
 6  there and decided how they were going to be put
 7  in and how to run the piping and the hoses on
 8  that?
 9         A.    That mainly would have been done by
10  Bruce Adkinson who was the head of the
11  subcontractor for the hydraulics, Kewanee
12  (phonetic) or something like that, had a little
13  mermaid on the side of his truck.  Other than
14  that his name is Bruce Adkinson.  I can find out
15  exactly how you spell it, but that is who did
16  the work.
17         Q.    When you came back from vacation
18  were they already working back in the lazarette?
19         A.    Yes.  I came on a Sunday, so Monday
20  -- I believe this was a Monday when this took
21  place, the 7th would have been a Monday.
22         Q.    Did you go into the lazarette that
23  morning or at anytime before the explosion took
24  place after you got back from vacation?
25         A.    I would say yes, I did go down in
```

JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1    there.
 2           Q.    Do you recall any observations,
 3    anything that you saw or any discussions that
 4    you might have had with anybody?
 5           A.    The discussions were that they were
 6    going to drill and tap the new pumps into the
 7    plate.  The guy Brian Mink (phonetic) that was
 8    working for Bruce Adkinson, he was working in
 9    there and he drilled holes and he is the one
10    that discovered that the plate was too thin to
11    tap into and that is when this new plan of
12    tapping a quarter inch or, I mean, a half inch
13    aluminum plate and then welding it to the deck
14    came about.
15           Q.    What was his name, the gentleman
16    that was drilling the holes?
17           A.    Brian Mink.
18           Q.    And who did he work for?
19           A.    He worked for Bruce Adkinson.
20           MR. WEBER:  Escuse me, was that
21       Brian Mink, M-I-N-K?
22           THE WITNESS:  I believe so.
23    BY MR. FAMULARI:
24           Q.    Did either Bruce Adkinson or Brian
25    Mink report to you during their work on this
```

```
 1    project?
 2            A.   Well, they would have said that
 3    they tried to drill and there wasn't enough meat
 4    to tap into and that is when they would have
 5    said we need to do something different.
 6            Q.   And again whose idea was it to put
 7    the doubler plates on there that they were going
 8    to tap into?
 9                 MR. KALLEN:   Whoa, whoa, let's back
10        up.
11                 MR. FAMULARI:   Okay.
12                 MR. KALLEN:   Let me object to the
13        form.
14                 MR. FAMULARI:   Okay.
15                 MR. KALLEN:   I think you skipped
16        something there.   I am not sure that there
17        was any testimony yet as far as tapping into
18        doubler plates or a decision to put doubler
19        plates.
20                 MR. FAMULARI:   Yes, I think before
21        he did say that --
22                 MR. KALLEN:   Okay.
23                 MR. FAMULARI:   -- That Brian Mink
24        had, or somebody from Adkinson discussed
25        they couldn't tap into the deck because it
```

```
 1          was too thin so they were going to put some

 2          doublers in and tap into, I think you said a

 3          piece of half inch aluminum plate.

 4                    THE WITNESS:  Yes.

 5   BY MR. FAMULARI:

 6          Q.    Do you know where that idea came

 7   from?

 8          A.    I think that was the only logical

 9   explanation to handle at the time.

10          Q.    Do you know who thought of it and

11   if you don't, that is fine?

12          A.    No, I would say I don't.

13          Q.    Do you recall being involved in any

14   of the discussions on how to, how they were

15   going to mount those pumps?

16          A.    They said we could just put the

17   pumps right on this plate and weld the plate to

18   the deck and we would be basically a half inch

19   higher than we were going to be in the first

20   place.

21                    It was the only place available in

22   the cockpit to put the pumps and we already had

23   everything laid out for that location.

24          Q.    Do you recall if Tony Watson was

25   there during any of those discussions?
```

1          A.   Tony Watson, I'm sure he would have

2     had to have been there for at least part of the

3     discussion because he would be the one to tell

4     Henry that that is what had to be done.

5          Q.   Do you recall Henry being there

6     during any of the discussions?

7          A.   Usually when we were discussing a

8     job Henry was there and usually Tony was there

9     at the same time.   I can't remember exactly if

10    they were there or not when this all took place,

11    but --

12         Q.   Do you recall if prior to the

13    explosion and prior to that day when they were

14    discussing putting the hydraulic pumps in

15    whether there was any other hot work done in the

16    lazarette?

17         A.   At that time I would say probably

18    not.

19         Q.   When you took delivery of the boat

20    from, after the boat show, do you recall going

21    in the lazarette or inspecting the space back

22    there at all?

23         A.   I had been in the lazarette many

24    times after the boat show, yes.

25         Q.   But before the major refit started?

66

1      Q.    And the deck above it?

2      A.    Correct.

3      Q.    Do you see the deck?

4      A.    I do.  This would be the deck, so

5   this would be a void area there.  It looks like.

6      Q.    Okay.

7      A.    You can look at it over here also.

8      Q.    That is on the right-hand side of

9   this drawing that is marked as Exhibit No. 27?

10      A.    That is looking forward.

11      Q.    And that would be, looks like a

12   side cut of the rear portion of the transom?

13      A.    Yes, it would be -- looks like

14   looking forward.

15      Q.    And it shows the ballast and the

16   decking?

17      A.    Yes.

18      Q.    Okay, do you remember telling Mr.

19   Naranjo that the cement and the deck were flush?

20      A.    No, I do not.

21          MR. KALLEN:  Object to the form.

22   BY MR. VALDES:

23      Q.    You don't remember telling him

24   that?

25      A.    No.  I doubt if I would have said

67

```
 1    that because, like I said, when you stepped on

 2    to this deck you could tell that it was not

 3    solid. You could tell that -- How big the gap

 4    was I couldn't tell you, but you could tell that

 5    it definitely was not stepping down on to

 6    cement.

 7            Q.   Did you physically help in the

 8    removal of the deck after the explosion, the

 9    work that Tony Watson did?

10            A.   I wouldn't be involved in the work

11    of it, no.

12            Q.   So you didn't have anything to do

13    with the ripping out of the floor that buckled

14    upward?

15            A.   No, no.

16            Q.   Okay, and that would have been

17    something that Tony Watson did?

18            A.   That would have been handled by

19    Bradford. They did the total reconstruction of

20    the deck also.

21            Q.   And if he testified, Tony Watson

22    testified that this deck was seam welded

23    completely around, is he correct?

24            A.   I would say no. You could see in

25    these pictures that it wasn't.
```

70

BY MR. VALDES:

Q.    You have to answer the question?

A.    I would stand corrected, yes.

Q.    Was it you that instructed Henry to weld the plate down in the lazarette, the doubler plate so they could put in the pump, the hydraulic pump?

A.    I would have talked to Tony Watson and we would have said this is what we need to have done because like anything else at Bradford it has to have a work order associated with it.

Q.    Okay, was there anytime while you were at Bradford that they were going to do something that you didn't want them to do in a certain way and you told them don't do it that way?

A.    No.

Q.    You could never overrule any of the people at Bradford, is that what you're saying?

A.    Not for how they, how they wanted to do things, no.

Q.    Or what you wanted done?

A.    I would ask for what I wanted done and what I needed to have done and they would do it the way that they wanted to do it. As long

```
 1    being welded down at three o'clock in the

 2    afternoon when the accident took place.

 3         Q.   Right.  Let me back up that

 4    conversation, though.  Was anybody else privy to

 5    that conversation?  In other words, did anybody

 6    else take part in that conversation?

 7         A.   Well, I am sure that we had Tony

 8    Watson there because he would have had to decide

 9    that we could go ahead and do what we were

10    talking about doing.

11              Whether or not Henry was there at

12    the time of the discussion I do not know.

13         Q.   Okay, so you think that Tony Watson

14    was there as well?

15         A.   He would had to have been present

16    for part of it because he is the one that had to

17    authorize the job.

18         Q.   Well, I don't want you to assume

19    anything.  What I really want to know is did

20    you and Brian Mink have a conversation about

21    this and then did you approach Tony Watson

22    yourself or was Tony Watson there when Brian

23    Mink was telling you about this?

24              MR. VALDES:  Object to the form.

25    BY MR. VALDES:
```

JULIO A. MOCEGA & ASSOC. (305) 374-0181

98

1      Q.    Do you understand my question?

2      A.    I understand -- Not really.

3  Everybody would have been there on this to

4  figure out how they were going to do it

5  together.

6      Q.    Okay.  Is it safe for me to assume,

7  though, at some point you had a discussion with

8  Tony Watson about fabricating two metal plates?

9      A.    That was one metal plate and, yes,

10  we would have had that discussion.

11      Q.    There was only one metal plate?

12      A.    Yes, two pumps went on one metal

13  plate.

14      Q.    All right, and tell me when did

15  that discussion take place?

16      A.    That would have taken place in the

17  morning after Brian had come there with the

18  pumps and tried to drill the holes and found out

19  that he couldn't tap it.

20      Q.    What did you say to Tony Watson?

21  What did you talk about?

22      A.    I said, Tony, hey, we need to do

23  something here.  I don't know.  Tony was a very,

24  was a very take care of business.  You just tell

25  him what needed to be done and he would say this

1     to tell.  It was welded down.

2          Q.    Mr. Valdes asked you some questions

3     about your conversation with Henry Naranjo and

4     he asked you if you remember only the, member

5     only the gist of the conversation.  Do you

6     recall that?

7          A.    Yes.

8          Q.    Okay, I want to ask you directly,

9     did you tell Mr. Naranjo that this, that the

10    cement went flush to the top of the aluminum

11    deck?

12         A.    I would have never told him it went

13    flush to it.  I told him that there was cement

14    down under the floor.  I didn't know how much,

15    how far it was from the bottom of the floor.

16         But when you jumped down into the

17    hole you could hear it echo, so you knew it

18    wasn't solid.

19         Q.    And you did observe holes in that

20    deck, is that correct?

21         A.    To the best of my knowledge I did

22    see holes when they came and told me that it

23    wasn't enough meat to tap into.

24         Q.    Those were observable without any

25    type of magnification?

```
 1        present during this conversation.

 2              Q.    But I am asking are you sure?

 3              A.    I am not sure.

 4              Q.    Do you have any experience welding?

 5              A.    No.

 6              Q.    Did you learn welding in the Navy?

 7              A.    No.

 8              Q.    When you testified earlier that you

 9        would talk to Henry, did you ever like have to

10        indicate with your hands something that you

11        wanted done with Henry?

12              A.    No.  I always felt that he

13        understood what we were talking about.

14              Q.    You never had to point anything out

15        or point with your hands, I want this done this

16        way, anything like that?

17              A.    Not to the best of my recollection.

18              Q.    You don't recall right now?

19              A.    No.

20              Q.    There could have been an instance

21        where you used your hands to convey an idea to

22        Henry that you wanted done?

23              A.    I suppose it's possible, yes.

24              Q.    Or conveying an idea as to what

25        something is?  Same answer?
```

```
 1   BY MR. VALDES:

 2        Q.   Well, opposing counsel?

 3        A.   Yes, he knows all of my numbers,

 4   E-mail, the whole deal.

 5        Q.   You have E-mail?

 6        A.   Yes.

 7             MR. FAMULARI:  John doesn't have

 8        E-mail yet.  He doesn't have a computer yet.

 9             MR. KALLEN:  I still use

10        walkie-talkie.

11             MR. VALDES:  No more questions.

12                  RECROSS-EXAMINATION

13   BY MR. KALLEN:

14        Q.   Just a few follow-up real quick?

15        A.   Okay.

16        Q.   You said that you don't have any

17   welding experience?

18        A.   Correct.

19        Q.   Would you know, putting yourself

20   back in July of 1997, whether or not a

21   particular job is safe to begin welding on?

22        A.   It wasn't my decision to make.

23        Q.   As far as any welding work that

24   would have been done and was done on the boat

25   would you defer to the welders and the welding
```

```
 1    people at Bradford?

 2          A.    Absolutely.

 3          Q.    Would there be any reason that you

 4    can think of that you would have actually told

 5    Henry Naranjo that it was "safe"  to weld?

 6          A.    No.

 7          Q.    You would have no reason to know

 8    that, would you?

 9          A.    No.

10          Q.    Did you ever have any reason to

11    know or suspect that there was or could have

12    been any type of ignitable or flammable gas or

13    fumes or liquid underneath that aluminum

14    subflooring in the lazarette?

15          A.    No.

16          Q.    As far as what type of work either

17    the owner or you wanted done on the boat, you

18    would express those desires or wants to the

19    people at Bradford, I take it?

20          A.    Correct.

21          Q.    As far as how the work would

22    actually be done and in what manner and whether

23    it was done safely, would you at anytime dictate

24    that to Bradford people?

25          A.    No.
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6022 CIV-LENARD

HENRY NARANJO and
MARLENE RAMIREZ,

            Plaintiffs,

vs.

STEPHEN BYRONS SMITH and
PALMER JOHNSON, INC.

            Defendants.
_____

                    Rivkind & Pedraza, P.A.
                    66 West Flagler Street
                    Suite 600
                    Miami, Fla.
                    1-16-2001 10:20 a.m.


            DEPOSITION OF PETER RIMMEL


taken before JULIO A. MOCEGA, R.P.R. and Notary

Public in and for the State of Florida at Large,

pursuant to Notice of Taking Deposition filed in

the above case.


            JULIO A. MOCEGA & ASSOC. (305) 374-0181

1    on vessels?

2          A.    Oh, it is different people now than

3    it was then.

4                Back then it would have been Mark

5    Tortora, a fellow named Torch, or Dave Henderson

6    and, of course, now they have other people who

7    call me in similar capacities that they had back

8    then.

9          Q.    Do you remember what you were

10    called to do when, back in 1997 when they asked

11    you to look at the SOUVENIR?

12          A.    Yes, they said that there had been

13    an explosion on board and they asked me to come

14    down and see if I could help them determine what

15    may have have caused the explosion.

16          Q.    Did you, prior to the explosion had

17    you been down on the SOUVENIR to gas free any

18    areas?

19          A.    Several months before that I had

20    been on board and written a chemist certificate

21    for fuel tanks, I believe, and maybe an engine

22    room.

23                But that was areas completely

24    removed from this and that work as I understand

25    it had already been completed long before this

JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1    accident.
 2         Q.   Can you explain to us what a gas
 3    free certificate is?
 4         A.   Yes, after I have performed an
 5    inspection to determine whether an area is safe
 6    for entry so that the space is safe for
 7    breathable air and nothing toxic in it and/or
 8    have inspected the space so that I have
 9    determined that it is safe to do hot work, in
10    other words, there is no flammable or
11    combustible liquid in the space, no sludge left
12    in the space that might be flammable and that
13    there is no way to have things come back into
14    the space that could become flammable or
15    explosive, then I write a certificate which is
16    called a marine chemist certificate.  They are
17    numbered.  There are usually five copies and I
18    keep one and the rest are left with the yard.
19              One is posted on the vessel that
20    spitulates what I have inspected, where I have
21    inspected, what my instructions as far as is it
22    safe or not safe and if there are any
23    limitations, those are put out certificate and
24    then there is, of course, standard boilerplate
25    that is on there that talks about the
```

13

1   and here is what you should or should not do.

2          And so usually the marine chemist

3   are the fellows that give these courses and I

4   have given probably 20, 25 of them over the last

5   twenty years.

6          Q.   Do you know if Bradford Marine had

7   shipyard competent persons back in July of 1997?

8          A.   Yes, they did, and referring to the

9   letter that I wrote at that time, I believe they

10   had four in the yard who had been trained.

11          Q.   Did you train them?

12          A.   I think I trained them all.  I

13   don't recall for sure, but I think I did.

14          I don't think that they all worked

15   for Bradford when I trained them because I know

16   Dave Henderson worked for Tracor when I trained

17   him.  He was still working there.

18          Q.   We are here to talk about the

19   explosion that took place in the lazarette area

20   on July the 7th of 1997.  Are you aware of an

21   explosion that took place?

22          A.   Yes.

23          Q.   And who called you to come down to

24   look at the area after the explosion?

25          A.   I believe it was Torch, Mark

14

1    Tortora.

2            Q.    And what did he ask you to do?

3            A.    He just asked me to come down and

4    he said there had been an explosion and a man

5    had been injured and they wanted to determine

6    what might have caused the accident.

7            Q.    Do you recall when you went down?

8    I believe the explosion was the afternoon of

9    July the 7th.

10            Do you know when you went down to,

11    do you remember when you went down?

12            A.    If I can refer to this I am sure

13    that I mentioned when I went.

14            MR. VALLE:  David, if he is going

15       to be referring to that during the course of

16       the deposition --

17    BY MR. FAMULARI:

18            Q.    Yes, why don't we mark this as the

19    next numbered exhibit.

20            MR. KALLEN:  For the record, that

21       has already been marked I think yesterday.

22            MR. FAMULARI:  Was it?

23            MR. KALLEN:  That was -- Anyone

24       know the exhibit number offhand?

25            MR. WEBER:  I don't, but I -- we

1    those gases are present and, of course, if

2    oxygen is present which is needed for breathing.

3           Q.    How big is the hose that comes off

4    the unit?

5           A.    I would say the inside diameter is

6    probably an eighth of an inch.

7           Q.    What is the outside diameter, if

8    you know?

9           A.    Maybe a quarter inch.   It's just a

10   piece of Tigon tubing that runs to the

11   instrument, to the pump, you know, something

12   that will bring the gases into the meter from

13   wherever you want to throw the hose.

14          Q.    Does it take any kind of special

15   training to use one of the meters?

16          A.    They are pretty easy to use, but

17   frequently when we give the courses people who

18   haven't used one before need some training in

19   them just to understand what they are doing, why

20   they are doing it and how to know if they are

21   working right before they start using them.

22          Q.    At the time that you looked at the

23   vessel after the explosion and wrote the report,

24   did you come to any conclusions about what might

25   have ignited or been the source of the

1    explosion?

2            A.    No.

3                  MR. VALLE:  Objection to the form.

4    BY MR. FAMULARI:

5            Q.    I note in your report you mentioned

6    something about some, being told some acetone

7    had been spilled, do you recall that?

8            A.    Yes, I made some guesses as to what

9    were possibilities.  I don't believe that I came

10   to any conclusions because I had no evidence

11   from which to make those conclusions, but I

12   believe that at one point the captain or

13   someone, maybe one of the crew members had

14   mentioned that there had been a can of acetone

15   that might have been spilled down in that area.

16                  I believe also we discussed the

17   possibility that some red gasoline cans for

18   outboard motors might have been down there.

19                  Those are the only substantive

20   things that I could come up with.  There are

21   other things that I wrote in this letter that

22   were possibilities, but I have no evidence one

23   way or the other about them.

24           Q.    From what you observed and from

25   what you were told about the vessel before the

1    curled up, but at this point I couldn't tell you

2    exactly how it looked.  I know there were photos

3    taken at the time and I didn't pay much

4    attention to that other than the fact that I do

5    recall seeing the floor heaved up and kind of

6    rolled back like a tuna can, if I recall.

7                     But I couldn't tell you more than

8    that.

9              Q.    Did you take photos at the time?

10             A.    No, I didn't.   Photos had been

11   taken and I had no reason to.

12             Q.    Do you know who took the photos?

13             A.    I think Mark Tortora did.

14             Q.    With the hatches off the top of

15   that space --

16             A.    You are talking on the cockpit

17   deck?

18             Q.    On the cockpit deck --

19             A.    Yes.

20             Q.    -- That would have exposed, given

21   access to that lazarette area, as a marine

22   chemist would you have considered that a

23   confined space?

24                   MR. KALLEN:   Object to the form.

25                   MR. VALLE:   Join.

JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1                    THE WITNESS:  Yes.

 2                    MR. VALLE:  I am sorry, what space

 3        are we talking about?

 4                    MR. VALLE:  Read the question

 5        back.

 6                    (Thereupon, the above-mentioned

 7        question was read by the reporter as above

 8        recorded.)

 9                    MR. VALLE:  Object to form.

10                    MR. FAMULARI:  What I am trying to

11        get is an opinion from him as, because we

12        have talked to other people about what is a

13        confined space.

14                    MR. VALLE:  Yeah, but I am not sure

15        what you are talking about.  Are you talking

16        about the area between the wooden deck and

17        the aluminum deck?

18                    MR. FAMULARI:  Yes, I am talking

19        about the area between the wooden deck and

20        the aluminum deck, not the subspace.

21                    MR. KALLEN:  David, let me clarify

22        my objection so maybe you can clean it up.

23                    MR. FAMULARI:  Okay.

24                    MR. KALLEN:  I don't think it has

25        been established as a predicate.  We know
```

```
 1        there were hatches on the cockpit deck for

 2        entry into the lazarette.

 3               I don't know if it has been

 4        established how many of those hatches were

 5        actually off and whether that makes a

 6        difference as to the definition of a

 7        confined space.

 8               THE WITNESS:  It doesn't.

 9               MR. KALLEN:  Okay, well --

10               THE WITNESS:  The definition is in

11        there.

12               MR. KALLEN:  Right.

13    BY MR. FAMULARI:

14        Q.    Why don't you tell us what the

15    definition of a confined space is.

16        A.    The definition of a confined

17    space?

18               MR. KALLEN:  I was just looking at

19        it.  Where was it?  Here it is.  Why don't

20        you read off the section first.

21               THE WITNESS:  This is 1915.4

22        paragraph P.  "The term confined space" --

23        this is OSHA's definition, "means a

24        compartment of small size and limited access

25        such as a double bottom tank, cofferdam or
```

1       other space which by its small size and

2       confined nature can readily create or

3       aggravate a hazardous exposure."

4              Now, when I teach the course we

5       extend that a little bit.  We say it's

6       normally any space that is not designed for

7       normal human use.  So when I say normal

8       human use being you don't live there, you

9       don't go into it on a regular basis.  It is

10      -- an enclosed space is a slightly

11      different definition and that is a space

12      that would be ventilated and used more

13      often.  A space that is regularly opened

14      and ventilated would be like an enclosed

15      space.  A confined space would be a space

16      that may or may not be ventilated, but it

17      isn't something where someone goes into it

18      regularly.

19             Very minute distinction between the

20      two, but OSHA chooses to have the two

21      different definitions and we just try and

22      deal with them both as marine chemists in

23      teaching the course.

24   BY MR. FAMULARI:

25             Q.   If there was a confined space and

1    there was going to be hot work done what should

2    be done?  What should the shipyard competent

3    person and/or the welder do?

4         A.   Well, first of all, they have to

5    determine where it is located relative to fuel

6    tanks or other spaces that have, may have

7    contained flammable work or combustible liquid

8    because if it is an adjacent space to one of

9    those spaces they are required to call a marine

10   chemist if their work is within twenty-five feet

11   of that space.

12         If that is not the case, if that is

13   not the case then anybody entering that space

14   prior to entering from a shipyard standpoint

15   that space should be tested for oxygen,

16   combustible or flammable gases to see if they

17   were present.

18         And if they are not -- if oxygen is

19   there, but the flammable gases aren't there,

20   according to the OSHA regulations there are

21   limits with numbers and all of this and I won't

22   go into the whole course on that.

23         If the numbers are what they are

24   supposed to be, then a competent person is

25   permitted to let someone go into the space.

1        Now, prior to hot work in addition

2   to that a person should be writing what is

3   called a competent person's log which would list

4   that that space has been inspected and what type

5   of work is permitted to be done there, any

6   limitation that should be done on that same

7   competent person's log.  The time and date of

8   the inspection should be there.

9        Any instruments that are used to

10  test the space should be written down and any

11  results of those tests such as the oxygen level,

12  LEL, the explosive limits of the gases found.

13       Again, it is all spelled out in

14  part of the course that is taught.  It gets a

15  little bit, how should I say, detailed I guess

16  is what should be done, but basically those are

17  the things that should be done before someone is

18  told, yes, it is safe to go in and do the work.

19       Someone is supposed to look at the

20  space, either a competent person or a marine

21  chemist and test the area that is supposed to be

22  welded in as well as consideration given to

23  adjacent spaces and, of course, anything on the

24  opposite side of any place that is being welded

25  on because that common plate is common to two

JULIO A. MOCEGA & ASSOC. (305) 374-0181

32

1    spaces.

2        In other words, if you are on one

3    side of a plate, whatever is on the other side

4    is another space and it has hot work being done

5    on it by nature of the fact that that plate is

6    being heated up to whatever temperature.

7        So at least two spaces have to be

8    examined anytime that you are doing work on a

9    piece of aluminum or a plate or a piece of steel

10   or whatever.

11       Probably the most notable exception

12   would be if you are inside the ship and you are

13   welding on the outside, as long as someone has

14   looked around and made sure there is no gasoline

15   tanks right next to the outside of the vessel,

16   you don't really examine and run around looking

17   the whole yard because that is adjacent to the

18   outside.

19       Q.    Let's assume --

20       A.    You got to use some logic.

21       Q.    Let's assume that --

22       MR. VALLE:  Can you read that

23   entire answer back for me.

24       (Thereupon, the above-mentioned

25   question was read by the reporter as above

```
 1              MR. VALLE:  Who is there?

 2              THE WITNESS:  -- Who is supposed to

 3      be there for it, yes.

 4              MR. VALLE:  Okay.

 5   BY MR. FAMULARI:

 6        Q.   Okay, let's assume that the

 7   lazarette is a confined space and that it is 25

 8   feet from fuel tanks.

 9              MR. KALLEN:  More than 25 feet?

10   BY MR. FAMULARI:

11        Q.   More than 25 feet.  We are assuming

12   that because I don't really know.  And let's

13   also assume that the welder, the actual person

14   that was going to do the work asked the captain

15   if there were any fuel lines or hydraulic lines

16   underneath that deck and was told no, and let's

17   assume that the welder was told that the area

18   below was filled with cement up to the top and

19   the deck was laid on top of that where he was

20   going to weld.

21              Let's assume all of that.  At that

22   point what should the shipyard competent person

23   do?

24              MR. VALLE:  Objection to the form.

25              MR. KALLEN:  Join.
```

JULIO A. MOCEGA & ASSOC. (305) 374-0181

1           THE WITNESS:  He is still required

2      to inspect the space in which there is

3      welding and -- You are saying we are

4      assuming the cement was right up to the

5      plate?

6   BY MR. FAMULARI:

7           Q.    Yes?

8           MR. VALLE:  Assuming he was told?

9   BY MR. FAMULARI:

10          Q.    Assuming he was told that, yes,

11     assuming he was told that?

12          A.    It would be up to him to verify

13     that is the case, that there is no space there.

14          And at that point he would either

15     find a space or not and at some point figure out

16     how to test that on the opposite side of the

17     plate if there is a space there by drilling a

18     hole.

19          If there isn't a space there they

20     may have called me on the phone and said, geez,

21     we are going to weld right against a piece of

22     cement on the opposite side of this, what do we

23     need to worry about?  They may or may not have

24     done that.

25          I get calls not necessarily about

1   cement, but from time to time about here is a

2   situation that is unusual, Pete, what should we

3   do.  So at that stand, from that stand point he

4   should have looked at the area and determined

5   whether it was safe using a meter and visual

6   inspection on both sides of the plate that was

7   to be welded.

8           Q.   And who should have been the one to

9   make that determination?

10          A.   The shipyard competent person.

11  Let me back up something that you said a minute

12  ago for clarification of you all.

13          Q.   Okay.

14          A.   You said if there is a fuel tank

15  further away than 25 feet.

16          Okay, this is something that

17  probably wasn't described earlier and I didn't

18  go into it in detail, but maybe I should so

19  there isn't a misconception.  And that is if

20  there is a fuel tank closer than 25 feet, but

21  you are working not in an adjacent space, two

22  spaces away, that fuel tank could be three feet

23  away and this space is not required to be

24  inspected.

25          It is only if you are in an

1    opinion when faced with a welding job in a

2    confined space --

3           A.    Right.

4           Q.    -- On this boat.   You said that he

5    should have made sure what was on the other

6    side?

7           A.    Right.

8           Q.    Now, in your opinion as a welder

9    what should he have done to make sure what was

10   on the other side?

11          A.    The easiest answer is talk to his

12   boss.

13          Q.    Okay.   Would it be adequate in your

14   opinion for him to simply ask the captain of the

15   vessel as opposed to his employer who is

16   responsible for the work?

17          A.    No, because it's good to ask the

18   captain about specific things such as in the

19   question are there hydraulic lines, et cetera.

20   The more information that you get the better, of

21   course.

22          Q.    Sure.

23          A.    But you don't know whether that

24   captain has had competent person training.   He

25   obviously is not working for the yard and hasn't

1    had safety training in the types of areas where

2    he is supposed to be looking for hazards.

3              Q.   Okay.  And I take it from your

4    testimony today that if there be any doubt as to

5    what may be behind the deck or on the other side

6    of the deck or any doubt as to the presence or

7    possible presence of combustibles or any doubt

8    as to the presence of any other potential risk

9    relative to the welding job to be undertaken,

10   the welder and his supervisor should error on

11   the side of caution and ask and get as much

12   information as possible before starting the job,

13   would that be fair to say?

14              A.   Yes.  I might mention --

15              Q.   Sure.

16              A.   In my competent person course I

17   have a clipboard with big pages of paper on it

18   and one of them is if you walk away from a job

19   and you still have doubts, you haven't done your

20   job; go back.

21              Q.   Okay.

22              A.   Now, this is for the competent

23   person.  The welders don't always go to these

24   classes.

25              Q.   No, I understand that.

JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1    have been left with Torch and I would have kept
 2    a cop for myself.
 3                   That long ago I don't know what
 4    they did with theirs.  I keep a copy of every
 5    certificate that I have.
 6          Q.    I just asked you --
 7          A.    Like I say, I can't find mine
 8    because it got pulled out at the time of this
 9    incident and never got refiled.
10          Q.    The question was, you did leave
11    several copies with Bradford?
12          A.    Yes.
13          Q.    Was there ever a time that you
14    posted a notice on the SOUVENIR certifying that
15    the entire ship was gas free?
16          A.    No, no, and I wouldn't have.  I
17    don't post them.
18          Q.    Gas free means gas free today,
19    right?
20          A.    I understand what you're saying.
21                 MR. KALLEN:  Wait -- go ahead.
22    BY MR. VALLE:
23          Q.    My next question --
24                 MR. KALLEN:  What about an answer
25          to that?
```

JULIO A. MOCEGA & ASSOC. (305) 374-0181

BY MR. VALLE:

    Q.    You understand what I am saying, what do you mean?

    A.    Well, my chemist certificate stipulates the condition at the time that I make the inspection.

    It doesn't guarantee anything in the future.

    Q.    That is what I am saying.

    A.    Yes.

    Q.    In a changing environment --

    A.    Exactly.

    Q.    In a work environment in a shipyard you are aware that from time to time there is a number of volatile liquids used in either removing paint, cleaning metals, thinning paint, that sort of thing, right?

    A.    Yes.

    Q.    And as the environment changes in an area that you have inspected you would expect that the people that, that would either call you back or that they would take down the gas free environment, correct?

    A.    Yes.

    Q.    When you went back to Bradford how

```
 1    long had it been when you went -- strike that.
 2                  How long prior to the explosion had
 3    it been that you had certified the areas that
 4    you examined to be gas free?
 5          A.    I don't recall offhand, but I
 6    believe it was like two or three months and the
 7    vessel had been out of the water at that time.
 8    It wasn't in the water.
 9          Q.    So they put it back in the water?
10          A.    Yes.
11          Q.    And they had been working on her
12    for two or three months between the time that
13    you certified her gas free and the time of the
14    explosion?
15          A.    That is correct.
16          Q.    Do you know what type of work they
17    did on that vessel during those two months?
18          A.    I have no idea.
19          Q.    Being in and around the vessel
20    after the explosion did you have occasion to see
21    any type of volatile liquid or solutions being
22    used in and around that vessel at that time?
23    Like, for example, acetone?
24          A.    I didn't see anything anywhere in
25    the vicinity.    There may have been on the dock
```

1          Was the report marked as Exhibit 17

2     in this case the first opportunity that you had

3     to mention a multi gas tester to Bradford

4     Marine?

5          A.    No.

6          Q.    How long had you worked for them

7     prior to this particular explosion in 1997?

8          A.    Well, ever since I became a marine

9     chemist in 1981 or December of '80.

10         Q.    If you had to give it to me off the

11    top of your head how many times would you have

12    mentioned to management or to the certified

13    competent persons, shipyard competent persons at

14    Bradford Marine that they should have a multi

15    gas tester or some kind of sniffer on hand when

16    they are doing these operations?

17         A.    I can't give you an absolute

18    number.  I know that each of the competent

19    persons who was trained had this mentioned a

20    number of times throughout the course that they

21    can't do their job without having a way to run

22    the test.

23              MR. VALLE:  Excuse me a second.

24              (Discussion off the record.)

25              THE WITNESS:  In addition to

JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1          training, and I noticed I mentioned in here

 2          four people, those four people at various

 3          times throughout the years, I know that I

 4          probably at least once or twice to each of

 5          them would have mentioned if they were

 6          working for Bradford at that time and I am

 7          not sure if all of them were because I don't

 8          remember who they are.

 9                    I would have mentioned, you know,

10          you need to get a meter for this or you have

11          to have a meter in this yard to use.

12     BY MR. VALLE:

13          Q.    Would it be --

14          A.    So it would have been mentioned a

15     few times, anyway.

16          Q.    Over the course of the years?

17          A.    Yes, over the course of the years.

18          Q.    To people who would have been in

19     management or shipyard competent persons working

20     at Bradford?

21          A.    The competent persons were either

22     the welding foreman or someone of that status.

23     It wasn't the welders themselves.  It was either

24     a welding foreman or Torch.  I think his job was

25     safety something or other.
```

1          Q.   Okay.

2          A.   So these were people who were not

3    on a line with welders, these were upper --

4          Q.   Management?

5          A.   Yes, management of some sort, yes.

6          Q.   So you did mention to management

7    on --

8          A.   Yes.

9          Q.   -- On a number of occasions prior

10   to this explosion that one of the pieces of

11   equipment that they needed to have on hand was a

12   multi gas tester?

13         A.   Yes.

14         Q.   And they call these things

15   sniffers, is that a nickname?

16         A.   That is a nickname for it, yes.

17         Q.   In your report you mention that the

18   crew, and I will read this again, it is on page

19   three, "The crew who initially started to

20   install the pumps stated that they had drilled a

21   couple of holes," not one, but "a couple of

22   holes in the area."

23         A.   Well, like I said, I don't remember

24   how many.

25         Q.   Okay, so that there were at least a

1    couple of ports available prior to the explosion

2    which you could have utilized or the shipyard

3    competent people could have utilized had they

4    had a multi gas tester --

5         A.    That is correct.

6         Q.    -- At the time?

7         A.    Yes.

8         Q.    And, sir, do you have an opinion

9    within a reasonable degree of scientific

10   certainty as to whether or not this incident

11   could have been prevented had the shipyard

12   competent people or management at Bradford

13   Marine employed the use of a multi gas tester to

14   test the space between the lazarette deck plates

15   and the concrete underneath it to determine if

16   there was explosive gas?

17        A.    Yes.

18        Q.    And what is that opinion?

19        A.    I don't believe this would have

20   occurred had that space been tested with a gas

21   tester.

22        Q.    And they have an affirmative

23   obligation to conduct those tests, do they not,

24   in situations like this pursuant to Section

25   1915.54 of the OSHA regulations governing the

```
 1    shipyard industry?

 2            A.   1915.54?

 3            Q.   Yes, 1915.54.

 4            A.   How about --

 5            Q.   1915.54 C, before welding, cutting

 6    or bracing is begun on structural voids such as

 7    skegs, bilges, keels, et cetera, et cetera, a

 8    competent person shall inspect the object and if

 9    necessary test it for the presence of flammable

10    liquids or vapors.

11            A.   Well, that is one area that covers

12    it.  Another one is 1915.14 part B, where it

13    says hot work requiring testing by competent

14    person, that is different in there than here.

15               It is probably twelve in here and

16    it says, shall be tested, dry cargo holds,

17    bilges, et cetera.

18            Q.   Okay, well, then --

19            A.   Your book is -- it has been

20    renumbered.

21            Q.   Okay, let me make it simple then.

22    Based on OSHA the regulations that existed at

23    the time that this explosion occurred, if there

24    was going to be welding on the deck of the

25    lazarette and there was any suspicion whatsoever
```

JULIO A. MOCEGA & ASSOC. (305) 374-0181

1    that there was a void space beneath it, the

2    shipyard competent person should have tested

3    that space for flammable fluids or vapors prior

4    the commencement of welding operations, correct?

5            A.    Yes.

6            Q.    And that is required by law?

7            A.    Yes.

8            Q.    And they didn't do it?

9            A.    Not to my knowledge.

10           Q.    And had they done it, in all

11   probability this explosion would have been

12   avoided?

13           A.    Yes.

14           Q.    Okay.  And they're not only

15   supposed to make the inspection, they are

16   supposed to log it, correct?

17           A.    Yes.

18           Q.    And maintain a log of all of the

19   inspections performed in suspect areas using any

20   type of sniffer device, correct?

21           A.    That is correct.

22           Q.    Do you know whether they have a log

23   of anything like that at Bradford?

24           A.    Not off the top of my head, no.

25           Q.    Do they have a multi gas tester

```
 1              Q.    Now, the lazarette certainly wasn't

 2    one of the areas that you certified as being gas

 3    free; is that correct?

 4              A.    No, that is correct.

 5              Q.    I want to make that clear for the

 6    record?

 7              A.    Yes.

 8              Q.    You mentioned earlier that there

 9    had been some discussion about ventilation of

10    the area beneath the deck of the lazarette.

11              Have you ever designed an area

12    similar to that?

13              A.    No.

14              Q.    If an area on board a vessel in

15    your opinion should have a ventilation port,

16    would that be a feature that would be a design

17    feature in the vessel?

18                    MR. FAMULARI:  Object to the form.

19                    THE WITNESS:  I don't follow what

20        you mean by that or what you're saying.

21    BY MR. VALLE:

22              Q.    In other words, let's assume that a

23    marine or that a naval architect had designed

24    this portion of the vessel and I mean the

25    portion aft of the original transom?
```

1

2          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA

3

4               CASE NO. 00-6022 CIV-LENARD

5

6   HENRY NARANJO and
    MARLENE RAMIREZ,

7            Plaintiffs,

8   vs.

9
    STEPHEN BYRONS SMITH and
10  PALMER JOHNSON, INC.

11           Defendants.
    ─────────────────────────────
12

13

14                        Rivkind & Pedraza, P.A.
                          66 West Flagler Street
15                        Suite 600
                          Miami, Fla.
16                        1-15-2001 2:35 p.m.

17

18

19           DEPOSITION OF TONY ALLEN WATSON

20

21  taken before JULIO A. MOCEGA, R.P.R. and Notary

22  Public in and for the State of Florida at Large,

23  pursuant to Notice of Taking Deposition filed in

24  the above case.

25


            JULIO A. MOCEGA & ASSOC. (305) 374-0181

```
 1    or the work that was, look at the work?

 2           A.    Yes, I went in there and looked at

 3    it.

 4           Q.    And this was prior to the

 5    explosion?

 6           A.    Yes, within like a day or so.

 7           Q.    Any particular reason why you would

 8    be going down there?

 9           A.    Might have been to look at the

10    pumps and just the position where they were

11    going to put them.

12           Q.    What kind of hatches were on the

13    upper deck or on top of the lazarette?

14           A.    They were teak covered.  They were

15    -- I don't think that they hinged down.  I

16    think they locked in.  I think there was maybe

17    three.

18                 I know there was a live bait well

19    or something that it was taken out so there was

20    like three big holes in the deck itself.

21           Q.    During the time period that

22    Bradford was doing this refit were those hatch

23    covers on the lazarette or were they put away

24    someplace?

25           A.    They were on up until the point
```

1    foreman had every right and authority and

2    prerogative to say we are not doing it that way,

3    correct?

4         A.    Correct.

5         Q.    So the ultimate decision to do that

6    welding work that day was really yours?

7              MR. FAMULARI:  Object to the form.

8    BY MR. KALLEN:

9         Q.    Because if you didn't feel it was

10   safe, it wasn't being done until proper

11   precautions were taken, correct?

12             MR. FAMULARI:  Object to the form.

13   BY MR. KALLEN:

14        Q.    You can answer?

15        A.    Yes.

16        Q.    It wasn't the captain's decision to

17   tell Henry how to do a job, a particular weld,

18   was it?

19        A.    No.

20        Q.    That is the welder's job?

21        A.    Right.

22        Q.    You wanted to make sure that the

23   plates were going to be positioned properly in

24   there?

25        A.    Right.

1          Q.    That was your decision or Henry's

2     decision?

3          A.    Yes, that was our decision.  He

4     wanted to show me where they were putting them.

5          Q.    So what we are talking about as far

6     as the captain's involvement here, if you will,

7     is nothing more than his desire, his request,

8     his want, if you will --

9          A.    Right.

10         Q.    -- To have these things done?

11         A.    Right.

12         Q.    But as far as how to do it

13    properly, how to actually set the amperage on

14    the machine, where to put the welds, that is not

15    the captain's job or decision, is it?

16         A.    No, no.

17         Q.    Do you know why the plates were

18    fabricated?

19         A.    The plates, there was really

20    nothing to bolt the plates, the pumps to.  They

21    were not thick enough.

22         Q.    What wasn't thick enough?

23         A.    The plates in the lazarette.

24         Q.    You mean the actual deck in the

25    lazarette?

1           A.    The deck, yes.

2           Q.    Or the subfloor as it has been

3    referred to?

4           A.    Right.

5           Q.    Why did it matter if the deck

6    wasn't thick enough?

7           A.    The pumps were heavy.  They weighed

8    a few pounds.

9           Q.    So?

10          A.    And a rolling, in a rolling sea the

11   screws, the fasteners would come loose and pull

12   through the deck and the pumps were heavy.

13          Q.    Oh, so you needed some more support

14   for the pumps?

15          A.    Yes.

16          Q.    Is that it?

17          A.    That is it.

18          Q.    Because of the thinness or lack of

19   thickness, if you will, of the deck?

20          A.    Yes.

21          Q.    Well, why would that matter if the

22   deck was resting flush on concrete?

23          A.    You got a half inch bolt or so that

24   holds the pump down.  You don't have any metal

25   to tap to it.

1          If you tap the deck, you try to

2   screw it in the deck he didn't have enough

3   meat.  The bolt was bigger than what you had as

4   far as the thickness of the plate there.

5          Q.    Wouldn't the concrete serve as the

6   meat?

7          A.    No.

8          Q.    Why not?

9          A.    There is just nothing to grab to on

10  there.

11         Q.    Do you know if an effort was made

12  first to see if the pumps would adequately be

13  supported by the deck on the concrete before the

14  decision was made to have plates installed?

15         A.    We knew that the deck wasn't thick

16  enough to support them.

17         Q.    How do you know that?

18         A.    Just the thickness of the metal.

19         Q.    How do you know that?

20         A.    Experience, I knew -- The way they

21  build those boats there is no way that it could

22  have been half inch plate back there.

23               You can tell by the oil can on the

24  deck when you stepped on it.

25         Q.    So you could tell just from being

JULIO A. MOCEGA & ASSOC. (305) 374-0181

1    on that boat plus your years of experience

2    beforehand that that aluminum deck in the

3    lazarette where the subfloor is wasn't thick

4    enough to hold these pumps?

5              A.    Yes.

6              Q.    So you made that or could have made

7    that decision independently of what anyone else

8    told you?

9              A.    Yes.

10             Q.    You knew that?

11             A.    Yes, it just wouldn't work.

12             Q.    Okay, so you had no problem with

13   the idea of, if this guy wants pumps installed,

14   aluminum plates to be or doublers to put on

15   there, that is a good way to go?

16             A.    Yes, that was a common practice,

17   installing pumps like that.

18             Q.    Did you as the welding foreman ever

19   ask the captain to see the ship's plans or

20   blueprints?

21             A.    No.

22             Q.    Were you aware that they were on

23   board?

24             A.    Most boats carry them.

25             Q.    Yes, so if you had a question about

JULIO A. MOCEGA & ASSOC. (305) 374-0181

1    there is nothing behind where you are tapping?

2              MR. FAMULARI:   Object to the form.

3    BY MR. KALLEN:

4         Q.   Correct?

5         A.   That is correct.

6         Q.   Who makes the decision whether or

7    not to call out the marine chemist, the welding

8    department who is doing the welding or the

9    captain who is not doing the welding?

10        A.   Usually the yard.

11        Q.   Okay, and that is your, in your

12   experience both Bradford and Merrill Stevens?

13        A.   Right.

14        Q.   The decision as to whether or not

15   it's necessary was the yard's call, correct?

16        A.   Yes, that is correct.

17        Q.   So the information that Henry was

18   traveling under before he welded as far as you

19   know was that there were no fuel tanks

20   underneath that deck?

21        A.   That is correct.

22        Q.   But, of course, you all knew that

23   anyway from the prior fuel tank work being done?

24        A.   That is correct.

25        Q.   And there were no fuel lines and as