UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 00-6022 CIV-LENARD/TURNOFF

HENRY NARANJO and
MARLENE RAMIREZ,

    Plaintiffs,

vs.

STEPHEN BYRON SMITH, PALMER
JOHNSON EXPORT SALES, INC.,
PALMER JOHNSON DISTRIBUTORS,
INC., and PALMER JOHNSON, INC.,

    Defendants,

------------------------------X



LOCATION:  LAW OFFICE
             80 SW 8TH STREET
             SUITE 2520
             MIAMI, FLORIDA  33160

DATE:      JANUARY 11, 2001 - THURSDAY

TIME:      10:30 P.M. - 4:45 P.M.

- - - - - - - - -

DEPOSITION

OF

HENRY NARANJO

- - - - - - - - -

*Hi-Tech Court Reporting, Inc.*

PROFESSIONAL REPORTERS

707 SOUTHEAST THIRD AVENUE • SUITE 202 • FORT LAUDERDALE, FL 33316
(954) 523-0915 / FAX (954) 523-0916

```
 1
 2                              I-N-D-E-X
 3
 4   WITNESS                                          PAGE
 5   HENRY NARANJO
 6
 7   (DIRECT EXAMINATION BY MR. VALLE)                 4
 8   (CROSS-EXAMINATION BY MR. KALLEN)                96
 9
10
11                   - - - - - - - -
12
13
14                         E-X-H-I-B-I-T-S
15                     (Marked for Identification)
16
17   DEFENDANT'S                ITEM                  PAGE
18   Exhibit No. 1   Broward General Medical Center Report    24
19   Exhibit No. 2   Hand Drawn Picture of Ship              76
20   Exhibit No. 3   Copies of Photographs of Plaintiff      102
21
22
23
24
25
```

```
 1          The deposition of the witness, HENRY NARANJO, taken

 2   in the above styled cause, before KATHERINE TRAINER,

 3   Shorthand Reporter and Notary Public, in and for the State of

 4   Florida, pursuant to the Notice heretofore filed

 5                            - - - - - - -

 6          (Thereupon, the interpreter was duly sworn.)

 7   THEREUPON:

 8                        HENRY NARANJO

 9   and Marlene Ramirez, witnesses of lawful age, having been

10   called by the Defendant, and being by the undersigned Notary

11   Public first duly sworn through the interpreter, was examined

12   and testified under oath as follows:

13                      DIRECT EXAMINATION

14   BY MR. VALLE:

15      Q.  Would you please state your full name for the record

16   and your present resident address for me?

17      A.  My name is Henry Naranjo.  I live at 8881 Northwest

18   8th Street, Pembroke Pines, Florida, 33024.

19      Q.  Do you have a telephone at that address?

20      A.  Yes, sir.  954-433951.

21      Q.  Mr. Naranjo, my name is Larry Valle.  I'd like to

22   say a few things at the beginning of the deposition, both for

23   you and your wife to hear.

24      A.  (Witness nods head).

25      Q.  Have you had your deposition taken before?
```

1       A.   No.

2       Q.   Let me explain a few things about a deposition to

3  you and that will be for your wife as well.   A deposition is

4  no more or no less than just a question and answer period.

5           Generally, in normal life people have a decision or

6  choice to make as to who they are going to talk to, but when

7  you file a lawsuit you lose that decision to the extent that

8  you have to talk to me.

9           In conversation and in a deposition are different

10  than normal conversations.   For example, generally, when

11  you're talking about a subject matter that you are familiar

12  with the other person could get halfway through a question

13  and you know what he is going to ask.

14           Again, you answer by shaking your head or going

15  uh-huh or nu-huh.   Depositions are a little different.   The

16  reason is that this lady, to your left, has to take down

17  everything that we say - word-for-word; and everything that I

18  say word-for-word.

19           You have to really wait until I finish asking my

20  entire question before you answer it.   Even if you think that

21  you know what I'm going to ask.   The other issue is when you

22  answer a question, you can't answer by shaking your head or

23  saying nu-huh or huh-huh because she can't shake the machine

24  upside down, you know.

25       A.   Uh-huh.

1    Q.  She can only record verbal answers?

2    A.  (Witness nods head).

3    Q.  Also if you know the answer to a question that I ask

4  you or if you can give me a reasonably accurate answer then

5  please do that.  Answers to a question are not simply telling

6  me the truth but telling me the entire truth.

7         The reason that we caution you against guessing - I

8  don't think anybody in the room wants you to guess at an

9  answer - is because if you guess at the answer and it's

10  wrong, you may have to live with that answer later on when I

11  read that answer back to you at trial; and it's going to be

12  embarrassing.

13         So when you answer my questions be sure number one,

14  that you know the answer to the question; and number two,

15  that you answer it fully and completely.  Any questions about

16  the procedure?

17    A.  No.

18    Q.  I'm going to ask you questions; and then the

19  gentleman to the left, Mr. Kallen will ask you questions; and

20  then your attorney will probably do a scathing

21  cross-examination, but I doubt if he will.

22         That's the way it is going to go.  Let me tell you

23  in advance the way that I take depositions so that you know

24  what to expect as we go along.  Generally, from the beginning

25  of your life until today I'll ask you questions in

1    chronological order.

2          Let's start off with you telling me a little

3    something about yourself.  Where were you born and raised?

4          A.  I was born Cali, Columbia on February 24, 1958.  I

5    lived in Columbia until I was 22, which is when I decided to

6    come here to this country.

7          Q.  How much education did you have when you were in

8    Columbia?

9          A.  I was in school for 11 years; elementary and

10   secondary school.

11         Q.  Can you read and write?

12             THE INTERPRETER:  English or Spanish?

13         Q.  In Espanola?

14         A.  Yes, sir.

15         Q.  Can you speak in any other language other than

16   Spanish?

17         A.  A little English.

18         Q.  I noticed that you smiled and your wife smiled when

19   we were talking earlier.

20             How functional are you in English?

21         A.  I understand more than I can speak.

22         Q.  During the deposition you might be tempted to answer

23   in English or respond before the interpreter has a chance to

24   interpret the question.  Please wait until she finishes so

25   that we can do the whole thing entirely in Spanish.

1     A.   That's right.

2     Q.   What type of work did you do in Columbia before you

3 left Columbia and came to the United States?

4     A.   I worked in the warehouse, clothing company.  I did

5 dispatch of merchandize and inspection.  Delivering - sending

6 merchandize to different cities in Columbia and at the time

7 inspected the merchandize.

8     Q.   Was that, basically, a desk job like dispatching;

9 and then, eventually, from time to time inspecting the

10 product?

11     A.   It was both at the desk and inspecting merchandize.

12     Q.   Do you feel that your experience in working in that

13 clothing company made you competent and qualified to act as a

14 dispatcher or a clothing inspector?

15     A.   Well, if I say it was a very simple job.  It is

16 easy, and I did it well.

17     Q.   You came to the United States at age 22; that would

18 have been 1990 - I guess - I'm sorry 1980?

19     A.   '80 or '81, something like that.

20     Q.   Where did you first reside after you came to the

21 United States?

22     A.   When I first got here I went to the home of friends

23 in Hialeah, and then I moved to an efficiency.  I don't

24 remember exactly the address.

25     Q.   Let me ask you this:  Since arriving in the United

1  States have you always lived in Dade County or Broward

2  County?

3       A.  I lived in Dade County until '97.

4       Q.  In 1997, is that when you moved to Pembroke Pines?

5       A.  Yes, sir.

6       Q.  You have given us a couple of addresses in the

7  answers to interrogatories.  I want to make sure that there

8  were no numbers transposed, so tell me if they are correct.

9       A.  Yes.  (Witness nod heads).

10      Q.  The first address that we have for you starts in

11 1992, and that address is 1745 Sansucci Boulevard?

12      A.  Yes, sir.

13      Q.  Did you live in an apartment on that boulevard?

14      A.  Yes.

15      Q.  What was the apartment number?

16      A.  It's on the third floor.  32.

17          Can I ask my wife?

18      Q.  Sure.  That is why I have her sworn in.

19          MARLENE RAMIREZ:  302.

20      Q.  Then after that you gave us an address of 20275

21 Northeast Second Avenue?  Apartment "L-2"; is that correct?

22      A.  Yes.

23      Q.  You lived there until 1997, and then you moved to

24 Pembroke Pines; is that correct?

25      A.  Yes, that's correct.

1    Q.  I'm going to ask you a number of questions that you

2    may think are somewhat ridiculous or perhaps insulting, but

3    please understand that these are standard questions that we

4    ask everyone.

5        Have you ever been arrested?

6    A.  Yes.

7    Q.  If you could tell me when that was and where that

8    was?

9    A.  It was here in Dade County because I had a suspended

10   license.

11   Q.  Is that the only arrest that you ever experienced?

12   A.  Yes, the only one.

13   Q.  Have you ever been convicted of a criminal offence?

14   A.  No.

15   Q.  What is your social security number, please?

16   A.  595-68-501.

17   Q.  Do you have a valid Florida driver's license at this

18   point?

19   A.  Yes.

20   Q.  Can I trouble you to take it out and read me the

21   number of it, please?

22   A.  Yes.  N-652380580640.

23   Q.  You provided us with an address earlier in the

24   deposition.  Can you tell me who that you live there with, if

25   anyone?

```
1      A.  I live with my wife and two children.

2      Q.  Can you give me your wife's full name, please?

3      A.  Marlene Ramirez.

4      Q.  Your two children, what are their names?

5      A.  The youngest is 10-years old, his named is Jonathan

6  Naranjo; and the 18-year old is Jeffery Naranjo.

7      Q.  Is Mrs. - I'm sorry - Ms. Ramirez travels under her

8  own last name or are you formally married or living together?

9      A.  She uses her maiden name.

10     Q.  Where and when were you married to Ms. Ramirez?

11     A.  In Columbia, on December 26.

12     Q.  This is the most important question in the

13  deposition; and you better get this one right?

14     A.  I know.  '81.  1981.

15     Q.  Was Ms. Ramirez your first and only wife or have you

16  been married to others?

17     A.  My only wife.

18     Q.  Do you know whether or not you are Ms. Ramirez's

19  only husband?

20     A.  Yes.

21     Q.  Since arriving in the United States back in 1990 -

22         MR. FAMULARI:   '80.

23     Q.  I'm sorry.  I want to say 1990.

24         What type of work have you done in general?

25     A.  I have done welding in general.
```

1      Q.  Where did you receive your training in welding?

2      A.  I learned in the company - Miami Metal.  That's also

3  the same company as Pompeii Furniture.

4      Q.  Where are they located?

5      A.  I don't know the exact address.  It is in Miami.  It

6  is 22nd Street and Northwest 2nd Avenue.

7          MR. FAMULARI:  I've got a question.  For Henry, the

8      social security file, that should have all that in

9      there.  When I get it, I'll pass it on to you.

10         MR. VALLE:  Do you want him to answer the question

11     or are you going to send it to us?

12         MR. FAMULARI:  I'll send the file to you.

13         MR. VALLE:  Thank you.  That will clear up a lot of

14     things.

15  BY MR. VALLE:

16     Q.  How long did you work for Miami Metals?

17     A.  From 1982 to 1992.

18     Q.  Who was your immediate supervisor or the boss that

19  you reported to every day?

20     A.  I don't remember.

21     Q.  Why did you leave that job?

22     A.  I went to another company that was paying more.

23     Q.  What company was that?

24     A.  Jorge, J-O-R-G-E, Welding.

25     Q.  Where is that located?

13

1    A.  In Hialeah Gardens.  I know it is on Okeechobee but
2  I don't know the exact address.

3    Q.  You don't have to tell me the exact address just as
4  long you know generally, we know where it is.

5        How long did you work for Jorge Welding?

6    A.  From January to August of 1992.

7    Q.  Why did you leave that job?

8    A.  I had put in an application at a company that I then
9  went to work for and when they called me I went to Bradford
10  Marine.

11    Q.  Before working for Bradford Marine did you have any
12  experience at all in welding aboard a ship?

13    A.  No.

14    Q.  When you went to work for Bradford Marine, I guess
15  it was 1992, was there any training program that you had to
16  go through?

17    A.  They give me a welding certificate there, "ABS"
18  certificate.

19    Q.  I'm concerned with what type of training that you
20  received, okay; and when you received it?

21    A.  I didn't receive any training.  It was repair work,
22  and I knew how to do it.  It was easy.

23    Q.  Do you know what "ABS" means?

24    A.  No, but I understand it is a certificate to work on
25  ships.

1       Q.   When were you provided with the ABS certificate?

2       A.   In October, I don't remember the exact address.   It

3   was more or less in October of the same year.

4       Q.   So around October of 1992 Bradford Marine certifies

5   you as an ABS welder?

6       A.   Yes, sir.

7       Q.   Do you have to take any type of a test or

8   examination in order to earn the certificate?

9            (WHEREUPON, the testimony requested was read back by

10           the reporter as recorded.)

11      A.   Yes, sir.

12      Q.   What kind of test was it?

13      A.   Welding two sheets of aluminum and a pipe.

14      Q.   Was there any written examination?

15      A.   I believe so because the company has a certificate

16   saying that I passed.

17           MR. DAPENA:   I don't think he understands.

18      Q.   I understand that you passed and got a certificate.

19           As part of the process of getting the certificate

20   did you have to take a written test?

21      A.   No, sir.

22      Q.   Did anyone at Bradford Marine give you any

23   instruction on what to do when welding in a confined space

24   aboard a ship?

25      A.   Yes.

1    Q.  Who was that, that gave you instruction and what was

2    that, please?

3    A.  My boss.

4    Q.  You know who that is, I don't.

5    A.  Tony Watson.

6    Q.  When was that?

7    A.  Well, before them there were other bosses for the

8    welding.

9    Q.  Correct, but I'm interested in whether or not there

10   was someone that actually said, Mr. Naranjo, this is the way

11   that you proceed to weld aboard a ship; and gave you

12   instructions on how to do that?

13   A.  Yes.  He gave me instructions.

14       Do you need to know when?

15   Q.  Yes, roughly.  When was it that he instructed you?

16   A.  Whenever there was a job to be done on the ship he

17   went with me and told me what to do.

18   Q.  In this particular case, when you were working on

19   the ship that did eventually explode, did Mr. Watson or

20   anybody else come aboard the ship with you and give you

21   instructions on how to proceed?

22   A.  The captain of the yacht that exploded he was the

23   one that told me what I had to do.

24   Q.  What exactly, to the best of your recollection, did

25   he instruct you prior to the time of your accident?

```
 1        A.  He took me through the place where I was going to do
 2   the work, and he told me that I needed some aluminium, black
 3   kit or plates, to install them there to be welded.
 4            MR. FAMULARI:  Just so that we don't mislead anybody
 5        by what is going on, we had the day that the yacht
 6        exploded; but I believe that Henry was working on the
 7        boat for five or six weeks with the captain, so this
 8        went on for a long period of time in case you didn't
 9        know that.
10            MR. VALLE:  I didn't.  I don't know if it is a sail
11        or a power boat.
12            MR. FAMULARI:  It is a beautiful sport fisher.
13            MR. VALLE:  I didn't know that they made a sport
14        fisher with concrete and all.
15            (WHEREUPON, a brief off-the-record discussion was
16        had.)
17   BY MR. VALLE:
18        Q.  Let me back up a step.  My original question was:
19   Did anybody from Bradford come aboard the ship at the time
20   that the accident happened and instruct you as to how to go
21   about welding the place that you were supposed to weld?
22        A.  No.
23        Q.  You were working for Bradford Marine for, roughly,
24   five years before this accident happened and during the
25   course of that employment had you welded aboard other ships?
```

1        A.  Yes.

2        Q.  Were you familiar with the type of equipment they

3   had at Bradford Marine by the time this accident occurred?

4        A.  Yes.

5        Q.  Do you know whether or not that they had any type of

6   devices that are commonly called "sniffers" which are used to

7   test the presence of gas in enclosed spaces before the

8   welding procedure?

9        A.  No, but they have a person there.  They have someone

10   that certifies that the area is gas free.

11           MR. DAPENA:  To what would be hired?

12           MR. FAMULARI:  No one was hired to do that.

13           MR. VALLE:  Could you read that answer back.

14           (WHEREUPON, the testimony requested was read back by

15        the reporter as recorded.)

16   BY MR. VALLE:

17        Q.  My understanding from your answer, to your

18   knowledge, they didn't have any type of equipment or a

19   machine that would test the presence of gas; is that correct?

20        A.  That's correct.

21        Q.  Who was the person at Bradford Marine, at the time

22   of this particular accident, that certified whether or not an

23   area was gas free?

24        A.  His name is Peter Raymond.

25           MR. DAPENA:  Rimmell, R-I-M-M-E-L-L.

1      Q.  Did Mr. Rimmell, to your knowledge, certify that

2  this particular area was gas free before you began welding on

3  the day that this accident happened?

4      A.  I suppose so because if the ship was certified as

5  gas free it meant that work would we done.

6      Q.  You are saying that, "I suppose so"; you're going to

7  get in trouble.  If you know you can say yes; if you don't

8  know, say that you don't know?

9      A.  The boat was certified gas free and the job could be

10  done.

11      Q.  Mr. Rimmel did that?

12      A.  He did.

13      Q.  Did you see him on the job site?

14      A.  No, I did not see him on the job site.

15      Q.  How do you know that he certified the vessel gas

16  free or are you assuming that he did?

17      A.  I don't know how to answer that.

18      Q.  Okay.  Do you have personal knowledge that Mr.

19  Rimmel came aboard that boat and declared that boat gas free

20  before you did the welding?

21      A.  No, I do not have knowledge.

22      Q.  Did Bradford Marine post any sign or give any

23  indication that the area has been inspected and found to be

24  gas free on the vessel where you have done your work?

25      A.  Yes.

1      Q.  What type of sign or what type of indication is

2  there to you when you go aboard a vessel that it has been

3  inspected and found to be gas free at Bradford Marine?

4      A.  They post a sheet of paper that has his signature on

5  it that certifies that the area is gas free.

6      Q.  Was there such a paper posted on this particular

7  ship before you performed your welding?

8      A.  Yes.

9      Q.  Before you began your welding did you ventilate or

10  air out the area that you were going to be welding in before

11  you began?

12      A.  Yes, I used air extractors; and the area was free

13  for several hours before I started working there.

14      Q.  What do you mean "Air extractors"?

15      A.  An air extractor is always used with a hose to

16  remove smoke or gas or fuel odors.  It's to prevent anything

17  from accumulating in the work area.

18      Q.  If this vessel was certified as gas free already,

19  why did you do that?

20      A.  Because the captain told me to do the job.

21      Q.  But if the vessel was certified as gas free and you

22  had been working aboard the vessel for a month, why did you

23  find it necessary to use air extractors in the area where you

24  welded on the day that the accident happened?

25          Do you want her to read it back?

1         THE INTERPRETER:  Yes.

2         (WHEREUPON, the testimony requested was read back by

3     the reporter as recorded.)

4     A.  As a precaution, it's always done.

5     Q.  Did you ever receive any training on what you should

6  do before you, in your welding, before you cut into the area

7  that may be confined or an enclosed area?

8     A.  Did you say cut?

9     Q.  Yes, before you weld or cut into an area where there

10  may be a space or a structural void, before you do that, were

11  you ever trained with regard to safety precautions?

12     A.  No, but the boss instructs us.  The boss instructs

13  us that we have to do that for our health to protect our

14  health and for safety reasons.

15     Q.  Let's assume that we're going to cut into the box or

16  tank.  Before you cut into that box or tank are you trained

17  to do anything to be sure that there are no gases enclosed in

18  that tank or in that box?

19     A.  No.

20     Q.  Before you began welding on the deck on the day this

21  accident happened, did you tap the deck or in any way

22  determine whether or not there was a hollow space under the

23  area where you were welding?

24     A.  No.

25     Q.  Is that a common procedure that you follow whenever

1  you weld on the deck to determine whether or not there might

2  be a hollow space underneath it?

3      THE INTERPRETER:  I don't understand the question.

4      MR. VALLE:  Neither do I.

5    Q.  Have you been trained to determine whether or not

6  there is a hollow space underneath decks or between bulkheads

7  where you were asked to weld aboard the ship?

8    A.  No.

9      (WHEREUPON, a brief off-the-record discussion was

10     had.)

11 BY MR. VALLE:

12   Q.  Mr. Naranjo, we got off track in the chronology of

13 the event.  We got into talking about how the incident

14 occurred a little earlier than I wanted to.  Let's back up a

15 little in time.

16     Between 1992 and 1997 other than the welding test

17 that you took were you given any other type of instruction or

18 did you receive any other type of training in welding and,

19 specifically, in welding aboard a ship?

20   A.  No.

21   Q.  Other than this particular accident have you ever

22 injured yourself by way of an accident before in your

23 lifetime and let me tell you what I mean by that.  All of us

24 have bumps and bruises as we grow up and minor cuts and

25 scratches as we grow up.  Things like that, I'm not concerned

1   with those types of accidents, those types of injuries.

2          I would like to know if you ever injured yourself in

3   an accident, other than this case, where the injury

4   was significant enough that you had to seek medical care?

5       A.   No.

6       Q.   In your answer to interrogatories you indicate that

7   you may have had a foot injury while you worked at Bradford

8   Marine.  Do you recall anything about that?

9       A.   Yes, I injured my foot.  I had an accident where I

10  injured my foot.

11      Q.   That's the type of thing that I was asking you

12  about?

13      A.   Oh.

14      Q.   Have you ever injured your back or your neck prior

15  to the time that you were involved in this accident?

16      A.   Not before the accident, no.

17      Q.   Can you tell me, again, what year it was that you

18  came to the United States?

19      A.   In December of '81.

20      Q.   There seems to be an indication from North Broward

21  Hospital records that you had a prior neck x-ray in '1977.

22          Would that, perhaps, be another Henry Naranjo or was

23  this you?

24      A.   It was me.

25      Q.   How did you have x-ray in 1977 at Broward General

1  Hospital when you had not come to the United States?

2      A.  No, in '97 - excuse me.

3      Q.  I meant the Broward General records that indicate

4  you had a prior x-ray of your neck in 1977?

5      A.  No.

6      Q.  That was a different Henry?

7      A.  Yes.

8      Q.  Your diagnostic tests in this particular case have

9  suggested that you had a prior or old injury in your low

10 back.  Can you recall having injured your low back at any

11 time prior to this particular case?

12     A.  Before the accident, I never hurt my back.

13         THE INTERPRETER:  I'm sorry:  I said I never hit my

14     back.

15         MR. VALLE:  I hate to do this.

16         MR. FAMULARI:  Are those North Broward medical

17     records?

18         MR. VALLE:  Yes.  The Broward General Medical

19     Center.

20         MR. FAMULARI:  You know what is here this is the

21     1977 - look what date was signed, you know.

22         MR. VALLE:  But it said that "Did you have previous

23     x-rays."

24         (WHEREUPON, the above referenced document was

25     marked as Defendant's Exhibit No. 1 for

```
 1        Identification.)
 2   BY MR. VALLE:
 3        Q.  Mr. Naranjo, looking at the document that has been
 4   marked Defendant's Exhibit No. 1 and tell me if that is your
 5   signature in the lower left-hand corner?
 6        A.  Yes.
 7        Q.  Now, if you look up - If you look up to Item 3 there
 8   is a question as to whether or not you had prior x-rays taken
 9   at that hospital; and the answer there seems to be, Yes; and
10   you had x-rays taken in 1977.
11        My question is:  Did you provide that information to
12   the hospital as it is reflected on the form?
13        A.  No.
14        Q.  When you signed that form did it have the answer on
15   it.
16        A.  I - when I signed the form it was not written there.
17   I don't know why the date is there.
18        Q.  So it is your testimony that you have never injured
19   your back or your neck prior to the time that this particular
20   accident occurred; is that correct?
21        A.  That's correct, not before.
22        Q.  Did you ever have any problems with your back before
23   this accident happened, pain?
24        A.  No.
25        Q.  Spasms or any type of limitations with lifting or
```

1    twisting?

2        A.  No.

3        Q.  Did you ever have any pain or numbness in either one

4    of your legs prior to the time this accident happened?

5        A.  Not before the accident, no.

6        Q.  Here is one of those silly questions, okay.  Have

7    you every been examined or treated for any type of substance

8    use or abuse prior to the time that this accident occurred?

9        A.  No.

10       Q.  Do you know what I mean by that?

11       A.  Yes, sir.

12       Q.  Let me just mention to you anyway, when I say,

13   "Substance use or abuse," I mean alcohol or any type of drugs

14   whether the drugs were prescribed or not.  With that in mind,

15   and with that definition or explanation in that context is

16   your answer still the same, that you had never been examined

17   or treated for any kind of substance abuse or use?

18       A.  I was never tested but when the accident happened, I

19   was tested.

20       Q.  I mean in your lifetime prior to this accident?

21       A.  No.

22       Q.  I'm not asking if you ever had a beer.  I mean did

23   you come under the care of a doctor or any type of medical

24   person because of what they considered to be an abuse of

25   alcohol or drugs?

```
 1        A.   No.

 2        Q.   On the day that the incident occurred, prior to the

 3   incident, did you consume any alcohol?

 4        A.   No.

 5        Q.   Were you taking any type of medication?

 6        A.   No, sir.

 7        Q.   At the time that this accident happened did you have

 8   a doctor that you referred to as your family doctor?

 9        A.   Yes.

10        Q.   Who was that doctor?

11        A.   Louisa Stern.

12             MR. KALLEN:  Spell that one.

13             MARLENE RAMIREZ:  S-T-E-R-N.

14        Q.   Louisa Stern.

15             Where is Louisa Stern located?

16        A.   In North Miami, I'll give the address to my

17   attorney.

18        Q.   Is this the doctor that you and your family went to

19   for colds and the flu and other things that came up?

20        A.   Yes, sir.

21        Q.   When you were working for Bradford Marine did they

22   have a health plan?

23        A.   Yes.

24        Q.   Were you cover by their health insurance while you

25   worked there?
```

1    A.  Yes.

2    Q.  What was the name of the company, do you recall?

3    A.  AvMed.

4    Q.  Were you part of the program, part of the AvMed

5  program?

6    A.  Yes.

7    Q.  Did they give you a little card with your number on

8  it and your group number on it?

9    A.  Yes, sir.

10    Q.  Do you happen to still have that card?

11    A.  Yes, but not here.

12    MR. FAMULARI:  I'll get it for you.

13    Q.  Who was in charge of health claims at Bradford

14  Marine?

15    A.  Repeat the question.

16    Q.  If you had a problem, if you had to go to a doctor,

17  and you had to fill out the paperwork was there anybody at

18  Bradford Marine in charge of that type of paperwork?

19    A.  No, I would make an appointment with my doctor; and

20  I would let my boss know and that's all.

21    Q.  There was a woman who did most of the administration

22  at Bradford Marine.  Do you recall her name?

23    A.  I think her name was Thelma.  She knows all about

24  the insurance.

25    Q.  Other than this particular lawsuit have you ever

1    made a claim against any person or company for damage as a

2    result of a personal injury to either yourself or any member

3    of your family?

4        A.   No.

5        Q.   Have you ever been involved in any litigation or any

6    lawsuit like this?

7        A.   No, sir.

8        Q.   I bet that you wish that you were not involved in

9    this one.

10           Do your children attend school?

11       A.   Yes, sir.

12       Q.   Where do they go to school?

13       A.   The older one is in high school called McArthur.

14   The other one Height's boulevard.   Heights Boulevard

15   Elementary.

16       Q.   To your knowledge have either your wife or your

17   children had to seek any type of counseling for any reason

18   whatsoever since your accident?

19       A.   No.

20       Q.   Have you either worked or looked for employment at

21   any time since this accident happened on July 7, 1997?

22       A.   I worked at the company until January of 1999.

23       Q.   When did you start working for the company?

24       A.   After the accident the doctor ordered me to do

25   light-duty work in about five months after the accident.   It

1  is the same company, Bradford.

2      Q.  How long did you work for them at that time?

3      A.  I would like to explain.  When I felt really bad I

4  went to the doctor; and the doctor would tell me not to go to

5  work, and sent me he the get more therapy.  After several

6  months he was - the doctor would sent me back to work.  I

7  don't know what period of time.

8      Q.  Give me your best estimate as to how long that you

9  worked for Bradford Marine after you began your light-duty?

10     A.  I can't estimate the time.

11     Q.  Was it weeks or months?

12     A.  Months.

13     Q.  What caused you to stop working?

14     A.  Because they thought that I could not do the work

15  and they told me that they don't have me there in this

16  company under those circumstances.

17         MR. FAMULARI:  Who exactly told you?

18  BY MR. VALLE:

19     Q.  Who exactly told you that?

20     A.  In a letter that I got that was signed by my boss at

21  the time and by the president of the company.

22     Q.  Do you still have a copy of that letter?

23     A.  I have a copy, yes.

24         MR. FAMULARI:  I'll get it.

25     Q.  What kind of work did they have you doing when you

1  returned to work at light-duty at Bradford Marine?

2      A.  I really couldn't do anything because of the pain.

3  First of all I couldn't walk well.  I couldn't move around,

4  and welding work always requires strength, et cetera; and

5  they saw that I could not do the work.

6      Q.  My question was:  When you returned to work at

7  Bradford Marine what type of light-duty work did they have

8  for you?

9      A.  They gave me easy jobs.  Like, really, they never

10  gave me anything hard to do.

11      Q.  What sort of thing did they ask you to do as part of

12  your job as light-duty?

13      A.  I was in - What do you call this department?  Is,

14  well - I was packing.  Pack rags in boxes.  That was,

15  basically, all that I had to do.

16      Q.  Pack rags into bags?

17      A.  Yes, take them out of the box and put them in a bag.

18      Q.  Were you doing any welding work for them?

19      A.  No.

20      Q.  Who was the supervisor on the light-duty job?

21      A.  I don't remember the name.

22      Q.  What is the name of the gentleman that you worked

23  directly for at Bradford Marine at the time that this

24  accident happened?

25      A.  Tony watson.

1    Q.  What is his position at Bradford?

2    A.  He is the boss of the welders, chief, head.

3        MR. FAMULARI:  Chief welder.  He is no longer with

4    Bradford.

5    Q.  Chief welder.  Okay.

6        Have you ever been examined or treated by a

7    psychologist or psychiatrist for any reason?

8    A.  Yes.

9    Q.  When was that?

10   A.  After the accident.

11   Q.  How about before the accident?

12   A.  No.

13   Q.  We'll get to that as well.

14       Let's now turn to the vessel that this accident

15   happened on.

16       MR. KALLEN:  Let me object to the form of the

17   question.

18   Q.  Let's now turn to the vessel on which this accident

19   happened.

20       MR. KALLEN:  Same objection.  Why don't we call it a

21   structure.  That's fine.  Call it what you will.

22       MR. VALLE:  I'll call it a boat.

23       MR. KALLEN:  I just wanted to say something.

24   BY MR. VALLE:

25   Q.  Let me rephrase the question.  Prior to this

1    accident how long had you been working on the vessel on which

2    the accident occurred?

3        A.  Several months.

4        Q.  Can you describe the vessel for us, please?  What

5    type of boat was she?

6        A.  No, I can't.

7        Q.  You can't describe it?

8        A.  I know it is 80 feet long.

9        Q.  Motor boat or sail boat?

10       A.  Motor boat.

11       Q.  Your attorney has described it as a sports

12   fisherman.

13           That's a big boat with a couple of chairs in the

14   back; and used, generally, for fishing; is that the kind of

15   boat that it is?

16       A.  Yes, that is the type of boat.

17       Q.  How many engines does it have?

18       A.  Two.

19       Q.  What type of work did you do aboard that particular

20   vessel before this accident happened in the month that you

21   worked on it, several months?

22       A.  Repairs.

23       Q.  What kind of repairs?

24       A.  I removed a seal from a door and put another one to

25   make the instrument console.  I worked in the engine room

1    also, and putting on sprockets.  Simple things but usually

2    repairs.

3         Q.   When you worked in the engine room did anyone

4    certify the engine room as gas free before you began working

5    there?

6         A.   It was certified.

7         Q.   How do you know that?

8         A.   Because there is always a paper posted.

9         Q.   When you were given a job to do on this particular

10   vessel would there be any paperwork that would describe what

11   you were supposed to do that you either filled out or worked

12   with?

13        A.   No, I always had to see the captain; and he told me

14   what I had to do; and he instructed me.

15        Q.   Did you fill out the work order?

16        A.   After the job I filled out a work order.

17        Q.   Did you kept track of your time that way, correct?

18        A.   Yes, my time.

19        Q.   Did you describe the job that you had performed on

20   the work order?

21        A.   Yes.

22        Q.   In other words if I go to Bradford Marine and say,

23   Give me the document that shows me what Mr. Naranjo did on

24   that particular vessel before this accident; then she should

25   have a record of the work that you did, correct?

    A.  Yes.

    Q.  What do they call those documents at Bradford
Marine?  Do they call them work orders or do they call them
invoice or vouchers or what do that they call them?

    A.  It's like a work order.

    MR. FAMULARI:  Larry, do you have those.  We got a
package last week from somebody.

    MR. VALLE:  I got a whole - I don't know if it is
posted or free - I don't know if it is after the
explosion or before, but I got a thing that thick with
all kinds of invoices and descriptions of work done to
the vessel.  But, very frankly, I have not looked
through them as far as the dates go.

    MR. FAMULARI:  I think it was before and after.

    MR. KALLEN:  That was something that you just got
in?

    MR. VALLE:  I got it in response to a request for
production.

    MR. FAMULARI:  They didn't send it to you, John?

    MR. VALLE:  It's about that high, descriptions and
invoices.

    MR. KALLEN:  Send me a copy somebody.

    MR. VALLE:  Sure.

    (WHEREUPON, a brief off-the-record discussion was
had.)

1          (WHEREUPON, the testimony requested was read back

2       by the reporter as recorded.)

3   BY MR. VALLE:

4       Q.   What information would you put on the work order

5   that you completed?

6       A.   What I did and how long it took.

7       Q.   If you did an air evacuation of the area - Strike

8   that.

9            Other than on that particular day, in all of the

10  jobs that you did aboard the vessel before this accident

11  occurred, did you ever find it necessary to perform an air

12  evacuation of any other area where you had welded aboard that

13  ship?

14      A.   Yes.

15      Q.   On how many occasions did you do that?

16      A.   Always.

17      Q.   What type of equipment do you have available to you

18  for that air evacuation that we're here talking about?

19      A.   A blower with a hose.  You extract gases or smoke.

20      Q.   How many hoses and what size?

21      A.   Two and they're about 8 inches.

22      Q.   8 inches in diameter?

23      A.   Yes.

24      Q.   What type of blower?

25      A.   I don't know the brand name.

1    Q.  Was it electric or a gasoline?

2    A.  Gasoline.

3    Q.  Was the blower located on board the vessel; or did

4  you have to bring it on board the vessel; or was the blower

5  located off the vessel and you just bring on the lines?

6    A.  We had to bring it and install.  We installed all

7  the equipment for that.

8    Q.  Who was it that determined how long this area had to

9  be evacuated before you could begin welding?

10    A.  Nobody decided it.  It was just known that it had to

11  be, well, the time it was about a couple of hours.

12    Q.  How did you learn to do that?

13    A.  One learned there in the company.

14        MR. KALLEN:  Say that again.

15        MR. VALLE:  One learned there in the company.

16    Q.  Did anyone give you a specific instruction as to

17  when and how to use the air evacuation system?

18    A.  Yes.

19    Q.  Who instructed you as to what to do?

20    A.  Tony Watson.

21    Q.  And when was that?

22    A.  Whenever there is a job to be done he requires that

23  it be done for your safety.

24    Q.  I use the word "instructed."  I probably should have

25  used a different word.

```
1          Who showed you how to use the equipment when you

2    first used it back at the beginning of your employment with

3    Bradford?

4          A.   My boss at the time.

5          Q.   Who was that?

6          A.   The first one that was there, I don't remember the

7    name.

8          Q.   How do you determine how long that you should use

9    the equipment before beginning welding?

10         A.   I don't understand the question.

11         Q.   Okay.  How do you know like - Strike that.

12              In this particular instance, before you began

13   welding on the day that this accident happened, how long did

14   you use the air evacuation equipment before you began

15   welding?

16         A.   I installed it in the morning on the day of work in

17   the afternoon.  So it would have been on some five or six

18   hours.

19         Q.   How did you know to put it on for five or six hours

20   as opposed to an hour or opposed to 10 hours?

21         A.   Whenever one is going to do a job one installs all

22   the safety equipment before starting a job; and take several

23   hours and leave it installed there.

24         Q.   But how did you know for how many hours to leave the

25   equipment operating before beginning your welding?
```

1          MR. DAPENA:  But you want to ask in Spanish.

2      Q.  Go ahead?

3      A.  There is no way to determine for a location.  First

4  one always ventilates the area well for a precaution for a

5  period of more than an hour or several hours.

6      Q.  Let's assume that you are going to be welding in a

7  small area, in closet or something?

8      A.  (Uh-huh).

9      Q.  How would that - Strike that.

10         How would you use the smoke or air evacuation system

11  in that small area as opposed to in a larger area such as the

12  lazarette?

13     A.  Could you repeat the question?

14     Q.  Let me rephrase it.  I take it on this vessel, as on

15  any other vessel you worked in, there were areas that were

16  smaller and areas that were larger?

17     A.  Yes.

18     Q.  How would you know how much time to use the air

19  evacuation equipment in small areas and in larger areas?

20     A.  I don't know how to answer that.

21     Q.  Well, I mean how do you know how long to use the air

22  evacuation equipment on a given area that you would be

23  welding in?

24     A.  I don't still - don't know how - I know that I

25  install it.  At the time that one decides to use the

1    equipment, one doesn't know.

2    Q. Okay. That's sort of where I was going with the

3    next question.

4    When you finish using the air evacuation equipment

5    how do you know that the area is safe at that time?

6    A. In this particular case where I worked, I was sure

7    of what I was doing because of the order that I got from the

8    captain that was a safe area. There was nothing there. But

9    in any case I take my precautions without him telling me to

10    install the equipment.

11    Q. At the end of the period of time that you think the

12    evacuation equipment was necessary did you perform any test

13    or do you have any other way of determining whether or not

14    you need to use the system for a longer period of time?

15    A. No, I didn't have to know anything. That was not my

16    job.

17    Q. You didn't light a match or anything like that?

18    A. No.

19    MR. FAMULARI: I think what might be confusing him

20    a little bit is - I might be wrong about this - is that

21    the air extraction equipment - I don't think that they

22    shut it off when they are welding. I think it is kept

23    going on when welding, especially, the lazarette - I

24    think that it is continued going.

25    Q. While you were welding on board the ship would you

1    have to disconnect and remove the air evacuation equipment or

2    was it continuously operating when you were welding?

3        A.  I would leave it turned on and then I would take it

4    out - take away.

5        Q.  When would you take it away?

6        A.  At the end of the job.

7        Q.  When the explosion occurred in this case was the air

8    evacuation system in operation?

9        A.  Yes.

10       Q.  If you were going to work in the smaller areas, as

11   opposed to larger areas, did you ever adjust the amount of

12   time that you would allow the air evacuation system to work

13   before you began welding?

14       A.  What do you mean "Adjust the time".

15       Q.  Let's assume that you worked in a small area.  How

16   long would you leave the air evacuation system on in the

17   smaller areas as opposed to an area the size of this room?

18       A.  Whatever time is necessary to do the job.

19           MR. KALLEN:  Larry, his testimony is that he keeps

20       it on all the time on all welding jobs.

21           MR. FAMULARI:  I think that is what he is saying.

22           MR. VALLE:  I want to know how long that he keeps

23       it on before he fires up the torch.

24           MR. FAMULARI:  Why don't you ask him, Did he keep

25       it on longer in the engine room than in the lazarette?

1        I assume the engine room is larger than the lazarette.

2    BY MR. VALLE:

3        Q.   Who makes the decision as to when it is safe to

4    light up the torch?

5            THE INTERPRETER:  What do you call the "torch"?

6            MR. DAPENA:  Tell him the welding torch.

7            THE INTERPRETER:  I want to tell him but I don't

8        know if that was the right word.

9            MR. VALLE:  Okay.

10           THE WITNESS:  The person doing the job makes that

11       decision depending on the instruction received from the

12       person giving the job.

13   BY MR. VALLE:

14       Q.   You agree with me there are a lot of gases,

15   inflammable gases, that you can't smell and that you can't

16   tell that are present in an area?

17       A.   Yes.

18       Q.   My last question before lunch is going to be:  How

19   do you know before you light your torch, how do you know that

20   it's safe to light the torch and that the gases have been

21   evaporated?

22       A.   I wouldn't know because I don't have a gas detector.

23           (WHEREUPON, a brief lunch recess was had.)

24           MR. VALLE:  Ready to go.  Read back the last

25       question and answer.

```
 1            (WHEREUPON, the testimony requested was read back
 2       by the reporter as recorded.)
 3  BY MR. VALLE:
 4       Q.  On the - Strike that.
 5            For several months that this vessel was at Bradford,
 6  before the accident happened, were you aware that other work
 7  was going on aboard the vessel?
 8       A.  Yes.
 9       Q.  Were you aware that work such as varnishing,
10  lacquering, or paint removal was taking place?
11       A.  Yes.
12       Q.  In those processes that I have just discussed, you
13  will agree with me, will you not, there is flammable fluids
14  that are used?
15       A.  Yes.
16       Q.  Were you aware of any spillage of any type of
17  flammable fluid in the area where you were working in the
18  lazarette or around that area before the date of accident?
19       A.  No.
20       Q.  Did you happen to notice whether or not there was a
21  can of acetone - Strike that.
22            Are you familiar with the fluid known as acetone?
23       A.  Yes, I am familiar with that.
24       Q.  Tell me what that is used for?
25       A.  I've seen it there.  I don't know what it is used
```

1   for.  It is used by the painters.

2       Q.  Were you aware or did you become aware before this

3   accident as to whether or not a can of acetone had been

4   knocked over or had spilled in this area where you were

5   working before the accident occurred?

6           MR. FAMULARI:  Object to form.

7       A.  No.  No.

8       Q.  When you were in this area before you began welding

9   on the date this accident happened, did you encounter any

10  unusual smells?

11      A.  No.

12      Q.  How often during the course of a week - Strike that.

13          In the week before this accident happened how often

14  did you find yourself performing work aboard this vessel?

15      A.  Several times.

16      Q.  On a daily basis were you there every day or every

17  other day?

18      A.  Almost every day.

19      Q.  Was the vessel in dry dock?

20      A.  No, it's in the water.

21      Q.  So it was outside then?

22      A.  In the water.

23      Q.  What areas of the vessel did you work on before you

24  were asked to weld in the lazarette?

25      A.  I worked in the engine room, and I worked in the

1  hall.  I worked in the part where the top part - where the

2  instrument panel is, the bridge.  That's all.

3      Q.  Please forgive me.  I don't mean to keep going back

4  to this but I want to clear something up in my mind.  You

5  have told me that you always use the air evacuation system

6  before you began welding?

7      A.  Yes, sir.

8      Q.  How did you know for how long to use the air

9  evacuation system before you began welding in the different

10  areas where you worked?

11      A.  One does not decide the time.  The first thing that

12  you do is install.  One does not determine the time.

13      Q.  Well, you installed the air evacuation system,

14  correct?

15      A.  Yes.

16      Q.  How would you know how long to keep it running

17  before you lite your torch so to be sure the area is safe?

18          THE INTERPRETER:  He says a minimum or maximum?

19          THE WITNESS:  There is no minimum.  I don't know.

20  BY MR. VALLE:

21      Q.  How do you know when you light your torch you know

22  that you're not going to blow up?

23      A.  Because if they send me to do the job there I was

24  sure what I was doing because the captain told me.  Because

25  he told me there was no - I asked the captain before starting

1   work, if there were any tanks or fuel lines there; and he

2   told me, no.  The only thing that he told me was there was

3   concrete and an aluminum sheeting plate.

4        MR. VALLE:  He used the word "flush."

5   A.  Right on top of the concrete.

6        MR. KALLEN:  Would you mind repeating that answer?

7   Because I'm not sure of what was - it was broken up.

8        (WHEREUPON, the testimony requested was read back by

9   the reporter as recorded.)

10       THE INTERPRETER:  Aluminum sheet or not sheeting.

11  He said there was a "no" in there that he said.  He

12  asked the captain if the fuel line on the tanks; the

13  captain said, no.  The only things is --

14       MR. KALLEN:  Was concrete and aluminum sheets or

15  plates on top.  Okay.

16  BY MR. VALLE:

17  Q.  Let's just for the moment forget this accident.

18  A.  Okay.

19  Q.  Let's go back to when you were welding in the engine

20  room.  You said that the engine room was certified gas free,

21  correct?

22  A.  Yes.

23  Q.  Did you still use the air evacuation system in the

24  engine room before you started welding?

25  A.  Yes.

1    Q. Why?

2    A. They taught us there in the company that it was

3    usual to use it for safety reasons and for our own safety.

4    Q. How did you know when you were in the engine room

5    when it would be safe to turn on your torch after the air

6    evacuation system had been on for some time?

7    A. One is sure of whatever one is doing because of the

8    instruction that one has received; and one is more confident

9    of safety when there is a piece of paper certifying.

10    Q. Is there any test that you did, any test at all, to

11    determine when it would be safe to turn on your torch in any

12    of the areas where you welded on that ship?

13    A. That one would do a test oneself, no; there is none.

14    Q. As I understand it, you used the air evacuation

15    system for a period of time; and it could vary from two hours

16    to five hours. There was no set period?

17    A. Yes, that's correct.

18    Q. Then whatever time you decided to begin welding

19    there was no test to determine if the area had been totally

20    evacuated from any gases that had been there before you

21    started welding, correct?

22    A. Yes.

23    MR. VALLE: You have to do it in English.

24    MR. DAPENA: What I am saying is that you asked

25    whether there was a test performed.

```
 1          She is saying were there any way of knowing but you

 2      wanted to know if it is a specific test?

 3          MR. VALLE:  Was any testing performed before he

 4      cranked up.

 5          MR. DAPENA:  The test performed --

 6          THE WITNESS:  That's not my job.

 7  BY MR. VALLE:

 8      Q.  When did you consider it safe to begin welding on

 9  the day that the accident happened?  Did you consider it safe

10  when the captain told you there was no tanks and no gas in

11  the area; there was no fuel line in the area?  Did you

12  consider it safe at some point after the air evacuation

13  system had been on?

14      A.  When he told me and I had a lot of confidence in

15  him, and that's why I proceeded to do the job.

16      Q.  Approximately, what time of day was it when this

17  accident happened?

18      A.  It was after three in the afternoon.

19      Q.  You were working for Bradford Marine full-time at

20  that time?

21      A.  Yes.

22      Q.  In the document that we have reviewed it appears

23  that you were earning in the area of $640 per week; is that

24  right?

25      A.  For 40 hours, yes.  When I did overtime, it was
```

1    higher.

2        Q.   So $640 was your base pay?

3        A.   Yes.

4        Q.   That was for a 40-hour week?

5        A.   Yes.

6        Q.   In the year before this accident happened were you

7    working for anybody other than Bradford Marine?

8        A.   No, I only worked for Bradford.

9        Q.   Do you have any independent recollection - Let me

10   get that simpler:  Do you have a memory of how this accident

11   happened?

12       A.   Yes.

13       Q.   When did your memory concerning the accident come

14   back?

15       A.   Several seconds went by after the accident, and I

16   remember what happened.

17       Q.   It appears in the medical records in a number of

18   places that you have no recollection as to how the accident

19   happened; is that not accurate?

20       A.   It is correct what it says there because I was about

21   to lose unconsciousness and they kept me a wake.  On several

22   occasions I was losing consciousness.  That's when they took

23   me to the hospital.

24       Q.   In the hospital the records say, pretty clearly in

25   four places, that you have no recollections of the event; are

1  those records inaccurate or not correct?

2      A.  That's correct.

3      Q.  My question:  When did you begin recalling how the

4  accident happened?

5      A.  After it happened - After it happened this is the

6  first thing that I felt was a lot of pain.  I think several

7  hours went by but I was more focused on the pain than what

8  was happening to me.  But I don't remember really - later, I

9  remembered.  But I don't remember what happened.

10     Q.  Can you remember telling anybody in the hospital

11 that you had know recollection as to how that accident

12 occurred?

13     A.  No, I don't remember.

14     Q.  You don't remember telling anybody that?

15     A.  There was so much time - It has been three years.  I

16 don't remember.

17     Q.  Is it your testimony today that as of a minute after

18 this accident happened that you recall exactly how it

19 occurred?

20     A.  I remember that they took me out.  Somebody got me

21 out of there; and somebody took me out from where I was

22 working at the time; and they helped me.

23     Q.  Why don't you tell me, Mr. Naranjo, from the time

24 that you arrived or that you got on the vessel on the day of

25 the accident until the time that the incident happened, tell

1  me what you did and how you did it?

2      A.  Well, I left my house and to go to work.  And when I

3  got there my boss, Tony Watson, told me to go see Captain

4  John Bredbec because he has a job for you.

5          He showed me the work area; and all the questions

6  that I asked him about safety, about whether there was a

7  tank, a gas tank, or oil tank.

8      Q.  Tell me to the best of your recollection what you

9  asked him and how that he responded?

10     A.  I understand from what people tell me in English

11 than what I can say.

12     Q.  Tell me in Spanish what you said to him and what he

13 said to you?

14     A.  When I went to see him I asked him if he had

15 something for me; and he said, yes.  So he took me to the

16 lazarette area, and he told me to put up the aluminum

17 brackets and to weld them where he showed me.

18         So I asked him whether there were tanks or some fuel

19 lines.  And he told me, no; what is there is concrete and a

20 sheet, flush on the concrete.  He told me the measurements,

21 the brackets.

22         So I started to prepare the area; and while I was

23 preparing the area there several hours went by and in the

24 mean time I was - I made several plates; and when I finished

25 making the plates I went and installed them there.

1          Sometime after three in the afternoon, I started
2    welding.  I welded to the first point and when I got to the
3    second one that is when the explosion happened.
4          After that I realized that they were taking me out.
5    They told me don't go to sleep and they shook my face.
6    That's when they took me to the hospital.
7       Q.  Let me stop you there.  You say that you made the
8    plates.  How do you make the plates?
9       A.  I made them in the welding shop.
10      Q.  You didn't make them on the ship?
11      A.  No.  I took them there and welded them to install
12   them.
13      Q.  What kind of metal were the plates made out of that
14   you prepared that day?
15      A.  Aluminum.
16      Q.  What type of deck were you welding on?
17      A.  Aluminum.
18      Q.  What type of welding torch were you using?
19      A.  It's called a welder.  Use argon and it's electric
20   and with an aluminum wire.
21      Q.  Was this the type of torch and type of wire that you
22   were accustomed to using?
23      A.  Yes, sir.
24      Q.  Did you use any equipment on the day this accident
25   happened that you were not familiar with?

1       A.   No, I always used the equipment that I know.

2       Q.   Was any air evacuation equipment being used anywhere

3    else on that ship, to your knowledge, when your accident

4    occurred?

5       A.   I don't know.

6       Q.   You said that you welded - You had already welded

7    one spot?

8       A.   Yes, I welded one spot and the second one was when

9    it happened.

10      Q.   Tell me what you did when you welded that first

11   point - I'm not a welder, so explain it to me like I'm a

12   student and you're a teacher?

13          MR. FAMULARI:   Explain how you welded the plate.

14      Q.   From beginning to end?

15          MR. FAMULARI:   The point.   There is a way to do it.

16      A.   This is the plate (indicating) and I put on my mask.

17   And I put my hand here to hold it so that it won't lift up

18   (indicating).   I take the torch and I aim it at the first

19   spot on this side (indicating).   Then I do the other corner

20   and that's when this explosion happened.

21      Q.   Were you involved in what they call "Spot welding"?

22      A.   What is that?

23      Q.   When you don't weld all the way around and when you

24   weld point-to-point?

25      A.   What I know from experience is that first that you

1    do one, two, three, four, the four corners; then you begin to

2    weld all the way around; and that's the idea.

3        Q.   When you weld the first point do you know whether or

4    not your torch penetrated the deck?

5        A.   It is very hard to see when it enters.  You can't

6    tell if the wire is going through or not.  You're not

7    underneath.

8        Q.   No, what I wanted to know, do you know - if you

9    don't know, that's fine - I wanted to know do you know

10   whether or not your torch penetrated the deck when you welded

11   the first point?

12       MR. FAMULARI:  Object to form.  What do you mean by

13       "Penetrated the deck"?  When he struck it and did it

14       blow a hole through the deck; or it was just a bond

15       between the plate and the deck?

16       MR. VALLE:  No, I mean penetrated the deck.

17       MR. FAMULARI:  You want to know if he blew a hole

18       through the deck?

19       MR. VALLE:  Or whether he knows if he did.

20       THE INTERPRETER:  Or whether he torched open the

21       hole?

22       MR. VALLE:  Let's start off - You can probably ask

23       it better than I do.

24   BY MR. VALLE:

25       Q.   Do you know whether or not your torch penetrated the

```
 1  deck and put a hole in the deck plate when you welded that

 2  first point?

 3      A.  No.

 4          MR. FAMULARI:  You don't know?

 5          MR. VALLE:  He doesn't know.

 6          THE WITNESS:  No, I don't know.

 7  BY MR. VALLE:

 8      Q.  Do you know whether or not your torch penetrated the

 9  deck plate when you were beginning to weld the second point?

10      A.  I don't know.

11      Q.  Give me your best estimate in seconds or minutes as

12  to how long that you were welding at the second point before

13  the explosion occurred?

14      A.  It was fast.  It was here and there.  Very fast.

15      Q.  You know I don't know about welding.  Tell me how

16  long that it takes?  How long did it take to weld the first

17  point?

18      A.  It's seconds.

19      Q.  Five or ten?

20      A.  One second - One second or less.

21          MR. FAMULARI:  When you tack something -

22          MR. VALLE:  I need to know.

23          A couple of seconds?

24          MR. FAMULARI:  One second?

25          THE WITNESS:  It's very fast.
```

1    BY MR. VALLE:

2        Q.  Was it just as quick when you welded the second

3    point before the explosion?

4        A.  Yes, sir.

5        Q.  So you welded the first point; and then you went to

6    the second point on the plate, the second corner; and you

7    welded it for a second before the explosion?

8        A.  More or less, a second, yes; is the accident

9    happened.   That's what one usually does on these jobs.

10       Q.  You were holding your torch in direct contact with

11   the deck plate or in direct contact with the bracket that you

12   were going to weld on the deck or were you - Strike all that.

13           When you're welding a point, as you were on this

14   particular incident, tell me in detail how that you go about

15   doing that?

16           MR. FAMULARI:  Pretend this is the plate and that

17        this is the deck (indicating).

18           MR. VALLE:  Fine.

19           MR. FAMULARI:  Here is your torch.

20       A.  This is my hand (indicating).  This is the plate.

21   Up there it is aluminum (indicating).  When I aim the torch

22   here, that comes up, so I have to hold it down with my hand

23   (indicating).  So I weld it here and just like that

24   (indicating).

25           MR. KALLEN:  Does the gun touch the plate?

1      Q.   Does the welding gun touch the wire?  You're welding

2   with wire, correct?

3      A.   Yes.

4      Q.   Are you melting the wire with the welding gun or are

5   you touching the deck or touching the plate that you're

6   welding onto the deck?

7      A.   You start with the plate and then the deck.

8      Q.   Where does the welding material come from, the wire?

9      A.   It's aluminum.

10      Q.   How does the aluminum wire get melted?

11      A.   With the heat.

12      Q.   Is the wire attached to - (indicating)?

13      A.   (Indicating) This is the torch and this is a roll of

14   wire; and it comes down here (indicating).  There's argon

15   here and electricity (indicating); and then that's when the

16   electricity causes a circuit and then it melts; and that's

17   how that I understand it.

18      Q.   The welding process is melting the aluminum to join

19   with aluminum on the deck and on the plate, correct?

20      A.   Yes, that is correct.

21      Q.   Is it necessary in the process for your torch to

22   come in direct contact with the plate that you're welding

23   onto the deck or the deck itself?

24      A.   It has to contact both of them otherwise where you

25   welded it, it might crack.

1      Q.  Does the welding torch soften up the aluminum on the

2  plate and the aluminum on the deck to be able to join with

3  the wire?

4      A.  In this case that is a question of chemistry but I

5  don't know.

6      Q.  Do you ever apply - Why is it that you apply that

7  torch to the deck?

8      A.  This is the aluminum sheet and this is the aluminum

9  plate (indicating); you have to fuse the two.

10         MR. FAMULARI:  I think I can ask him a quick

11      question to clear it up?

12         MR. VALLE:  Go ahead.

13         MR. FAMULARI:  Henry, the aluminum wire, does it

14      have to hit the plate to complete the electric circuit

15      that lights up the gas?

16         THE WITNESS:  Yes.

17         MR. FAMULARI:  You have to have a completed

18      electric circuit - is there a lead hooked to the plate

19      some place, a second lead, a ground?

20         THE WITNESS:  A ground.

21         MR. FAMULARI:  With the ground?

22         THE WITNESS:  The ship is aluminum.  So I find - I

23      find a bracket or a post and attach it there; and

24      that's the ground, so that makes energy when I make

25      contact.

BY MR. VALLE:

   Q.  What you're telling me is that until you make

contact with the tip of the torch onto to plate or onto the

deck there is no heat?

   A.  That's right.  There is no heat until I make

contact.

       (WHEREUPON, a brief off-the-record discussion was

   had.)

BY MR. VALLE:

   Q.  How thick is the deck?

      MR. FAMULARI:  How thick is the aluminum deck?

   A.  Can I explain something?

   Q.  Go ahead.

   A.  One knows from the kind of aluminum how much heat to

use.

      MR. FAMULARI:  You see that I think that I wrote

   this question down, and we'll probably have to ask a

   welding expert.  Those machines have different settings

   and I believe that you set them depending on how thick

   the plate is and what alloy that you use.

BY MR. VALLE:

   Q.  How did you determine how much heat to use in this

particular case?

   A.  Starting with what the captain told me that the

plate here was a quarter - was a quarter-of-an-inch,

1  aluminum.

2      Q.  The deck plate was a quarter?

3      A.  The deck plate was a quarter (Witness answers in

4  English).

5          And the plate that I made to install was

6  three-quarters-of-an-inch.

7      Q.  So how did that tell you at what setting to put your

8  machine?

9      A.  From the years of experience, one knows.

10     Q.  What type of wire were you using?

11     A.  We used the best quality aluminum.

12     Q.  You don't know what kind of aluminum it was?

13     A.  I can't guess.  It has a number but I don't know

14  what number.

15     Q.  Does the type of wire that you use have any bearing

16  on how hot that you make the machine or what setting that you

17  put the machine on?

18     A.  No, it does not matter.  It could be thick or it

19  could be a thin wire.  It does not matter.

20         MR. FAMULARI:  He doesn't understand.

21     Q.  Does the nature of the material that the wire is

22  made out of have anything to do with how hot that you make

23  the machine?

24     A.  Yes, I believe so.  Yes.

25     Q.  What setting did you have the machine at on the day

1   of this accident?

2        A.   A 125 amps.  It goes up to 250.

3        Q.   What is the range?

4        A.   From 1 to 250.

5        Q.   From 1 amp or 100?

6        A.   It's a dial.  From 1 to 250.  Number 1 to 250.

7        Q.   You then had it at half power?

8        A.   Yes, which is sufficient heat to melt the wire with

9   the plates so that it will adhere.

10        Q.   If you didn't have to penetrate the plate what does

11   it matter how thick the plate is, in so far, as what dial or

12   what style setting that you're using on the machine?

13        A.   One knows more or less what degree of heat is needed

14   for the two parts to melt, so that they are fused.

15        Q.   The deck could have been 2-inches thick.  It would

16   not have made any difference because of the heat setting that

17   you used?

18             MR. FAMULARI:  No.

19        A.   No - There it depends if the deck is an inch and the

20   plate is an inch thick you have to heat it more.

21             MR. FAMULARI:  I might be able to clear it up.

22        Q.   Let's assume the plate is a quarter-of-an-inch or a

23   half-inch plate?

24             MR. FAMULARI:  No.  It is a quarter.

25             MR. VALLE:  The plate or the deck?

1           THE WITNESS:  They only use quarter-inch plates.

2           MR. KALLEN:  I'm confused.  I'm sorry.  When you

3      say, "Plates," are you referring to the one that he

4      fabricated or that are welded on the deck?

5           MR. FAMULARI:  No.  He is talking about the deck.

6           MR. VALLE:  Deck plate?

7           MR. FAMULARI:  The deck.  He said the plate

8      fabricated was three-quarters-of-an-inch, right?

9           THE WITNESS:  Three-quarters (Witness answers in.

10     English).

11  BY MR. VALLE:

12     Q.  When you weld - I'll rephrase it.

13          THE INTERPRETER:  The confusion is because they are

14     all plates.

15          MR. VALLE:  I'll rephrase it then.

16  BY MR. VALLE:

17     Q.  When you're welding the plate to the deck your

18  welding iron softens the plate and softens the deck so that

19  it accepts the bonding material, correct?

20     A.  Yes, that's true.

21     Q.  If you don't have to penetrate the deck what does it

22  matter how thick the deck is?  If all that you are doing is

23  melting the surface of the deck and melting wire --

24          THE INTERPRETER:  You want to make sure that you're

25          not penetrating is the point.

1           MR. VALLE:  Let's go off for a second.

2           (WHEREUPON, a brief off-the-record discussion was

3       had).

4   BY MR. VALLE:

5       Q.  Let me approach it from a different angle.  Assume

6   that the deck was an inch-thick and the plate that you were

7   welding on the deck was three-quarters-of-an-inch thick, and

8   you were using the same wire.  What setting do you put the

9   machine at?

10      A.  At the highest, 250.

11      Q.  Why?

12      A.  So that the heat would fuse the wire with the two

13  other materials.

14      Q.  We're going to have to talk to a welding expert.  I

15  don't want to beat this to death.  We could continue on this

16  the rest of the week.

17          MR. FAMULARI:  I don't know the answer either, but I

18      know enough about welding that the temperature depends

19      on how thick the metal is because you don't get the

20      proper penetration - by penetrations, I don't mean

21      blowing a hole; but you need a certain penetration to

22      make a bond.  You don't want the weld to be too

23      shallow.  You don't want it too deep.

24          MR. VALLE:  What you're talking about is one

25      second.

1          MR. FAMULARI:  To tack it down.

2          MR. VALLE:  Yes.

3          THE WITNESS:  This had to be strongly welded

4     together because the plate was for some jack cylinders.

5     BY MR. VALLE:

6          Q.  How certain are you as to the setting as to what the

7     machine was at when the incident occurred?

8          A.  I had done several jobs like that; and from

9     experience, I know.

10         Q.  Tell me what - Are you certain that the welding

11     machine was set at a 125 amps when the incident occurred?

12         A.  Yes.

13         Q.  How do you know?

14         A.  I installed it myself.  I set it myself.

15         Q.  What is your first recollection - Strike that.

16             Do you have a recollection or memory of the

17     explosion itself?

18         A.  It was very strong.  It was so strong - It was very

19     strong.

20         Q.  The first question:  Do you remember the explosion

21     itself?

22         A.  Yes, I remember.  Now, I remember.

23         Q.  Did the explosion occur at the corner of the plate

24     that you were welding onto the deck or did it occur

25     elsewhere?

1    A.  No, it was right there.

2    Q.  Tell me what your first recollection is of the

3  explosion?

4    A.  What I remember was that I felt a lot of pain; and

5  that there were a lot of people there shouting that I

6  shouldn't - that I felt like I was falling asleep.  They told

7  me not to, and then rescue came and took me to the hospital.

8    Q.  When you were feeling a lot of pain, where was the

9  pain?

10    A.  In my back and in my foot.  I couldn't feel my feet.

11  I couldn't feel anything in either leg; but, especially, the

12  right one.

13    Q.  They took you by fire-rescue to the hospital?

14    A.  Yes, they took me to the hospital.

15    Q.  What hospital was that?

16    A.  Broward General.

17    Q.  What did they do for you when you arrived at Broward

18  General Hospital?

19    A.  They took x-rays and they took blood; and they took

20  blood.  I was many hours in the emergency room until they

21  took me to a room, and I was there for a week.

22    Q.  Our records show that you were there for about four

23  days?

24    A.  Four days.  Monday, Tuesday, Wednesday, Thursday,

25  and Friday.

1     Q.   You went in on a Monday and came out on the Friday?

2     A.   Yes.

3     Q.   What did they do for you in the hospital?  What kind

4 of treatment did you receive?

5     A.   They give me therapy.  They did x-rays of my back.

6 Then they sent me home and the insurance sent me to the

7 doctor.

8     Q.   What is your understanding of the type

9 of injuries that you sustained in this accident?

10     A.   I had three fractured ribs, and I had fractured the

11 L5 S1, which is the lower part.

12     Q.   Who told you that you had a fracture of the L-5 S-1?

13     A.   The papers from a doctor.

14     Q.   What else?

15     A.   I had problems in my right leg, in my ankle.

16     Q.   What kind of problems?

17     A.   The swelling didn't go away and it hurt a lot.  My

18 heels hurt a lot when I walk.

19     Q.   I'm talking about back in 1997, not today?

20     A.   Okay.  That was what happened in '97.  A lot of pain

21 in my back and in my neck.

22     Q.   Did they perform any surgery on you when you were in

23 the hospital for that four to five days?

24     A.   No, sir.

25     Q.   Which doctor told you that you had a fracture at L5

```
1   S1?

2       A.  Gaetano.

3           MR. VALLE:  Off the record.

4           (WHEREUPON, a brief off-the-record discussion was

5       had.)

6   BY MR. VALLE:

7       Q.  When you were released from the hospital were you

8   sent home?

9       A.  Yes, sir.

10      Q.  Were you instructed to follow up with your doctor?

11      A.  Yes, sir.

12      Q.  Did you follow up with the doctor?

13      A.  The insurance company recommended a Dr. Gary

14  Schwartz .

15      Q.  Did you go see Dr. Schwartz?

16      A.  No.

17          Yes.  Yes, but he told me to go back to work.  He

18  sent me back to work but I was still sick.

19      Q.  When did he do that?  When did he tell you, you were

20  able to go back to work?

21      A.  About a year later, more or less, almost a year.  He

22  sent me to do light-duty.

23      Q.  In the year you were treating with Dr. Schwartz the

24  whole time?

25      A.  Yes.
```

1      Q.  What kind of treatment did Dr. Schwartz give you?

2      A.  He sent me for therapy.  He took x-rays.  That was

3  all until I kept feeling bad, and I got approval

4   from the insurance to go to another doctor.

5      Q.  When Dr. Schwartz released you to return to work was

6  that for light-duty?

7      A.  Yes.

8      Q.  How long did you work at light-duty at Bradford

9  before you felt the need to go back to another doctor?

10     A.  About two months.

11     Q.  What doctor did you see after that two months?

12     A.  Gaetano, Scuidero.

13     Q.  Has Dr. Scuidero remained your treating doctor from

14  that time until the present time?

15     A.  Yes, sir.

16     Q.  Were you examined by any other doctors or

17  physicians, or medical personnel, of any type, other than Dr.

18  Schwartz and Dr. Scuidero as a result of injuries from this

19  accident?

20     A.  They sent me to Dr. Bauer -

21          MR. KALLEN:  Ballwag.

22          MR. VALLE:  B-A-L-L-W-A-G.

23          THE WITNESS:  Then then they sent me to Dr.

24      Ballwag.

25  BY MR. VALLE:

1    Q.    How many times did you see Dr. Ballwag?

2    A.    One time that I think or two times.

3    Q.    How about Dr. Felice?

4    A.    Several times.

5    Q.    When was the last time that you saw Dr. Felice?

6    A.    I don't remember.

7    Q.    Did you see her last year?

8    A.    I think so probably.

9    Q.    Is Dr. Felice located in the North Shore Center?

10   A.    Yes.

11   Q.    What did you Dr. Felice do for you?

12   A.    Dr. Felice reviewed my therapy; and for the pain,

13   she recommended a massage machine, TENS --

14         MR. KALLEN:    TENS, all caps.

15   A.    -- and she suggested that I see a Dr. Henderson.    I

16   don't remember the other name.    Dr. Hall.

17   Q.    You saw Dr. Hall for what problem?

18   A.    No.    She recommended that I see him to see if that

19   doctor would give me an injection in my back to help the

20   pain.

21   Q.    Does Dr. Felice is the one that recommended Dr.

22   Henderson and Dr. Hall?

23   A.    Yes, sir.

24   Q.    Did Dr. Hall also treat your knee or examine your

25   knee?

1    A.  No.

2    Q.  Did you eventually go to see Dr. Henderson or Dr.

3  Hall?

4    A.  Henderson is a psychologist.  I think that is a

5  psychologist.

6        A psychologist, I don't remember exactly (Witness

7    answers in English).

8    Q.  What about Dr. Hall?  When did you see Dr. Hall?

9    A.  Yes, sir.

10    Q.  Did you actually see Dr. Henderson?

11    A.  Yes.

12    Q.  How many times did you see him?

13    A.  Once.

14    Q.  How many times did you see Dr. Hall?

15    A.  Once.

16    Q.  What did Dr. Hall want to do for you?

17    A.  He wanted to give me an injection in my back, in the

18  lower back.

19    Q.  Did you have that injection?

20    A.  I don't remember.  They were going to do a small

21  operation to do the injection.  But I didn't want to because

22  the other operation was very, very recent and I had a lot of

23  pain.

24    Q.  Okay.  Is that why you did not have an injection in

25  your back that Dr. Hall recommended?

1      A.   No.

2      Q.   "No" is not the answer; or No, you did not have the

3  injection?

4      A.   No, I didn't do it.

5      Q.   You saw Dr. Hall after you had your back surgery?

6      A.   Yes, sir.

7      Q.   Did any of your other doctors, other than Dr.

8  Scuidero, recommend that you have surgery?

9      A.   No, Scuidero recommended a second operation.   No one

10  else recommend surgery.

11      Q.   Did anyone else recommend the first operation?

12      A.   No.

13      Q.   No.

14          So Dr. Scuidero has been the only doctor that

15  examined or treated you for this accident who ever

16  recommended that surgery; is that correct?

17      A.   That is correct.

18      Q.   He has recommended that you undergo a second surgery

19  now?

20      A.   Yes.

21      Q.   Are you going to go through with that?

22      A.   Yes.

23      Q.   Are you scheduled for it?

24      A.   No.

25      Q.   Other than the one attempt that you made to return

1    to work at Bradford Marine have you attempted to return to

2    work anywhere else since this accident?

3    A.  No.  No, senor.

4    Q.  What kind of doctor is Dr. Felice?

5    A.  I don't know, sir.

6        MR. VALLE:  Off the record.

7        (WHEREUPON, a brief off-the-record discussion was

8    had.)

9        (WHEREUPON, a brief recess was had.)

10   MR. VALLE:

11       Q.  Mr. Naranjo, other than Broward General Hospital,

12   Dr. Schwartz, Dr. Scuidero, and Dr. Henderson, and Dr. Hall,

13   and Dr. Ballwag and Dr. Felice, have you been examined or

14   treated by any other doctors or physicians or medical

15   personnel of any type as a result of the injuries from this

16   accident?

17   A.  Lazaro Guerra.

18   Q.  How many times did you see Dr. Guerra?

19   A.  About three times.

20   Q.  What did Dr. Guerra do for you?

21   A.  He recommended therapy treatment.

22   Q.  Did Dr. Guerra recommend surgery?

23   A.  No.

24   Q.  Let's go back to the accident for a second.

25       Were you aware at the time that you were working on

1    the deck in the lazarette as to whether or not any other

2    workers had drilled holes through the deck before you began

3    your work?

4        A.   No.   No, I checked in the area.

5        Q.   When you checked the area, did you see any holes

6    drilled through the deck in the area where you were about to

7    weld?

8        A.   No, sir.

9        Q.   Is that something that you customarily do as part of

10   your job; that you check to see if there are any holes or any

11   possible gas ventilation or gas access fittings or fixtures

12   before you begin your welding?   Forget the question - Strike

13   the question.

14            Is it part of your customary preparation to examine

15   the area where you are going to weld and determine if there

16   are any perforations in the area where you are going to weld?

17            MR. DAPENA:   "Perforation" is a problem.

18            MR. VALLE:   How about holes?

19       A.   Yes, for safety reasons I have to do it; and, also,

20   not to damage any other area.

21       Q.   What is the safety aspect of checking for holes or

22   perforations in the area where you are about to be welding?

23       A.   First of all I have to be sure that I have a clean

24   area where I have to work.   Because if the area is

25   contaminated with other elements or oil or liquid or

1  something, I have to take precautions; and the area where I

2  was working there were no holes; and there are none there.

3      Q.  Were you actually working on the deck of the vessel

4  or were you working on an area below the deck?

5      A.  Under the deck in the lazarette is the deck where it

6  has a wood floor and that is underneath it.

7      Q.  Why were you welding the plate on the deck?  Did

8  they tell you why it was necessary to put the plates on the

9  deck?

10     A.  Yes.  The captain told me that they needed material

11  of three quarter-of-an-inch to hold some hydraulic jacks.

12     Q.  Did you ever hear anything about or anything

13  concerning the installation of pumps in that area?

14     A.  The captain told me that is what it was for.

15     Q.  Pump or jacks?

16     A.  Hydraulic jacks, cylinders; not pumps.

17     Q.  When you were performing your welding, were you

18  welding on the top of the deck?  In other words, were you

19  welding the plate to the top of the deck?

20         THE INTERPRETER:  He said it was under the deck.

21     Q.  He said on top of the deck earlier.  I wanted to

22  know - that just threw me for a loop.

23         Let me try to clear that up.

24     A.  On top of the aluminum plate that is installed

25  there.

1    Q.  Now, you mentioned there was a wooden deck?

2    A.  (Indicating) Yes, it is like as if there were a part

3    where people walk.  I am underneath.

4    Q.  Then you're in a smaller enclosed area, are you not?

5    A.  Yes.

6    Q.  Is the deck itself, what you walk on, is that made

7    of wood?

8    A.  Yes, sir.

9    Q.  You gain access to this area, lazarette, by a hatch,

10   correct?

11   A.  That's correct.

12   Q.  Then you go down inside the lazarette?

13   A.  Yes.

14   Q.  You're doing your welding on top of the raw aluminum

15   that is part of the structure of the vessel?

16   A.  Yes, sir.

17   Q.  Had you ever been told or did you ever learn whether

18   or not where you were working was part of the extension of

19   the ship that was built especially for this owner or not?

20   A.  No.

21   Q.  How close were you in feet or inches or yards,

22   however that you like to describe it, from the transom when

23   you were performing your welding on the day that your

24   accident happened?

25   A.  I don't know.

```
 1      Q.  You know what a "Transom" is, right?

 2      A.  No, senor.

 3      Q.  If I use words that you don't understand, tell me to

 4  explain them.

 5          Let me say it in plain English.

 6          Where you were welding when the explosion occurred,

 7  how close was that to the back of the boat?  Your best

 8  estimate?

 9          MR. FAMULARI:  How about a diagram for him to look

10      at?

11          MR. VALLE:  Yes, sure.

12          MR. FAMULARI:  You got a compartment back there

13      (indicating).  Whereabouts in the compartment?

14      (Indicating in the drawing).

15          THE WITNESS:  The plate that I was welding was

16      about a foot or two foot from here (indicating).  From

17      the wall --

18          MR. KALLEN:  From the bulkhead.

19          THE WITNESS:  Uh-huh.  From here to there is about

20      6-feet; and then the hatch is here (indicating); and I

21      was putting one here; and then I had another that I was

22      going to install here.  I started right here

23      (indicating).  I did this point here and then I went to

24      the other one (indicating).

25          MR. VALLE:  Can I have that page.
```

1          For the purpose of the record, let the record

2     reflect that the witness has been indicating on a very

3     rough schematic drawing of the boat - resembling a boat

4     only because it is pointed at one end and square at the

5     other end - He has been showing us on the rough

6     schematic of the boat an area in which he was working

7     at the time that the incident occurred.

8          (WHEREUPON, the above referenced document was marked

9     as Defendant's Exhibit No. 2 for Identification.)

10 BY MR. VALLE:

11     Q.  Let me ask you to do some things for me.  Okay.

12          Take a look at the schematic marked as Exhibit No. 2

13 and put an "A," the letter "A," where you made the first

14 weld.

15     A.  (Witness complies).

16     Q.  Put a letter "B" where you made the weld the time

17 that the explosion occurred?

18     A.  (Witness complies).

19     Q.  Now, you drew two squares there.  Do they represent

20 the two plates that you manufactured?

21     A.  Yes, sir.

22     Q.  As you are facing the drawing there is a plate on

23 the left side and a plate on the right side?

24     A.  Yes.

25     Q.  Had you attempted at all to weld the plate on the

1    left side?

2        A.   No.

3        Q.   So this was the first plate that you were attempting

4    to weld after you brought the plate that you manufactured

5    back to the ship?

6        A.   Yes.

7        Q.   How much space was there inbetween the aluminum deck

8    and lazarette and the wooden deck above it?

9        A.   (Indicating) I would calculate from the floor to

10   bottom of this table.

11       Q.   Roughly, 3-feet?

12       A.   Uh-huh (affirmative answer).  Probably.

13       Q.   How big was the lazarette compartment?

14       A.   I think it the about the size of this room.  This

15   wide (indicating).

16       Q.   About 20-feet by --

17       A.   No.  Maybe 15-feet.  I don't know.

18           MR. KALLEN:  A better question perhaps was the

19           lazarette from one side of the boat all the way to the

20           other side of the boat; from the left said to the right

21           side.

22           THE WITNESS:  (Indicating) What is the starboard

23           side (Witness answers in English) --

24           MR. KALLEN:  And port side?

25           MR. VALLE:  Port is the left side.

1           THE WITNESS:  Port side and starboard side this way

2      (Witness answers in English).

3           More or less like this (indicating).  I think it is

4      about - I never measure it but I think --

5           MR. FAMULARI:  Unless you look at it.

6    BY MR. VALLE:

7      Q.  How long is the compartment?

8      A.  About this wide (indicating).

9      Q.  From wall-to-wall?

10     A.  More or less, yes.

11     Q.  10-feet?

12          MR. FAMULARI:  It was a 10-foot cock pit extension

13     according to the plans.  I can tell you that much.

14          MR. VALLE:  What I want to know is did the incident

15     occur in the extension?

16          MR. FAMULARI:  It did, but --

17          MR. VALLE:  That's what I'm trying to nail down.

18          MR. KALLEN:  Swear him in.  He testifies.

19   BY MR. VALLE:

20     Q.  Let me try to picture the compartment in which you

21   were working in when the incident occurred.

22          The compartment was, roughly, 3-feet high?

23     A.  Yes.

24     Q.  It was, roughly, 10-feet long?

25     A.  Yes.

1        Q.   Roughly, 15 feet wide; is that correct?

2        A.   I estimate that way more or less but I'm not very

3    sure at all.  More or less.

4        Q.   Did the compartment run from the left side of the

5    boat to the right side of the boat?

6        A.   Yes.

7        Q.   So on the left side there would by a hull and when

8    you look to the right there would be a hull on the right

9    side; is that correct?  Hull.

10            THE INTERPRETER:  He doesn't know the word.  I don't

11       know the word.

12       A.   Yes.

13       Q.   From the front to back (indicating) it was about

14   10-feet?

15       A.   Yes, more or less.

16       Q.   Can you put your initials here in the right-hand

17   corner of the paper and date it?

18       A.   (Witness complies).

19            MR. FAMULARI:  Can we go off the record for a

20       second.

21            (WHEREUPON, a brief off-the-record discussion was

22       had.)

23   BY MR. VALLE:

24       Q.   When you worked at Bradford Marine did you ever hear

25   of a group of regulations called OSHA?

1      A.  I don't remember.

2      Q.  Did you ever receive any instruction - this is

3  another silly question after your last question - Did you

4  ever receive any instruction from anyone at Bradford Marine

5  as to what OSHA was or what it required you to do before

6  commencing welding in an enclosed area?

7          MR. DAPENA:  "Enclosed area" part is missing.

8          THE INTERPRETER:  Sorry.

9      A.  Yes, but I didn't know it was called OSHA.  They

10  give us instructions that, say, take a group from each

11  department; and they gave safety instructions and about these

12  small areas and what one is to do.

13      Q.  Tell me what instructions that you received?

14      A.  It's the security chief there his name is Mark Torch

15  (phonetic).  And he tells us what safety measures to take.

16  For instance when there is a fire or how to avoid anything,

17  the safety to prevent accidents.

18      Q.  What instructions did you receive with regard to

19  what you should do before you light your torch in an enclosed

20  area?

21      A.  Ventilate the area.  To put on the blower, air

22  hoses; and inspect the area to make sure that there is

23  nothing there that could cause a fire.  That's basically what

24  they're all about; and not do any damage and to other areas

25  that don't have to do with the work.

1    Q.   We had spoken earlier about gas that you can't smell

2  and that might be dangerous and explosive gases?

3    A.   That's correct, yes.

4    Q.   How do you know after you finish with the blowers -

5  Strike that.

6         How do you know before you begin welding that there

7  aren't any of those gases that you can't smell or see or

8  taste in the area?

9    A.   First of all, the ship has a paper posted where it

10 specifies that it's gas free; and second, one has instruction

11 from the person who is giving the job; in this case, it was

12 the captain who told me what to do.  And when I asked him

13 questions because I did ask him whether there were tanks or

14 gas lines and so with that - with that assurance I do the

15 work trusting the person who is giving me the job to do

16 because I'm not capable of determining whether it is gas

17 free; that's not my job.

18   Q.   Before this accident happened can you tell me what

19 type of social activities or hobbies that you had and that

20 you regularly engaged in?

21   A.   I went out a lot with my family.  I used to do

22 sports.  I play soccer.  I was a soccer coach.  We used to go

23 to the movies, to the beach.  I went out dancing, a lot of

24 parties.  I'd like to go out on trips.  We used to go to

25 Tampa and to Tallahassee and Orlando.

```
 1        Q.  Why in the world would you go to Tallahassee?  I can

 2   see Orlando.  Of course, the show may be better in

 3   Tallahassee.

 4            How often did you go, say, dancing with your wife, I

 5   would assume?

 6        A.  With my wife, yes; about twice a month or so.  Our

 7   friends that have family get together or we used to go to

 8   discos.

 9        Q.  Where did you coach soccer?

10        A.  Here in Miami.

11        Q.  The place, where?

12        A.  In North Miami, Highland Oaks; and near Adventura.

13        Q.  Is that a park?

14        A.  That is a park.

15        Q.  Highland Oaks Park?

16            MR. KALLEN:  Ives Dairy Road.  Was that a league?

17        A.  Ives Dairy Road.

18            MR. KALLEN:  Close to 23 Avenue.

19        A.  Ives Dairy Road close to 26th Avenue.

20        Q.  Were you doing that for a sport league or children's

21   league or what?

22        A.  It's a children's sports league.

23        Q.  How many years did you do that?

24        A.  There - I was about a year-and-a-half or two years.

25        Q.  What did you coach?  Were you the coach of the whole
```

1  team or did you coach forward or goalies or what?

2      A.  No, the whole team.

3      Q.  What age group?

4      A.  The age of my younger son when he started at

5  five-years old.

6      Q.  So you coached five year olds?

7      A.  Six years.

8      Q.  Okay.  Did you have any other hobbies or any other

9  sporting activity that's you engaged in?

10      A.  I used to run a lot.

11      Q.  "Run" in what sense?

12      A.  Track, jogging.

13      Q.  Did you run competitively in races?

14      A.  No, I ran for my health.

15      Q.  How often would you run?

16      A.  Almost every day.

17      Q.  What distance would you run?

18      A.  About 20 blocks back and forth?  20 blocks out and

19  20 blocks back.

20      Q.  What kind of shoes did you have?

21      A.  Sneakers for running.

22      Q.  Were they running shoes or tennis shows?

23      A.  Tennis shoes.

24      Q.  What make?

25          THE INTERPRETER:    Tennis shoes in the Spanish mean

1    sneakers.

2    A.   Nike or Addidas.

3         MR. KALLEN:   PF flyer's.

4    Q.   How long would it take to you run the 20 blocks

5    roughly?

6    A.   30 or 40 minutes, all together.

7    Q.   Did you run with anybody or by yourself?

8    A.   By myself and sometimes with my older son.

9    Q.   Did you ever - Strike it.

10        How long had you done that?  How long had you been

11   running regularly every day for 30 minutes?

12   A.   A couple of years.  I continued to gain weight so I

13   did that to keep the weight down.

14   Q.   Did you develop any toe problems or ankle problems

15   or knee problems as a result of running every day?

16   A.   No.

17   Q.   What kind of surface did you run on?

18   A.   In the street, cement.  On the sidewalk mostly.

19   Q.   Did you belong to any club, organization, or

20   churches?

21   A.   The church.

22   Q.   What church?

23   A.   Catholic church.

24   Q.   Which Catholic church?

25   A.   Biscayne Boulevard at Saint Rose of Lima in North

1    Miami.

2         Q.   Saint Rose of Lima; that is in Miami shores?

3         A.   Yes, Miami Shores and the Holy Family in North

4    Miami.

5         Q.   Are you a member of a diocese or did you actually

6    belong to a church?

7         A.   I went to church a lot but I was not a registered

8    member.

9         Q.   Did you belong to any Catholic organization in any

10   of the churches that you attended?

11        A.   No, but I went to their activities about how to

12   coping in the family, together, and so on.

13        Q.   What activities do you have or engage in now with

14   your family?

15        A.   I read with them.  I watch TV with them.  Especially

16   watch soccer and basketball games.  I don't do anything else.

17   I don't feel well enough.

18        Q.   Do you still go to the movies?

19        A.   No.

20        Q.   Why not?

21        A.   Because it's very cold in the movie, in theaters;

22   and cold makes me feel bad.

23        Q.   Tell me what your present physical complaints are

24   that are attributed to the injuries from this accident?

25   Let's start from the top of your head and go to the tip of

1    your toes?

2        A.   My head.

3        Q.   What is the matter with the head?

4        A.   A lot of headaches and in my forehead, the front.

5        Q.   And your neck?

6        A.   Yes, my neck.

7        Q.   Where?

8        A.   (Indicating).

9        Q.   Indicating directly below your skull, in the back of

10   the neck?

11       A.   Right here (indicating).  I get, like, very stiff

12   here, very tense.

13       Q.   Do you get pain or tension and stiffness?

14       A.   The tension and it causes the pain.

15       Q.   What else?

16       A.   The lower part of my back where they did the

17   surgery; and here on the side (indicating) these bones here,

18   I feel pain.

19       Q.   Your hip bones?

20       A.   Yes.  I can't sleep on my side.  I turn on my side

21   for short periods but I can't feel comfortable.  So I can't

22   get comfortable to sleep.

23       Q.   Keep going.

24           MR. KALLEN:  Only if there is more.

25       A.   I can't walk quickly.  Because my heels hurt a lot.

1    I keep telling my doctor my knee hurts a lot.  This right

2    foot swells up a lot.

3              MR. KALLEN:  Which knee?

4         A.   The right knee.  I feel a lot of pain here

5    (indicating) in my lower buttock and radiating down my leg.

6         Q.   Which side?

7         A.   On the right side.  And I feel a lot of burning

8    sensation and pain on the left side very close to my rectum.

9         Q.   How often to you have headaches?

10        A.   Every day.

11        Q.   And where do they - Tell me where the headaches and

12   what type of headaches that you have?  Are they constant

13   throbbing or what?

14        A.   If I move around a lot or if I'm sitting for a long

15   time or standing for a long time, I get upset and that gives

16   me a headache.

17        Q.   Where do the headaches occur, in the front or on the

18   side?

19        A.   All over my head, but especially in the front.

20             MR. KALLEN:  Do you have a headache now.

21             THE WITNESS:  Yes.

22             MR. VALLE:  That's because of you, John.

23             MR. KALLEN:  I have one too.

24             MR. VALLE:  He's got something else from me.  That's

25        a No. 7.  Please forgive us for laughing with you.

1          We're not making light of your condition.  It's just

2          that if we don't keep a sense of humour in this

3          business, we would go crazy.

4               THE WITNESS:  (Witness nods head.)

5     BY MR. VALLE:

6          Q.  I was suggesting that I gave you the burning pain

7     right now.

8               Any pain, any problems, in your legs other than your

9     right knee?

10         A.  No.  Just here in the right leg I have a lot of

11    pain.

12         Q.  How about your feet?

13         A.  My heels.

14         Q.  We covered that.

15         A.  Especially when I walk or if I stand for a long

16    time.

17         Q.  Do you have any appointments at the present time to

18    be examined by any other doctors other than Dr. Scuidero?

19         A.  No.

20         Q.  Do you have an appointment to see Dr. Scuidero

21    again?

22         A.  No.

23         Q.  Do you have an appoint to see Dr. Felice again?

24         A.  No.

25         Q.  When was the last time that you saw Dr. Scuidero?

```
 1        A.   October 31, of last year.

 2             MR. KALLEN:  Of 2000?

 3             THE WITNESS:  Yes.

 4   BY MR. VALLE:

 5        Q.   I think that you said that you saw Dr. Scuidero last

 6   year sometime but you don't know when, right?

 7        A.   That's right.  I don't remember.

 8        Q.   What medication are you currently taking?

 9        A.   I'm taking Advil.

10        Q.   How often do you take Advil?

11        A.   I take 500-milligrams every day.

12        Q.   In one pill or do you break it up during the day?

13        A.   I take them both at the same time because I have a

14   lot of pain.

15        Q.   Do you take them in the morning or afternoon or

16   night?

17        A.   In the morning if I have pain; or if not, in the

18   afternoon.

19        Q.   You take two 250-milligrams pills?

20        A.   Yes, sir.

21        Q.   Is that medication that you can buy over the counter

22   in the drug store or do you have a prescription for that?

23        A.   It's over the counter.

24        Q.   When was the last time that you took a prescription

25   pain killers?
```

1      A.   January of last year.  I think it was January of

2  last year.  It made me feel sick.  I went to the doctor and

3  told the doctor that it was making me bleed.

4      Q.   Making you bleed where?

5      A.   It was called Celebrex, the medicine.

6      Q.   Where did it make you bleed?

7      A.   From the rectum.

8      Q.   Was it red or black blood?

9      A.   Red and black.

10      Q.   Red and black?

11      A.   Yes.

12      Q.   Are you taking any other medications?  Have you

13  taken any other prescribed medication since January of 2000

14  other than the medication that you just mentioned?

15      A.   No, the doctor told me that in order not to have

16  that I probably should take Advil.

17      Q.   What doctor was that?

18      A.   Scuidero.

19      Q.   How do you spend an average day?

20      A.   I get up late around 9:00 or 9:30.  I have a cup of

21  coffee and by then my wife is back from work.  I read a

22  little and not a lot because I get tired reading.  I watch

23  TV.  I listen to music.  I go back and read some more and

24  then than I go back and watch TV some more.  I go out and get

25  some sun.  That's how I spend the day, or I go out for a

1    drive with my wife in the car.

2        Q.  Where does your wife work?

3        A.  She works now as a crossing guard, crossing the

4    children.

5        Q.  Is that an elementary school or high school?

6        A.  Both, elementary and high.

7        Q.  Does she get paid for that?

8        A.  She gets paid, not much.

9        Q.  So by the time you get up and have coffee, she's

10   back from her job in the morning?

11       A.  Yes.

12       Q.  Does she go back to work in the afternoon when the

13   school is letting out?

14       A.  Yes, sir.

15       Q.  Are you receiving any type of payment at the present

16   times as a result of claims for disability or otherwise?

17       A.  Yes.

18       Q.  Tell me what type of disability payment that you

19   receive?

20       A.  Social security approved my disability.

21       Q.  How much do you receive per month from social

22   security?

23       A.  A $153 a month.

24       Q.  Are you receiving any other disability payments?

25       A.  No.

1     Q.   You had a case - You had a Longshore case that you

2  settled, correct?

3     A.   Yes.

4     Q.   And the settlement was $120,000?

5     A.   Yes, but I don't get that amount.

6     Q.   Your attorney got $20,000 and you got $100,000; is

7  that right?

8     A.   No.

9     Q.   You received - I'm sorry - it was $110,000 and you

10  received 90?

11     A.   90, yes.

12     Q.   Was this $90,000 net to you or did you have to pay

13  doctors?

14     A.   It was net.  It was $90,000 for me and $95,000 for

15  the doctors and surgery on and so on.

16     Q.   Are you currently on Medicare?

17     A.   No.  I'm hoping they will give me Medicare.

18          MR. KALLEN:  Say that again.

19     A.   No, but I'm hoping they will give me Medicare.

20     Q.   Are you on Medicaid?

21     A.   No, sir.

22     Q.   Has anybody been representing you with regard to

23  your social security claim or entitlement to Medicare?

24     A.   The one that represented me was Lieberman.

25     Q.   Lyle Lieberman?

1      A.   Lyle Lieberman.

2      Q.   What is the problem with Medicare?

3      A.   You have to wait two years after the social security

4  is approved.

5      Q.   During the time usually they give you Medicaid.

6           Have you applied for Medicaid?

7      A.   I asked social security and they told me to wait two

8  years after approval.

9      Q.   He got too much net worth.  He has too much money to

10  get Medicaid, that is for sure.

11      A.   Yes, I have to spend it first.

12      Q.   How is your appetite?

13      A.   More or less, okay.

14      Q.   How is your weight problem?

15      A.   I'm watching my weight.

16      Q.   Have you gained or lost any weight since the

17  accident?

18      A.   No.

19      Q.   Has this accident - This is another question that

20  you may have already answered in several different ways, but

21  I have to ask you the question directly.

22           Has this accident or the injury from this accident

23  affected your relationship with your wife?

24      A.   Yes.

25      Q.   Tell me how, please?

1     A.   I have become very nervous and irritable.  I shout a

2 lot; and sexually, I can not satisfy her.  I know that we

3 have problems.

4     Q.   Is it that you have a problem with sex because of

5 the pain or is there a mechanical problem?

6     A.   Because of my pain; and I don't feel desire or

7 pleasure as I did before.   If I do it once a month, it's not

8 with the same quality as before.

9     Q.   How often were the sexual relations before this

10 accident?

11     A.   Three times a week.

12     Q.   Have you and your wife thought about a separation or

13 divorce since this accident occurred?

14     A.   No, thank God.  No.

15     Q.   Have you been to a marriage counselor?

16     A.   No, but I think that we need to.

17     Q.   Other than your immediate family, do you have any

18 other relatives living in Broward County or Dade County?

19     A.   I have a brother in Broward.  His name is Miguel.  I

20 have two sister-in-laws, one is in Broward; and my wife has a

21 brother.  My sister-in-law's husband is like a brother to me.

22     Q.   Your sister-in-law's husband - Your wife's brother?

23         MR. WEBER:  His sister-in-law's husband.  This is

24     her sister's husband.

25         MR. VALLE:  That's what I thought.

1        MR. FAMULARI:  I thought not her brother.  Her

2    sister's husband.

3        THE WITNESS:  Talking about my wife's sister

4    brother - husband - sorry.  My wife's sister husband

5    who is like a brother to me.

6  BY MR. VALLE:

7        Q.  That's your brother-in-law, right.

8            You mentioned that you go for drives with your wife?

9        A.  Yes, I go with her sometimes to Publix or get

10 Chinese take out.

11       Q.  Do you still drive?

12       A.  Yes.

13       Q.  How often do you drive?

14       A.  I pick up my son from school.

15       Q.  Which son, the young or the older?

16       A.  The small, the younger one.  I go to buy bread at

17 the Columbian bakery.  I go to buy bread, and I come back

18 home.

19       Q.  How many motor vehicles do you own or does your

20 family own?

21       A.  We have two.  One is mine and one is my wife's.

22       Q.  What kind of car is that?

23       A.  A Honda Accord, '92.  My wife has a Honda ,Civic

24 '93.

25       Q.  What color is the Accord?

1       A.  Both are black.

2           MR. VALLE:  I think that I'm done.  I don't have any

3       further questions.  I'm sorry that we took this long

4       but it is a very difficult case to understand.

5           MR. KALLEN:  First, don't go anywhere.

6           MR. FAMULARI:  You thought he was asleep all day.

7           MR. VALLE:  Coiled and waiting.

8           MR. FAMULARI:  Are you done now?

9           MR. KALLEN:  No.

10                       CROSS-EXAMINATION

11  BY MR. KALLEN:

12      Q.  When did you acquire both cars?

13      A.  In '97.  In 1997, just one; and her's was in '95.  I

14  don't remember exactly.

15      Q.  The residence in Pembroke Pines where you reside is

16  that a house?

17      A.  It's a house.

18      Q.  Do you own it?

19      A.  Yes.

20      Q.  When did you purchase the house?

21      A.  In '97.

22      Q.  When in 1997?

23      A.  In December.

24      Q.  Do you recall the purchase price?

25      A.  Yes, sir.  $134,000.

1     Q.  How big a house is it?

2     A.  Three bedrooms and two baths, a double garage,

3  two-car garage, pool and the yard.

4     Q.  Do you swim?

5     A.  I get in the pool; and get in the pool for awhile in

6  the summertime.

7     Q.  Do you do laps?

8     A.  No.

9     Q.  Did your doctor tell you that swimming may be good

10  therapy for you?

11     A.  The doctor never told me but someone told that me I

12  should walk and do exercises.

13     Q.  Do you do them?

14     A.  Yes, I have done it.

15        MR. VALLE:  Can I ask you to ask, does he have a

16     nickname or are you known by another name.

17     Q.  Do you have a nickname or are you known by any

18  other name besides Henry?

19     A.  No, just Henry.

20     Q.  The home that you live in, is that in a development?

21     A.  No.

22     Q.  Who would you say your best friend is besides your

23  wife?

24     A.  My son.

25     Q.  Who do you socialize with or speak to the most?

1    A.   Actually, no one visits me.  It's very rare that any

2  one visits me.  Everything has changed.  No one comes to see

3  me anymore.

4    Q.   Are you saying that you have no friends?

5    A.   Yes, I have - I have made a friend.  He is from my

6  country also.  Not very constant, maybe, once a week.

7    Q.   Did you have more friends before the accident?

8    A.   No.

9    Q.   Would you describe yourself as a private person?

10    A.   I believe so, yes.

11    Q.   You appear to be rather calm.  Is that the way that

12  you have always been?

13    A.   I think that I am very nervous, but I prepare myself

14  to be calm today.

15    Q.   You don't show your nervousness.  You appear to be

16  very calm?

17    A.   Yes.  I drink a lot of lemon tea which calms my

18  nerves.

19    Q.   Had you had personality changes since the accident?

20    A.   Yes.

21    Q.   In what way?

22    A.   I get tired of people easily.  I get bothered.  I

23  can be with somebody and I want them to leave.  Of course, I

24  don't say it; or someone comes to my house, like my friend,

25  that one that I mentioned.  I go to his house or in an hour

(954) 523-0915  HI-TECH COURT REPORTING, INC.

1    and I go back home; and it bothers me a lot that I can't act

2    the way that I did before.

3        Q.  How did you act before?

4        A.  Especially, with my children.  I used to do more

5    with them.  For example, they used to chose where we were

6    going to go and we would go.

7        Q.  What is your friend's name?

8        A.  His name is Edison.

9        Q.  Is that his first name?

10       A.  His first name.

11       Q.  What is his last name?

12       A.  Aristizabal, A-R-I-S-T-I-Z-A-B-A-L.

13       Q.  Why do you think that you need to see a marriage

14   counselor?

15       A.  Because we argue a lot, and I get easily bothered by

16   the way that she talks to me.  I was not like that before.

17       Q.  Did you ever fight before the accident, have

18   arguments?

19       A.  No.

20       Q.  How long has your wife worked as a crossing guard?

21       A.  I think a month.

22       Q.  Before that did she work?

23       A.  Yes, she used to work.

24       Q.  Where?

25       A.  She worked for a used car dealer.

1    Q.   Doing what?

2    A.   In the office.

3    Q.   How long did she do that?

4    A.   Four years.

5    Q.   Why did she leave the used car dealer?

6    A.   I suggested to her that she leave.

7    Q.   Why?

8    A.   Because she was - She had a lot of nervous problems.

9    Q.   From the work?

10   A.   No.  Because she was in charge.  Well, I didn't have

11   the money before that they gave me now from the Longshoremen,

12   so she was responsible for all the expenses of the house.

13   That was one of the reasons she lost a lot of weight, and was

14   very upset.  And I told her now that we have the money that

15   she should take it easy.

16   Q.   Which is one of reasons why she left that job?

17   A.   That's a reason.

18   Q.   Do you wear any type of back brace?

19   A.   They have not recommended any.  I don't use any.

20   Q.   Have you ever worn one since the accident?

21   A.   No.

22   Q.   Any other type of brace that you have worn since the

23   accident for your knee, arm, anything else?

24   A.   Yes, I used one that I got at Eckerd's for my knee.

25   Q.   When did you get that?

1        A.   More than two years.   Almost three years.

2        Q.   After the accident?

3        A.   After the accident.

4        Q.   Why did you get that knee brace?

5        A.   To help with the pain in my leg; that part on the

6   side here (indicating) hurts me a lot.

7        Q.   Are you wearing it now?

8        A.   No, sir.

9        Q.   When do you wear it?

10        A.   When my knee is hurting, I put it on.

11        Q.   When is that?

12        A.   When I'm walking and it starts to hurt or if I'm

13   standing for a long time.

14        Q.   Do you ride a bike?

15        A.   No.

16        Q.   Do you read English?

17        A.   I take the newspaper and read it.

18        Q.   The Sun-Sentinel?

19        A.   Okay.

20        Q.   You have no problem understanding what you're

21   reading in the paper?

22        A.   I don't get a 100 percent but I can understand it.

23        Q.   You get most of it?

24        A.   Yes.

25        Q.   For example, Defendant's Exhibit 1, you can read

1    that and understand it?

2       A.   (Witness reading Exhibit No. 1 in Spanish.)

3           Here, for example, it says, "What is your present

4       complaint?  Did you have any prior surgery; and if so,

5       say where."

6       Q.   Does your handwriting appear on that document other

7    than your signature?

8       A.   Yes.

9       Q.   Point it out for us, please?

10      A.   (Witness complies).

11          MR. VALLE:  Repeat that question.

12      Q.   Other than your signature, did you write anything

13   else on that document?

14      A.   No.

15      Q.   Let me show you what we will mark as Exhibit 3, four

16   pages of photographs, provided by your attorney.  Is that you

17   or at least the back of you in the photographs?

18          (WHEREUPON, the above referenced document was marked

19      as Defendant's Exhibit No. 3 for Identification.)

20      A.   Yes, that's me.

21      Q.   Were those photographs taken in your attorney's

22   office?

23      A.   Yes, sir.

24      Q.   Can you give me the approximate date they were

25   taken?

1      A.  I don't remember.

2      Q.  Do you know which of your attorney's office those

3  photos were taken?

4          MR. FAMULARI:  It was Manny's.

5      Q.  Was it Manny's office, Mr. Valdes?

6      A.  Valdes?

7      Q.  Do you think that is where the photographs were

8  taken?

9      A.  Yes, sir.

10     Q.  Do you remember when you first had Mr. Valdes

11 represent you?

12     A.  No, sir.

13     Q.  When is the lawsuit filed?

14         MR. VALLE:  '97.

15         MR. KALLEN:  I don't have that.  I have the amended

16     complaint and not the original.

17         MR. VALLE:  What is your case number?

18         MR. FAMULARI:  I have it here.  I show a 00 case

19     number, a 2000.

20         MR. FAMULARI:  It was filed January 6, 2000.

21 BY MR. KALLEN:

22     Q.  Do you know why the photographs were taken?

23     A.  Yes, of course.

24     Q.  Why?

25     A.  Because I have an injury in my back.

1    Q.  Were photographs taken of any other part of your

2  body?

3    A.  No.

4    Q.  On many of these photographs there appears to be

5  some type of device on your back.  What is that?

6    A.  It is the TENS machine.

7    Q.  The TENS unit?

8    A.  The machine for electrical therapy.

9    Q.  When did you stop using that?

10    A.  Last night.

11    Q.  Do you use that every day?

12    A.  Yes, sir.

13    Q.  Do you have that on now?

14    A.  No.

15    Q.  When do you use it?

16    A.  When I'm at home laying down in bed.

17    Q.  For how long do you use it?

18    A.  20 minutes.

19    Q.  Does it help?

20    A.  It helps.  It relaxes me a little but not

21  completely.

22    Q.  It relaxes you?

23    A.  It does not completely help.

24    Q.  Do you have any other source of income besides your

25  social security disability and your wife's income?

1    A.  No, sir.

2    Q.  Did you file a tax return for 1999?

3    A.  Yes, sir.

4    MR. KALLEN:  David, can you make a note to get that

5    to us.  I only have them through '98.

6    MR. FAMULARI:  Yes.

7    MR. KALLEN:  Larry, do you have that?

8    MR. VALLE:  I got through '98; that's it.

9 BY MR. KALLEN:

10    Q.  Mr. Valdes, can you tell us why the tax returns that

11 were filed - I think going back to '93, '94, you filed these

12 returns individually as head of the household?

13    MR. VALLE:  You called him Valdes.

14    Q.  Mr. Naranjo, I'm sorry.  I'll ask it a different

15 way.

16       Is there a reason why you and your wife have not

17 filed joint income tax returns?

18    A.  I don't have a reason but I have always done it that

19 way.

20    Q.  Would it be fair to assume that your wife would also

21 have her own income tax returns for the same year?

22    A.  Yes, she does her's separately.

23    Q.  So if we request them we should be able to obtain

24 them?

25    A.  Yes, sir.

1        Q.   Were you married in Columbia or here in the United

2   State's?

3        A.   In Columbia.

4        Q.   When did you become a citizen of the United States?

5        A.   In '96.

6        Q.   Did your wife also become a United States citizen at

7   the same time?

8        A.   No.

9        Q.   Is she now a US citizen?

10       A.   No.

11       Q.   Why is that?

12       A.   She is a resident.  I don't know.  She may have her

13   reasons for not doing it.

14       Q.   You have you never discussed that with her?

15       A.   Yes.  Everyone has their own way of thinking.  I

16   tend to rush into things.  I became a citizen.

17       Q.   The reason that your wife has not become a citizen

18   we would have to ask her since you don't know?

19       A.   Yes; that's right.

20       Q.   Did your wife come to the United States with you at

21   the same time?

22       A.   Almost at the same time.  I came first.

23       Q.   When did your wife come?

24       A.   Six months later.

25       Q.   Do you have a marriage certificate?

1      A.   Yes, but not here.  Not with me.

2      Q.   At home?

3      A.   No.

4      Q.   Where would we get a copy from?

5      A.   Columbia.

6      Q.   Your income tax returns reflect only one dependent,

7  one child?

8      A.   My older son.

9      Q.   Is there a reason why you do not the claim younger

10 son as a dependent also?

11     A.   No.  Just that she took the younger.  I took the

12 elder.

13     Q.   So as far as you understand in your wife's tax

14 returns that would show your younger son being claimed a

15 dependent of her?

16     A.   Yes.

17     Q.   Now, was this done at the suggestion of your

18 accountant?

19     A.   No.

20     Q.   That was something that you and your wife decided to

21 do?

22     A.   Probably, but I don't remember if we discussed it.

23     Q.   Were you wearing glasses on the day of the accident?

24 Your prescription glasses?

25     A.   Yes.

1        Q.   For how long have you worn prescription glasses?

2        A.   About four months.

3        Q.   Let's back up.  Are the glasses that you are wearing

4    today prescription glasses?

5        A.   Yes.

6        Q.   For how many years have you been required to wear

7    glasses?

8        A.   I've never used them before just now.

9        Q.   Only in the past four months?

10        A.   Yes, the last four months.

11        Q.   Is there something about your eye sight that has

12    deteriorated as of four months ago?

13        A.   Yes.  Well, as of about a year ago.  I can't read

14    too well.  I need a lot of light.  So I went to get an eye

15    exam and the doctor told me that I need to use glasses.

16        Q.   Since you have been wearing the glasses has that

17    helped with your headaches?

18        A.   That was also one of the reasons but it doesn't

19    help.

20        Q.   It doesn't help.

21             Do you have scars on your back?

22        A.   Yes.

23        Q.   From the surgery?

24        A.   Yes, sir.

25        Q.   Why have you not gone back to see Dr. Scuidero since

1    October?

2        A.   Because it is very expensive.

3        Q.   Do you have health insurance?

4        A.   No, sir.

5        Q.   Does your wife have health insurance?

6        A.   No.

7        Q.   When was the last time that you had health

8    insurance?

9        A.   January of 1999.

10       Q.   So you're saying that have you not seen Dr. Scuidero

11   simply because you cannot afford it?

12       A.   Yes.  He is very expensive and the x-rays that he

13   takes are expensive.

14       Q.   Do you still think that you need to go back to see

15   him?

16       A.   Yes.

17       Q.   Have you told your attorney that?

18       A.   Yes, I have.

19       Q.   Are there any other doctors that you have wanted to

20   see but you have not because of financial reasons?

21       A.   Yes, I have thought about it.  Yes.

22       Q.   Such as who?

23       A.   I went to see some doctors that are from the

24   government on Pembroke Road at 42nd in Broward.  I have tried

25   to go there but there were a lot of people.  I had to wait a

1    long time.  I was in pain.

2        Q.  When was that?

3        A.  About a year ago.

4        Q.  Do you think that you need to see a psychiatrist?

5        A.  Yes, sir.

6        Q.  Why?

7        A.  Because of the way I behave.  My nervous system.   I

8    yell a lot a home.  At my children and at my wife.  I argue

9    with her.  We don't fight but we argue.

10       Q.  How long have you felt that way that you felt that

11   you need to see a psychiatrist?

12       A.  A few months.

13       Q.  Three months or more or less?

14       A.  More or less, three months.

15       Q.  What has happened in the past three months which was

16   not occurred before now that required you to see a

17   psychiatrist?

18       A.  The way that I'm behaving has been continuous; and I

19   didn't realize it.  I thought about it but I had not made the

20   connection, and I didn't want to pay for it.

21       Q.  So your behavior has gotten worse in the past few

22   months?

23       A.  No, it hasn't gotten worse.  It is the same.  But it

24   was three months ago when I starting think that would be a

25   good thing to do, that we both need some psychological help.

1     Q.  Do you feel that your children have suffered in any

2  way because of your injuries?

3     A.  No.  It's mostly with my wife.

4     Q.  Now, you explained to Mr. Valle here the list of

5  your ailments from your head to your toes.  Would you say

6  that you have had those problems since the accident?

7     A.  What I told him?

8     Q.  Yes.

9     A.  Yes.

10     Q.  In other words there are not any problems that have

11  started, say, in the past six months or since one year ago,

12  that were not present right after the accident?

13     A.  Yes, it is all since the accident.

14     Q.  Have you attended any schools, any kind of school in

15  the United States?

16     A.  No.

17     Q.  Have you attended any seminars as part of your job?

18     A.  No.

19     Q.  As I understand it since you came to the United

20  States in 1981 your occupation was, basically, as a welder?

21     A.  Yes.

22     Q.  So as of the date of the accident in 1997, you had

23  been working as a welder for approximately 16 or 17 years?

24     A.  Yes.

25     Q.  As of the date of the accident would you consider

1  yourself to have been an expert in welding?

2        MR. FAMULARI:  Object to form.

3     Q.  You can answer.

4        MR. FAMULARI:  Go ahead and answer.

5     A.  Yes.

6     Q.  Was there anything about welding that you felt that

7  you did not know or could not do?

8     A.  No.  I liked welding from the very beginning.  I

9  know how to weld anything.  I'd like to feel it was a way to

10  make money and had a good future.

11    Q.  You did well at it?

12    A.  Yes.

13    Q.  You were making good money, right?

14    A.  Yes, I did well.

15    Q.  Was there an occasion at Bradford when they gave you

16  a welding job, and you said, I can't do it.  I don't know how

17  to do it.

18    A.  No.  I always said, yes; and learned very fast.

19    Q.  There was a fabrication welding department at

20  Bradford, yes?

21    A.  Yes, sir.

22    Q.  How many welders were there?

23    A.  Right now?

24    Q.  Let's go to June of '97?

25    A.  15 welders.

1        Q.   15 welders.

2             Of the 15 who was most senior in time on the job?

3        A.   I was the first welder there.

4        Q.   So you were on the top of the list as far as

5   seniority?

6        A.   Yes, sir.

7        Q.   Your immediate boss was Tony Watson?

8        A.   Yes, sir.

9        Q.   What was his title?

10       A.   Tony Watson, chief of welders.

11       Q.   Okay.  Chief of welders.

12            Did you hope to perhaps hope to become chief of

13   welders one day at Bradford?

14       A.   Yes, sir.

15       Q.   Did you feel that you were qualified to do that?

16       A.   Yes, sir.

17       Q.   Were you ever given any promises or did anyone ever

18   tell you from management that you were in line to become

19   chief of welders?

20       A.   No one told me but I felt it - that I thought that I

21   could if I asked for it.

22       Q.   Do you know why Tony Watson left the employment of

23   Bradford Marine?

24       A.   I have never spoken to him about it.

25       Q.   Have you not heard a rumor or hearsay as to why?

1    A.  No.

2    Q.  Did you get along well with Tony Watson?

3    A.  Yes, sir.

4    Q.  What was the job of chief welder?  What did a chief

5  welder do?

6    A.  He is in charge of supervising all the welders,

7  including me; and to give work orders to each employee; and

8  to see what everyone was doing.

9    Q.  When you say "Supervising other welders," tell us

10  what that means in real terms?  What does that mean

11  "Supervise"?

12    A.  When there is a group there has to be a boss.

13    Q.  Would that include being instructed?

14    A.  To monitor and to instruct.

15    Q.  To make sure the jobs are being done properly?

16    A.  Yes, sir.

17    Q.  And safely?

18    A.  Yes, sir.

19    Q.  And to instruct, if necessary?

20    A.  Yes, sir.

21    Q.  You felt that you were qualified to do all that in

22  1997?

23    A.  Yes, I was hoping for an opportunity for some help.

24  One always starts as an assistant to the chief.

25    Q.  Does the chief welder do welding jobs too?

1      A.  Yes.

2      Q.  I take it it's extremely important in your line of

3  work to make sure that before you start welding that there is

4  nothing in the area that could catch on fire?

5      A.  Yes, that is true.

6      Q.  Or explode?

7      A.  Yes.

8      Q.  For that reason before you start welding, you as a

9  welder, make it a point to make sure that the area is safe?

10     A.  Yes sir.

11     Q.  Also, that the surrounding area is safe, as well?

12     A.  Yes.

13     Q.  This type of welding machine that you were using can

14  it create what is known as "slags" from welding?

15     A.  I don't know.

16     Q.  When you weld does is create sparks?

17     A.  Yes.

18     Q.  If you're not careful those sparks can ignite some

19  type of material in the area?

20     A.  Yes.

21     Q.  Besides the sparking there can be hot balls of metal

22  or aluminum that fly away and ignite material, as well?

23     A.  That's why one always used a fire blanket to cover

24  the area because you don't know if there will be sparks.

25     Q.  Did you put a fire blanket in the lazarette before

1  you welded?

2       A.  Yes, sir.

3       Q.  Did it cover the entire deck of the lazarette?

4       A.  No, just the area where I was going to work.

5       Q.  How big was the fire blanket?

6       A.  I don't know how to --

7       Q.  Estimate for us.

8       A.  (Indicating) about half the sides of the table.

9           MR. VALLE:  3-by-2.

10      Q.  3-feet by 3-feet?

11      A.  More or less, 3-by-3.

12      Q.  Besides putting down the fire blanket, you looked

13  around the area to see if there were any combustible

14  materials?

15      A.  Yes, that is true.

16      Q.  Because you don't want a spark flying off of the

17  machine and igniting some material while you are welding?

18      A.  Yes, sir.

19      Q.  Did you see any combustible materials?

20      A.  No, I inspected the area and it was clean.

21      Q.  No paper, no debris?

22      A.  Nothing.

23      Q.  Okay.  Was there any type of equipment or machinery

24  in the lazarette?

25      A.  Yes, there was a machine.  There was machinery.

```
 1        Q.   Do you know what kind?

 2        A.   There was a compressor.  A blower there, I was

 3   using.  No, that's all.  The hydraulic jacks.

 4        Q.   Did you cover up the compressor?

 5        A.   They were further away.  It was not necessary.

 6        Q.   Did you cover up the hydraulic jacks or pumps?

 7        A.   They were also further away.

 8        Q.   Did you see any hoses that could catch on fire?

 9        A.   No.  I saw no hoses.

10        Q.   Did you have a fire watch?

11             THE INTERPRETER:  What is that?

12        Q.   Fire watch.

13             Just ask him.

14        A.   No.

15        Q.   Are you supposed to have a fire watch when you weld?

16        A.   Yes, I should have one.

17        Q.   But you didn't on this occasion, did you?

18        A.   No, I didn't.

19        Q.   What is the purpose of the fire watch, Mr. Naranjo?

20        A.   When dangerous areas that could cause fires, one

21   needs one.

22        Q.   The fire watch is the eye - the fire watch looks for

23   any possible sparks that may cause a fire or explosion and is

24   there to watch out for your safety as well, correct?

25        A.   Yes, that is true; but this area didn't pose any
```

1  danger.

2      Q.  So you're saying that you did not need a fire watch?

3      A.  They didn't send one with me, it is because it was

4  not necessary.  I didn't make that decision.

5      Q.  Did your boss know that you were welding?

6      A.  My boss knew, yes.

7      Q.  He knew that you were fabricating the two plates to

8  install on the boat?

9      A.  Yes.

10     Q.  He didn't send a fire watch with you when it came

11  time to weld?

12     A.  No.

13     Q.  You knew that you needed one though?

14         MR. FAMULARI:  Object to form.

15     Q.  You can answer.

16     A.  No.  No, I didn't.

17     Q.  Did you discuss with your boss what you were welding

18  before you went to do it?

19     A.  Yes.  I spoke to him and he was the one that told me

20  to talk to the captain, and he told me what I had to do.  He

21  showed me; and explained to me when I said, Is there a tank

22  there and fuel lines?

23         He said, no.  There is no problem.  And weld there

24  because there is only solid concrete there and a plate flush

25  on top.

1          I didn't see any danger in the area around there.

2     Q.  Mr. Naranjo, this will go quicker if you just answer

3  my question, okay?  So let's be clear:  Your boss was Tony

4  Watson, correct?

5     A.  Yes.

6     Q.  You were paid by Bradford Marine, correct?

7     A.  Yes.

8     Q.  Did you discuss with Tony Watson, your boss, the job

9  that you were going to do:  That is weld these two aluminum

10  plates onto deck in the lazarette; yes or no?

11     A.  Yes.  He sent me to do it.  I knew I was going to do

12  it and the captain knew also.

13     Q.  Mr. Watson knew what jobs you were going to do that

14  day?

15     A.  Yes.

16     Q.  Where was this piece of paper that certifies that

17  the lazarette was gas free?

18     A.  On the boat.

19     Q.  Where on the boat?

20     A.  At the entrance of the boat (indicating).  You come

21  in over here and walk this way and the paper is facing you as

22  you come on.

23     Q.  Did you read that piece of paper that day?

24     A.  No.  All of us that work there know that is a gas

25  free certificate.

1      Q.  Did you ever read that certificate?

2      A.  No, sir.

3      Q.  Do you know if the lazarette, specifically, had been

4   inspected to make sure it was gas free?

5      A.  Only the captain and the person that does the gas

6   free inspection would know that.

7      Q.  Mr. Naranjo, answer my question, please?

8      A.  Yes.

9      Q.  Did you know if the lazarette was inspected to be

10   certified to be gas free?

11      A.  No, I do not know.

12      Q.  Did you just assume that it was inspected and

13   certified to be gas free before you started welding there?

14      A.  No, I don't assume.  I know that on every ship where

15   this work is done it is certified to be gas free.

16      Q.  But you don't know because you did not read the

17   certificate, did you?

18      A.  I never read it.

19      Q.  Did Captain Bredbec tell you this space in the

20   lazarette is gas free?  Did he use those words?

21      A.  Captain Bredbec?

22      Q.  Captain Jack?

23      A.  I asked if there were a tank or fuel lines; and he

24   said, no.

25      Q.  You did not ask Captain Jack, did you, whether this

1  lazarette was inspected and certified to be gas free, did

2  you; yes or no?

3      A.  No.  No, I did not ask him at that time if it was

4  gas free; but I did ask him for my safety if there were a

5  tank or gas lines.

6      Q.  You knew where the fuel tanks were because you had

7  welded on them before, had you not?

8      A.  Yes.

9      Q.  Where are the fuel tanks, looking at the diagram,

10  and put an "X" - If you don't mind, Larry?

11          MR. VALLE:  Go ahead.

12      Q.  Put an "X" on the diagram where the fuel tanks are?

13      A.  In the engine room, I don't know.  In the engine

14  room, but I did not work on fuel tanks.

15      Q.  But the fuel tanks are in the engine room?

16      A.  No, I don't know.

17      Q.  You don't know?

18      A.  Sometimes they put them here and sometimes they put

19  them there (indicating).  I can't say exactly where they

20  were.

21      Q.  You know what a multi-gas tester machine is?

22      A.  No.

23      Q.  Do you know what a gas tester is?

24      A.  I have heard it spoken but I have not seen one.

25      Q.  You know what that machine does?

1      A.   I saw once but I don't know the procedure.

2      Q.   I'm not saying how to operate, but you do know that

3   a gas tester is testing for the presence of flammable gases

4   and vapors, correct?

5      A.   Probably, yes.

6      Q.   Would you have welded in the lazarette if you did

7   not think that certificate, that piece of paper, referred to

8   the lazarette being gas free?

9           Can you translate that term or I can rephrase?

10          THE INTERPRETER:   I would appreciate it.

11     Q.   Let me rephrase it.   You knew there was a gas free

12  certificate, a piece of paper, on that boat, right?

13     A.   Yes.

14     Q.   As far as you knew that piece of paper said this

15  boat is gas free?

16     A.   Yes.

17     Q.   If that piece of paper was not on that boat would

18  you have welded that day?

19     A.   No.

20     Q.   Do you know what Captain Jack's welding knowledge

21  consisted of?

22     A.   I don't know if he knows anything about it.

23     Q.   Between you and him you are the expert, right?

24     A.   He may also be because he is the captain.

25     Q.   You didn't ask Captain Jack to tell you what setting

1    to put the welding machine on, did you?

2        A.    That is true, I did not.

3        Q.    That's your decision?

4        A.    Because I know what temperature to put it on.

5        Q.    That's right.  Captain Jack told you what he wanted

6    welded, right; but it was up to you as to how to do it

7    correctly, correct?

8        A.    Yes.

9        Q.    Do you know what an air extractor does?

10        A.    Yes.

11        Q.    What is the purpose of it?  What does it do?

12        A.    It specifically is to blow out the smoke and bad

13    odors; and especially smoke so that it does not cause health

14    problems to someone.

15        Q.    Is the blower, the air extractor that you're talking

16    about, has nothing to do with telling you whether there is

17    gas or vapor in the space where you welded, correct?

18            MR. FAMULARI:  Object to form.

19        A.    Repeat the question.

20        Q.    Does that blower tell you if there is vapors or

21    flammable gas in the space where you are welding?

22        A.    In the - no.

23        Q.    Does that blower blow away the flammable gas or

24    vapor that may be in the space that you're welding?

25        A.    No.  It is for smoke.

1       Q.   Let me show you a picture; and we'll mark it as No.

2   4; and, again, that was provided by your attorney --

3       A.   Excuse me.   I need a break if you don't mind.

4       Q.   Take your time.

5            (WHEREUPON, a short recess was had.)

6            MR. KALLEN:   Back on.   We're on the record, and

7       we're going to suspend the deposition right now; and

8       continue, maybe, on Tuesday.   We're going to try and

9       reschedule for Tuesday if possible.   Everyone is a

10      agreed?

11           MR. FAMULARI:   Yes.

12           MR. VALLE:   Yes.

13           MR. WEBER:   Who retains the original?

14           (WHEREUPON, a brief off-the-record discussion was

15      had.)

16           MR. WEBER:   Mr. Kallen is holding the original

17      photographs; you have the original of exhibit 1 and 2,

18      a picture; and the Broward Medical Center Report.

19           (WHEREUPON, the deposition was suspended at 4:45

20      p.m.)

21

22

23

24

25

- - - - - - -


CERTIFICATE OF OATH


THE STATE OF FLORIDA,    )
                         )
COUNTY OF BROWARD        )


        I, KATHERINE TRAINER, Court Reporter and Notary
Public, do hereby certify that HENRY NARANJO personally
appeared before me and was duly sworn.


        WITNESS MY HAND AND SEAL this 8th day of February,
2001.

Katherine Trainer
My Commission CC668617
Expires August 03, 2001

--------------------------------
KATHERINE TRAINER
COURT REPORTER and NOTARY PUBLIC,
STATE OF FLORIDA AT LARGE:


RULE 1.310.  FLORIDA RULES OF CIVIL PROCEDURE PROVIDES, IN

PART: (E)"...Any changes in form or substance that the

witness wants to make shall be entered upon a separate

correction page by the officer with a statement of the

reasons given by the witness for making them..."

2-8-01

Henry Naranjo
8881 Northwest 8th Street
Pembroke Pines, Florida  33024


IN REFERENCE:  Henry Naranjo vs Stephen Byron Smith et al.


Dear sir:

This letter is to inform you that your deposition given
on 11th day of January, 2001, is now ready for your
reading and signing.



This transcript will be held in our offices up to and
no later than 30 days from the date of this notification.


Please phone our office to schedule a convenient time
for you to come in and read and sign your deposition.


If you choose not to respond, the transcript will be
forwarded to counsel(s) accordingly.
Thank you for your cooperation.

Sincerely,



Katherine Trainer
Court Reporter
cc:  Court File
     MR. VALLE
     MR. KALLEN
     MR. FAMULARI
     MR. WEBER

```
 1                    E-R-R-A-T-A   S-H-E-E-T

 2   PAGE/LINE                CORRECTION                 REASON

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

     _____

     _____

13   _____

14   _____

15   _____

16   _____

17                  (Use other side if necessary)

18   I, HENRY NARANJO, do hereby certify that I have read the

19   foregoing transcript of my deposition given on the 11th day

     of January, 2001; that together with any additions or

21   corrections made herein it is true and correct.

22   _____            _____
     HENRY NARANJO                       DATE
23

24   _____            _____
     NOTARY PUBLIC, STATE OF             DATE
25   FLORIDA AT LARGE:
```

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2

 3   THE STATE OF FLORIDA    )
                             )
 4   COUNTY OF BROWARD       )

 5

 6           I, KATHERINE TRAINER, Court Reporter and Notary

 7   Public, in and for the State of Florida at Large, do hereby

 8   certify that HENRY NARANJO was by me first duly sworn to

 9   testify the whole truth, and that the above deposition by him

10   given was recorded stenographically by me personally, and

11   reduced to typewriting under my direction to the best of my

12   ability.

13           I further certify that I am neither attorney for any

14   party nor am I related to or employed by an attorney or party

15   connected with the action, nor am I financially interested in

16   the action.

17           WITNESS MY HAND AND SEAL this 8th of February, 2001.

18

19           X_____
             KATHERINE TRAINER
20           COURT REPORTER and NOTARY PUBLIC
             STATE OF FLORIDA AT LARGE:
21

22                              Katherine Trainer
                                My Commission C
23                              Expires August

24

25
```

1                    E-R-R-A-T-A  S-H-E-E-T

2    PAGE/LINE                CORRECTION                REASON

3    PG 24    LN 22    He was very specific....

4    _____    erros por la

5    _____    reportera

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17               (Use other side if necessary)

18   I, HENRY NARANJO, do hereby certify that I have read the

19   foregoing transcript of my CONTINUATION deposition given on

20   the 16th day of January, 2001; that together with any

21   additions or corrections made herein it is true and correct.

22   _____    03-23-01
     HENRY NARANJO             DATE

23                                        Katherine Trainer
                                          My Commission CC668617
24   _____    3/20/01   Expires August 03, 2001
     NOTARY PUBLIC, STATE OF   DATE

25   FLORIDA AT LARGE:

```
 1              E-R-R-A-T-A   S-H-E-E-T

 2  PAGE/LINE              CORRECTION              REASON

 3  Pg 91   LN 23   $853.00            error por la

 4  Pg 11   LN 6    16 años            reportera

 5  _____

 6  _____

 7  _____

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17            (Use other side if necessary)

18  I, HENRY NARANJO, do hereby certify that I have read the

19  foregoing transcript of my deposition given on the 11th day

20  of January, 2001; that together with any additions or

21  corrections made herein it is true and correct.

22  _____        03 - 23 - 01
    HENRY NARANJO                   DATE
23
24  _____        5/-23-01
    NOTARY PUBLIC, STATE OF         DATE
25  FLORIDA AT LARGE:
```

Katherine Trainer
My Commission CC668617
Expires August 03, 2001

1    and where I was working; and where I was able to do the work,

2    I believe.

3        Q.  Isn't that why you looked and your foreman looked?

4        A.  Well, to be more brief the first thing that I saw is

5    that my boss told me to go and see the captain.  The captain

6    showed me what I had to do.  And my boss also knew what I had

7    to do in there.

8        Q.  When you say the "Captain showed you what he wanted

9    you to do" what you mean by that is that he told you that he

10   wanted two aluminum plates made; and he told you the area

11   where he wanted it - where he wanted the plate put on the

12   deck?

13       A.  Exactly.

14       Q.  He did not tell you how to do your job, correct?

15       A.  No, he told me to put the plate in this position and

16   that's the way that he wanted them.

17       Q.  That's right; but it was up to you do that job

18   safely, correct?

19       A.  Correct.

20       Q.  Was there something that the captain told you to do

21   which he should not have said?

22       A.  He was not very specific when I asked him if there

23   was any danger in there; and he said, no.  The only thing

24   that he said was concrete and then aluminum plate and then

25   flush.