UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 00-6022 CIV-LENARD/TURNOFF

HENRY NARANJO and
MARLENE RAMIREZ,

    Plaintiffs,

vs.

STEPHEN BYRON SMITH, PALMER
JOHNSON EXPORT SALES, INC.,
PALMER JOHNSON DISTRIBUTORS,
INC., and PALMER JOHNSON, INC.,

    Defendants,

------------------------------X

COPY

LOCATION:   LAW OFFICE
              80 SW 8TH STREET
              SUITE 2520
              MIAMI, FLORIDA  33160

DATE:         JANUARY 16, 2001 - TUESDAY

TIME:         2:30 P.M. - 4:00 P.M.

- - - - - - - -

CONTINUATION DEPOSITION

OF

HENRY NARANJO

- - - - - - - - -

```
 1                      - - - - - - - -

 2   APPEARANCES:

 3

 4   BLANCK & PERRY, P.A.
     5730 SW 74th Street
 5   Suite 700
     Miami, Florida 33143
 6   BY:  F. DAVID FAMULARI, Esquire
     BY:  JOSE A. DAPENA, Esquire
 7   Appearing on behalf of the Plaintiffs.

 8

 9   VALLE & CRAIG, P.A.
     80 Southwest 8th Street
10   Miami, Florida  33130
     BY: FRANK SIOLI, Esquire
11   Appearing on behalf of the Defendant, Palmer Johnson, Inc.

12

13   PINKERT LAW FIRM LLP
     P.O. Box 89
14   Sturgeon Bay, WI 54325-0089
     BY:  DAVID L. WEBER, Esquire
15   -----Appearing on behalf of Defendant, Palmer Johnson,
     co-counsel.

16

17   BADIAK, WILL & KALLEN
     17071 West Dixie Highway
18   North Miami Beach, Florida 33160
     BY:  JOHN D. KALLEN, Esquire
19   Appearing on behalf of Defendant, Stephen Byron Smith.

20

21   ALSO PRESENT:  SILVIA QUIJANO, INTERPRETER
                    MARLENE RAMIREZ

22

23   REPORTED BY:  KATHERINE TRAINER
                   COURT REPORTER

24

25
```

```
 1
 2                          I-N-D-E-X
 3

 4

 5   WITNESS                                          PAGE

 6   HENRY NARANJO

 7

 8   (CROSS-EXAMINATION BY MR. KALLEN)                 4

 9   (CROSS-EXAMINATION BY MR. WEBER)                 26

10   (CROSS-EXAMINATION BY MR. DAPENA)                28

11

12                      - - - - - - - -

13

14

15                      E-X-H-I-B-I-T-S

16                  (Marked for Identification)

17

18   DEFENDANT'S              ITEM                    PAGE

19   Exhibit No. 18    Interrogatories: Q&A            15

20   Exhibit No. 19    Tax Returns: 1992, 1993, 1994,  16
                       1995, 1996, 1997, 1998.
21

22

23

24

25
```

1          The CONTINUATION deposition of the witness, HENRY

2   NARANJO, taken in the above styled cause, before KATHERINE

3   TRAINER, Shorthand Reporter and Notary Public, in and for the

4   State of Florida, pursuant to the Notice heretofore filed

5                     - - - - - - -

6          (Thereupon, the interpreter was duly sworn.)

7   THEREUPON:

8                     HENRY NARANJO

9   and Marlene Ramirez, witnesses of lawful age, having been

10  called by the Defendant, and being by the undersigned Notary

11  Public first duly sworn through the interpreter, was examined

12  and testified under oath as follows:

13                  DIRECT EXAMINATION

14  BY MR. KALLEN:

15      Q.  Mr. Naranjo, how are you today, sir?

16      A.  Not too good.

17      Q.  I'll try to be relatively quick, and I'll apologize

18  in advance if I begin asking you questions that were asked of

19  you a number of days ago, but I'll try to avoid that.

20      A.  Okay.

21      Q.  Other than yourself on the day of the explosion was

22  anyone else welding on this boat?

23      A.  No.

24      Q.  Prior to the time that you started welding the

25  aluminum plate to the deck in the lazarette --

```
1          THE INTERPRETER:  I'm sorry.
2          MR. KALLEN:  Just say "Lazarette."
3     Q.  Did you do any other welding that day in the
4   lazarette?
5     A.  No.
6     Q.  You had done other welding jobs on the boat besides
7   that one on the day of the explosion, correct?
8     A.  The same day, no.
9     Q.  On other days?
10    A.  Yes.
11    Q.  Other than yourself, were there other welders who
12  had done welding jobs on that boat before the day of the
13  explosion?
14    A.  Yes.
15    Q.  Do you remember their names?
16    A.  Yes.  Frank Pichardo.
17         THE INTERPRETER:  By sound, P-I-C-H-A-R-D-O.
18    A.  Santiago Biasteras.
19         THE INTERPRETER:  S-A-N-T-I-A-G-O
20  B-A-L-L-E-S-T-E-R-O-S.
21    A.  Andre Pichardo.
22    Q.  Anyone else?
23    A.  I don't recall any other one.
24    Q.  Do you remember your Employee ID number at Bradford?
25    A.  Not at this time.
```

```
1        Q.   In order to fabricate the aluminum plates that you

2   did that day, where did you get the aluminum material from?

3        A.   The aluminum is always in stock at the welding shop.

4        Q.   So you did not have to get the aluminum from the

5   materials department or materials shop?

6        A.   They just provide that there, right from the very

7   shop.

8        Q.   What shop?

9        A.   The welding shop.

10       Q.   In order to get this aluminum to make the plates,

11  did you have to sign a work slip or a materials order?

12       A.   Yes.

13       Q.   You do make out a sheet of paper where you are

14  ordering the materials, the materials that you are going to

15  use on the boat; did you do that?

16       A.   Yes.

17       Q.   Don't you or would you put your Employee ID number

18  on that; correct?

19       A.   Yes.

20       Q.   Do you know for sure whether when you first started

21  to work on the aluminum plates that day of the explosion or

22  whether you started a day before or two days before?

23       A.   It was the same day of the explosion.

24       Q.   How many hours did it take you to fabricate the two

25  aluminum plates?
```

1          A.  Several hours.  I don't know exactly how many at

2    that time.  I don't know how to tell you exactly what it was,

3    several hours.

4          Q.  Do you think at least three hours?

5          A.  I believe it was longer.

6          Q.  Other than - Let's call it the "lazarette job" - do

7    you understand what I mean by the "lazarette job"; that you

8    were doing?

9               I'll be more specific:  On the day of the explosion

10   other than fabricating the two aluminum plates; take the

11   plates on board the boat and into the lazarette; and

12   beginning to weld, did you do any other welding job on that

13   boat that day?

14         A.  No.

15         Q.  So the only welding job that you do on this boat on

16   the day of the explosion is what we just discussed?

17         A.  Yes, that's what it was on that day.

18         Q.  And if I recall your testimony before, when you

19   showed up at work that morning your boss, Tony Watson, told

20   you this was the job that you were doing; is that correct?

21         A.  That is correct.

22         Q.  Did you know that Tony Watson had inspected the

23   lazarette space before you started to weld later that day?

24         A.  Yes.

25         Q.  Do you know why Tony Watson inspected the lazarette

1   space before you started to weld?

2       A.  Can you repeat that again?

3       Q.  Do you know why Tony Watson inspected the space

4   before you started to weld there?

5       A.  He would always inspect all of the jobs before he

6   would order someone.

7       Q.  To weld?

8       A.  Yes.  In order to do the work that has to be done in

9   there, he would go first.

10      Q.  And that is because it's part of his job to make

11  sure that it's going to be safe for you to weld before you

12  start; is that right?

13      A.  Yes.

14      Q.  You rely on that before you will start a welding

15  job, right?

16      A.  Correct.

17      Q.  You will not begin a welding job if your supervisor

18  has not inspected the space first, correct?

19      A.  That's correct.

20      Q.  And you also will inspect the area or space as well,

21  correct?

22      A.  Yes.

23      Q.  I believe that you testified before in this case

24  that you did inspect the space; is that right?

25      A.  Yes, that is correct.

1     Q.  You look for combustible materials?

2     A.  Yes.

3     Q.  You made sure the area was clean and free of debris?

4     A.  Yes.

5     Q.  You also checked for any holes in the area where you

6 were welding?

7     A.  Yes.

8     Q.  You did not see any holes; is that right?

9     A.  That is right.

10     Q.  Why do you check?  Why did you check for holes?

11     Tell me, I'm not welder.

12     A.  Can I have some water?

13     Q.  Sure.

14     (WHEREUPON, a brief recess was had.)

15     A.  Can you ask the question again.

16     (WHEREUPON, the testimony requested was read back by

17     the reporter as recorded.)

18     A.  The area where I work, I inspect to see if they do

19 have or do not have holes; that is because that is to see if

20 there is nothing underneath, that something will slide down,

21 or that you have a spark going down since the buckets are

22 also made with wood.  You have to be cautious so there are no

23 holes and cover them up; for that reason there were no holes.

24     Q.  What would you have done if you saw a couple of

25 holes in the deck?

1     A.   I would ask or I would ask the captain, What is in

2  the area?  What do they have in there?

3     Q.   Why?

4     A.   To be cautious.

5     Q.   Would you have asked your foreman to find out for

6  sure?

7     A.   Of course I would.

8     Q.   Why did you put a fire blanket on the deck?

9     A.   Because they had these balloons - these balloons

10 that's in order to protect the boat and made out of plastic.

11    Q.   I'm not sure that I understand.

12         Did you see some plastic material that you wanted to

13 cover up?

14    A.   Well, I recall perfectly well before I started the

15 job, they had this protector, that's the bumper protector in

16 order for the ship not to get hit.

17    Q.   Like fenders?

18    A.   Like fenders.

19    Q.   That they put on the outside of the boat so that

20 when it stops the dock rubs up against the fender and not the

21 boat?

22    A.   That is right.

23    Q.   You saw some of those in the lazarette?

24    A.   Yes, sir.

25    Q.   How many did you see?

1    A.   I don't recall.

2    Q.   So you covered those with a fire blanket?

3    A.   Yes.

4    Q.   Did you cover anything else with a fire blanket?

5    A.   No.

6    Q.   You also said before that in addition to checking

7    the area for combustibles you also ventilated the space.  How

8    do you ventilate the space?

9    A.   Well, actually, the area was well - Well, the hatch

10   that was there was open.  It had been open for days.  Anyhow,

11   I did put in there a blower in order to extract the smoke.

12   Q.   How many hatches were open or off?

13   A.   They had two large hatches.

14   Q.   And they were off?

15   A.   No, they were open.

16   Q.   Do you remember what machinery or equipment was in

17   the lazarette?

18   A.   They had some hydraulic pumps, jacks - excuse me.

19   Strike that.  It is a jack, a hydraulic jack.  They had a

20   compressor tank; and then what I installed, the machine, the

21   blower.

22   Q.   Were people painting the boat that day?

23   A.   No.

24   Q.   Were there any painters on the boat?

25   A.   Yes.  They had painters but they were not painting.

1    Q.  What were there doing?

2    A.  They were sanding.

3    Q.  What part of the boat?

4    A.  The front area of the deck.

5    Q.  The bow, the front.

6    A.  Yes.

7    Q.  Did you see any painters at the transom?  Did you

8  see painters at the transom, at the very back of the boat?

9    A.  No.

10   Q.  Do you know who "Aki" is?

11   A.  "Aki"?  It sounds familiar, but it's a young man

12  that I believe that he works there.  I don't know.  I don't

13  recall.

14   Q.  Did it rain that day?

15   A.  No.

16   Q.  Did the captain tell you why the aluminum plates

17  that you were making was necessary?

18   A.  Yes.  He did tell me and he told me specifically.

19  He gave me the specifications and tell me why; for what.

20   Q.  Why did he tell you that the plates were necessary?

21   A.  I don't understand your question.

22   Q.  What were they being used for?

23   A.  The purpose for that was it was a bracket in order

24  to load up hydraulic jobs.

25   Q.  Why not put the jacks right on the deck?

1    A.   The plates that I made were - The purpose for that

2  was in order to put the jacks so that the jacks would be able

3  to use enough force because it was large and heavy.

4    Q.   I'm not sure that I understand.

5         Why not just install the jacks right on the deck?

6    A.   I don't know how to answer that.

7    Q.   Did the captain tell you that they had tried to do

8  that first without the plates?

9    A.   No.  No, I don't have any knowledge about that.

10    Q.   Did you read, what you referred to as "The piece of

11  paper," that was on the boat?

12    A.   The only thing that I read was that "Gas Free."  It

13  is in large letters.

14    Q.   That told you it was safe to weld in the lazarette,

15  as far as you know?

16    A.   Yes.

17    Q.   If you did not see that gas free certificate you

18  would not have welded, correct?

19    A.   That is correct.

20    Q.   Did you ever attend any safety meeting before this

21  explosion occurred?

22    A.   Several months before there was a safety meeting,

23  but I don't recall it exactly.

24    Q.   Do you remember what was discussed in this safety

25  meeting?

1      A.  Well, they talk about the smoke that you can inhale

2  while your welding; because they have different departments

3  in there; and we work with the kind of welding that produces

4  a lot of smoke; and they talked about that it is for us not

5  to inhale a lot of smoke; and not to have any residues from

6  the materials that would cause a fire.

7      Q.  Were you ever given a safety manuel?

8      A.  No.

9      Q.  Were you ever given an employee manuel?

10     A.  No.

11     Q.  Did you wear goggles at the time of the explosion?

12     A.  I had the welding mask, the helmet.

13     Q.  That covered your face?

14     A.  Yes, sir.

15     Q.  I take it that you can see through that?

16     A.  The way it works is that you look at the area where

17  you put on the mask and then you - and as you move your head

18  it goes down as you are going to weld.

19     Q.  I want to mark as the next exhibit --

20         (WHEREUPON, a brief off-the-record discussion was

21      had.)

22      MR. KALLEN:  Let the record reflect that is Exhibit

23      18.  After Mr. Naranjo's deposition was commenced back

24      on Thursday - I guess that it was the 11th - We took

25      some interim depositions; and they have been marked

```
 1        exhibits consecutively; and that's why the next exhibit
 2        of Mr. Naranjo's deposition will be 18 as opposed to
 3        what would otherwise be 4 or 5 or whereever we left
 4        off.
 5            In any event Exhibit 18 will be a set of
 6        interrogatories and answers to interrogatories; and I'm
 7        going to keep the original set; and we'll make a copy
 8        for transcript purposes.
 9            (WHEREUPON, the above referenced document was marked
10        as Defendant's Exhibit No. 18 for Identification.)
11    BY MR. KALLEN:
12        Q.  Mr. Naranjo, let me show you Exhibit 18.  First,
13    I'll ask you on the last page of this exhibit, is that your
14    signature?
15        A.  Yes.
16        Q.  Now, do you remember having to answer these written
17    questions; and go ahead and look through this.
18        A.  (Witness complies).
19        Q.  Mr. Naranjo, let me show you these questions that
20    are part of 18 and request if you remember seeing these
21    questions and having to provide answers to them?
22        A.  Can you read that to me?
23        Q.  Okay.  Did you ever see these before, these
24    interrogatories?
25        A.  Let me see.
```

1      Q.  No, it says in here - February.  Where did it say

2    that?  What year was this done in?  Do you remember --

3      A.  Is it my signature but I don't recall - Yes, well, I

4    don't recall that very well.  That was a year ago if that was

5    last year.

6      Q.  Are you having any type of memory problems, even

7    today?

8      A.  No, but it is that I don't recall.  I don't recall

9    that.

10      Q.  That's fine.

11           I'd like to mark as the next exhibit - and we'll

12    make it a composite to these were produced to me by Mr.

13    Naranjo's counsel; and specifically, they appear to be W-2

14    forms and income tax returns from Mr. Naranjo and mark it

15    Composite Exhibit 19.

16           MR. DAPENA:  Can I see the interrogatories?

17           MR. KALLEN:  Yes.

18           For the record, these are for the years 1992, 1993,

19        and 1994, 1995, 1996, 1997, and 1998.

20           (WHEREUPON, the above referenced document was marked

21        as Defendant's Exhibit No. 19 for Identification.)

22    BY MR. KALLEN:

23      Q.  Let me show these to you, Mr. Naranjo.  Do you

24    recognize these as being your income tax returns for the

25    years 1992 through 1998?

1    A.  Yes, this is mine.  So is this one also mine, yes.

2  Yes, also.  Also, yes.  This is all mine.

3    Q.  There are as part of this Exhibit 19- There are some

4  W-2 forms from a company called First Delta Financial Corp.,

5  for 1997.

6    What work did you do for First Delta Financial

7  Corp., in 1997?

8    A.  No, I did not work over there for them.

9    Q.  You did not?

10    A.  No.

11    Q.  In 1998, for the 1998 return there is also a return

12  from Allied Transportation Resource?

13    A.  Yes, I believe that is for some work that my wife

14  did.  I believe this is also for work that my wife did.

15    Q.  The reason that I ask these forms are made out and

16  sent to Henry Naranjo; that is why I asked.

17    A.  This was at first - This was done over there.  I

18  don't remember that.

19    Q.  Well, I'm not sure what you're referring to now.

20    Let me ask you --

21    A.  Yes.

22    Q.  -- since this accident happened have you worked

23  anywhere other than at and for Bradford Marine?

24    A.  No.

25    Q.  You have not done any other jobs for pay other than

1    at Bradford Marine?

2        A.  No.

3        Q.  Have you looked for any work?

4        A.  No.

5        Q.  Why not?

6        A.  Because shortly after the accident I was very, very

7    upset.  I was sick.

8        Q.  That's understandable.  Let me be more specific, Mr.

9    Naranjo.

10           Have you looked for any work or any job to do in

11   1999, in the year 2000, or up to now in 2001?

12       A.  No.

13       Q.  Why not?

14       A.  Because I don't feel well.

15       Q.  Do you feel that you are presently able to work?

16       A.  No.

17       Q.  That's because of the way that you feel?

18       A.  That is due to the way that I feel.

19       Q.  Would it be your preference to be able to work?

20       A.  If I was well, yes.

21       Q.  For example, if a job would be found for you to do,

22   would you be willing to do that job if you felt physically

23   able to do it?

24       A.  If I felt well, I could do it.

25       Q.  Have you met with anybody in the past two years

1   about trying to get you to be able to work?

2      A.  No.

3      Q.  Who prepared the four income tax returns?

4      A.  I do it with a friend of mine who is like an

5   accountant but he is not - well, I'm - I do them.

6      Q.  How many years has your friend helped you do your

7   income tax returns?

8      A.  Three, four years.

9      Q.  Did you file a return for 1999?

10     A.  Yes.

11     Q.  So we should be able to get that from somewhere?

12     A.  Yes.

13     Q.  Did you file a return yet for 2000?

14     A.  No.

15     Q.  What is your friend's name that has helped you

16  prepare the returns in the past three or four years?

17     A.  Carlos Becerra.

18     Q.  Can you spell the last name?

19     A.  B-E-C-E-R-R-A.

20     Q.  Where does he live?

21     A.  He lived here and he left.

22     Q.  Where does he live now?

23     A.  I don't know.  I believe that he went back to his

24  country.

25     Q.  What country is that?

1    A.   Honduras.

2    Q.   When did he go back to Honduras?

3    A.   I couldn't say.  I don't recall exactly but it was

4  last year.

5    Q.   Does Mr. Becerra speak English?

6    A.   Yes.

7    Q.   Better than you?

8    A.   Yes.

9    Q.   And he reads English?

10    A.   He reads English.

11    Q.   Better than you?

12    A.   Better, and speaks better.

13    Q.   And you say that he is not an accountant?

14    A.   Not here.

15    Q.   Honduras, you think?

16    A.   I think so.

17    Q.   In what way did Mr. Becerra help you with the tax

18  returns?

19    A.   Well, he would save me the $100 that it would cost.

20    Q.   Yes, but as I understand it that both of you

21  prepared these returns; and what I'm asking is what part of

22  these returns did he help you with?

23    A.   We would read the book.  I get that book, and based

24  it on that.

25    Q.   Okay.  Do you know who prepared your wife's income

1   tax return?

2       A.   The person that I just told you.

3       Q.   Carlos?

4       A.   Carlos Becerra.

5       Q.   By the way, does your wife speak English?

6       A.   She speaks better than I do, yes.

7       Q.   Does she read English?

8       A.   Also.

9       Q.   Better than you?

10      A.   Yes.

11      Q.   I don't know if this question was asked:  Do you

12  write English?

13      A.   Some basic things too.

14      Q.   For example, if I asked you to write, How are you? -

15  can you do that?

16      A.   Yes, sir.

17      Q.   My back hurts; can you do that?

18      A.   Yes, basic words, short.

19      Q.   Basic short words?

20      A.   Yes.

21      Q.   You do know that I represent Steven Smith who owns

22  the boat that you were working on?

23      A.   Yes, of course; and you're telling me now.

24      Q.   I'm also telling you that Captain Jack - Who you

25  know?

1     A.  Yes.

2     Q.  -- was employed, was working for Mr. Smith?

3     A.  Yes.

4     Q.  You knew that right before me telling you?

5     A.  Well, yes, I learned about that now.  I knew the

6  captain, and I met the owner.

7     Q.  You did meet the owner one time?

8     A.  Yes, shortly after surgery when I went over to the

9  job.

10     Q.  Did he come to see you?

11     A.  No, the captain introduced me to him because the

12  department for the job was over here and the boat was right

13  next to it.

14     Q.  That was after you had surgery on your back?

15     A.  Yes, afterwards.

16     Q.  Did the captain ever tell you after the accident

17  that it was his fault?

18     A.  We never speak about that.

19     Q.  Now, do you understand that you are claiming a

20  lawsuit that the captain was at fault?

21     A.  Yes.

22     Q.  So you feel that the captain should have done

23  something that he did not do?

24     A.  I do believe that, yes.

25     Q.  What should he have done that he did not do?

1      A.   He should have made sure that nothing was going to

2  happen to me over there.

3      Q.   How would he do that?

4      A.   That I don't know how to answer.   The only thing

5  that is that I did trust him.

6      Q.   Did you also trust your foreman?

7      A.   Yes.

8      Q.   Who was the expert welder here, you or the captain.

9      A.   I don't know what knowledge the captain has but I

10 had trust.   I had to put my trust in him.

11     Q.   Did you also put your trust in yourself to make sure

12 that it was safe also?

13     A.   I also took some precautions.

14     Q.   Did you also put your trust in that piece of paper

15 that said "Gas free"?

16     A.   Also.

17     Q.   Did you also put your trust in the fact that your

18 boss had inspected the space?

19     A.   Also.

20     Q.   So let me ask you again; and try to be specific if

21 you can, you had a few years to think about this:   Is there

22 something in particular that the captain should have done but

23 did not do?

24     A.   The time that has elapsed up until now, I believe

25 that the captain should have seen or looked at the area well;

1  and where I was working; and where I was able to do the work,

2  I believe.

3       Q.   Isn't that why you looked and your foreman looked?

4       A.   Well, to be more brief the first thing that I saw is

5  that my boss told me to go and see the captain.  The captain

6  showed me what I had to do.  And my boss also knew what I had

7  to do in there.

8       Q.   When you say the "Captain showed you what he wanted

9  you to do" what you mean by that is that he told you that he

10  wanted two aluminum plates made; and he told you the area

11  where he wanted it - where he wanted the plate put on the

12  deck?

13       A.   Exactly.

14       Q.   He did not tell you how to do your job, correct?

15       A.   No, he told me to put the plate in this position and

16  that's the way that he wanted them.

17       Q.   That's right; but it was up to you do that job

18  safely, correct?

19       A.   Correct.

20       Q.   Was there something that the captain told you to do

21  which he should not have said?

22       A.   He was not very specific when I asked him if there

23  was any danger in there; and he said, no.  The only thing

24  that he said was concrete and then aluminum plate and then

25  flush.

1     Q.   The captain used the word "flush"?

2     A.   Yes.

3     Q.   How many times in the year that you were working for

4   Mark Watson did he explain to you - Tony Watson - did he

5   explain to you that before you were to start a job you were

6   to ask Tony about the job so that he could review it with

7   you?

8          MR. DAPENA:   Object to form.

9     A.   He would always check; that is he would go and look

10  at the job that has to be done; and look at the people that

11  were available to do that.

12    Q.   Right, because you know from working at Bradford

13  Marine that it was their policy that before any welding work

14  was done the welder and foreman who makes the decision that

15  it was safe to do?

16         MR. DAPENA:   Object to form.

17    A.   Yes.

18    Q.   So regardless of what the captain may say to you, if

19  your boss says, This is not safe; you're not doing it,

20  correct?

21    A.   Correct.

22    Q.   The same thing even if the captain says, It's safe;

23  you don't do the work until you and your boss, the foreman,

24  say, It's safe?

25    A.   Yes.

```
 1            MS. BARKER:  I think that I'm done.

 2                     CROSS-EXAMINATION

 3   BY MR. WEBER:

 4      Q.  Just a couple of questions.  I think that you stated

 5   earlier that you were aware that Tony Watson had inspected

 6   the area before you did your work?

 7      A.  Yes.

 8      Q.  Did you speak with Tony Watson about his inspection?

 9      A.  No.  No, just to go and do the job.  He had gone and

10   seen the captain to see what has to be done.  He told me also

11   what had to be done.

12      Q.  Did Tony Watson tell you what he did to inspect the

13   area?

14      A.  No, he didn't say.

15      Q.  Did you observe Tony Watson inspect the area?

16      A.  No.

17      Q.  Do you know when Tony Watson inspected the area

18   prior to your working in the area?

19            THE INTERPRETER:  I'm sorry - When?

20            MR. WEBER:  Prior to his doing the work.

21      A.  No.

22      Q.  Do you have a valid Florida driver's license?

23      A.  Yes, sir.

24      Q.  Does it have any restrictions on it?

25      A.  No.
```

1      Q.   Are you able to drive?

2      A.   Yes.

3      Q.   Have you, in fact, driven since this accident?

4      A.   Excuse me?

5      Q.   Sure.   For instance who drove here today?

6      A.   She did.

7      Q.   Were you able to drive here today?

8      A.   No, I was not feeling well.

9      Q.   What about your condition is it that would have

10   prevented you from driving here?

11     A.   I want to come relaxed and quiet in the car.

12     Q.   Does driving a car irritate or aggravate your back

13   at all?

14     A.   Well, if the trip is not too long, because otherwise

15   it does bother me.

16     Q.   How long can you drive before your back starts to

17   hurt?

18     A.   Immediately, as you sit down - Well, it is immediate

19   because of the way that the seat is built; and it's

20   uncomfortable to be inside the car.

21     Q.   Do you drive - Strike that.

22          How often during the week do you drive a car?

23     A.   Sometimes - Well, yesterday I did not drive.   Maybe

24   two, three times during the week.

25     Q.   Giving me an example of where you will drive your

1  car, do you drive it to the grocery store?

2       A.  I go to the grocery.

3       Q.  Where else do you drive your car?

4       A.  Near my home there is a shopping center, a mall.

5       Q.  Do you have your own vehicle?

6       A.  Yes.

7       Q.  What kind of car do you have?

8       A.  A Honda Accord.

9       Q.  Does your wife have a separate car?

10      A.  Yes.

11      Q.  What kind of car does she have?

12      A.  Civic Honda.

13          MR. KALLEN:  That was asked.

14          MR. WEBER:  That's all that I have.

15                      CROSS-EXAMINATION

16  BY MR. DAPENA:

17      Q.  Who in your opinion would know this vessel better

18  than the captain?

19          MR. KALLEN:  Object to the form.

20      A.  The captain.

21      Q.  And why is that?

22      A.  Because - because of his experience.  He has to be

23  in charge of that and also of the crew.

24      Q.  So is that why you asked him what was underneath the

25  lazarette?

1         MR. KALLEN:  Object to form.

2     A.  Yes, of course.

3     Q.  What did he say?

4     A.  That there were no fuel tanks; there were no fuel

5  lines; that there was just concrete and aluminum plate

6  flushed.

7     Q.  You felt you were safe under those circumstances?

8         MR. KALLEN:  Object to form.

9     A.  Yes.

10         MR. DAPENA:  That's it.  Read.

11         (WHEREUPON, the deposition was concluded at 4:00

       p.m.)

13

14

15

16

17

18

19

21

22

23

24

25

```
 1                    - - - - - -

 2

 3                    CERTIFICATE OF OATH

 4

 5

 6   THE STATE OF FLORIDA,   )
                             )
 7   COUNTY OF BROWARD        )

 8

 9        I, KATHERINE TRAINER, Court Reporter and Notary
     Public, do hereby certify that HENRY NARANJO personally
10   appeared before me and was duly sworn.

11

12

13        WITNESS MY HAND AND SEAL this 23 of February, 2001.

14

15

16   ----------------------------------------
     KATHERINE TRAINER
17   COURT REPORTER and NOTARY PUBLIC,
     STATE OF FLORIDA AT LARGE:

18

19

20   RULE 1.310.  FLORIDA RULES OF CIVIL PROCEDURE PROVIDES, IN

21   PART: (E)"...Any changes in form or substance that the

22   witness wants to make shall be entered upon a separate

23   correction page by the officer with a statement of the

24   reasons given by the witness for making them..."

25
```

Katherine Trainer
My Commission CC□
Expires August 03, 2□□

2-23-01

Henry Naranjo
8881 Northwest 8th Street
Pembroke Pines, Florida  33024


IN REFERENCE:  Henry Naranjo vs Stephen Byron Smith et al.


Dear sir:

This letter is to inform you that your continuation
deposition given on 16th day of January, 2001, is now ready
for your reading and signing.


This transcript will be held in our offices up to and
no later than 30 days from the date of this notification.


Please phone our office to schedule a convenient time
for you to come in and read and sign your deposition.


If you choose not to respond, the transcript will be
forwarded to counsel(s) accordingly.
Thank you for your cooperation.

Sincerely,


Katherine Trainer
Court Reporter
cc:  Court File
     MR. VALLE
     MR. KALLEN
     MR. FAMULARI
     MR. WEBER

```
 1              E-R-R-A-T-A  S-H-E-E-T

 2   PAGE/LINE              CORRECTION                    REASON

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17              (Use other side if necessary)

18   I, HENRY NARANJO, do hereby certify that I have read the

19   foregoing transcript of my CONTINUATION deposition given on

20   the 16th day of January, 2001; that together with any

21   additions or corrections made herein it is true and correct.

22   _____        _____
     HENRY NARANJO                  DATE
23

24   _____        _____
     NOTARY PUBLIC, STATE OF        DATE
25   FLORIDA AT LARGE:
```

```
1                    C-E-R-T-I-F-I-C-A-T-E

2   THE STATE OF FLORIDA   )
                           )
3   COUNTY OF BROWARD      )

4

5         I, KATHERINE TRAINER, Court Reporter and Notary

6   Public, in and for the State of Florida at Large, do hereby

7   certify that HENRY NARANJO was by me first duly sworn to

8   testify the whole truth, and that the above deposition by him

9   given was recorded stenographically by me personally, and

10  reduced to typewriting under my direction to the best of my

11  ability.

12        I further certify that I am neither attorney for any

13  party nor am I related to or employed by an attorney or party

14  connected with the action, nor am I financially interested in

15  the action.

16        WITNESS MY HAND AND SEAL this 23 day of February,

17  2001.

18

19        ------------------------------
          KATHERINE TRAINER
20        COURT REPORTER and NOTARY PUBLIC
          STATE OF FLORIDA AT LARGE:

21

22                                  Katherine Trainer
                                    My Commission CC668617
23                                  Expires August 03, 2001

24

25
```

(954) 523-0915  HI-TECH COURT REPORTING, INC.