```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI, DIVISION

3   HENRY NARANJO and                CASE NO.   00-60222-CIV
    MARLENE RAMIREZ,                 LENARD/TURNOFF
4
         Plaintiffs,
5
    vs.
6
    STEPHEN BYRON SMITH, PALMER      COPY
7   JOHNSON EXPORT SALES, INC.,
    PALMER JOHNSON DISTRIBUTORS
8   INC., AND PALMER JOHNSON INC.

9        Defendants.
    _____/
10
    APPEARANCES:
11
    PINKERT LAW FIRM, LLP.,          VALLE & CRAIG, P.A.,
12  DAVID L. WEBER, ESQUIRE,         FRANK J. SIOLI, ESQUIRE,
    P.O. Box 89                      80 S.W. 8th Street,
13  Sturgeon Bay, WI.                Suite 2520,
    CO-COUNSEL FOR THE DEFENDANT,    Miami, Florida,
14  Palmer Johnson.                  ATTORNEYS FOR:
                                     Palmer Johnson, Inc.
15
    BLANCK & PERRY, P.A.,            BADIAK, WILL & KALLEN,
16  F. DAVID FAMULARI, ESQUIRE,      JOHN D. KALLEN, ESQUIRE,
    5730 S.W. 74th Street,           17071 W. Dixie Highway,
17  Suite 700,                       North Miami Beach, Fl.,
    Miami, Florida,                  ATTORNEY FOR:
18  CO-COUNSEL FOR PLAINTIFFS.       Stephen Byron Smith.

19               FOWLER, WHITE, BURNETT, HURLEY,
                    BANICK & STRICKROOT, P.A.
20                  BRIAN P. HILL, ESQUIRE,
                    Bank of America Tower,
21                 100 S.E. Second Street,
                        17th Floor,
22                  Miami, Florida,
               ATTORNEY FOR BRADFORD MARINE, INC.
23
              * * * * * * * * * * * * * * * * * * * * * * * * * * * *
24                      DEPOSITION
                           OF
25                     MARK TORTORA
```

```
 1                           I N D E X

 2    1/12/'01

 3    WITNESS                                DIRECT

 4    Mark Tortora

 5
      By Mr. Weber                               3
 6
      By Mr. Kallen                             68
 7
      By Mr. Famulari                          100
 8
                                         CONTINUED DIRECT
 9
10    By Mr. Weber                              87

11    By Mr. Kallen                             96

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Deposition of MARK TORTORA, a witness of lawful age,

2     taken by the Defendants for the purpose of discovery and for

3     the use as evidence in the above-entitled matter, wherein

4     HENRY NARANJO and MARLENE RAMIREZ are the PLAINTIFFS, and

5     STEPHEN BYRON SMITH, PALMER JOHNSON EXPORT SALES, INC.,

6     PALMER JOHNSON DISTRIBUTORS INC., AND PALMER JOHNSON INC.

7     are the Defendants pending in the United States District

8     Court, Southern Division of Florida, Miami Division,

9     pursuant to notice heretofore filed before DEBORAH PEARLMAN,

10    a Notary Public in and for the State of Florida at Large,

11    taken at 300 S.W. 7th Street, Fort Lauderdale, County of

12    Broward, State of Florida, on the 12th day of January of the

13    year 2001, commencing at 2:30 o'clock p.m.

14             ------------------------------

15    THEREUPON:

16                      MARK TORTORA,

17    a witness of lawful age, being called as a witness by the

18    Defendant, having been duly sworn, testified under oath as

19    follow:

20                    DIRECT EXAMINATION

21    BY MR. WEBER:

22         Q.    Could you state your name please?

23         A.    Mark Tortora.

24         Q.    And would you spell your last name?

25         A.    T-O-R-T-O-R-A.

1    Q.    And is it okay if I call you Mark or do you go by a

2    nickname?

3    A.    You can call me Mark or Torch or anything.

4    Q.    And how old are you, Mark?

5    A.    Thirty seven.

6    Q.    And what's your address?

7    A.    2780 South Oakland Forest Drive, Number 1603,

8    Oakland Park, Florida, 33309.

9    Q.    Have you ever had your deposition taken before?

10   A.    Yes, I have.

11   Q.    You know then I'm going to be asking you some

12   questions today and I would like you to answer these

13   questions; do understand that?

14   A.    Yes.

15   Q.    This lady here is going to take down the questions

16   and answers and that's difficult so you need to answer out

17   loud and we need to not talk over each other.

18         Are you agreeable to that?

19   A.    That's agreeable.

20   Q.    If I ask you something today, Mark, that you don't

21   understand, ask me again and I'll rephrase it, is that

22   agreeable?

23   A.    Okay.

24   Q.    You're currently employed at Bradford Marine?

25   A.    Correct.

1    Q.    In what capacity?

2    A.    I'm the Operations Coordinator.

3    Q.    We had deposed Dave Henderson earlier today and I

4    think he did he described you as the "Project Manager"; is

5    that the same thing as an Operations Coordinator?

6    A.    That's one of my duties.

7    Q.    That's one of your duties, Operations Coordinator?

8    A.    Yes.

9    Q.    Do you have other duties as the Operations

10   Coordinator?

11   A.    I do.  I assist Dave Henderson who's the yard

12   superintendent.  I coordinate projects throughout the yard

13   and I oversee the safety environmental issues in the yard.

14   Q.    How long have you been the Operations Coordinator?

15   A.    About three years.

16   Q.    And have you been a project manager about the same

17   amount of time?

18   A.    I guess project manager probably about four years

19   and maybe a little bit longer; between four and five years.

20   Q.    As a project manager I could assume that's the

21   capacity in which you assist Dave Henderson?

22   A.    Correct, in the capacity with Dave Henderson; he

23   over sees the entire operations of the yard and I'm there in

24   the same office as him.

25        I take on projects of my own at the yard, coordinate

```
 1   between contractors and yard personnel work with department

 2   foreman and crew to accomplish the work that needs to be

 3   done on vessels, on particular vessels.

 4        Q.   He identified a number of different foreman in the

 5   yard.  I assume that these various foreman report to you?

 6        A.   Correct.

 7        Q.   And do you report then to Dave Henderson?

 8        A.   Yes.  Dave Henderson is my immediate supervisor.

 9        Q.   I want to talk you a little bit about the Safety

10   Department or what did you call it, safety and  --

11        A.   Safety and Environmental; yeah.

12        Q.   How long has that department been in existence?

13        A.   Since, I believe prior to -- they had started - are

14   you asking about how long have I've been involved in

15   Bradford Marine or how long had  --

16        Q.   Did I ask you how long had you had been at Bradford?

17        A.   Yes.

18             MR. KALLEN:   No.

19   BY MR. WEBER:

20        Q.   Did I ask you how long you've been the Operations

21   Coordinator?

22             Let's make sure we're clear.  How long have you been

23   at Bradford?

24        A.   I've been at Bradford since 1995, I believe

25   September 1995.  It's my second tenure at Bradford Marine.
```

1     Q.    Your first tenure was when to when?

2     A.    October 1990 - sorry '91.  October 1991 to October

3     1993.  The month is approximate.

4     Q.    And why did you leave Bradford the first time?

5     A.    I left and went to a more technical position at a

6     marine engineering company to further my career.

7     Q.    But you ended upcoming back in 1995?

8     A.    I asked to come back to Bradford marine to assist

9     the management.  When I was working at Bradford Marine the

10    first time, I was an employee in the machine shop there.

11          When I came back, I came back in a management

12    position and a Safety Director position at Bradford.

13    Q.    Was the safety department there, was it in existence

14    when you came back 1995?

15    A.    Yes.

16    Q.    Who was the head of it at that time, prior to your

17    taking over the department?

18    A.    Lonnie; Sargent.

19    Q.    The last name, what's the last name?

20    A.    That is the last name.

21    Q.    Sergeant is the last name?

22    A.    Lonnie.

23    Q.    Lonnie, okay.

24          Did you have any experience welding between 1991 and

25    1993 at Bradford?

1 A. Personally?

2 Q. Yes?

3 A. No. I'm a welder by trade so I have experience in

4 welding; although I was not employed as a welder at Bradford

5 Marine, no.

6 Q. When you say you're a "welder by trade", what do you

7 mean by that?

8 A. I'm a tradesman boilermaker. I did my

9 apprenticeship in Australia for four years, an

10 apprenticeship there. I'm classified as a Journeyman.

11 Q. Did you ever work as a welder?

12 A. At Bradford or anywhere?

13 Q. Yes, anywhere?

14 A. Yes.

15 Q. Where?

16 A. In Australia and in the United States.

17 Where do you want me to start?

18 Q. From the beginning.

19 A. I started my apprenticeship when I was 15 years old

20 in Australia. Walker Limited hired me on as an apprentice

21 boilermaker.

22 I did a four year apprenticeship and became a

23 tradesman boilermaker. I then left and worked in the coal

24 mines in Central Queensland, Australia on coal mine

25 construction.

1    Q.    How long did you do that?

2    A.    I did that from 1980 or 1983 until 1987.  I worked

3    at various construction cites building coal mines. There's a

4    big coal mine thing in Central Queensland.

5          I then went and worked for a coal mine as a

6    maintenance boilermaker in maintenance and open cutting

7    underground, open cutting and underground mining are

8    something different.

9          So I was in maintenance department and I did heavy

10   equipment moving for the mine.  I then left and came to

11   America in 1987.

12   Q.    Did you work as a welder in this country?

13   A.    I have worked in welding in this country for a

14   company called Chicago Bridge and Iron out of Plainfield,

15   Illinois.

16   Q.    How long did you work there?

17   A.    I was with them approximately eight months.

18   Q.    Was that right after you got here?

19   A.    No, I worked construction in Miami, but not in the

20   welding capacity in Miami.  My last paid welding job was

21   C.B.I.

22   Q.    That's Chicago Bridge and Iron?

23   A.    Yes.

24   Q.    Other than the eight-month stint with Chicago Bridge

25   and Iron, did you work as a welder at any other place in the

1    U.S.?

2        A.    No.  No.

3        Q.    And when you got your first job at Bradford Marine,

4    it was in the machine shop, correct?

5        A.    Correct.

6        Q.    You did not work in a welding capacity?

7        A.    No.

8        Q.    What were your job duties, in general, as head of

9    the Safety and Environmental Department?

10        A.    My job duties are to this company was keeping up to

11    date with O. S. H A. Regulations, with the cleanliness of

12    the yard and overall safety throughout the yard.

13        Q.    And what do you do in order to do that?

14        A.    I do inspections, hold safety meetings, I assist and

15    I'm there for employees or department heads to come to with

16    a problem and I try to take care of a problem.  If there is

17    a safety issue, I address it and we take care of that.

18        Q.    When new employees come to work at Bradford, are

19    they given an employee manual?

20        A.    They were back in 19 -- early 1996 there was an

21    employee manual that was printed for Bradford Marine.  I

22    worked in -- we hired a safety consulting company called

23    Workplace Safety Solutions, which worked with me for a

24    period of two to three months when I first got back there in

25    '95 through into '96 and we built our safety program; full

1    safety program for Bradford Marine along with an employee

2    handbook that was handed out at that time, for a period of

3    time and faded.

4           The actual handbook faded out due to whatever.  I

5    don't even really know the reason it was faded out.  It was

6    moving along and everything was dandy, then suddenly it

7    faded out.

8    Q.    Who's idea was it to bring on a consultant?

9    A.    I believe Paul Engle, the General Manager of

10   Bradford.

11   Q.    Was there a particular event or series of events

12   that prompted the hiring of a consultant for safety reasons?

13   A.    I believe that the Workman's Comp. Insurance

14   premiums at Bradford Marine were starting to -- there was an

15   obvious lack of supervision in the safety area.

16          There had been a few accidents that had prompted

17   that they hire a Safety Director.

18   Q.    Was this part of the pitch to you when you came back

19   in 1995, that they wanted to you revamp the safety

20   department?

21   A.    Correct.

22   Q.    As part of this whole process, a consultant was

23   brought in?

24   A.    Correct.

25   Q.    Do I take it that  ---

```
 1      A.    His name was Brian Hill, by the way.

 2      Q.    The consultant that you actually dealt with?

 3      A.    The company was Workplace Safety Solutions.

 4      Q.    And his name was Brian Hill?

 5      A.    Yes.

 6      Q.    There had been a number of workplace accidents and

 7   maybe premiums had gotten a little high?

 8      A.    Yes, there had been an influx of a reasonable number

 9   of minor accidents, but a lot of them had been happening,

10   eye injuries, sprains and as the way I heard it, when I got

11   there, there was a certain amount of premium that Bradford

12   Marine had come to - what I believe, I can't remember the

13   exact name of it, but to a point with their premiums that

14   they may be dropped by their insurance company at the time

15   and right at this second I don't remember the name of the

16   insurance company at the time; but then they had like one

17   more year to show what they could do and I was hired.

18            There was like --

19      Q.    Principally to turn things around, as it were?

20      A.    Absolutely.  Yes.

21      Q.    Were you able to keep your comp. carrier?

22      A.    Yes, we kept the comp. carrier for the following

23   year.  After what we did.

24            MR. KALLEN:  They renewed it?

25            THE WITNESS:  They renewed it, exactly.
```

BY MR. WEBER:

Q.    That would be the calendar year of 1996?

A.    Uh-huh.

Q.    That's a yes?

A.    Yes.

Q.    Do you know if you have the same comp. carrier today that you had back then?

A.    No, we don't.

Q.    What comp. carrier do you have today?

A.    As of November 15th of last year, it's a new accompany by the name of Zenith.

       Prior to that, we were with Freemont Industrial Indemnity.

Q.    This handbook that you talked about that was implemented, when did that really go and fall by the wayside?

A.    I would say it started to fall by the wayside towards the end of '96.

Q.    All right.  So was this in effect for about a year then?

A.    Yes.

Q.    As part of that employee handbook, were there any O.S.H.A. regulations defined in that handbook?

A.    As far as the handbook itself that was handed out, I don't remember.  I believe - it's been a long time.  I

1    looked at it and there were actual O.S.H.A. regulations

2    stipulated; although it was an overall safety message going

3    out to the employees of particular things to look out for in

4    particular areas of the yard.

5        Q.    I understand.  But it's your recollection, sitting

6    here today, that the handbook didn't contain O.S.H.A.

7    regulations itself?

8        A.    The handbook did not, no.

9        Q.    As a part of the safety program that you

10   implemented, were O.S.H.A. regulations handed out to the

11   employees in any capacity?

12       A.    We had -- as far as handed out to the employees, I

13   can't say whether or not there was actual O.S.H.A.

14   regulations handed out.

15           There were safety meetings.  There were particular

16   times when regulations were mentioned although at this

17   moment in time I don't remember them actually being in the

18   handbook.

19           I don't remember that.  Now I can dig up a copy of

20   the handbook, I know where one is.   I might be dreaming

21   here, I just don't remember.  So I'm not going to answer

22   yes.

23       Q.    That goes for the rest of the questions today, I'm

24   only asking what you know.  If you don't know, tell me that.

25       A.    Sometimes, automatically, my brain tries to think

1      and remember.

2          Q.    I understand what you're saying and I'll continue

3      that way.

4                There are copies of the handbook still, at the

5      present time at Bradford?

6          A.    I believe so, yes.

7          Q.    If someone like me wants a copy, who would we ask?

8          A.    Me.

9          Q.    If I asked you for copy of this, you would be able

10     to get me one?

11         A.    Yes.

12         Q.    How thick is it?

13         A.    The handbook is probably a half an inch thick.

14         Q.    Is that something that you devised yourself or did

15     you do it with a consultant?

16         A.    I did in conjunction with a consultant, although the

17     consultant definitely had the reins on that.

18         Q.    I'll get to the safety meetings in a second.

19               Is there anywhere in the Bradford yard where you

20     post the O.S.H.A. regulations?

21         A.    There's an O.S.H.A. poster posted on the main dock.

22     But as far as actual O.S.H.A. regulations being posted, no.

23     There was a safety manual each department actually had.

24               There was the larger on which explains this --

25               May I explain what I was trying to talk about?

1    There was three-ring binder at Bradford Marine about safety

2    at Bradford Marine, the Safety Program; which is around

3    about 3 inches thick.

4         There was the safety policies of Bradford Marine in

5    a smaller, in a smaller folder that each department, each

6    foreman had his own folder for their department, which

7    included O.S.H.A. regulations.

8         There was an employee handbook which went further;

9    which was what we just discussed, it's a half an inch thick

10   or three eighths of an inch thick; that gave an all around

11   view to safety within the yard.

12   Q.   Okay.   Let me explore that a minute.

13        The three-ring binder; how many of these existed;

14   just one?

15   A.   No, I believe there were two copies of the three-

16   ring binder.

17   Q.   Where was that kept?

18   A.   One was in Paul Engle's office and one was in my

19   office.

20   Q.   And I assume that that was the overall safety

21   planning?

22   A.   Correct.

23   Q.   And it probably had copies of each of the safety

24   policies for each of the separate departments in it?

25   A.   Correct.

1   Q.   Did it have anything else in it?

2   A.   It had things all the way to checklists.   It was a

3   fully-fledged O.S.H.A. handbook on how to run a safety

4   department in a business close to ours.   There isn't really

5   a book to tell you how to run a private yacht repair

6   facility.

7   Q.   Does that three-ring binder still exist?

8   A.   Yes.

9   Q.   Do you refer to it from time to time?

10  A.   From time to time I still refer to it.   It has not

11  been updated for a few years.

12  Q.   For how long?

13  A.   It was updated, I believe one time since '96.   I

14  couldn't -- I don't remember what the date was or how much

15  it was updated, and then it has not been updated since.

16  Q.   Why not?

17  A.   Why?

18  Q.   Yeah.

19  A.   There was a time when Brian Hill, from Workplace

20  Safety Solutions, had offered to update the book, that was

21  one of his things that he did.

22       And the estimate was not approved.

23  Q.   It's not cheap to hire a consultant, is it?

24  A.   Not from what I've seen.

25  Q.   So basically what you're saying is that is not an

1    expense that was approved?

2        A.    Correct.

3        Q.    In a nutshell, it wasn't updated?

4        A.    Yes.

5        Q.    Do I take it then that there were separate safety

6    policies for each of the various departments?

7        A.    Yes.

8        Q.    And were those in folders, or binders as well?

9        A.    Yes, that was the second binder.  The binder about

10    an inch, inch and a half thick.  The three different

11    binders, each one, they were all exactly the same but

12    carried each of the department's information in them.

13        Q.    Right.  So we would have a separate binder for,

14    let's say, the welding department, correct?

15        A.    Although it would encompass more than just the

16    welding department.

17        Q.    What would it encompass?

18        A.    General safety throughout the yard as well when they

19    were printed out this was work for in the welding

20    department.  There was about ten folders printed up that

21    were exactly the same and contained the same information and

22    given to each department and held in the foreman's office in

23    each department.

24        Q.    For instance, the foreman of the welding department

25    would get these?

1    A.    Yes.

2    Q.    And the foreman of the paint department would get

3    these?

4    A.    Correct.

5    Q.    And the foreman of the machine shop would get these?

6    They were all same?

7    A.    Yes, they were all the same, encompassing the whole

8    yard, encompassing all depths.

9    Q.    But it didn't include everything that was in the

10   three-ring binder?

11   A.    No.

12   Q.    My statement is correct?

13   A.    Correct.

14   Q.    So do I understand then that, let's say, the foreman

15   of the welding department would have certain information in

16   that folder about welding safety, but also if you wanted to

17   find something out about safety in the paint shop, he could

18   also look to his folder?

19   A.    Correct.

20   Q.    Were O.S.H.A. regulations contained in these

21   folders?

22   A.    I believe so.  Yes, I believe so.

23   Q.    And did your consultant create these folders with

24   your help as well?

25   A.    Correct.  Actually the consultant had his own

1    direction of how he was creating it.  When I came on board

2    as a mechanic slash welder, I did it for a living.  I wasn't

3    the safety director.  He came and turned me into what was

4    known as a "Safety Director" at the time.

5         So as far as my input, my input was limited to how

6    the folders were formatted.

7    Q.   When you say "limited to how the folders were

8    formatted", what do you mean by that?

9    A.   I didn't say what goes where or what O.S.H.A. rules

10   should be in there.  It was where he and I spent a couple

11   months together.  He brought me up-to-date where he felt

12   that a safety director the size of Bradford Marine should be

13   and he had a contract with Bradford Marine for a particular

14   amount of the money, for a particular length of time.

15        When it was time, he gave me a certificate and cut

16   me loose, for lack of a better expression.

17   Q.   He gave you a certificate.  What kind of

18   certificate?

19   A.   There were certificates that he made on his

20   computer, by his company saying certified by Workplace

21   Safety Solutions, Mark Tortora has completed a particular

22   amount of hours for the course of supervisor, training for

23   different things.

24   Q.   I think ultimately what you said earlier that

25   satisfied your Worker's Compensation carriers?

1      A.   Yes.   I worked closely to with the Worker's

2   Compensation company as well.   We all met, Frank Maura, was

3   his name.   He and I, after that, met pretty frequently,

4   probably once a month.

5        We would go over loss control and we would go over

6   any accidents that were out there and see how the safety --

7      Q.   Frank Maura was with Zenith?

8      A.   Exactly.

9      Q.   It sounds to me like you had Zenith for at least --

10     A.   About another year after that, and then and I don't

11  know if Zenith dropped us or if we got a better price.

12       Every year in November they shop for another price

13  just to shop around and to see what rates are out there.   I

14  know that prior to me coming to Bradford Marine in six

15  months prior there had been lost time, 43 lost-time

16  accidents at Bradford Marine and in the 12 months after I

17  had been hired as their Safety Director and gone through the

18  course, there had been three or four.

19       It was a drastic, a drastic drop.

20     Q.   So you don't know, with respect to Zenith, whether

21  they dropped Bradford or whether you got a more competitive

22  price somewhere else?

23     A.   I believe - I believe we got a more competitive

24  price somewhere else.   I remember the conversation because I

25  got along -- you get to know somebody and suddenly you think

 1    you work with them for a while and they're gone.  There

 2    didn't seem to be any hard feelings.  I don't believe they

 3    dropped us.  I think another price came in from Industrial

 4    Indemnity then.

 5        Q.    Do foreman have their own offices at Bradford?

 6        A.    Yes.

 7        Q.    Is that where these particular folders were kept?

 8        A.    Yes.

 9        Q.    Did the employees underneath the foreman have access

10    to these folders?

11        A.    Absolutely.

12        Q.    In that where they were instructed -- I'm talking in

13    a general sense now, were employees instructed that if they

14    had any questions about any aspect of safety, they should go

15    and consult with those folders?

16        A.    At the time when the employees meetings and

17    handbooks were handed out, everyone was instructed as to

18    what was in the folder and that the folder was available.

19            As to whether or not we actually said, you must

20    check this folder, I don't know.  But what was - what was

21    put forward and stressed to the foremen, I mean to the

22    employees, was that they could either go see their foreman

23    if they had a problem or they could come see me.

24        Q.    So you instructed employees that they had a

25    responsibility, I take it, to find answers to any questions

1    that they had; is that a fair statement?

2        A.    That's a fair statement, yes.

3        Q.    They could do that a number of ways:    They could

4    talk to their foreman?

5        A.    Yes.

6        Q.    They could talk to you?

7        A.    Yes.

8        Q.    But they actually had a responsibility of answering

9    whatever questions they may have had about safety, is that

10   fair?

11       A.    It was stressed to the employees at Bradford Marine

12   during this time that nobody is forced to do anything that

13   they don't feel comfortable with and if there's question or

14   a doubt at all, I have said this myself, that they are more

15   than welcome to ask a question of the foreman or of me and

16   if I did not know the answer, we would get an answer for

17   them and we would find out just so somebody doesn't have a

18   question in the back of their mind about anything in all

19   departments.

20       Q.    Tell me about the safety meetings.

21             Who conducted the safety meetings?

22       A.    For the first couple of months it was Brian Hill

23   from Workplace Safety Solutions and myself.

24             Then I started taking over the safety meetings.

25       Q.    How were they conducted?

1      A.    We met.  We had a Safety Committee at that time.  I

2   had, like, a little shed built, or set up, at the end of

3   what we call "main street" at Bradford Marine.

4          I would get the committee in there.  After we did

5   an overall -- once the safety program went into effect, we

6   took all the employees and at the time I think, or I

7   believe, there was 150 employees in each department.

8          We split the large departments, like the welding

9   department and paint department, we split up the departments

10  because there was a lot of people.

11         We made them come to the meetings, 20 to 30 people

12  at a time from the bigger departments and the smaller

13  departments brought that whole department in because some of

14  them ranged from three to fifteen, you know.

15         So we had an entire yard-wide meeting about:  This

16  is what's happening from now on and we started doing fit

17  testing.

18     Q.    But you didn't close the yard just to have a safety

19  meeting?

20     A.    That's what I'm saying, we spent a couple of days to

21  take pieces of departments.  We didn't close the yard, but

22  it certainly slowed the yard down.

23     Q.    In the course of a year, when was the first meeting,

24  if you recall, after you became the Safety Director or head

25  of the Safety Department?

1      A.    Uh.    I would have to - I do believe the first one

2      started in January '96, I believe.  Like I said, that was

3      one overall meeting with the entire yard.  Then the Safety

4      Committee was brought into action.

5            Then I would talk to the Safety Committee and then I

6      would also go around and ask different employees -- each

7      foreman if I could get different employees to get different

8      inputs.

9      Q.    Who was on the Safety Committee?

10     A.    We had a mixture of employees, regular employees;

11     foremen and supervisors.  I don't remember their names right

12     off the top of my head.

13     Q.    Is that Safety Committee still in existence?

14     A.    No.

15     Q.    When did that dissolve?

16     A.    Probably a year or so after.

17     Q.    Going back to 1996, you had an overall meeting with

18     the entire yard in January?

19     A.    Uh-huh.

20     Q.    That's a yes?

21     A.    That's a yes.  Up to, it would have been December,

22     it was close though because I started in October.  It may

23     have been November, December, or January; but in was in that

24     area.

25     Q.    Then I take it during the course of the year you had

1    various safety meetings with smaller numbers of employees?

2       A.    Correct.

3       Q.    Let's take 1996, do you know how many safety

4    meetings you would have had?

5       A.    I had a record of those safety meetings.  I do not

6    right now, anymore, have a record of those safety meetings.

7       Q.    Why not?

8       A.    Because I had it on my hard drive of my computer.  I

9    had a paper list and I had it on a disk in that shed I was

10   telling you about on the end of Main Street and water got

11   into that shed and ruined the books that I had in the desk.

12           I had an old desk that was going to be thrown out,

13   so I set up safety shed.  It wasn't in the best shape back

14   there but they got damaged and I was starting to - I wasn't

15   really a computer whiz back then, but I was trying to keep

16   records on my computer and my disk - I had just gotten into

17   computers - after a period of about 12 months, I lost the

18   hard drive off my computer and I had no back up of these

19   papers.

20      Q.    Would it be fair to state that in 1996 that every

21   employee would have attended the overall meetings?

22      A.    Yes.

23      Q.    Then would each employee have attended a smaller

24   meeting, at least one?

25      A.    No, not each employee.  There was a lot of

1    employees.  There was a lot of turnover in a couple of the

2    departments at Bradford Marine, especially the Paint

3    Department; the turnover is pretty great there.

4        With the skill level it's kind of transient, there's

5    more transient workers in the Paint Department.  It's not

6    the funnest work you want to do.  The turnover of employees

7    we try to keep up with, I tried to keep up with new-hire

8    orientation.  Eventually that fell to the wayside as well

9    after a period of time as well due to my duties at Bradford

10   Marine being pegged.

11       Q.   You were in charge of new-hire orientation at one

12   point?

13       A.   Correct.

14       Q.   That's fallen by the wayside?

15       A.   As well, yes.

16       Q.   Basically you have too many duties and not enough

17   time in the day?

18       A.   Correct.

19       Q.   Let's go back though to 1996 and the safety

20   meetings.  I understand that you don't have any records

21   anymore?

22       A.   Yes.

23       Q.   But can you give me any sense of how many meetings

24   you had in 1996?

25       A.   We had one each month in 1996 and I believe they

```
 1    even took us into early 1997.  There was one period in 1996
 2    where I missed a meeting.
 3          So we had one each month.  Then somewhere closer to
 4    the end of the year, due to whatever the circumstances were,
 5    I missed a month.
 6          Then this went to the next month.  I planned to go
 7    back and fill that gap but I never got back there.  So I
 8    could confidently tell you we had, in the period of 1996, 11
 9    meetings with various employees throughout the yard.
10    Q.    How about 1997, were things starting to fall by the
11    wayside, in 1997?
12    A.    My duties were starting to fill up in 1997.  Yes,
13    early - yes, in 1997, it started to fade.
14          It was probably in the first quarter.
15          As far as how many we had, by my memory, that I
16    remember, the safety meetings would go every two months and
17    then when I could put one together and get the backing of
18    the yard, we would put one together.
19          Then it suddenly, you know, then I would get with
20    the foreman every now and then and then it became less after
21    that.
22          Knowing in the back of my mind this was one of my
23    duties, I said, we need to keep up on this.  We need to keep
24    up on this because we had done such a good job during that
25    period and seen a good job and got a pat on the back by the
```

1    insurance company.

2         I always knew we needed to make sure to do this.  I

3    would have a meeting in the office with the foreman and meet

4    with the employees and it would become less formal, if I may

5    say so, but I was trying to get the message out and trying

6    to keep it out there.

7    Q.   Did you have any safety meetings, formal safety

8    meetings anymore?

9    A.   Yes -- well, actually, yes, to the latter part of

10   2000.  I have documented safety meetings and documented

11   meetings with myself along with the loss control, I think,

12   their loss control officers or something like that, whoever

13   these guys are with the company; his name is Mike Magrino.

14        We just received an award for Bradford Marine for

15   2000 because safety had slid to the point, I could really

16   see it.  I got a report on the injuries.  I get to see that

17   stuff in my position.

18        In early 2000, I said we really need to tighten up

19   again and we did and made a drastic drop because we

20   tightened the reins in the safety department.

21   Q.   So if I understand what you're saying, after you

22   implemented the safety program in early 1996 or late 1995,

23   the safety at Bradford decreased significantly at first?

24   A.   Yes.

25   Q.   And then over a period of a year or a couple of

1    years, things started to fall by the wayside, if I might

2    say?

3        A.    Yes.

4        Q.    -- then the safety kind of slipped a little bit  --

5        A.    Yes.

6        Q.    -- to the point where in early 2000 you decided

7    something needed to be done again?

8        A.    Later in 1999 I started to call Industrial Indemnity

9    and just say, amongst my other duties, this is what I need

10   to do and I need your help here.

11             Insurance companies are always offering their help.

12   Sometimes you don't have time to ask for it.   So I took the

13   time to ask for a hand,; which is what we did.  We worked

14   hard to get back on track.

15       Q.    Let's say in 2000, how many safety meetings did you

16   have?

17       A.    We had about six safety meetings in 2000, and I have

18   them documented.

19       Q.    That's with employees or foremen?

20       A.    That's was employees and foremen.

21             Actual, well, it was mostly foremen; mostly foremen

22   because I felt that the word would get to the departments

23   better, more clearly when I made the foreman responsible for

24   their safety.

25             When I would hold them accountable for their safety,

```
 1    because I felt I couldn't be held accountable for the

 2    entire yard, I needed help from them.

 3         I explained that to them in a meeting like that.  I

 4    got the backing from Dave Henderson.  We had meetings and

 5    sometimes 19 and 20 people were there.  It was mandatory to

 6    be there.  They helped really well and the trickle effect

 7    worked in my book.

 8    Q.   Going back to 1991, when you first started at

 9    Bradford, you said a Lon-somebody was the head of the Safety

10    Department?

11    A.   No.  Lon was in charge of safety before I got there

12    in '95 and he was also the dockmaster at Bradford Marine at

13    the time.

14         Back in 1991, in all honesty I was a mechanic and

15    there wasn't a safety program there in 1991.  I was in a

16    different position.  So I wasn't privy to management things

17    that were going on.

18         But I don't remember going to a safety meeting in

19    '91.

20    Q.   You were in the machine shop?

21    A.   Exactly.

22    Q.   You were a worker?

23    A.   Exactly.

24    Q.   And my question is:  Do you remember getting called

25    into any safety meetings?
```

1    A.    No.

2    Q.    As a machinist?

3    A.    No.

4    Q.    Do you remember getting an employee handbook when

5    you started back in '91?

6    A.    No.

7    Q.    Do you remember anybody ever given you any type of

8    O.S.H.A. regulations back in '91?

9    A.    In '91, I was a machinist.  I was a mechanic but it

10   was in the machine shop.  No, I did not and there was

11   different management back then too.

12         Paul Engle was not there and it was a different

13   regime.  It was a different Bradford Marine back then

14   entirely.

15   Q.    In a number of different respects?

16   A.    Yes.

17   Q.    One of it was it was less safe?

18   A.    Yes.  Absolutely.  Definitely.

19   Q.    It's fair to say though by 1997 this safety program

20   that you had implemented, based on your consultant, was

21   already starting to fall by the way side a little bit?

22   A.    In '97?

23   Q.    Yes.

24   A.    Yes.

25   Q.    When -- strike that.

```
 1            When would you say that it hit the bottom point

 2      again where you thought something had to be done about it?

 3      Did you say it was late '98, '99?

 4      A.    It was probably - it was probably in, I remember,

 5      yes, '99.  I was starting to see the change was drastic.   I

 6      was starting to look at the numbers and really saying, like

 7      we need to do something about this and the meaning about the

 8      amount of accidents, plus our premiums.

 9            I mean, I was proud that we saved $200,000 the first

10      year in premiums.   But suddenly we're $400,000 over again

11      two or three years later.  It was a personal thing.  I felt

12      I was failing in that respect.

13            It was always in my mind to clean it up.

14      Q.    Let's talk about welders at Bradford Marine today?

15      A.    Uh-huh.

16      Q.    When you hire a welder to come to work at Bradford

17      Marine, in talking to Dave Henderson earlier today, I

18      understand that you give that person some sort of test?

19      A.    Uh-huh.  A welding test.

20      Q.    What does that consist of?

21      A.    That consists of different kinds of metals.  A lot

22      of people say they're welders, they might have been given a

23      hood one day and they say they're a welder.

24            They're given a welding test that's classified.

25      Some of the welders do it as A.B.S. welding; which is, which
```

1    is American Bureau of Shipping.

2            They do the same tests these guys, the American

3    Bureau of Shipping would accept.  And they send the tests to

4    a lab to have it destructively tested to see if that welder

5    really knew what he was doing when he welded it.

6            There's different positions and different types of

7    metal.

8        Q.    That's what it takes to get A.B.S. qualified,

9    correct?

10       A.    Exactly.

11       Q.    In order for to you hire a welder they don't have to

12   be up to A.B.S. standards to be hired; but you give that

13   person a test?

14       A.    Uh-huh.  Yes.  Correct.

15       Q.    It has the same basic components as the A.B.S. test?

16       A.    Yeah.

17       Q.    You don't send that out to the lab?

18       A.    No, because the foreman of the welding department is

19   really a welder and he knows whether that guy can weld or

20   not.

21       Q.    Do you give welders any other tests?

22       A.    I don't believe there are any other tests.

23       Q.    Do you give them any written tests?

24       A.    No, not that I know of.

25       Q.    Assuming they pass the test that you give them and

1    they meet the other qualifications and you need welders, do

2    they get hired?

3        A.    Sure, as long as they meet the criterium.  Not by me

4    or Dave Henderson.  The foreman has the discretion to hire

5    the welders.

6        Q.    Who is the foreman?

7        A.    Harry Rampersad.

8        Q.    How do you spell that?

9        A.    R-A-M-P-E-R-S-A-D.

10       Q.    As far as you know, Mark, has this procedure in

11   terms of hiring welders at Bradford Marine, has that in been

12   effect since 1991?

13       A.    No, I don't believe so.

14       Q.    How has it changed over the years?

15       A.    There's been different foreman in the Welding

16   Department who have different criteria on how they would

17   like to see it done.

18           I don't believe - I don't believe in a time of heavy

19   work that there's a difference.  When you need welders and

20   you need welders, the good guys are put right to work.

21           The foreman knows where to put guys.  If you've got

22   a guy that puts a piece of metal together and then moves it

23   over, I think -- now the last foreman of the welding

24   department, Jerry Goss, I believe, he started testing.

25           He started that whole thing.

1    Q.    When was Jerry Goss the foreman?

2    A.    Those dates?    I mean, he's been the foreman - he

3    was the foreman for a year or so.  He's been gone, I think,

4    for two years or something like that.

5    Q.    Let me put it this way:  This test that we're taking

6    about that would be the most stringent requirement that's

7    imposed on employees at Bradford; is that fair?

8    A.    I would say that's fair.

9    Q.    You're saying there have been times in history of

10    the company since 1991 that new employees have been hired

11    with less stringent standards; is that fair?

12    A.    Yeah.

13    Q.    Do you know sitting here today, Mark, if testing was

14    given to Henry Naranjo before he was hired?

15    A.    No.

16    Q.    To your knowledge, is that documented anywhere?    In

17    other words, does Bradford keep records as to what testing

18    has been given to new employees, new welders?

19    A.    Not to my knowledge.  Not to my knowledge.

20    Q.    All right.  And do I take it that there's no

21    particular requirements after somebody is hired as a welder

22    at Bradford Marine to get continuing education or testing?

23    A.    There's no requirement, no.

24    Q.    Do they do so?

25    A.    Personally?  I mean, I don't know what you mean by

1    that question.

2        Q.    Well, when you say, there's no requirement.  Do some

3    welders do that voluntarily, get additional education or

4    schooling?

5        A.    Yeah, some people do.  Yeah, I've seen that, yes.

6        Q.    What have they done?  Give me an example.

7        A.    Harry, who's now the welding foreman, was taking a

8    naval architecture course to better his career; that's one

9    that sticks out in my mind.  He went from a regular employee

10   welder and now he's running the whole show.

11           Some people have more of a plan in their life than

12   others.

13       Q.    And maybe my question has not been clear.  Maybe it

14   doesn't jive with reality.

15           But my question is:  Once a welder is certified to

16   work at Bradford, is there any process from time to time

17   that that welder has to pass certain testing or make sure

18   that welder is competent, do you understand my question?

19       A.    I understand.  Not that I -- I don't believe so,

20   no.

21       Q.    Or is it a situation that once somebody knows how to

22   weld, it's kind of like riding a bike; they know how to

23   weld?

24       A.    I believe that's the thought.

25           At Chicago Bridge and Iron, I was tested every six

1    months.  We were X-ray Certified welders; although they're

2    not X-ray Certified welders at Bradford Marine.

3         I was tested every six months at Chicago Bridge and

4    Iron.  You were tested every six months just to make sure

5    you didn't lose your chops.

6    Q.    That's what I'm getting at.  There's no retest at

7    Bradford Marine?

8    A.    No.

9    Q.    My statement is correct?

10   A.    Correct.

11   Q.    I'm trying to move this along as quickly as I can.

12        There is a term that has come up in connection with

13   this case called a "shipyard competent person", have you

14   heard that term.

15   A.    Correct.

16   Q.    Are you familiar with that phrase?

17   A.    Yes.

18   Q.    What does that mean to you?

19   A.    A shipyard competent person is the person that would

20   check a confined space.  It would be the person - it's a

21   course that you need to do and would he check an area for

22   welding or hot work.

23   Q.    Check it for what reason?

24   A.    For safety.  To see whether it was safe for hot

25   work.

1    Q.    What does that mean, generally?

2    A.    If there's going to be work done in a vessel, let's

3    say in the engine room, there are certain criteria that

4    needs to be followed to make it safe.   The atmosphere for

5    welding.   There could be gases there.   There could be fluids

6    liquids; combustible.

7    Q.    Are you a shipyard competent person?

8    A.    Yes.

9    Q.    Is anybody else at the yard?

10   A.    Harry Rampersad is shipyard competent.   At the time

11   of 1996 or '97, if I remember, during the time Henry's

12   accident happened, I believe - I believe the welding foreman

13   back at the time was Tony Watson, if I remember correctly,

14   and he was a shipyard competent person.

15        There are now shipyard competent people in the

16   Frank Pichardo welding Department now competent person and

17   Dale Rampersad.

18        Now, we have two more.   Michael Grillo is shipyard

19   competent.

20   Q.    Could you spell Frank's last name?

21   A.    P-I-C-H-A-R-D-O.

22   Q.    Is Frank a welder?

23   A.    Yes.

24   Q.    But back in 1997, how many shipyard competent

25   person's did you have?

1          A.    I believe it was myself and Tony Watson and if - I

2    believe Dave Henderson also.  I could be wrong, but I do

3    believe that Dave Henderson was shipyard competent.

4          Q.    Do I take it that it would be incumbent on shipyard

5    competent persons to check these spaces that we've been

6    talking about to see if welding could go on?

7          A.    Yes.

8          Q.    As an example, is a shipyard competent person, is

9    that limited to welding?

10         A.    No, it's limited to a confined space.  It could be

11   any reason.  You don't have to be welding something, working

12   inside a tank and coating the inside of a tank and you need

13   to make sure the entry an egress from the entry into the

14   tank.

15         Q.    So a shipyard competent person applies to anything

16   done in a confined space?

17         A.    Correct.

18         Q.    Whether that's welding, painting or anything?

19         A.    Correct.  Even just inspections.

20         Q.    What is a confined space?  How is that defined?

21         A.    A confined space is defined by limited access to an

22   area and the actual size, the volume of the area that you're

23   talking about.  There are exact terms that right now escape

24   me.

25         Q.    Are you familiar, general, with the part of the

1    vessel where this explosion took place with Mr. Naranjo?

2        A.    Yes.

3        Q.    Would you classify it as a confined space?

4        A.    Yes.

5        Q.    I do take it then that protocol would have been for

6    a shipyard competent person at Bradford to inspect this

7    space before any type of work would have been done in that

8    particular area?

9        A.    Yes.

10       Q.    Do you know if that was done?

11       A.    No - well, no I take that back actually.   Okay.    I

12   know that - I know that the space had been, I know that Tony

13   Watson, I believe had seen the area.

14            I did not - I was not informed if the area to be

15   welded, I don't believe, I don't believe Dave Henderson was

16   informed of the area.   I shouldn't mention Tony to often.

17            Maybe at the time he wasn't the foreman; maybe has

18   was.   I just think he was around the yard at the time.

19            I believe the area where Henry was welding, where we

20   had been welding on that boat, it was a different area of

21   that boat.   He had been asked to come in to quick plate the

22   plate for the steering pumps.   I believe it was the captain

23   at the time, I believe it was the captain - I'm just trying

24   to remember his name  --

25       Q.    Bredbeck?

1     A.    Yeah, Jack.  Don't tell him I said that.

2           So it wasn't really - it wasn't the place that we

3     would normally be working on that boat at the time so  --

4     Q.    Maybe I'll follow-up with that in a minute.  Maybe I

5     can talk about the general situation.

6           Let's suppose one encounters a confined space.

7     A.    Uh-huh.

8     Q.    That's a yes, you're with me?

9     A.    Yes.

10    Q.    Who makes a determination in the first instance

11    whether a shipyard competent person has to inspect that

12    confined space?

13    A.    I would say the foreman of the welding shop or the

14    safety director.

15    Q.    In the case of welding?

16    A.    Well, the foreman the welding shop.

17    Q.    How about the employee himself?  The welder himself?

18    A.    Absolutely.

19    Q.    So they have a responsibility too.  If a foreman is

20    not around, for example, they should go to somebody like

21    yourself?

22    A.    Correct.

23    Q.    Before working in a confined space?

24    A.    Correct.

25    Q.    We're talking about a general sense?

1    A.    Yes.

2    Q.    Let's suppose that happens.  Let's suppose that the

3    worker, again I'm taking generally in this case, let's say

4    it's a welder.  A welder goes to his foreman and says, I'm

5    going to be working in this confined space.

6        What happens then if the foreman is not a shipyard

7    competent person?  What does the foreman do?

8    A.    You would find a shipyard competent person to check

9    the area for no gases.  If we had a detector at the time of

10   the accident, we did not have a detector back then.

11       If it was a questionable area, we could call marine

12   chemist.  We are not chemists.  If there's a confined space

13   or explosive atmosphere, we would call in a marine chemist

14   and have that area certified safe for hot work.  That's the

15   name of it, certified safe for hot work.

16   Q.    Would a shipyard competent person make the

17   determination as to whether a chemist would have to be

18   brought in or not?

19   A.    Yes.  That's what the shipyard competent person's

20   job would be, to be bring the chemist in because a shipyard

21   competent person could not certify it safe for hot work;

22   only marine chemists can do that.

23   Q.    Tell me, do you mean you call a chemist in every

24   instance?

25   A.    When it comes to a confined space for welding, yes;

1    within the criteria, within 25 feet of a fuel tank.

2            There's a whole bunch of different criteria.

3    Q.    That's what I want to know.

4            Tell me again the criteria for when you bring in or

5    call in a chemist versus when you wouldn't.

6    A.    Okay.   If we're working on a boat that you're more

7    than 25 feet from, a fuel tank, okay, or an oil tank, you

8    would call a chemist in.

9            If you walked into a engine room and in reality if

10    you follow all the rules, all the O.S.H.A. rules, you have a

11    confined space and the engine room is pretty close to a

12    confined space, as far as getting into the engine room and

13    getting out if there's a fire.

14            For any welding in the engine room, we would have a

15    marine chemist certify that engine room safe for hot work

16    because of the bilge, because of contamination from oils and

17    solvents.

18            The Souvenir was certified safe for hot work.

19    Q.    Let's suppose you're not 25 feet from the oil or

20    fuel tank or in the engine room but you encounter, or a

21    welder encounters a confined space.   The welder goes to the

22    foreman and the foreman comes to you.

23            Is it necessary to bring in the chemist?

24    A.    Not necessarily, no.

25    Q.    What would you do then as the shipyard competent

1    person?

2    A.    Make an inspection to find out where the fuel tanks

3    are.  Find out where the area is and see if there's, like, a

4    risk of explosion.

5    Q.    And you do that by one of these multi-gas testers

6    correct?

7    A.    Yes.

8    Q.    But you said you didn't have one back in July 1997,

9    correct.  Do you have one today?

10    A.    Yes, Sir.

11    Q.    How many do you have?

12    A.    We have two; one in the Bahamas yard and one here.

13    Q.    Dave Henderson said they're a couple of hundred

14    bucks?

15    A.    No, they're $2,500 dollars.

16    Q.    Twenty-five hundred dollars.  But they're relatively

17    small to hold in your hand?

18    A.    Yes, Sir.

19    Q.    And you can read the results, they come out fairly

20    quickly?

21    A.    Yes.

22    Q.    They're not difficult to use, are they?

23    A.    No, Sir, not when you're trained to use them.  Not

24    when you're trained to use them.  The shipyard competent

25    persons are the ones who should be using them.

1   Q.   There were shipyard competent person's at Bradford

2   Marine in July of 1997, correct?

3   A.   Yes.

4   Q.   But there were no multi-gas testers?

5   A.   Correct.

6   Q.   Okay.  So let's continue on with our hypothetical

7   example here.

8        Let's suppose you're brought in as a shipyard

9   competent person to check on a confined area.  The first

10  thing you're doing is trying to do find out the location,

11  whether it's close to a fuel tank or something like that.

12  A.   Yes.

13  Q.   In essence, you're making a determination whether

14  you need a chemist or not?

15  A.   Correct.

16  Q.   Let's suppose you do not need a chemist, are you

17  with me?

18  A.   Yes.

19  Q.   Now, you do what?  You check to see if any gases are

20  present?

21  A.   You would, yes.

22  Q.   You do that with your multi-gas tester?

23  A.   If you have one, yes.

24  Q.   You have one.  I'm  talking about today?

25  A.   Yeah.

1    Q.   Let's suppose that you determine that there are

2    gases present that are combustible, flammable or ignitable.

3    What do you do?  What is the protocol?

4    A.   The protocol is:  If there's gases present, the

5    protocol is to call a marine chemist.  He will come down and

6    he'll then give you what can be done.

7         In some cases it's called he purges the area with a

8    C.O.2, purges into the area from a bottle with a cylinder

9    under the marine chemist's direction and under the marine

10   chemist's eye.  He'll watch what's going on.

11   Q.   It's under his supervision?

12   A.   It's under his supervision, the marine chemist.

13        Then he'll certify it safe for hot work and how

14   you're going to purge it.  He'll inspect the way that you're

15   purging the area and he'll check the area with his detector,

16   gas detector, before he'll allow you to weld.

17   Q.   Is there a certain amount of time -- strike that.

18        Let's suppose that the chemist certifies the area

19   safe for hot work.  Is there a certain amount of time that

20   the work has to be completed?

21   A.   Yes -- well, no.

22        No, there's not a certain amount of the time.  But

23   if the boat moves, if the vessel is shifted or if the

24   atmosphere changes, if anything changes in about it, you

25   could weld all day and night but with a marine certificate

1    if something changes though, meaning recontamination or for

2    some reason you needed to move the vessel from one place to

3    another, that certificate is void and you need to do a

4    reorganization.

5        Q.    I'm going to show you, Mark, something that has been

6    marked as Exhibit Number 11?

7        A.    Uh-huh.

8        Q.    Are you with me?

9        A.    Yes.

10       Q.    Do you see that in front of you?

11       A.    Yes.

12       Q.    Is this the certificate that you're talking about?

13       A.    It looks somewhat like it.  It's not the exact one

14   that I normally see.

15       Q.    Is this something similar to it though?

16       A.    Yes.

17       Q.    And this is hung up on the wall or something?

18       A.    Yes.

19       Q.    In the confined area?

20       A.    In an easily visual area on the vessel so people can

21   easily see it.

22       Q.    And what you're saying is once that's up on the

23   wall, assuming that the conditions haven't changed or the

24   boat hasn't been moved, there is no minimum amount of time

25   or maximum amount of time in which the work has to be

1    completed?

2        A.   Correct.

3        Q.   Now, why didn't Bradford have a multi-gas tester

4    back in July of 1997, if you know?

5        A.   I don't really know.

6        Q.   Well, certainly you had paid good money to have a

7    consultant, right?

8        A.   Yes.  I believe I had asked to buy one.  I was told

9    that we were going to have a marine chemist to take care of

10   the hot work situation; that's why we didn't buy one at the

11   time.

12       Q.   And the marine chemist was Mr. Rumell.  Is there --

13   you as the Director or Head of the Safety Department

14   appreciated the need for having a multi-gas tester; is that

15   a fair statement?

16       A.   Yes.

17       Q.   And you asked for one?

18       A.   Yes.

19       Q.   And they're response, someone's response was, well,

20   we've got a marine chemist for that?

21       A.   Yes.

22       Q.   The marine chemist is Peter Rumell?

23       A.   Yes.

24       Q.   When did you request the multi-gas tester?

25       A.   Not long after I was crowned Bradford Marine Safety

```
 1   Director.
 2      Q.   And that was before the accident which forms the
 3   basis of this case?
 4      A.   Yes.
 5      Q.   Mr. Rumell, is he actually employed by Bradford
 6   Marine?
 7      A.   No.
 8      Q.   He's an independent contractor?
 9      A.   Yes.
10      Q.   The space wherein this accident occurred on the
11   Souvenir, you said earlier you thought it was a confined
12   area?
13      A.   Yes.
14      Q.   Do you know, Mark, if that area had been inspected
15   by a shipyard competent person?
16      A.   No.
17      Q.   You don't know?
18      A.   I don't know.  I don't believe it had.
19      Q.   What makes you say that?
20      A.   Because I did the accident investigation.
21      Q.   And your accident investigation revealed what?
22      A.   In particular, that in that particular area, I don't
23   know how to answer that.
24           What's the question.  Tell me what the question was
25   again, please.
```

1    Q.   Sure.  And I'm just trying to get at:  You did an

2    accident investigation after this accident, correct?

3    A.   Correct.

4    Q.   And you did so, I assume, as the Head of the Safety

5    Department?

6    A.   Yes.

7    Q.   And I assume that you went around and interviewed

8    various people and found out what happened?

9    A.   Yeah.

10   Q.   You weren't there?

11   A.   I was in the yard, I wasn't on board the vessel.  I

12   was in the front office actually.

13   Q.   So you didn't observe the accident happened?

14   A.   No.

15   Q.   Everything that you know about this accident came

16   through other people?

17   A.   Yes.

18   Q.   Including Henry Naranjo?

19   A.   Yes.

20   Q.   You did have an opportunity to talk to him?

21   A.   Not in depth, but yes, I spoke with Henry after the

22   accident.  I interviewed him like I interviewed the other

23   people.

24   Q.   Did you actually prepare a report based on your

25   investigation?

1    A.   Yes.

2    Q.   I'm talking about now, other than your actual

3    statement - you gave a statement, true?

4    A.   Yes, I did.

5    Q.   But did you prepare a separate report concerning

6    your findings?

7    A.   I did an accident report which was for the Insurance

8    Company, I believe that's it or are you calling my

9    statement, my report, or -- I mean--

10   Q.   That's the nature of my question.  I have your

11   statement.  It's about a paragraph long.  I'll talk to you

12   about that in a moment.

13        But did you prepare any documents, other than your

14   statement, as a part of your investigation?

15   A.   Yes, I prepared other people's statements.  I put

16   the entire report together.

17   Q.   I got you.

18   A.   That's what I believe I'm saying is my report.

19   Q.   You probably took some photos?

20   A.   Yes.

21   Q.   As a part of your investigation though I take it you

22   came to the conclusion that this space had not been viewed

23   by a shipyard competent person prior to the welding that had

24   been done by Mr. Naranjo?

25   A.   Correct.

1    Q.   Had the space been inspected by Mr. Rumell or any

2    other marine chemist prior to the accident?

3    A.   That particular space, no.

4    Q.   Now, Mr. Naranjo told us yesterday that he was hired

5    at Bradford Marine back in 1992?

6    A.   Okay.

7    Q.   This accident happened in July of 1997.  So you

8    assume that he was an employee there when you were, when you

9    came on board in 1995 and got the Safety Program up and

10   running again; is that a fair statement?

11   A.   Yes.

12   Q.   He would have been part of the safety meetings that

13   you had implemented in late 1995 or '96?

14   A.   Yes.

15   Q.   Do you know Mr. Naranjo?

16   A.   Yes.

17   Q.   The word has been that he's a good worker?

18   A.   Absolutely.

19   Q.   I assume that he took his job seriously?

20   A.   Yes.

21   Q.   And he took safety seriously?

22   A.   Definitely.  He was one of the better employees that

23   we've ever had there, as far as his ability and his

24   attitude.

25   Q.   Also, I assume that he understood protocol about

1   consulting with his foreman about any questions that he

2   might have?

3      A.   Yes.

4      Q.   I take it you've seen him do that in the past?

5      A.   I wouldn't say that, I wouldn't say that I have seen

6   him do it.  It certainly wouldn't surprise me if he had done

7   it.

8      Q.   You don't have any reason to believe that he was

9   unaware that he should go and talk to his foreman if he had

10   any concerns?

11      A.   If he had any concerns?  No, not at all.

12      Q.   Or to talk to somebody like yourself?

13      A.   No.

14      Q.   You would agree with me that would have been

15   something that he should have done?

16      MR. FAMULARI:  Object to the form.

17   BY MR. WEBER:

18      Q.   Go ahead and answer.

19      A.   If he had a question, if he had a doubt; sure.

20      Q.   Are you confident, Mark, that all welders in the

21   yard understood what confined areas were, was that explained

22   to them?  Was it explained to Henry?

23      A.   No, because of the turnover of employees and the way

24   everything that happened, I can't say that I explained that

25   to him, no.

1     Q.    Because there may have been some welders as an

2    example, that came on board after your initial safety

3    meetings?

4     A.    Yes.

5     Q.    But if Mr. Naranjo started in 1992  --

6     A.    Yes.

7     Q.    -- and worked continually until July of 1997, are

8    you confident that somewhere along the line it would have

9    been explained to him, as a welder, what a confined area is?

10     A.    Yes.

11     Q.    How would that have happened?

12     A.    That would have happened with the entire yard

13    meeting that we had because when I did those meetings,

14    bringing all the yard in, when I would go over the big

15    picture of the safety and how we were implementing safety at

16    Bradford Marine, then as the meeting would go on - the

17    meetings were an hour long - as the meeting would go on,

18    that was where I came in with the safety consultant, and I

19    kind of geared the meeting toward that group of individuals.

20          We started out with the big picture, like big

21    folder.  Then we got down to the nitty gritty.  Like the

22    painters, now in your department you need to consider a mask

23    and welders need to consider hot work for instance.

24     Q.    I don't know this but I assume that on the scale of

25    jobs in a boat yard such as Bradford Marine that welding

1    potentially is one of the more dangerous jobs?

2        A.    Yes.

3        Q.    You would agree with that?

4        A.    Yes.

5        Q.    I would assume it's extremely difficult for you as

6    the Director of the Safety Department to explain to welders

7    what a confined area is?

8        A.    Yes.

9        Q.    That's because you have danger associated with

10    welding in a confined area, true?

11        A.    True.

12        Q.    And you have already told me that's it's the

13    responsibility of the welder to ask questions if he has any

14    concerns about the area in which he going to be welding?

15        A.    Yes.    I actually stopped a job once that was going

16    to be done because a welder came to me and asked me to go

17    look at a job.

18            I went to the boat and to my dismay, I cancelled the

19    job on the boat.    Instead of going in from the top, we had

20    to let the captain of the vessel know, to let the owner know

21    that we were not going in there because it's a confined

22    space and a dangerous spot to cut an access into a vessel.

23    It was hulled out.

24            It was going to cost, whatever, $10,000 or more but

25    that's the only way we were going to be able to do the job

1    because that was the right and safe way to do it.

2         The employee did not feel comfortable doing it.  I

3    didn't feel comfortable sending an employee in there and the

4    other negative feelings, and having to control that

5    situation and personally for me, personally when it comes to

6    production, the production facility was put out.  The window

7    - we stopped that job and it was important and we feel it's

8    important.

9    Q.   That was an instance that an employee actually came

10   to you?

11   A.   Exactly.  The employee came to me and told me to go

12   to a job and came into my office knowing that he could come

13   to me and ask and say, please, at least have a look at this.

14        When I had a look at it, I agreed.  I said, it's not

15   a way to do it.  You need to go in a different angle.

16   Q.   The employee in this instance was whom?

17   A.   One of the transient welders, yeah.  His name - I

18   don't remember his name.  I don't remember his name.  I'm

19   sure I could find it out.  It was a couple years ago.  It

20   was few years ago when this happened.  It was something that

21   actually happened.  I bring it up to say we were serious

22   about what we were doing.

23   Q.   Did that happen before or after the accident with

24   Mr. Naranjo?

25   A.   That was after the accident.

1    Q.    In that instance, was that employee directed to do a

2    job by the foreman?

3    A.    Correct.

4    Q.    Isn't that the typical case where a welder will be

5    told to do a job by the foreman?

6    A.    Yes.

7    Q.    In your opinion as the Safety Director at Bradford

8    Marine, and based upon your experience, is it ever excusable

9    for an employee, such as a welder, to simply, to let's say,

10    follow the advice of somebody else other than the foreman

11    without doing any independent investigation himself?

12    A.    In what - in what respect?  On how to do a

13    particular job?

14    Q.    Sure.   Let's say the captain says, Mr. Welder, I

15    want you to do this.

16    A.    Yes.   That's fine and it's not inexcusable.

17    Q.    And does that happen from time to time?

18    A.    Yes.

19    Q.    Where the captain will actually direct certain

20    employees to do certain tasks?

21    A.    Yes, all the time.

22    Q.    That happens a lot?

23    A.    A lot.

24    Q.    And does the employee have to go and tell a foreman

25    about that?

1      A.    If what the captain is asking him to do is going to

2   run into more money or if it's a quote job, when it comes to

3   money; if we quoted it one particular way to do the job and

4   the captain says, no, I want this done this way; well, then,

5   that employee should go to the foreman and most likely would

6   go to the foreman to just say, well, listen the captain is

7   telling me to do it this way.

8          But when you're on the vessel, you, the employee,

9   should always go to the foreman although when you're in

10  close quarters with the person who's running the vessel and

11  it's his kingdom and he says, I want to you do it this way;

12  the employee is going to do it that way as long as he deems

13  it safe or -- it's not like we have -- not every time is the

14  employee instructed to say, sorry, captain, I'm not going to

15  do it this way.   We all have to get off the boat and find

16  my foreman.

17     Q.    I understand that but you said something there that

18  I want to follow-up on.

19          It's okay as long as the employee deems it safe,

20  correct?

21     A.    Yes.

22     Q.    The employee still has the responsibility of making

23  sure or making that determination, does he not?

24     A.    Yes.

25     Q.    No matter what anybody says, a captain, or the owner

1    or the man on the moon, in every instance that employee has

2    to make a determination as to whether or not the task

3    requested of him is safe, true?

4        A.    True.

5        Q.    This whole business about checking confined spaces;

6    recognizing what is a confined space and going and getting a

7    shipyard competent person; no matter what anybody else says,

8    whether it's the captain or the owner, doesn't negate the

9    duty that you have as a particular employee of following

10   protocol, does it?

11       A.    No.

12       Q.    My statement is correct?

13       A.    Correct.

14       Q.    Doesn't the yard have an interest in keeping track

15   of job numbers and so on?

16       A.    Yes.

17       Q.    So, I mean, what if a welder is walking the deck and

18   the owner calls him and says, I want to you do X, Y, or Z.,

19   it has no job number or anything else.

20           Are you saying it happens all the time, that welders

21   are doing it?

22       A.    That's not what I mean when I say it happens all the

23   time.    I mean, it happens that the captain or engineer will

24   direct you on how they want you to you do a particular job

25   because a lot of the time it's their vessel; they feel close

1    to it.

2          It's not like a commercial vessel.  It's a private

3    vessel and they live on it.  It's their home and they might

4    direct you on particular way, how to do a particular job.

5          Yes, in the event that sometimes they will be on

6    there and they would say, quick, run and tack this down in

7    place.

8          It's done and put on the same work order number.  It

9    can be billed anyways.

10    Q.    Early on in this deposition you paraphrased what you

11    thought Henry was doing right before this accident.

12          What is your understanding of what he was doing?

13    A.    Henry was tacking a base plate about a half an inch,

14    aluminum base plate; tacking it to the deck in the lazarette

15    for the steering pumps.

16    Q.    How was it that he was performing that particular

17    task at that point in time; what's your understanding?

18    A.    My understanding is that he was installing the

19    steering pumps and had the captain asked Bradford Marine to

20    tack the base plate in the lazarette so he could mount the

21    plates on the steering plate.

22          I believe the captain asked Henry to take care of

23    the job.  I don't remember if there was an actual job

24    number written at that moment in time, I don't remember.

25    Q.    We've identified here in this deposition, Mr.

1    Henderson identified this, what I'm showing you that has

2    been marked as Exhibit 8.  This was job 99.

3         Does that square with your knowledge?

4    A.    Yeah - no, not that - that's not the job.

5    Q.    That's not?

6    A.    That's not the job.  I'm sure that's not job.

7    Q.    Why are you sure?

8    A.    Because the description of the job is not the job

9    that Henry was doing.  Henry was putting steering pump base

10   plates on.  He not installing brackets for a tool box.  The

11   tool box was in the engine room not the lazarette.

12   Q.    Tell me again.  I'm sorry.  Somebody wanted to put

13   steering pumps in this particular location.  Who wanted do

14   that, do you know?

15   A.    The captain, I mean, the owner of the boat wanted

16   steering pumps on.  The captain is there to make sure the

17   new steering pumps go in.  The guy that they hired to do it

18   who was Bruce Atkinson.

19        I think it was company called Bruce Atkinson Marine,

20   something like that.  As far as who wanted to put them in

21   there; the owner wanted them in there or the captain wanted

22   them in there.

23        They Bruce Atkinson to put them in there.  I believe

24   that Bruce asked the captain to have Bradford Marine or

25   Henry tack this plate.  He was going to bolt them down.  If

1    I remember correctly, he was going to bolt them down and he

2    couldn't put his hand underneath to put his hand on the bolt

3    togs, where he wanted put the steering pump plate.

4         I'll show you in these photographs what I'm talking

5    about.  The idea was to get the plate made up and welded and

6    then the plate was thick enough at that point to bolt it to

7    the plate.  There was a deck that wasn't thick enough.

8    Q.   Do you remember anything about the deck not being

9    thick enough to actually support these pumps?

10   A.   I don't know if it wasn't.  In my opinion, in my

11   professional opinion, the deck, I wouldn't have mounted

12   pumps on that deck.  I would have put a decking plate, which

13   is exactly what was being done.

14   Q.   Why was that, it seemed to thin?

15   A.   Like it wasn't solid mounting.  Hydraulic steering

16   pumps are heavy and going into the stern of the boat.

17   They're going to work the steering of the vessel, you know,

18   like that.  They've got to work the hydraulics.

19   Q.   Did your investigation reveal any holes that were

20   drilled in the deck  --

21        First of all, do you know if it was tried without

22   the plate first?

23   A.   I believe more than one hole was drilled and that's

24   when they realized the deck was too thin.  I believe there

25   was a hole drilled.

1    Q.   So that's when the idea of the plates came about?

2    A.   Correct.

3    Q.   Now, is it possible that Mr. Naranjo was sent on

4    this mission to do this without a work order being produced?

5    A.   It's very possible.

6    Q.   Does that happen?

7    A.   That happens from time to time.   Henry, people

8    wanted Henry, they didn't want anybody but Henry working on

9    their boat.   He was well respected.   A lot of people only

10   wanted Henry on their boat.   He dressed well.   He presented

11   well and worked very hard.   He was a very good welder and

12   respectful, so who wouldn't want him on their boat?

13        He was doing work on their boat.   He was pretty much

14   the guy on this boat.

15        The possibility of him working on the mast, he may

16   have been doing something on the mast with his equipment on

17   board the boat.   Maybe they said, can you come quick and

18   tack this plate and that's probably what happened.   I'm

19   saying "probably", but the chance of there not being a work

20   order written for that job is good and I don't remember one

21   and I'm trying to remember a lot of things about this case,

22   and I don't remember seeing a work order for this job.

23   Q.   And you don't believe that Mr. Rumell went to this

24   particular space and inspected it?

25   A.   No.

1    Q.    My statement is correct?

2    A.    Correct.

3    Q.    If I understand this the deck that he was welding

4    this plate to was an aluminum deck?

5    A.    Correct.

6    Q.    Obviously, Mark, an explosion occurred.  Do you have

7    any idea, sitting here today, why that explosion occurred?

8    A.    No.

9    Q.    Have you ever seen anything like that?

10    A.    Not like that.

11    Q.    I.E.:  A deck actually buckling and exploding like

12    this?

13    A.    I've seen damage in explosions before, yes.  Yes,

14    I've seen damage from explosions.   An explosion like this

15    that has no, has no - it seems there was no heat when it

16    exploded.  It was like - it was like, I mean, I would

17    imagine there would be some or that I would see some kind of

18    soot or burn mark or something where the explosion happened

19    to show there was flammable substance.

20    Q.    Do you know what flammable substance ignited here?

21    A.    No.

22    Q.    Did your investigation reveal what that might have

23    been?

24    A.    My investigation revealed zero.

25    Q.    Do you know any investigation that revealed anything

1    along those lines?

2        A.    I know that I called Peter Rumell in to do an

3    investigation of the area.  His investigation revealed

4    nothing of any substance at that time, although there is

5    speculation of what it could have been and it blew itself

6    out, like dead marine growth or something like that; which

7    is not that far fetched.

8        Q.    It isn't?

9        A.    No, it happens in rub rails.

10       Q.    In what?

11       A.    In rub rails, on the side of a vessel.  If there's a

12   leak on the rub rail side of a vessel, that's an enclosed

13   space and it's been known to happen that salt water gets

14   there and the salt water acts to affect some kind of marine

15   growth.  It could produce methane, flammable gas.

16           I know of that by going to competent person

17   training.

18       Q.    That has actually resulted in explosions?

19       A.    In rub rails, yes, methane gas is very flammable.

20       Q.    Is it your understanding that there was a space?  Do

21   you understand that there was apparently poured cement in

22   the bottom of this boat?

23       A.    Yes.

24       Q.    That there was a space between the top of the poured

25   cement and the aluminum deck?

1    A.   Yes, a small void between that area, yes.  It is

2    known now.  I wasn't aware of that before.  Obviously it's

3    because of my investigation that I know that.

4    Q.   You weren't aware of that beforehand?

5    A.   No.

6    Q.   In the course of doing the work for Mr. Smith, did

7    you ever get any blueprints for this boat?

8    A.   No.

9    Q.   Were you the appointed guardian in terms of

10   arranging this whole job and meeting with Mr. Smith?

11   A.   I was the yard appointed project manager, the

12   liaison between the owner and the captain.

13   Q.   Are there circumstances where you will get

14   blueprints for boats?

15   A.   Yes.

16   Q.   What circumstances will you get blueprints for

17   boats?

18   A.   To find tankage.  To find out where tankage areas

19   are.  To find out where the wires run.  We get blueprints

20   to see what's behind walls, bulk heads, numerous reasons,

21   behind closets, where pipe work runs.

22   Q.   And it's your testimony that you didn't see the need

23   to get any blueprints for this project?

24   A.   No.

25   Q.   You did not?

1    A.    No, we did not.

2    Q.    All right.  Based on your understanding today of

3    the space between the top of the cement and the aluminum

4    deck, do you have an opinion, as somebody who has welded

5    over the years, as to whether the welding gun must have

6    penetrated the aluminum deck?

7    A.    I believe that's what happened, yes.  I believe it

8    blew a whole in the deck.  The deck was a light deck.

9    Q.    How thick was the deck?

10   A.    I don't know how thick it was.  I'll take a guess.

11   If I was going to guess, I don't know if you want me to

12   guess or anything?

13   Q.    I don't want you to guess, but that's obviously not

14   the goal of a welder, to actually penetrate through the

15   aluminum deck, is it?

16   A.    No, not at all.

17   Q.    Nevertheless, based upon your experience in the

18   welding profession that would be your opinion as to what

19   happened here?

20   A.    I believe that's what happened

21                   DIRECT EXAMINATION

22   BY MR. KALLEN:

23   Q.    Let me jump in here, if you don't mind?

24        I'll follow-up where you left off.  And I'll take

25   you back to your welding years and perhaps any knowledge

1    that have you gained since then relative to welding.

2          Henry testified that he understood the aluminum deck

3    was a 1/4 inch thick.

4     A.   Okay.

5     Q.   He had been requested to fabricate two aluminum

6    plates; 3/4 inches each?

7     A.   Okay.

8     Q.   He set the amperage, if you will, of the torch at

9    150; so basically that's fifty percent?

10         MR. FAMULARI:  No.

11   BY MR. KALLEN:

12    Q.   Sorry.  Do you have any opinion one way or the other

13   if that would be insufficient or inappropriate or

14   appropriate amperage?

15    A.   For a 1/4 inch; I don't believe that plate was a 1/4

16   inch, I believe it was less than that.

17    Q.   That's based upon your speculation or based upon

18   what you recall to be the width of that plate after your

19   investigation?

20    A.   Yeah.  I saw the plate and when I said I was going

21   to guess, I would have said a range between 3/16ths of an

22   inch; 1/8th to 3/16th's, which is less than a quarter, you

23   know.

24    Q.   If Henry had been requested to fabricate two

25   aluminum plates which were to be utilized to lend support to

1    the hydraulic pumps, is that - does that justify a work

2    order?

3        A.    Yes.  Yes, it justifies a work order, yes.

4        Q.    I mean, that's not that they just tack something;

5    here you're fabricating to an aluminum plate?

6        A.    Correct.

7        Q.    If Henry also testified that when he arrived at work

8    that morning Mr. Watson told him what his job would be that

9    day, which included this particular job that he was doing at

10   the time of the explosion, would that tell you that at least

11   prior to the explosion if Mr. Watson was aware of what was

12   going to take place in the lazarette?

13       A.    Yes.

14       Q.    And given the fact that this was a confined space,

15   in your opinion anyway, knowing that a welding job was going

16   to be conducted in there, would that have called for a

17   shipyard competent person to conduct an inspection for him?

18       A.    That would have called for an inspection, yes.

19       Q.    Henry should have known that, right?

20       A.    Yes.

21       Q.    When you were asked questions about, well, if a

22   welder, or any employee for that matter, has a question or

23   concern about whether to do a job or whether he should do it

24   in such a way as instructed; he should ask his foreman?

25       A.    Yes.

1     Q.    I take it the person that he should ask or the

2     appropriate person he should ask is his foreman?

3     A.    Yes, the next in chain of command.

4     Q.    Sure.   If he can't find the foreman, he could look

5     for you?

6     A.    Correct.

7     Q.    Or the assistant foreman?

8     A.    Exactly.

9     Q.    He shouldn't rely on what the captain tells him, if

10    he says it's safe?

11    A.    He shouldn't rely on what the captain says if he

12    says it's safe.

13    Q.    Yeah.   In lieu of that he should ask his foreman if

14    he has safety questions?

15    A.    Yeah, if it's a safety questions, he should talk to

16    his foreman.

17    Q.    A safety question would include whether or not

18    there's the possibly presence of flammable, ignitable vapors

19    or gas fumes in the space you're utilizing; would you agree?

20    A.    Yes.

21    Q.    Were you part of the project team that put together

22    the bid for this project?

23    A.    I coordinated getting the bids together, following

24    up on everybody to make sure it was okay.   I did not write

25    any bids.

1    Q.    Did you ever deal with Stephen Smith?

2    A.    Yes.

3    Q.    Did you meet with him actually?

4    A.    Yes.

5    Q.    Nice guy?

6    A.    Very nice guy.

7    Q.    This was at the outset of the project or during the

8    course of the project?

9    A.    During the course of the project.  I don't go

10    through dinner with him.  I knew him through the boat

11    vessel, through Jack.

12    Q.    Basically, if something came up on a daily basis,

13    Captain Jack was there?

14    A.    Correct.  I would deal directly with Captain Jack.

15    Q.    When a project like this starts, in particular if a

16    captain or owner who has never been in at Bradford, so they

17    don't know the Bradford protocol, is something explained to

18    the captain and the owner as far as how Bradford likes to

19    see things done; that if the captain has a question or has a

20    request he should go to certain people as opposed to other

21    people?

22    A.    Yes.

23    Q.    What is explained to the captain at the outset of

24    the project as far as that's concerned?

25    A.    Well, you mean if they need work to be done?  They

1    have to see either the project manager.  Bradford Marine

2    doesn't  have but two project managers and the foreman; so I

3    mean, he either sees the project manager or the foreman.

4        Q.    Of that department?

5        A.    Of that department.

6        Q.    For example, if the captain one day, out-of-blue

7    decides, you know what, I want this other thing welded,

8    which wasn't in the original contract or original plans; he

9    knows that he should address that questions to the foreman

10   of the welding department?

11       A.    He knows that's the right thing to do.

12       Q.    Other than O.S.H.A. regulations in your position as

13   Safety Director, are you also familiar with the N.F.P.A.

14   guidelines?

15       A.    Yes, I'm familiar with them.  I could not tell what

16   you they are, but yes.

17       Q.    I wouldn't ask you to cite them chapter and verse

18   but you're aware N.F.P.A. guidelines relative to welding?

19       A.    Yes, sir.

20       Q.    Were these N.F.P.A. guidelines incorporated into the

21   --

22       A.    Safety program?

23       Q.    Yes, the Safety Program?

24       A.    Yes.

25       Q.    This employee manual that was handed out which you

1    had some safety committee discussions about it, was that

2    handed out to all existing employees when it was created?

3         A.    All existing employees at the time and for a period

4    of time after that.  All new employees for a period of time,

5    they had to sign a piece of paper - sorry - to say that they

6    had received it.

7         Q.    So assuming this employee manual was created and

8    generated and distributed some time in '96, Mr. Naranjo was

9    certainly employed there, then he would have received one?

10        A.    Yes.

11        Q.    Now, was the safety book that was handed out to each

12   individual department, was that updated after '96?

13        A.    No.

14        Q.    So just like three-ring safety manual, there were no

15   updates were made?

16        A.    Correct.

17        Q.    Did you, as Safety Director, notwithstanding the

18   fact that these manuals were not updated, subscribe or

19   otherwise receive any O.S.H.A. materials from time to time?

20        A.    I would receive O.S.H.A. materials from time to time

21   from free business and legal reports and companies that send

22   it you when they know you're the title of Safety Director.

23   Somehow you wind up on a list that everybody has.

24        Q.    Did you speak about it with Captain Jack after this

25   accident about what happened?

```
1      A.    Yes.

2      Q.    What did he tell you?

3      A.    Without reading my statement that I got from him, I

4   don't really remember exactly.

5      Q.    We may have the statement?

6          MR. WEBER:  That's your statement?

7   BY MR. KALLEN:

8      Q.    Mr. Weber is handing you a copy of your statement.

9      A.    This is my statement.

10     Q.    Did you actually get a written statement from

11  Captain Jack?

12     A.    I think so.  I think, if I remember rightly, I did.

13     Q.    I haven't seen one.  Has anyone here seen one?

14     A.    Yeah.

15         MR. WEBER:  Yeah, it's in there.

16         THE WITNESS:  I didn't know if I was able to flip

17      threw it.

18         MR. WEBER:  Right here.

19         MR. KALLEN:  Where?

20         MR. WEBER:  Well,  this is July 10th.

21  BY MR. KALLEN:

22     Q.    From Rick Roughin?

23     A.    Rowen.

24         MR. WEBER:  You're right.  You're right.

25  BY MR. KALLEN:
```

1    Q.    In any event --

2    A.    I took statements from three or four.

3    Q.    Some of the crew?

4    A.    And maybe Gerber.

5    Q.    Moving along, Mark, sitting here today, do you have

6    any independent recollection of what Captain Jack told you

7    about the accident?

8    A.    My recollection right at this moment is that Jack

9    had asked or that Bruce Atkinson had asked Captain Jack,

10   Bruce Atkinson being the guy putting the pump in, if he

11   could get these plates.

12        I don't remember at this moment if they were

13   fabricated by us.  I don't know if they were handed over.  I

14   don't know if they were fabricated by us.

15   Q.    I understand.

16   A.    All I know is that they needed to be welded into

17   place in the lazarette.

18   Q.    That's your recollection as to what Jack told you?

19   A.    Yes, as to what Jack told me.

20   Q.    Do you know, or otherwise remember, when that

21   request was made, whether it was the day of the explosion or

22   the day before?

23   A.    No, I don't remember that.

24   Q.    Is there any documents that you think you can review

25   which would refresh your recollection as to what Captain

```
 1    Jack told you about the circumstances of the accident?

 2              Can you think of any documents that may refresh your

 3    recollection?

 4       A.    No, just my statement.  I haven't read my statement

 5    for a year.

 6              MR. WEBER:  Do you want to read your statement?

 7    BY MR. KALLEN:

 8       Q.    Go ahead since we've referred to it so many times

 9    today and we'll mark that as the next numbered deposition

10    exhibit, whatever that may be.

11       A.    That didn't do anything.  I don't remember if Jack

12    was there that day.

13       Q.    Mark, is there any document that you can look at to

14    refresh your recollection as to what Captain Jack told you

15    about circumstances of the accident?

16       A.    A document?

17       Q.    Yes.

18       A.    I have a file that thick (indicating) at Bradford

19    Marine.

20       Q.    What is that file called?

21       A.    "Souvenir".  It's that stuff, you know, I mean,

22    these are copies of that file, different things.  I mean, I

23    didn't get a chance to flip through that before I came

24    today, but I can tell you right now that's one thing that

25    would spark my memory of what Jack Bredbeck told me.
```

1    Q.    That's fine.    Now you referred to a photograph

2    before.    So I take it at some point after the explosion

3    leading up to today you have had the opportunity to see the

4    photographs?

5    A.    Sure, I took the photographs.

6    Q.    You took the photographs?

7    A.    I took the photographs, yes.    There may be some

8    photographs here that I didn't take, but I did take

9    photographs.

10    Q.    I'm sure there are.    Do you know how many

11    photographs that you took?

12    A.    I would imagine approximately 12 photographs.

13    Q.    Was this taken -- when were these photographs taken?

14    A.    The day of the accident.

15    Q.    The day of?

16    A.    Yeah, the day of the accident.

17    Q.    Now, I have a been provided photographs by Henry's

18    attorney.    I don't know where he got them?

19        MR FAMULARI:    I think we got them from Bradford.

20    BY MR. KALLEN:

21    Q.    From Bradford.    I'll show you a number of

22    photographs.    You may be able to tell if there's ones that

23    you took or not.

24        For the record, I have eleven pages of photographs

25    with two photographs on each page.

1          We'll mark these next, entitled photographs, start

2    at 13 and going up.

3          The first question I'll ask you are these the

4    photographs that you took (indicating)?

5    A.    I don't think so.  I don't think these were the

6    ones.

7    Q.    You don't think so?

8    A.    I don't think these are the photos that I took.

9    Q.    Let me ask you:  Do have copy of the photos that you

10   took in the Souvenir file anywhere or in any file?

11   A.    I should have.  We've given stuff to lawyers.  I

12   imagine we have pictures or photographs. I don't believe

13   these are mine (indicating).

14   Q.    Let me ask you this:  Do you have your own Souvenir

15   file as opposed to Bradford?

16   A.    No.  Bradford has all my stuff.  When I say, "mine",

17   I mean Bradford.

18   Q.    In any event, let's look at the photographs.

19   There's a blower machine in there, isn't there?

20   A.    Yeah, it's called a "CAT Blower".

21   Q.    And the purpose of that is to?

22   A.    Ventilation.

23   Q.    To Dissipate the smoke that's generated from the

24   welding?

25   A.    Correct.  It also has power outlet on it.

1     Q.   Oh, really.

2     A.   It has a power outlet you could plug something into;

3   a light or something like that.

4     Q.   How is that blower powered?  Is it electrical?

5     A.   Yes.

6     Q.   Is that marine grade?

7          MR. WEBER:  Marine grade, what do you mean?

8   BY MR. KALLEN:

9     Q.   Could that ignite a spark that's flammable?

10    A.   It's non-explosive proof.  It's non-explosive proof.

11    Q.   Anyway, I guess my next question was going to be

12  that blower is not utilized for purposes of detecting

13  flammable vapors, fumes or gases, correct?

14    A.   No.

15    Q.   I just want to make sure.

16         You said an aluminum plate was going to be welded or

17  was in the process of being welded onto the deck?

18    A.   Yes.

19    Q.   Now, there appears to be some stuff sticking out at

20  the top of it, around the corners?

21    A.   Yes.

22    Q.   What would you say these things are?  Because I'm

23  not a welder, I don't know what these things are.

24    A.   They're bolts.  They're mounting bolts that they

25  were going to mount the pumps to.

1    Q.    Assuming there was no explosion, those bolts would

2    have been drilled through the plate, through the deck, if

3    you know I'm trying to get at, in this picture (indicating)?

4    A.    No.    These bolts would have been drilled.    These

5    bolt holes would have been drilled in the plate and it's

6    been threaded.    That was the whole idea, for the plate -

7    from what I heard - it was a thicker plate and they needed

8    to bolt something with metal to the deck.    It wasn't thick

9    enough to do heavy duty bolt, that's why they're standing

10   up, they're threaded in.

11   Q.    These bolts that are sticking out the top of the

12   aluminum plate, that's what the pump was going to sit on,

13   these bolts?

14   A.    No, the pump was going to sit on the plate and the

15   bolts were going to be used tighten the pump.    The base of

16   the pump has a flange and it has four holes.    This thin

17   flange, that was going to sit on top of the metal plate and

18   use the threads to put into the plate as a fastening system.

19   Q.    And for the record, that Page is 13-A.    The

20   photograph that you have been describing is the first one on

21   the Page at the top.

22       When you went on board the boat, in specific the

23   lazarette for inspection, did you see a hole on the deck not

24   from the explosion but from drilling or some other source?

25   A.    I think I remember seeing a drill hole.    I remember

1    seeing a burn hole that blew through the deck with the

2    welding, I remember seeing that.

3        Q.    And that burn hole, from what you believe, could it

4    have been from the welding?

5        A.    Correct.

6        Q.    Was it all the way through the deck itself?

7        A.    Yes.

8        Q.    And the drilled holes, hole or holes, that you saw,

9    were they in the approximate area where the plate was going

10   to be welded?

11       A.    Yes.

12       Q.    So if someone was a fixing that plate to the deck

13   for purposes of welding, there's no reason why they

14   shouldn't have seen those drilled holes through the deck at

15   that time?

16       A.    Correct.

17       Q.    If they were right there; is that fair to say?

18       A.    Yes.

19       Q.    If you looked through those drilled holes, would it

20   be something you would observe, to someone doing the work

21   where there was a void space underneath?

22       A.    Those holes are very small.  If you took the time to

23   go look through them, you would probably see a void space,

24   yes.

25       Q.    If you would have been aware you wouldn't think

1    somebody would start to weld in that confined space with a

2    pocket; where there's a void space underneath?

3        A.    Yes.

4        Q.    I'll show you another page of two photographs.

5    We'll mark this 13-B.  I'll refer specifically to the on the

6    bottom?

7        A.    The welding machine.

8        Q.    The welding machine?

9        A.    That's a welding machine.

10       Q.    If that's the one?

11       A.    I didn't take the picture.

12       Q.    Was it TIG welding machine?

13       A.    I think so.

14       Q.    This photograph of the, Miller, I don't know--

15       A.    Uh-huh.  Yes.

16       Q.    Is that a MIG or a TIG?

17       A.    Yes, that's a MIG.  I believe this one would be used

18   as a TIG machine.

19       Q.    Either or?

20       A.    Yeah, with the right adaptors.

21       Q.    With the right adaptors.

22             When you went into the lazarette, to investigate --

23   by the way, were you on board with Ken Rimer.

24             MR. FAMULARI:  Ken Rumell?

25             THE WITNESS:  That's yesterday's case.

BY MR. KALLEN:

Q.    Peter?

A.    Yes, Peter Rumell.

Q.    You went on board with Peter Rumell?

A.    I went on board with Peter Rumell, yes.  I believe the following day, or maybe he came out that night.  I think he may have come the next day though.

Q.    You went into the lazarette?

A.    Yes.

Q.    Obviously a good part of the decking or the deck of the lazarette had been displaced?

A.    Correct.

Q.    Was it possible to tell at that point in time whether, pre-explosion, there had been any opening in the deck itself, either where it joined at the bulk head?

A.    Was it possible to tell?

Q.    Yeah.  From your post-explosion inspection?

A.    The only way you would be able to tell that -- I didn't video anything, but you would be able to tell that by determining between the tear in the metal and the area of metal that had been exposed to the atmosphere for any length of time.

        I investigate for that.  It was observed that it happened then.

Q.    What I'm showing you is another page of photographs.

1    Let's mark that - this is 13-B.  You're looking at 13-C.

2    The top photo too.  There's a piece of, I guess that's

3    aluminum?

4        A.    Yes.

5        Q.    What's that supposed to represent or actually be?

6        A.    That's the plate that was being welded.

7        Q.    Okay.  And on the top right-hand corner of this

8    appears to depict some type of damage to it.  Do you know

9    what the purpose of that depiction was or what that is?

10       A.    That's - well, may I look at it closer again?

11   That's a weld.

12       Q.    So it's not damaged.  It's an actual weld?

13       A.    It's a weld being tore up.  It's a weld taken out of

14   the deck, taken out again.  The plate was welded in one or

15   two areas and then on the second or third time that he

16   struck on it, then the explosion happened.

17            It wasn't first time he touched it.  He attempted it

18   when he was welding.  It was like the third weld that went

19   through and exploded and went through the deck.

20       Q.    When you say, the "third weld", is that based upon

21   your recollection or is that based upon what Henry told you?

22       A.    Based upon my recollection and what Henry told me

23   and my investigation and I do believe in my photographs it

24   shows how many areas you could see, how many areas were

25   welded before.

1    Q.    Well, yeah.  In particular, this one right here

2    (indicating).

3    A.    What are you looking at?

4    Q.    In 13-A, you're referring to what now?

5    A.    You can see a weld, here, (indicating) on the top.

6    You can see a weld here on the plate (indicating).  I don't

7    know.  It may have been two places at the time of this

8    accident, a weld had been laid safely.

9          It was on the second or third time that something

10   happened and the explosion happened.  He was well - in

11   full-weld mode, he had not just flipped his hood.

12   Q.    Do you know if he was wearing a mask or hood?

13   A.    A hood, yeah.

14   Q.    He was?

15   A.    Yeah.

16   Q.    Do you know if he laid - laid a fire blanket?

17   A.    I don't know if he laid a fire blanket and get weld

18   spatter on your clothes or protect yourself.

19   Q.    The question was:  Do you know if he did?

20   A.    No.

21   Q.    Would your photographs may depict that?

22   A.    They may well.

23   Q.    Was the explosion scene, if you will, disturbed, in

24   any way before you had a chance to get on board other than,

25   of course, the circumstances under which Henry was taken off

1    by the paramedics?

2    A.    That's the only area (indicating).    There was also a

3    water pipe, a P.C. control water pipe broken and people were

4    coming in.    We had people coming there.

5    Q.    I may be done.

6    MR. FAMULARI:    Do you want me ask a few more

7    questions ?

8    MR. KALLEN:    I have to apologize.    I said how many

9    pages of photographs?    Let me correct the number of

10   photographs. For  the record, I just found two, three,

11   four, five, six more pages.

12   So for the record Exhibit 13 will consist of 17

13   pages of photographs.

14   Put the rest of the letters on them in the case

15   we're referring to them.

16   Again, for the record, these are photographs that

17   were produced to me by Plaintiff's Counsel, so

18   everyone should have a copy of those.

19   I have no further questions at this time.

20                CONTINUED DIRECT EXAMINATION

21   BY MR. WEBER:

22   Q.    Okay.    The safety meeting that you talked about

23   earlier, these were conducted by you and who else?

24   A.    Originally:  Myself and Brian Hill.    Then just me.

25   Q.    Were these safety meetings done in English and

1    Spanish?

2        A.    No.

3        Q.    Just English?

4        A.    English.  Only there was a time - and it may have

5    even been Henry - there were a few guys there I would ask

6    people, I wouldn't do it with them, we wouldn't do an entire

7    safety  meeting in Spanish and English.

8            There was guys there I would ask to explain to the

9    people that did not have a really good grasp of English to

10   translate.

11       Q.    Do you know if Henry was one of the people that you

12   asked to have it explained to?

13       A.    I don't remember if it was Henry.

14       Q.    The safety manuals that were printed up, were these

15   in English and Spanish?

16       A.    No, just English.

17       Q.    You were the Project Manager on the Souvenir; is

18   correct?

19       A.    Correct.

20       Q.    Part of the project that had to do with putting the

21   new hydraulic pumps in for the steering, was that worked

22   into your bid?

23       A.    No, it wouldn't a job that Bradford Marine was

24   performing.

25       Q.    Was Bruce Atkinson going to do everything that to

1    the hydraulics:  The mounting, the piping, the testing, all

2    that kind of thing or was Bradford going to have any

3    involvement at all?

4         A.   I don't remember us having any involvement in it.

5         Q.   What about if -- my understanding is that the

6    hydraulic pumps were going to be put in what was now the

7    lazarette on the boat, actually the rudder post and the

8    steering gear in front of it, correct?

9         A.   Yes.

10        Q.   When it came time to go through the bulk head with

11   the hydraulic holes, also would that be something Atkinson

12   would have Bradford do or would he have his own people do

13   that?

14        A.   Bruce Atkinson had tools and the ability to put a

15   bulk head fitting in.

16        Q.   Bradford didn't have any problem with him coming in

17   to do that?

18        A.   Well, Bradford likes to make the owner of the vessel

19   happy and Bradford gets money to paint boats and every now

20   and then the owner says we would like to do this, and we

21   would say, okay; but we much prefer they work through the

22   yard.

23        Q.   Henry testified yesterday that he was asked to

24   fabricate these plates that the pumps were going to go on

25   to.   Would he have to have a work order to get the aluminum

1  plate out of the shop to make those?

2      A.   At the time he would not have had to have a work

3  order to get the material to do the job.

4          At that time.  It's more difficult now to start a

5  job and get materials at Bradford Marine than it was then.

6          Back then you could do an entire job and get

7  materials say in the welding department because they don't

8  stock metal in the parts department.  But in the welding

9  shop you'd go to the metal rack, pull a piece of metal and

10  cut it and you could do an entire job saying that you had

11  wire in your gun and everything without having to get a

12  number, per say.

13     Q.   July 7th, when this accident took place, the

14  documents that we have received from Bradford reveal that, I

15  think you looked at it earlier, one of the exhibits, that

16  Henry had been welding on a toolbox bracket?

17     A.   Correct.

18     Q.   I believe there's another one in there for the same

19  day he had been welding some type of bracket on the mast.

20          If he was going to be spending time say to go ground

21  in thee tack plates, it would be unusual for him to put the

22  hour or two it took on to the other jobs, does that kind of

23  thing happen.

24          MR. KALLEN:  Object to the form.

25  BY MR. WEBER:

1    Q.    Go ahead, you can answer.

2    A.    In the past it had happened, yes.

3    Q.    How did it work with the, you know -- well, let's

4    use welders in general, Henry in particular.  He would go

5    into work in the morning and if he hasn't finished a job

6    from the day before, would he just check into the shop and

7    go start the job himself?

8    A.    Yes.

9    Q.    And if Tony Watson had another project, would Tony

10   tell him what needed to be done next?

11   A.    Yes.

12   Q.    How did Henry keep track of his time every day?

13   A.    A time card.  A time sheet.

14   Q.    So he would do a project and write on the time sheet

15   what he did and how long it took?

16   A.    Correct.

17   Q.    In this particular case, we can assume that Henry

18   didn't write anything on the time sheet after the explosion;

19   is that correct?

20   A.    I would say not.

21   Q.    Do you think that may explain why we don't have

22   anything on the Bradford time sheet about these double

23   letter plates and welding them in?

24        MR. KALLEN:  Object to the form.

25        THE WITNESS:  Yes, that's one reason.

BY MR. WEBER:

Q.   Can you think of any other reasons?

A.   The only other reason that I could imagine would be that, like you said earlier, could you do it and put it on another job to save paperwork?  Yes, that could have been done.  It could have been done.  It could have been he's working on the boat and we know the time is billed for the mast job or whatever job that day, and the captain says, knock this out.

He would go ahead and Henry was smart enough, he didn't have to go to anybody, he was smart enough that he could go to the shop and cut out the plates.  He was quite competent to take care of business.  He didn't need anybody watching what he was doing.

He would bring it back, do that job, go back to the mast.  The captain's fine with billing of that mast because either way they were going to pay for it.

Q.   Do you know if Captain Bredbeck was there that day?

A.   I don't remember now.

Q.   When you inspected the lazarette afterwards, did you - do you remember seeing an actual hole blown in the plate because or by the weld?

A.   To my recollection, I think I saw a hole blown in the plates there.

Q.   We've got some photographs.  Let's look at them.

 1    Can you tell from any of the photographs whether there was

 2    any holes blown in the deck?

 3        A.    I cannot tell from these photographs.

 4        Q.    What about - we don't quite know if this was, if

 5    that plate was still on there or if it was moved, but is

 6    there any evidence there of any holes being blown next to

 7    the plate?

 8            MR. KALLEN:    Object to the form.    Lack of predicate

 9        and you're asking for speculation.

10    BY MR. WEBER:

11        Q.    You can answer, if you can.

12        A.    From the angle that I'm looking at now, you see that

13    the hole (indicating), that a hole had been blown through by

14    a welding torch, a gun.

15            I can see where the deck has peeled up and ripped

16    up, all the old weld is there.    This is the area where there

17    was drilling (indicating).

18            I do see drill holes in this photograph

19    (indicating).    All they -- with the amount of material

20    that's left on this plate, I would imagine it's underneath,

21    in the corner of this plate (indicating).

22            If I remember, that's where (indicating).    You're

23    seeing a blown hole in the plate.    I do remember seeing a

24    blown hole.

25        Q.    We're looking 13-A, the top photograph; is that

1    correct?

2        A.    Yes.

3        Q.    Did you consider Henry to be a good welder?

4        A.    Yes.

5        Q.    Would it be unusual for a welder of Henry's

6    competence to be blowing holes in plates when he's tacking

7    something?

8        A.    Yes.

9        Q.    Henry testified yesterday that he thought that the

10   plate that he was welding on was a 1/4" thick.  Would that

11   make a difference on what -- strike that?

12           MR. KALLEN:  Are you talking about the plate or the

13       deck?

14   BY MR. WEBER:

15       Q.    The deck, excuse me.

16           Would the thickness of the deck make a difference on

17   what you set amperage on, the welder at?

18       A.    Yes, it would.

19       Q.    And if it was less than 1/4 of an inch, would you

20   set at lower amperage?

21       A.    Yes, you would set lower amperage.  The chance of

22   blowing through a deck greatly increases with the higher

23   amperage.

24       Q.    Since you have been a trained as a welder, I might

25   as well ask you:  Henry said the welder was set at 125 amps,

1    would that have been appropriate in a 1/4 inch plate?

2    A.    Yes.

3    Q.    What about a 3/16's plate?

4    A.    3/16's, depending on how you weld it.  It's a little

5    high for 3/16 to 1/8 inch plate.

6    Q.    Can you tell by looking at those photographs what

7    the thickness of the plate was that it's blown up a couple

8    of places?

9         MR. KALLEN:  The plate or deck?

10   BY MR. WEBER:

11   Q.    Deck, sorry.

12   A.    Approximately 1/8th of an inch thick.

13   Q.    When you did your investigation and inspection

14   afterwards, did you see any vents that would have vented

15   that void space underneath up into the lazarette area?

16   A.    No.

17   Q.    In the years that you have been or studied, did you

18   say you were a boilermaker?

19   A.    Yeah, a boilermaker.

20   Q.    Is it unusual to have a void space that doesn't have

21   a vent?

22   A.    Probably not, not if you weren't filling it with

23   anything you need to vent in.  You're putting something into

24   it.  I believe, so.  No.

25   Q.    Have you, in your years of working at Bradford, have

1    you seen void spaces on vessels that weren't vented?

2        A.    That weren't vented?

3        Q.    That were not vented.

4        A.    Yes.

5        Q.    What kind of application?

6        A.    Rub rail, as we spoke before.  Rub rail around the

7    side of the boats; void space.   Exhaust sponsons.  You

8    know, exhaust sponsons are vented because that's where the

9    vent comes out; that's not good.

10            Probably rub rail and maybe some other things as far

11    as tankage storage areas, they're normally always vented.

12    Some are not vented as well as they should be.

13            I can't say the idea of trying to fill a void space

14    without having a vent, it doesn't work.

15        Q.    What's the purpose of the vent?

16        A.    To displace the air if you're filling it.

17        Q.    Do you -- do you know whether Tony Watson had gone

18    into the lazarette prior to the explosion at any time?

19        A.    No, I don't know.

20        Q.    You don't know?

21        A.    I don't know.

22            MR. WEBER:  I don't have anything else.

23                    CONTINUED DIRECT EXAMINATION

24    BY MR. KALLEN:

25        Q.    Something just came to my mind.

1          Put your welding hat on.  You're asked to weld an

2     aluminum plate on a 1/4 inch thick aluminum deck; that's

3     what you're told.

4          A.    Yes.

5          Q.    I take it that you, as a welder, know that a welding

6     machine generates a good amount of heat?

7          A.    Yes.

8          Q.    The reason for all these safety rules is that heat

9     can ignite flammable vapors, gases that will not only ignite

10    the immediate area but perhaps on the other side of the

11    sheet that you're welding?

12         A.    Correct.

13         Q.    Because the heat generates through the - in this

14    case - aluminum deck and possibly ignites vapors on the

15    other side of it?

16         A.    Correct.

17         Q.    Well then, my question is:  If you know you're

18    igniting -- I'm sorry, welding on what is really a thin

19    sheet of aluminum, shouldn't you do something to determine

20    what's on the other side of that other sheet?

21         A.    Yes.

22         Q.    What should you do?

23         A.    You should investigate the area.

24         Q.    And how do you do that?

25         A.    You either drill a hole or do it with a holesaw, not

1    just a regular drill bit.

2         Q.    Again, you're talking as a welder?

3         A.    Yes.  Then you would investigate what's in there

4    find out what's behind that void space.  As a welder, one

5    of the mantras is that you will not weld an unknown void

6    space or you're going to kill yourself.

7         Q.    Particularly something that's thin, I take it, a 1/4

8    inch aluminum deck is on the thin side?

9         A.    It's getting there.  The deck was around 1/8th of

10   an inch; that's really thin-skinned.

11        Q.    But you're told it's 1/4?

12        A.    If you're told it's 1/4 of an inch and you set your

13   machine to burn into a half an inch or - I don't believe

14   that plate was 3/4's.  It's like a 1/2 an inch or 5/8ths.

15             You can burn into part of a metal plate and you can

16   wash the weld into the 1/4 inch without blowing a hole

17   through the back of it but it's not good practice.

18             You should know what you're welding against.

19        Q.    That's my point, you know you're welding onto a  1/4

20   inch thick aluminum?

21        A.    Whatever you're welding, if it's a 1/2 an inch, you

22   should know what's behind it.

23        Q.    You know that generates heat, especially with

24   aluminum.  Again it heats and goes through the aluminum and

25   could possibly ignite whatever is behind it?

```
 1      A.    Correct.

 2      Q.    So you, as a welder, you should do something to

 3  determine what's on the other sides of that?

 4      A.    At the very least, I would question it.

 5      Q.    Before you light up that torch?

 6      A.    Yes.

 7      Q.    All right?

 8            MR. FAMULARI:  Any follow-up questions to that?

 9  BY MR. KALLEN:

10      Q.    By the way, the Workplace Safety Solutions people,

11  do they submit something in writing as far as

12  recommendations for to you consider?

13      A.    For our --

14      Q.    Yeah, back in '95, '96 about a work safety proposal?

15      A.    Yes.

16      Q.    They submitted something in writing:  Like, here's

17  what we submitted?

18      A.    Yes.

19      Q.    Do you still have that?  I'm not talking about what

20  was ultimately prepared as the manual, I'm talking about

21  their recommendation?

22      A.    Their name is on our manual and their

23  recommendations for Bradford Marine is there and there might

24  even be a fourth folder, but there's a folder that's

25  floating around that has the recommendations to Bradford
```

1    Marine, yes.

2        Q.    Were there any recommendations not followed or

3    adopted properly?

4        A.    Most likely, yes.

5        Q.    We'd have to find that  --

6        A.    You had have to close your business if you want to

7    follow every O.S.H.A. regulation.

8        Q.    That's true.

9                        DIRECT EXAMINATION

10    BY MR. FAMULARI:

11        Q.    I have a follow-up question and I'll ask this

12    hypothetically so John doesn't give me the predicate

13    objection and all the other type of objections.

14            If you were going to weld, and I'm asking you this

15    as a welder.

16        A.    Yes.

17        Q.    If you were going to weld in a space like what we

18    had here on the Souvenir, and you asked what was under

19    there, if any fuel lines were there or asked if any fuel

20    lines or hydraulic lines were under there and you were told

21    no, and you were told that it was filled with cement to the

22    top and then the plate was laid on top and welded around it;

23    if, assuming that you asked that and that's what you were

24    told, would you think it would be safe to weld then?

25        A.    No.

1    Q.    What should you do then?

2    A.    At least cut some kind of hole and get multi-gas to

3    check the void.

4    Q.    But what if you were told it was filled with cement

5    to the top and a plate was laid directly on the cement and

6    you were told there wasn't a void space.  It was filled with

7    cement and had a plate on it?

8    A.    It should have been checked.  It should be checked

9    because you're putting your life into somebody else's hands.

10         MR. FAMULARI:  I have nothing further.

11         MR. KALLEN:  For the record, I'm going to retain the

12         original or the last color copies of the photo exhibits

13         because they're my set.

14         (Whereupon, the deposition was concluded.)

15                          STIPULATION

16         It is hereby stipulated to by and between appearing

17         counsel and the witness, that the notice, reading and

18         signing of said deposition be, and the same are hereby

19         waived.

20         And further deponent saith not.

21

22

23

24

25

```
 1                      CERTIFICATE

 2   STATE OF FLORIDA  )

 3                     )SS

 4   COUNTY OF BROWARD )

 5

 6         I, DEBORAH PEARLMAN, a Notary Public in and for the

 7   State of Florida at Large,

 8         DO HEREBY CERTIFY that the foregoing deposition was

 9   held before me at the time and place therein designated,

10         I FURTHER CERTIFY that I am not of the employ of

11   either the witness or any counsel nor am I financially

12   interested in the outcome of these proceedings.

13         I FURTHER CERTIFY that the foregoing pages, 1

14   through 98 inclusive, is a true and correct copy of the

15   proceedings held.

16         WITNESS MY HAND on this the 24th day of January of

17   the year 2001 in the County of Broward, City of Fort

18   Lauderdale, State of Florida.

19

20

21

22                        Notary Public

23                        State of Florida at Large

24

25
```

```
080         2  14 Jun 97  11001  MODIFY BEARINGS              0    2.00    150.00
080         3  16 Jun 97  05202  BUILD UP SHAFT BEARINGS      R    0.50     25.00
080         4  30 Jun 97  05202  BUILD UP SHAFT BEARINGS      R    0.50     25.00
                                              Total Labor            300.00
```

OP' PRESSURE TEST AFT FUEL TANKS.

```
            Material
081         1  06/13/97 03708 TEFLON TAPE                      1     4.95
081         2  06/13/97 03708 PIPE FITTING - 90 DEGREE BRASS   1     3.40
081         3  06/13/97 03708 PIPE FITTING - BRASS NIPPLES     1     3.30
081         4  06/13/97 03708 PIPE FITTING - BRASS NIPPLES     1     6.30
081         5  06/13/97 03708 PIPE FITTING - BRASS TEES 1/2"   1     4.00
081         6  06/13/97 03708 PIPE FITTING - BRASS RED BUSHING 2     4.70
081         7  06/17/97 03763 BLACK ELECTRICAL TAPE            1     4.86
081         8  06/17/97 03749 DURACELL - BATTERIES AA          2     4.42
081         9  06/21/97 03749 PERMATEX FORM-A-GASKET N1        1     3.25
081        10  06/21/97 03749 HOSE CLAMPS - NM-12             20    37.00
081        11  06/21/97 03749 BLACK WET EXHAUST HOSE (WITH-OUT W 1    4.35
081        12  06/26/97 03763 PIPE FITTING - BRASS PIPE PLUG 3/4 2    5.50
081        13  06/26/97 03763 HOSE CLAMPS - NM-16              2     3.70
                                              Total Material          89.73
```

```
            Purchases
081         1  06/13/97 11076-001  3/8 DRAIN PLUG   LEWIS MARI  1     3.30
081         2  06/13/97 11076-002  7/16 DRAIN PLUG  LEWIS MARI  1     3.50
081         3  06/13/97 11076-003  1/2 DRAIN PLUG   LEWIS MARI  1     3.30
081         4  06/24/97 11405-001  5/8 NYLON MENDERS VANGUARD P 20   14.40
0C'         5  06/26/97 11526-001  3/4 PVC HOSE COUP LEWIS MARI  8    8.00
                                      Total Direct Purchases          32.50
```

```
                                      Total Sublet Purchases          0.00
```

```
            Labor
081         1  13 Jun 97  03758  LEAK TEST TANKS            R   1.00    50.00
081         2  13 Jun 97  03763  PRESSURE TEST TANKS        R   3.50   175.00
081         3  13 Jun 97  03628  LEAK TEST TANK             R   0.50    25.00
081         4  13 Jun 97  03708  PRESSURE TEST              R   6.00   300.00
081         5  16 Jun 97  05202  PRESSURE TEST FUEL TANKS   R   0.50    25.00
081         6  16 Jun 97  03758  PRESSURE TEST              R   1.00    50.00
081         7  16 Jun 97  03689  PRESSURE TEST AFT FUEL TANK R  5.00   250.00
081         8  16 Jun 97  03763  PRESSURE TEST FUEL TANKS   R   5.50   275.00
081         9  16 Jun 97  03628  LEAK TEST                  R   0.50    25.00
081        10  16 Jun 97  03749  PRESSURE TEST FUEL TANKS   R   8.00   400.00
081        11  19 Jun 97  03752  STERN TUBE BOLTS           R   1.00    50.00
081        12  20 Jun 97  03749  PRESSURE TEST TANKS        R   1.50    75.00
081        13  20 Jun 97  03739  PRESSURE TEST TANKS        R   1.50    75.00
081        14  26 Jun 97  03740  PRESSURE TEST FUEL TANK    R   8.00   400.00
081        15  26 Jun 97  03763  PRESSURE TEST TANKS        R   6.50   325.00
081        16  26 Jun 97  03740  PRESSURE TEST FUEL TANK    0   0.50    37.50
081        17  30 Jun 97  05202  PRESSURE TEST FUEL TANK    R   0.50    25.00
081        18  02 Jul 97  03740  REINSTALL VENT HOSE        R   1.00    50.00
081        19  03 Jul 97  03740  RECONNECT VENT LINES       R   1.00    50.00
                                              Total Labor          2,662.50
```

Dift  5
Dr.
DANAS
HENOFRISO



080   BUILD UP THICKNESS ON SHAFT BEARINGS WITH FIBERGLASS          321.31
      FOR TURNING TO PROPER DIAMETER AS DIRECTED.

      NOTE: STERN TUBE EGG SHAPED.


            DUST MASKS - 3M
            SQUEEGEE
            THROW AWAY BRUSH - 2"
            RUBBER GREEN GLOVES - LARGE
            DIAPER RAGS
            PAPER BUCKETS - SMALL
                                    Materials    21.31
                                    Labor       300.00

081   PRESSURE TEST AFT FUEL TANKS.                                2,784.73


            BLACK ELECTRICAL TAPE
            PIPE FITTING - 90 DEGREE BRASS
            PIPE FITTING - BRASS TEES 1/2"
            PIPE FITTING - BRASS PIPE PLUG 3/4"
            PIPE FITTING - BRASS RED BUSHING
            PIPE FITTING - BRASS NIPPLES
            PIPE FITTING - BRASS NIPPLES
            PERMATEX FORM-A-GASKET #1
            TEFLON TAPE
            BLACK WET EXHAUST HOSE (WITH-OUT WIRE)
            HOSE CLAMPS - #M-12
            HOSE CLAMPS - #M-16
            DURACELL - BATTERIES AA
            3/8 DRAIN PLUG
            7/16 DRAIN PLUG
            1/2 DRAIN PLUG
            5/8 NYLON MENDERS
            3/4 PVC HOSE COUPLINGS
                                    Materials   122.23
                                    Labor      2,662.50

082   HULL: SET UP FLOATS AND SCAFFOLDING. COVER DECKS AND         24,420.00
      SUPERSTRUCTURE FOR PROTECTION AS NECESSARY. MASK OFF
      RUBRAILS, SAND AND PREPARE SIDES OF HULL AND TRANSOM.
      SAND, PRIME AND GLAZE ANY IMPERFECTIONS AND DAMAGED
      AREAS. PRIME AS NECESSARY AND APPLY TWO COATS OF PAINT.
      RELETTER NAME AND HAILING PORT. REMOVE PROTECTIVE
      COVERING.

      NOTES: THE ABOVE PRICE INCLUDES FAIRING HULL PATCH
             AND NEW HAWSE EYES ON STERN.

      ######## QUOTE 010505 ########

083   BOOTSTRIPE: MASK OFF AS NECESSARY. SAND, GLAZE, SPOT          3,550.00

Jeff. L Henderson
1/12/01

079% INSTALL MOUNTS SUPPLIED BY NAUTICAL STRUCTURES INSIDE

    MAST TO BE USED IN HYDRAULIC STEPPING SYSTEM AS
    DIRECTED.

080% BUILD UP THICKNESS ON SHAFT BEARINGS WITH FIBERGLASS

    FOR TURNING TO PROPER DIAMETER AS DIRECTED.

    NOTE:  STERN TUBE EGG SHAPED.

081% PRESSURE TEST AFT FUEL TANKS.

082% HULL: SET UP FLOATS AND SCAFFOLDING. COVER DECKS AND                    0.00

    SUPERSTRUCTURE FOR PROTECTION AS NECESSARY. MASK OFF
    RUBRAILS, SAND AND PREPARE SIDES OF HULL AND TRANSOM.
    SAND, PRIME AND GLAZE ANY IMPERFECTIONS AND DAMAGED
    AREAS. PRIME AS NECESSARY AND APPLY TWO COATS OF PAINT.
    RELETTER NAME AND HAILING PORT. REMOVE PROTECTIVE
    COVERING.

    NOTES: THE ABOVE PRICE INCLUDES FAIRING HULL PATCH
          AND NEW HAWSE EYES ON STERN.

08  BOOTSTRIPE:  MASK OFF AS NECESSARY.  SAND, GLAZE, SPOT            0.00

    PRIME AND PAINT BOOTTOP TWO FULL COATS.

    NOTE:  THE ABOVE PRICE DOES NOT INCLUDE HAUL OUT, IF
          NECESSARY.

084% LAY OUT NEW BOOTSTRIPE AS DIRECTED.

085% HOOK UP PORTABLE A/C UNIT TO VESSEL WHEN  HAULED OUT.

    DISCONNECT PRIOR TO LAUNCHING.  RECONNECT TO VESSEL IN
    PAINT SHED AND DISCONNECT.

086% FAIR IN WELDED OVER SHORE POWER BOXES ON MAIN DECK

    BULWARKS AS DIRECTED.

087% REPAIR EXISTING LEAKS IN FUEL TANKS FOUND DURING

    PRESSURE TEST.

08   AKE NECESSARY REMOVALS FOR ACCESS TO REPAIR LEAKING

Def' 7
DAVID
HENDER.
1/12/00

```
        Labor
098       1  30 Jun 97  02628  PANEL CLOSET                R   3.00    150.00
098       2  04 Aug 97  02599  FIT PANELING INSIDE CLOSET  R   2.50    125.00
099       3  04 Aug 97  02596  FIT PANELING IN CLOSETS     R   2.50    125.00
                                              Total Labor          400.00
```

099 FABRICATE AND INSTALL BRACKETS FOR TOOL BOX AS
    DIRECTED.

```
        Material
099       1  06/27/97  09002 HEX HEAD S/S MACHINE BOLT 1/4"-20   3    0.72
099       2  06/30/97  09002 ROUND HEAD S/S MACHINE SCREWS       4    0.24
099       3  07/07/97  09002 1 X 1 X 3/16 5086 ALUM. ANGLE       5    7.80
099       4  07/07/97  09002 FLAT HEAD S/S MACHINE SCREWS        3    0.63
                                        Total Material                9.39
```

                              Total Direct Purchases        0.00

                              Total Sublet Purchases        0.00

```
        Labor
099       1  27 Jun 97  09002  TOOL BOX BRACKET            R   5.00    250.00
099       2  03 Jul 97  09009  BRAKE FOR TOOL BOX          R   1.00     50.00
099       3  03 Jul 97  09002  FAB. AND INSTALL BRACKETS   R   1.00     50.00
099       4  07 Jul 97  09002  BRACKETS FOR TOOL BOX       R   2.00    100.00
099       5  30 Jul 97  09009  MAKE BRACKET FOR TOOL BOX IN R 4.00    200.00
                                              Total Labor          650.00
```

100 FABRICATE HANDRAIL FOR ENGINE ROOM STAIRS.

                              Total Material               0.00

                              Total Direct Purchases       0.00

                              Total Sublet Purchases       0.00

```
        Labor
100       1  26 Jun 97  09002  FAB. HANDRAIL               R   1.00     50.00
                                              Total Labor           50.00
```

101 CLEAN AND PREPARE BOTTOM FOR ANTI-FOUL.

```
        Material
101       1  06/30/97  01008 ANGLE BRUSH            1    9.36
101       2  06/30/97  01008 2" DUCT TAPE           1   12.00
101       3  06/30/97  01008 DIAPER RAGS            1    6.00
101       4  06/30/97  01008 ALUMIPREP              1   22.00
101       5  06/30/97  01008 METAL PAINT POTS       1    3.50
```

Def't 8.
DAVIS
HENDER
1/2/01

TANK TOPS AND PIPING AND REINSTALL.

089: INSTALL SUCTION PIPES IN FRESH WATER TANK AS DIRECTED.

   (PIPING SUPPLIED BY VESSEL.)

090: WELD MISCELLANEOUS BRACKETS IN ENGINE ROOM SUPPLIED BY

   VESSEL.

091: COVER BULKHEADS WITH DOORSKIN AS PER CAPTAIN.

092: REPAIRS TO SLIDING DOORS.

093: INSTALL SWITCH FOR WINDLASS.

094: FABRICATE AND INSTALL MOUNT FOR CAMERA ON MAST.

095: MODIFY ENGINE ROOM SINK AS DIRECTED.

096: SAND BOTTOM EDGE OF BOOTSTRIPE (OLD) AND APPLY SEALER

   TO ACCEPT BOTTOM PAINT AS DIRECTED.

098: FIT PANELLING INSIDE CLOSET.

099: FABRICATE AND INSTALL BRACKETS FOR TOOL BOX AS

   DIRECTED.

100: FABRICATE HANDRAIL FOR ENGINE ROOM STAIRS.

101: CLEAN AND PREPARE BOTTOM FOR ANTI-FOUL.

102: PAINT BOTTOM AS DIRECTED.  PRIME AND PAINT RUNNING

   GEAR.

**Side 1**

**HOT WORK PERMIT**

Date _____

Building _____

Dept. _____ Floor _____

Work to be done _____

_____

Special precautions _____

_____

Is fire watch required? _____

The location where this work is to be done has been examined, necessary precautions taken, and permission is granted for this work. (See other side.)

Permit expires _____

Signed _____
                    Permit Authorizing Individual (PAI)

Time started _____ Completed _____

**FINAL CHECK**

Work area and all adjacent areas to which sparks and heat might have spread [including floors above and below and on opposite side of wall(s)] were inspected 30 minutes after the work was completed and were found firesafe.

Signed _____
                    Permit Authorizing Individual (PAI)

**Side 2**

**ATTENTION**

Before approving any hot work permit, the PAI shall inspect the work area and confirm that precautions have been taken to prevent fire in accordance with NFPA 51B.

PRECAUTIONS
- ❑ Sprinklers in service
- ❑ Hot work equipment in good repair

WITHIN 35 FT OF WORK
- ❑ Floors swept clean of combustibles
- ❑ Combustible floors wet down, covered with damp sand, metal, or other shields
- ❑ All wall and floor openings covered
- ❑ Covers suspended beneath work to collect sparks

WORK ON WALLS OR CEILINGS
- ❑ Construction noncombustible and without combustible covering
- ❑ Combustibles moved away from opposite side of wall

WORK ON ENCLOSED EQUIPMENT
(Tanks, containers, ducts, dust collectors, etc.)
- ❑ Equipment cleaned of all combustibles
- ❑ Containers purged of flammable vapors

FIRE WATCH
- ❑ To be provided during and 30 minutes after operation
- ❑ Supplied with a fully charged and operable fire extinguisher
- ❑ Trained in use of equipment and in sounding fire alarm

FINAL CHECK
- ❑ To be made 30 minutes after completion of any operation unless fire watch is provided

Signed _____
                    Permit Authorizing Individual (PAI)

**Figure A-3-3.1(a)   Sample of a hot work permit.**

# HOT WORK PERMIT[1]

**BEFORE INITIATING HOT WORK, ENSURE PRECAUTIONS ARE IN PLACE!
MAKE SURE AN APPROPRIATE FIRE EXTINGUISHER IS READILY AVAILABLE!**

This Hot Work Permit is required for any operation involving open flames or producing heat and/or sparks. This includes, but is not limited to: Brazing, Cutting, Grinding, Soldering, Thawing Pipe, Torch-Applied Roofing[2], and Cadwelding.

## INSTRUCTIONS

A. Verify precautions listed at right (or do not proceed with the work).
B. Complete and retain this permit.

HOT WORK BEING DONE BY
☐ EMPLOYEE
☐ CONTRACTOR _____

| DATE | JOB NO. |
|---|---|

LOCATION/BUILDING & FLOOR

NATURE OF JOB/OBJECT

NAME OF PERSON DOING HOT WORK

I verify the above location has been examined, the precautions checked on the Required Precautions Checklist have been taken to prevent fire, and permission is authorized for work.

SIGNED:

| PERMIT EXPIRES: | DATE | | TIME | AM |
|---|---|---|---|---|
| | | | | PM |

NOTE EMERGENCY NOTIFICATION ON BACK OF FORM. USE AS APPROPRIATE FOR YOUR FACILITY.

**THIS PERMIT IS GOOD FOR ONE DAY ONLY!**

## Required Precautions Checklist

☐ Available sprinklers, hose streams, and extinguishers are in service/operable.
☐ Hot work equipment in good repair.

**Requirements within 35 ft (10 m) of work**
☐ Flammable liquids, dust, lint, and oil deposits removed.
☐ Explosive atmosphere in area eliminated.
☐ Floors swept clean.
☐ Combustible floors wet down, covered with damp sand or fire-resistant sheets.
☐ Remove other combustibles where possible. Otherwise protect with fire-resistant tarpaulins or metal shields.
☐ All wall and floor openings covered.
☐ Fire-resistant tarpaulins suspended beneath work.

**Work on walls or ceilings/enclosed equipment**
☐ Construction is noncombustible and without combustible covering or insulation.
☐ Combustibles on other side of walls moved away.
☐ Danger exist by conduction of heat into another area.
☐ Enclosed equipment cleaned of all combustibles.
☐ Containers purged of flammable liquids/vapors.

**Fire watch/hot work area monitoring**
☐ Fire watch will be provided during and for 30 minutes after work, including any coffee or lunch breaks.
☐ Fire watch is supplied with suitable extinguishers.
☐ Fire watch is trained in use of this equipment and in sounding alarm.
☐ Fire watch may be required for adjoining areas, above, and below.
☐ Monitor hot work area for 30 minutes after job is completed.

**Other Precautions Taken**
☐ Confined space entry permit required.
☐ Is area protected with smoke or heat detection.
☐ Ample ventilation to remove smoke/vapor from work area.
☐ Lockout/tagout required.

© 1992 Factory Mutual Engineering Corporation. Reprinted with permission.

Notes:
1. When used in accordance with NFPA 51B, this permit is to be used for, but not limited to, the following: welding, cutting, grinding, open-flame soldering, and thawing pipe.
2. Torch applied roofing is exempt from NFPA 51B per 1-2.3.

**Figure A-5-5.1(b)  Sample of a hot work permit.**

Henry

12A
1/12/01

M/Y SOUVENIR
STATEMENT OF ACCIDENT FROM MARK P. TORTORA
DATE OF ACCIDENT: 7/7/97 - APPROX. TIME 3:20-3:30

On Monday, July 7, 1997 at approximately 3:20 p.m I was in a meeting with the General Manager of Operations, Mr. Paul Engle, when I heard a very loud explosion. At first, I thought it may have been an accident on the road in front of the facility. I did not react immediately, but I was thinking that the sound and vibration was too close for comfort. I then heard over our two-way radios that there had been an explosion on the vessel "SOUVENIR" and that an employee had been injured and for our receptionist to dial 911 emergency. I immediately rushed to the rear of the stockroom and instructed parts department employees to hand me a first response kit and a shock blanket that is always kept in the parts department in case of emergencies. Terry Peters is an employee in the parts department and a certified Paramedic, he asked if I would like him to come with me. I agreed that was a good idea and we rushed to the vessel. After arriving at the vessel, I noticed that Henry was laying in the cockpit and was being assisted by Doug Pierce (a vessel employee and trained Paramedic) and Luis Montalvo (BMI employee), I asked what happened and was told that Henry was welding a pump bracket in the lazaret and there was an explosion. There were no flammable liquids in the lazaret at the time of the accident as far as anyone can remember.

Henry was doing various welding jobs on the vessel and was instructed to weld the pump base on by crew.

Mark P. Tortora
(954) 731-4498

7-10-97

Date:





13 A.









13





13D
1/12
TU?









13 F
11/12/'01
DP.



(



13 G
D. P.
11 12 01





131









13J
12





13 K
1|12|01









13 M
1|12|01





13ᴺ





B° 1/12/01









139

M/Y SOUVENIR
STATEMENT OF ACCIDENT FROM ALBERT WILLIAMS
DATE OF ACCIDENT: 7/7/97 - APPROX. TIME 3:20-3:30

I was "taping-off" the varnished cap rail leading from the cockpit to the aft deck. I knew Henry Naranjo was working in the lazaret, but did not see him welding. All of a sudden, I heard a loud explosion which stunned me for a few seconds. I saw a lot of things flying. I immediately looked down into the lazaret and saw Henry Naranjo holding his stomach and crouched in the hole. I started to help him from the hole to the deck, shortly afterwards, Gerber Escobar joined me to lend his assistance. Afterwards, other people started arriving on the scene and between a few of us we laid his head on the deck hatch near the port side of the cockpit. Henry Naranjo was complaining about the pain in his stomach, back and chest. Doug Pierce (vessel's crew) yelled to us "don't move him" and come down to the cockpit and kind of took over, he moved towards the aft starboard stern line to loosen it. Gerber Escobar went to the floats in back of the transom door and waited.

Albert Williams

Date: 7 10 97





# BRADFORD MARINE, INC.

WORLD'S LARGEST AND MOST MODERN UNDERCOVER YACHT REPAIR FACILITY

07/10/97                                    07016 Q10635
                                            Page 1

MR. STEPHEN B. SMITH
P.O. BOX 52

BARRINGTON, IL 60011

RE: YACHT SOUVENIR EX KEVALLI

Dear Sir:

We are pleased to submit the following proposal:

001 Make repairs as follows to cockpit deck and subdeck in          $34,479.00
    lazarette area:

    1. Straighten and repair damage to cockpit deck. (100
       Hours)
    2. Remove subdeck in lazarette. (50 Hours)
    3. Weld in additional angle framing as needed to
       secure removable deck plating. (100 Hours)
    4. Fabricate and install subdeck in similar fashion
       as original. (100 Hours)
    5. Make allowances for sump area in forward end of
       lazarette. (50 Hours)
    6. Drill additional limber holes for drainage. Weld in
       new or existing mounts as needed for equipment
       installation. (100 Hours)
    7. Make repairs to thru hulls as needed. (50 Hours)
    8. Make repairs to port and starboard freshwater
       tanks as needed. (50 Hours)

    NOTES: An out of water survey of hull is suggested
           for additional repairs which are not included
           in the above price.

           The above price does not include carpentry,
           paint, electrical or mechanical work.

002 Remove and renew teak deck. Repair teak cabinet.               $15,550.00

    NOTE:  This is an ESTIMATE ONLY.

003 Remove listed explosion damaged equipment from below           $16,205.00
    deck in cockpit extension. Provide and install
    replacement equipment that is identical or equivalent
    in function and value. Replumb as required. Equipment
    includes two (2) hydraulic steering pumps, one (1)
    circular pump for refrigeration unit, two (2) Par bilge
    pumps, and one (1) pressure pump with expansion tank.

3051 STATE RD. 84 • FT. LAUDERDALE, FLA. 33312 • 854-791-3800 • FAX 854-583-9938

NFPA CERTIFIED
MARINE CHEMISTS



**MARINE CHEMISTS & TESTING CO., INC.**

TELEPHONE (954) 435-1480

3710 N.W. 94TH AVENUE
HOLLYWOOD, FL 33024

July 8, 1997

Mr. Paul Engle
Bradford Marine, Inc.
3051 S. R. 84
Ft. Lauderdale, FL. 33312

Re: M/Y "Souvenir"

Dear Mr. Engle:

I am writing this letter as a result of being called to the Bradford yard this morning by Mr. Dave Henderson and Mr. Mark Tortora in order to inspect the M/Y "Souvenir". It was reported to me that on the afternoon of July 7, 1997, an explosion took place during hot work operations in the lazarette area of the vessel.

Upon inspection of the vessel, it was found that the entire floor of the lazarette had been displaced upward and away from the hull and frames below. Additionally, the floor had areas torn out where it had detached from the frames to which it had been stitch welded. Upon looking below the floor, frames were noted to be detached from the shell plate and heaved upward. The deck of the cockpit, above this area was bowed in the middle, and wood in the cabinetry at the forward end of the cockpit was cracked and displaced.

The area below the floor contained cement which had been poured in between the frames. There was noted a space of approximately 1-2 inches above the cement and below the top of the frames. This area apparently contained a flammable vapor or gas which ignited when the welder started to attach the doubler plates upon which hydraulic pumps were to be installed. At the time of the mishap, this area was reported to have been flooded with water from a broken through hull fitting. This area was pumped out by the crew and the through hull fitting secured. During my inspection no flammable gas or vapor was found. This is to be expected, since it would have been consumed by the explosion, or displaced by the subsequent flooding.

It is fortunate that the hydraulic pumps were in the work area to limit the upward motion of the deck. I understand that one worker was taken to the hospital, and this morning was reported to be OK. Had the pumps not been in the area, the deck may have heaved upward to a height where the worker may have been crushed between the cockpit floor above and the deck on which he was working.

I inspected the interior of the vessel, forward of the original transom, and have determined that there are no fuel tanks adjacent to the tank in question. There is a sump area aft of the aft fuel tank in which the rudder and steering gear is installed. It may be noted that on May 20th the fuel tanks were cleaned and Certified as "Safe for Hot Work" by myself. This work was completed and the vessel was subsequently relaunched and moved to its present covered dock.

I can, at this point, only surmise what might have caused the explosion. I suggest that one of three sources of an ignitable mixture could have caused this mishap. Upon questioning the captain and crew, I was told that they had noticed a can of acetone lying on the deck, above the lazarette, which had been overturned, in the days prior to this incident. The Captain stated that there was still some liquid in the can, but he could not state where the remainder of the contents had gone. This acetone or a similar flammable liquid which may have been stored in the lazarette at some time in the past may have been accidentally spilled, and worked its way below the deck plates. It then could have been soaked up by the cement, and contained in the area below the deck either in the void space or the cement. This should be checked before any future hot work is performed in the area. Likewise, at some time, gasoline in storage containers may have been stored in the lazarette, and at some time a portion of it may have spilled and accumulated below the deck plates.

The third source is not so obvious, but nevertheless is as dangerous. It was noted that there had been live bait wells and similar equipment in the lazarette area in the past. It is possible that sea water containing sea life had spilled below and collected in the area between the cement and deck plates. Decomposition of this material over time could have caused a build up of methane gas which is odorless. It would not have been detected, by smell, in the area. The crew who initally started to install the pump, stated that they had drilled a couple of holes in the area in order to bolt down the pumps. Upon finding the deck plate too thin to hold the fasteners, they then had the yard make up the plate which was being welded to the deck at the time of the explosion. The crew who had drilled the holes stated that they did not smell any solvent or gasoline smells when they drilled the holes. The small holes that they drilled may not have allowed any solvent vapors trapped below to exit to the extent that they would have smelled them, so this is inconclusive.

What is apparent is that a flammable gas or vapor was trapped below the deck plate, and it was ignited during the welding of the doubler plate to the lazarette deck plate. Either the heat of welding penetrated the plate and ignited the mixture below, or vapors came out of the drilled holes and were ignited and flashed back, igniting the mixture below the deck plates. If the area below the deck plates had been tested, using a multi-gas tester, the flammable mixture would have been detected and this mishap could have been avoided. It is reported that no test was possible, since your yard does not own a multi-gas tester. I recommend that instruments be purchased and used regularly both in this yard, and in your new yard in the Bahamas when

the time comes.  Inspections and logging of these inspections, as
required by OSHA regulations, should be a standard safety procedure in
your yard at times when a Marine Chemist is not required to be called
for certification of spaces. For spaces which require Marine Chemist
Certification, the competent person must daily perform tests to assure
himself that the conditions as stated on the MC certificate are being
maintained and have not changed, and again these tests are to be
logged.  Use of a multi-gas tester is required to perform these tests.

You have at least four persons in the yard who have been trained as
Shipyard Competent Persons, all of whom now realize that testing this
space would have prevented this mishap.  OSHA regulations USC 29 CFR
1915.54 (c) states "Before welding, cutting, heating or brazing is
begun on structural voids..., a competent person shall inspect the
object and, if necessary test it for the presence of flammable liquids
or vapors.  If flammable liquids or vapors are present, the object
shall be made safe."

Should you have questions about this matter, or if I can be of
assistence in helping you decide what type of test equipment you need
for the yards, do not hesitate to contact me.

( am sending a copy of this letter to the NFPA Marine Chemist
committee which oversees my certification.  This is a requirement by
them for me to communicate any mishaps of which I have knowledge, so
that they can be aware of problems which may affect either the Marine
Chemists or regulations which may require changes as we learn more
about how and why accidents occur.

Sincerely,

Peter Rimmel, CMC 638

cc: Mark Tortora, Bradford Marine Safety Dept.
    Guy Colonna, NFPA, Marine Field Service