```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION

 3   HENRY NARANJO and              CASE NO. 00-60222-CIV.
     MARLENE RAMIREZ,               LENARD/TURNOFF
 4
          Plaintiffs,
 5
     vs.
 6
     STEPHEN BYRON SMITH, PALMER
 7   JOHNSON EXPORT SALES, INC.,
     PALMER JOHNSON DISTRIBUTORS            COPY
 8   INC., AND PALMER JOHNSON INC.

 9        Defendants.
     _____/
10

11   APPEARANCES:

12   PINKERT LAW FIRM, LLP.,        VALLE & CRAIG, P.A.,
     DAVID L.  WEBER, ESQUIRE,      FRANK J. SIOLI, ESQUIRE,
13   CO-COUNSEL FOR DEFENDANT:      80 S.W. 8th Street,
     Palmer Johnson,                Suite 2520,
14   P.O. Box 89,                   Miami, Florida,
     Sturgeon Bay, WI.             ATTORNEYS FOR DEFENDANT:
15                                  Palmer Johnson, Inc.

16   BLANCK & PERRY, P.A.,          BADIAK, WILL & KALLEN,
     F. DAVID FAMULARI, ESQUIRE,    JOHN D. KALLEN, ESQUIRE,
17   CO-COUNSEL FOR PLAINTIFFS,     ATTORNEYS FOR:
     5730 S.W. 74th Street,         Stephen Byron Smith,
18   Suite 700,                     17071 W. Dixie Highway,
     Miami Florida.                 N. Miami Beach, Florida.

19            FOWLER, WHITE, BURNETT, HURLEY,
                 BANICK & STRICKROOT, P.A.,
20                  BRIAN P. HILL,
                Bank of America Tower,
21               100 S.E. 2nd Street,
                    17th Floor,
22                 Miami, Florida,
             ATTORNEY FOR BRADFORD MARINE INC.
23
         **********************************
24                  DEPOSITION
                       OF
25               DAVID HENDERSON
```

I N D E X

1/15/'01

Witness                                        Direct

By Mr. Weber                                      3

By Mr. Kallen                                    43

By Mr. Famulari                                 112


                                              Redirect

By Mr. Weber                                    114

1          Deposition of DAVID HENDERSON, a witness of lawful

2     age, taken by the Defendants, for the purpose of discovery

3     and for the use as evidence in the above-entitled matter,

4     wherein HENRY NARANJO and MARLENE RAMIREZ are the

5     PLAINTIFFS, and STEPHEN BYRON SMITH, PALMER JOHNSON EXPORT

6     SALES INC., PALMER JOHNSON DISTRIBUTORS INC., AND PALMER

7     JOHNSON INC. are the DEFENDANTS, pending in the United

8     States District Court for the Southern District of Florida,

9     Miami Division, filed before DEBORAH PEARLMAN, a Notary

10    Public in and for the State of Florida at Large, taken at

11    300 S.W. 7th Street, Fort Lauderdale, Florida, in the County

12    of Broward, State of Florida, on this the 12th day of

13    January of the year 2001, commencing at 9:00 o'clock a.m.

14               -----------

15    THEREUPON:

16                     DAVID HENDERSON,

17    a witness of lawful ages, being called as a witness by the

18    Defendants, having been duly sworn, testified under oath as

19    follows:

20                   DIRECT EXAMINATION

21    BY MR. WEBER:

22       Q.   Would you state your name, please?

23       A.   David Henderson.

24       Q.   Mr. Henderson, have you ever had your deposition

25    taken before?

1    A.    Yes, I have.

2    Q.    How many times?

3    A.    Twice.

4    Q.    So you know then that I'm going to ask you

5    questions.  It's a question and answer format, do you

6    understand that?

7    A.    Yes, I do.

8    Q.    If you don't understand a question that I put to you

9    today, would you please let me know and I'll try again; is

10    that agreeable?

11    A.    That's agreeable.

12    Q.    It's also important for to you answer out loud.  You

13    can't shake your head because non-verbal communications

14    don't come across on the transcript, do you understand?

15    A.    Yes, Sir.

16    Q.    How old are you, Sir?

17    A.    Fifty one.

18    Q.    And where do you reside?

19    A.    At 17165 Southwest 49th Place, Miramar.

20    Q.    And what's your occupation?

21    A.    Yard Superintendent.

22    Q.    Where?

23    A.    At Bradford Marine.

24    Q.    I think I know this, but why don't you tell me for

25    purposes of the record, what Bradford Marine is in the

1    business of?

2        A.   Yacht repair.

3        Q.   Is there -- I take it then Bradford doesn't do any

4    new developments, they don't construct vessels?

5        A.   No, they do not.

6        Q.   They're exclusively in the repair business?

7        A.   That's correct.

8        Q.   How long have you been the superintendent?

9        A.   Approximately three years; three and a half years.

10       Q.   What generally are your job duties as Yard

11   Superintendent?

12       A.   Billing, approving work orders, insuring that the

13   work is done in a timely manner and a safe manner.

14       Q.   Who is your direct supervisor?

15       A.   Paul Engle.

16       Q.   And what's his position?

17       A.   General Manager.

18       Q.   Does Mr. Engle have a supervisor or somebody that he

19   reports to?

20       A.   The owner.

21       Q.   And who's that?

22       A.   Mr. Cosman, Diter Cosmen.

23       Q.   Could spell that, please?

24       A.   I couldn't.

25       Q.   Give it your best stab.

```
1      A.    Diter, D-I-T-E-R.

2            The first name:  Cosmen, C-O-S-M-E-N.

3      Q.    And do you have certain people who report to you?

4      A.    Yes.

5      Q.    Could you list those persons for me, please?

6      A.    Joe Quinn.

7      Q.    Joe Quinn?

8            MR. KALLEN:  That's J-O-E?

9            THE WITNESS:  Excuse me?

10           Joe.  Mark Tortora, T-O-R-T-O-R-A.

11           Tom Kreager, K-R-E-A-G-E-R.

12           How far do you -- I mean, they all report to me but

13        they're my subordinates.  The next step then is the

14        foremen, they all report to me directly.

15   BY MR WEBER.

16     Q.    So Joe Quinn, Mark Tortora and Tom Kreager?

17           Who else reports to you?

18     A.    All the project managers work underneath me.

19     Q.    They're title is project managers?

20     A.    Yes.

21     Q.    Then you said that the foremen also report to you?

22     A.    Yes.

23     Q.    How many foreman are currently employed at Bradford

24   Marine?

25     A.    Seven.
```

```
 1      Q.   Is it possible for to you list their names?

 2      A.   Harry Rapicet, you pronounce the last name Rapiset.

 3   It's long R-A- -- I'm not sure.  I can get a list.

 4      Q.   Just do your best though.

 5      A.   Charlie - Chuck Eckerd, E-C-K-E-R-T.

 6           Juan Izquierdo.  Dave Mockel.

 7           Manny Mueller.   Jack Liner.

 8      Q.   Jack Liner?

 9      A.   Liner.

10      Q.   That's six according to my count?

11      A.   Who did I miss?   Oscar Spencer.

12      Q.   Oscar Spencer?

13      A.   Uh-huh.

14      Q.   That's a yes?

15      A.   That was a yes.

16      Q.   Can you tell me, generally, what Joe Quinn's job is?

17      A.   Special projects.

18      Q.   And what does "special projects" mean?

19      A.   Large on-going projects that maybe in the yard for

20   longer than a three-month period.

21      Q.   Can you give me an example?

22      A.   As a name or as a type?

23      Q.   A type of job that would last longer than three

24   months?

25      A.   A boat that's going to be extensive, having the
```

1  bottom plate removed, an interior change out and extension,

2  boat extensions.

3      Q.    And Mark Tortora, what are his duties, generally?

4      A.    He's a Project Manager.  He's simply running the

5  normal, every day jobs on vessels, a few vessels at a time.

6  Vessels that may only be there three months or longer.

7          Sometimes even he get involves with them when it

8  turns out to be longer jobs, but they're all basically the

9  same type.

10     Q.    Is Joe Quinn a Project Manager as well?

11     A.    Yes, we title - he does what a project manager does.

12  His title is Special Projects, that's his actual title.

13     Q.    Do I take it then that Mark Tortora's job duties

14  would involve jobs that don't last as long?

15     A.    Normally, yes.

16     Q.    Is that the only difference between say Mark

17  Tortora's job duties and Joe Quinn's?

18     A.    That's correct.

19     Q.    How about Tom Kreager?

20     A.    His title is Assistant Superintendent; that's Tom

21  Kreager's title.

22     Q.    And what does an Assistant Superintendent do?

23     A.    The same thing assist a Project Manager, except when

24  I'm not there, he runs the yard.

25     Q.    Let's say you're there, what does Tom Kreager do?

```
 1        A.    What his projects are is the Bahamas Yard.  He

 2   assists with the operations of Bahama Yard; scheduling,

 3   shipping, manpower, planning.

 4        Q.    Let me back up.  Bradford Marine has how many

 5   locations?

 6        A.    Bradford Marine has one location, that's in Fort

 7   Lauderdale; and they have Bradford Marine, Bahamas, that's

 8   not affiliated with this company, it's just another company

 9   we assist with.  It's not a partnership.

10        Q.    What is that company called in the Bahamas?

11        A.    Bradford Grand Bahama.

12        Q.    Bradford Grand?

13        A.    Bahama.  Yeah.

14        Q.    And what is Bradford Grand Bahama engaging in

15   business of, generally?

16        A.    Yacht repair.

17        Q.    The same work as Bradford Marine?

18        A.    Yes.

19        Q.    Can you give me an idea of how many employees

20   Bradford Marine has?

21        A.    Approximately 140.

22        Q.    Do you know how many employees it had back in 1997?

23        A.    Approximately 140.

24        Q.    How about Bradford Grand Bahama?

25        A.    I don't know.
```

1    Q.    Do I take it that project managers are responsible

2    for coordinating the various departments, let's say welding

3    or painting or fabricating; they oversee all those different

4    job duties?

5    A.    That's correct.

6    Q.    How about the foremen, are these people also, are

7    their jobs, are they broken down in any particular fashion?

8    A.    To their shop foremen, yes.

9    Q.    What do you mean by that, to their shop foremen?

10    A.    Meaning that the paint foreman has nothing to do

11    with welding unless they tell them after they weld

12    something.

13        It's separate, you know, except that after they weld

14    something and it's done, that he's going to have to paint

15    the areas that's just been prepared and they would

16    coordinate that between each other and the project manager.

17    Q.    Why don't we just go through the foremen then.  Why

18    don't you tell me what they're particular duties are.  Start

19    with Harry Rapicet?

20    A.    He's the Welding Foreman.

21    Q.    Now, you're talking about today, in 2001?

22    A.    Yes.

23    Q.    What about back in 1997, who was the welding

24    foreman?

25    A.    If I'm not mistaken, it may have been Jerry Goss.

1    Q.    Could you spell that?

2    A.    J-E-R-R-Y. The last name, I would be guessing again

3    really, Goss.

4    Q.    G-U-S-S-Y.

5    A.    G-O-S-S, I think.  G-O-S-S; that's what it is.

6    Q.    To the best of your recollection Mr. Goss was the

7    welding foreman back in 1997?

8    A.    To the best of my recollection.

9    Q.    You understand we're here to talk about an accident

10   that happened in July of 1997?

11   A.    Yes.

12   Q.    Can you tell me if Mr. Goss was the welding foreman

13   on the date of the accident?

14   A.    I could not positively tell that you, no.

15   Q.    Who would know that, if anyone?

16   A.    Personnel records.

17   Q.    Were there any other wielding foreman back in 1997

18   other than Mr. Goss?

19   A.    It's a possibility there could have been a gentleman

20   named Tony Watson.

21   Q.    Do you recall if Mr. Watson was a welding foreman?

22   A.    Yes, he was.

23   Q.    He's no longer with the company?

24   A.    No, he's not.

25   Q.    Do you know when he left?

1    A.    He first went to Freeport and worked in the Freeport

2    yard for approximately a year and a half, two years.  Then

3    he left and then I think he's working at Meryl Stevens in

4    Miami at the present time.

5    Q.    Do you remember when he left Bradford?

6    A.    No.

7    Q.    I take it Mr. Goss is no longer at Bradford?

8    A.    No, he's not.

9    Q.    Do you know when he left?

10    A.    I would say at least, approximately two years.

11    Again, exact dates and times I'm not sure of.

12    Q.    Do you remember when Mr. Rapicet became the welding

13    foreman?

14    A.    Not exactly, but it was right after Mr. Goss left.

15    Q.    Do you know if Mr. Watson and or Mr. Goss left

16    Bradford for any reason dealing with this particular

17    accident?

18    A.    I would say, no.

19    Q.    Do you know why, let's say, Mr. Watson left?

20    A.    He left the Bradford yard to work in the Freeport

21    yard because there was new yard starting and they asked him

22    if he would like to do that and he said yes, and I believe

23    that's the only reason that he went there.

24    Q.    The Freeport yard, is that affiliated with Bradford

25    Marine?

1   A.   It's not really affiliated; it's a yard that we

2   help.  We're subcontracted to the yard.  We subcontract

3   people to that yard to work.  We subcontracted Tony Watson,

4   he was still our employee but he was working the Grand

5   Bahama yard.

6   Q.   How about Mr. Goss, do you know why he left?

7   A.   The reason he left was for personal reasons, as he

8   put it.

9   Q.   Do you know anything about these personal reasons?

10  A.   No, I do not.

11  Q.   How about Charlie Eckert, what is - what department

12  is he the Department Foreman of?

13  A.   Fiberglass Repair.

14  Q.   Do you know how long he has been the foreman of

15  Fiberglass Repair?

16  A.   Three years.

17  Q.   And how about Wanda Starrato, do you know how to

18  spell that?

19  A.   Wanda Starrato?  Nope.

20  Q.   Well, do it phonetically.

21       I take it that's a woman?

22  A.   Yes.

23  Q.   And what was Mr. Eckert to the foreman of?

24  A.   He's in charged of Lifts; lifting the vessels out of

25  the water, which we call the Lift Department.

1    Q.    How long has he been the foreman of the Lift

2    Department?

3    A.    Approximately three and a half years.

4    Q.    Dave Mockel

5    A.    Dave Monkel.

6    Q.    Who's Dave Monkel?

7    A.    He's the Machine Shop Foreman.

8    Q.    How long has he been the Foreman of the Machine

9    Shop?

10    A.    Approximately six months.

11    Q.    Who was the foreman before that?

12    A.    Carlos Robinson.

13    Q.    Is he still with the company?

14    A.    He's on loan to the Grand Bahama shop.

15    Q.    How long was Mr. Robinson the foreman of the Machine

16    Shop?

17    A.    Approximately a year.

18    Q.    Before that who was the foreman?

19    A.    I don't remember the sequence, a name.  He was only

20    there approximately for a month and then Tom Kreager was the

21    foreman, I believe, at the time of the accident.

22    Q.    Tom Kreager was the Foreman of the Machine Shop at

23    the time of this accident?

24    A.    I believe so.

25    Q.    He has since been promoted up to Project Manager?

1    A.    No, he left the yard and then came back.

2    Q.    All right.  And he's now the Project Manager slash

3    Assistant Superintendent?

4    A.    Correct.

5    Q.    How about -- is it Manny Mueller?

6    A.    Right.

7    Q.    What's he the foreman of?

8    A.    The Carpentry Shop.

9    Q.    How long has he been Foreman of the Carpenter Shop?

10   A.    A year and a half.

11   Q.    And who was it prior to that?

12   A.    Joe Reid.

13   Q.    How about Jack Liner?

14   A.    He's the foreman of the Paint Shop.

15   Q.    How long has he been foreman of the Paint Shop?

16   A.    Approximately 25 years.

17   Q.    And Oscar Spencer?

18   A.    He's the foreman of the Hydraulic Shop.

19   Q.    How long has he been foreman of the Hydraulic Shop?

20   A.    Approximately five years.

21   Q.    You were the yard superintendent on the date of this

22   accident, correct?

23   A.    I believe so.

24   Q.    You said three and a half years.

25         Can you give me a date as to when you became Yard

1  Superintendent.

2      A.    No, I cannot.

3      Q.    What were you doing before becoming the Yard

4  Superintendent?

5      A.    Project Manager.

6      Q.    Did you have -- was that the same term job or was

7  that the same position that Mark Tortora has?

8      A.    That's the same as Mark Tortora.

9      Q.    You said one of your jobs is approving work orders;

10  what did you mean by that?

11      A.    A captain puts in a request for a job and it's to be

12  submitted.  The foreman, if he's the one making the request,

13  will write it on the form sheet and he'll bypass it to me

14  then it goes to the front office to be typed as a job work

15  order.

16          Also bidding contracts are the same way, it comes

17  through my desk.  We bid on it.  I read it.  I approve it

18  and send to the front office to be typed up.

19      Q.    So let's take a situation where a vessel is at

20  Bradford and being repaired.

21          Do I take it that in lot of instances somebody on

22  the boat, either the owner or the captain, will actually

23  request that a certain something be done to a boat.

24      A.    That's correct.

25      Q.    They would tell somebody from Bradford, was that a

1    foreman or somebody else?

2    A.    That's correct.

3    Q.    Would they usually tell a foreman?

4    A.    Normally, yes.

5    Q.    A foreman would type a job order or a work order?

6    A.    He would handwrite it, yes.

7    Q.    And then give it to you?

8    A.    It would pass through my desk, yes.  I would not

9    necessarily be there, but there would a box he would put it

10   in.

11        I would review it and put it back in box with my

12   initials, signature, normally.

13   Q.    Why do you review it?

14   A.    To check for corrections and an explanation of what

15   is to be done, to find out if there's enough description.

16   Q.    But ultimately if you approve the work order, what

17   happens then?

18   A.    It's typed.  It's also approved.  After it's

19   approved, the a work order is approved by the owner.  It's

20   signed at the time when he asked for it.

21        Then it's approved for by me.  I check for

22   clarification of what's happening.

23        Then it's typed into job form, which goes along with

24   the rest of the work that goes into the vessel, and it's

25   given an item number.

1    Q.    It's given an item number?

2    A.    Right.

3    Q.    At some point does it get back to the foreman so he

4    can coordinate the job?

5    A.    Yes.  Exactly.

6    Q.    By "coordinate the job", I mean assembling the

7    necessary workers to complete that job?

8    A.    That's correct.

9    Q.    To make sure enough materials are available to

10   complete that job?

11   A.    That's correct.

12   Q.    That's the foreman's job?

13   A.    That's correct.

14   Q.    Was this system in place back in July of 1997?

15   A.    Yes.

16   Q.    So any repairs that were done on the Souvenir --

17   strike that.

18         When we talk about the Souvenir, are you familiar

19   with the vessel that we're talking about?

20   A.    Vaguely, yes.

21   Q.    My understanding is that's the vessel that Mr.

22   Naranjo was working on when this explosion occurred?

23   A.    That's correct.

24   Q.    Do you have an independent recollection of this

25   vessel?

1    A.    Yes.

2    Q.    And is it your testimony here today that there would

3  be in existence, somewhere, work orders that would have

4  pertained to the work that Bradford would have done on the

5  Souvenir?

6    A.    Yes.

7    Q.    The handwritten ones you're talking about, or job

8  ones.  Pardon me?

9    A.    I'm sorry.  Which ones were you specifically asking

10  for:  The work order, the one that was handwritten or the

11  one distributed back to the foreman to use or either one?

12    Q.    Either one?

13    A.    Yes, it's there.

14    Q.    Do you keep files that would contain the work

15  orders?

16    A.    The office keeps the files for so many years.  How

17  many, I don't know.

18    Q.    So do I take it then that if --

19         Let me back up.  You said that the owner actually

20  signs the work orders?

21    A.    The owner or the captain.

22    Q.    So let's say the captain or the owner wanted some

23  painting done on a particular vessel, the captain would tell

24  a foreman, probably the paint foreman; is that correct?

25    A.    Yes.

1    Q.    And he would specifically tell the paint foreman
2    what he wanted done, is that fair?
3    A.    Him or the Project Manager, yes.
4    Q.    All right.  And then the foreman or the project
5    manager would write a handwritten work order?
6    A.    That's correct.
7    Q.    Would he give it a number at that point in time?
8    A.    No.
9    Q.    Then he would put on your desk or see to it that it
10   ended up on your desk?
11   A.    That's correct.
12   Q.    And at some point you review that?
13   A.    That's correct.
14   Q.    And you review it to see if it needs any further
15   clarification or explanation?
16   A.    If it needed it, yes.
17   Q.    Assuming it met with your approval - do you
18   understand what the question - you would it give to somebody
19   to type up?
20   A.    That's correct.
21   Q.    At what point would the captain or owner sign that
22   particular work order?
23   A.    At the time that he requested it or there right
24   after, we implement a form.  I don't believe it was
25   implemented at the time.  We had a large form, the size of

1    loose leaf paper.

2           There we write the request on it, which means that

3    the foreman normally goes back to his office, writes it up,

4    carries it back to the captain or the owner, whoever

5    requested to have it done.

6           They get it signed and then it would show up at my

7    office.

8    Q.    In any event, you would have it typed up?

9    A.    That's correct.

10   Q.    When would the work number be assigned to that work

11   order?

12   A.    When it was typed.

13   Q.    And at what point in time somebody from Bradford

14   Marine, you or somebody else, would sign that work order or

15   would you not?

16   A.    Not after it was typed, no.  Not after it was typed.

17          The work order had been issued, now meaning that the

18   work order came to the foreman and he had a number to use to

19   charge material, assign material, to assign these people.

20   Q.    Would you ever sign the work order at any point in

21   the process?

22   A.    No, there would be another manager, the Project

23   Manager who would do that.

24   Q.    The foreman?

25   A.    No, the foreman does not sign it.  The foreman

1  doesn't sign it, no, not the work order.

2      Q.    How long have you been at Bradford Marine?

3      A.    Approximately four and a half years.

4      Q.    Does Bradford Marine keep personal files on it's

5  employees?

6      A.    Yes.

7      Q.    Do they keep separate medical files on it's

8  employees?

9      A.    Yes.

10      Q.    So, for instance, if we wanted to know if a certain

11  employee had made, say, let's say a Worker's Compensation

12  claim, or had been injured on the job, there would be a file

13  that we could go to look at to see it?

14      Q.    Would it show you how many times he's been there?

15      A.    Yes.

16      Q.    Would it say anything about the nature of the

17  injuries?

18      A.    Yes.

19      Q.    Would it describe how the injury or accident

20  occurred?

21      A.    There would be an accident report, a description,

22  yes.

23      Q.    And possibly the symptoms that employee was having?

24      A.    Whatever he stated, yes.

25      Q.    Is that file separate from the personnel file?

1    A.    I believe so.

2    Q.    Where are the personal files kept?

3    A.    In what we call, the front/back office.

4    Q.    The front/back office.    That's at the Fort

5  Lauderdale location?

6    A.    That's correct.

7    Q.    How about the medical file we were just talking

8  about?

9    A.    It's in the same area.

10    Q.    Are there any other files kept on employees that you

11  can think of today other than the personal file and medical

12  file?

13    A.    No.

14    Q.    I want to talk to a little bit about the training,

15  just speaking generally.

16        Now, the training that your employees receive when

17  they first come to work at Bradford, are you with me?

18    A.    Yes.

19    Q.    Let's specifically talk about, I guess welders and

20  or fabricators?

21        First of all, are welders separate from fabricators?

22    A.    They're one in the same but one has more skill than

23  the other.

24    Q.    Which one has more skill?

25    A.    A fabricator.

1    .    Q.    Go ahead?

2         A.    Fabricator and welders, the fabricator, he puts

3    things together and the welder's just a welder.

4         Q.    So you do have two separate job descriptions at

5    Bradford?

6         A.    Yes.

7         Q.    Mr. Naranjo, at the time of his accident, what was

8    he, if you know?

9         A.    I don't know.

10         Q.    He testified yesterday that on the day of the

11    accident he actually made two of these plates before he

12    started welding; would that give you any insight?

13         A.    That would tell me he's a fabricator/welder.

14         Q.    Does one start off as a fabricator slash welder or

15    is that something that you work up to?

16         A.    It's all in the mechanical ability, yes.

17              Normally I say you would be hired as a welder in

18    South Florida and become a fabricator.

19         Q.    Mr. Naranjo started at Bradford, I guess back in

20    1992.  That would mean that he was there before you joined

21    Bradford?

22         A.    That's correct.

23         Q.    Do you have any personal knowledge as to the extent

24    of his training at Bradford?

25         A.    I would not have any.

1    Q.   So in other words, do you know how he was trained?

2  What type of - what type of training he received?

3    A.   No.

4    Q.   Who would I ask to determine that, other than Mr.

5  Naranjo himself, at Bradford?

6    A.   Possibly the hiring person Jerry Goss or Harry

7  Rapicet.

8    Q.   Putting Mr. Naranjo aside, generally speaking, when

9  somebody comes into or strike that --

10      Putting Mr. Naranjo's situation aside, when somebody

11  comes to work at Bradford as a welder today, can you tell me

12  how what type of training they receive?

13    A.   Formal training?  None.

14    Q.   So you don't send them, for instance, to tech

15  school?

16    A.   No.

17    Q.   And pay the tuition, as an example?

18    A.   No.

19    Q.   Are they taken under the wing of a foreman or some

20  other welder to be shown the ropes, so to speak?

21    A.   When a welder applies for a job as a welder, he's

22  given a test to see if he can weld.  And if he can weld,

23  he's hired as long as he passes his medical.

24      At that point, the foreman explains to him what is

25  expected of him.  Explains to him about his time sheet, how

1    to fill them out.   He explains what a work order is and how

2    to fill it through and walks him around the yard and shows

3    him the yard and basically that's it, as far as my knowledge

4    of that.

5        Q.    And what if he can't weld?

6        A.    He's not hired.

7        Q.    So you don't send him to school or take him through

8    a special training program or something like that to make

9    sure that he can or that he learns how to weld?

10       A.    No.

11       Q.    You just don't hire that person?

12       A.    That's correct.

13       Q.    What does the test consist of?

14       A.    For a welder, all it is is two pieces of three by

15   eight plates welded at a 45 degree angle and put together at

16   the welded edges and they commence to stick weld, or make a

17   weld or make a weld on different materials.

18       Q.    And assuming that he can do those various things

19   that you just mentioned, he passes the test?

20       A.    It's a visual inspection, yes.  If we feel

21   satisfied that he knows how to use the machine, how to

22   adjust it, how it set it, he's hired; if we need him, of

23   course.

24       Q.    Is there any written examine that's taken?

25       A.    No.

1    Q.   I've seen the initials "A.B.S." in connection with

2    Mr. Naranjo's qualifications, what does that mean, if you

3    know?

4    A.   At a later date - some time during a later date

5    there's a qualification that has to be applied to certain

6    boats and you need a certain amount of welders to be

7    qualified to weld on these boats.

8         And that's a test that's given as the same test that

9    we give for a visual but this time it would be done under an

10   X-ray plate.  It would be welded, sent out, X-rayed, or bent

11   and have a break test done it.

12        If A.B.S. approves it., then he has the

13   certification of being A.B.S.

14   Q.   What does A.B.S. stand for?

15   A.   American Bureau Standard.

16   Q.   American Bureau Standard.  That's actually a

17   certificate that's issued?

18   A.   Yes.  The company is certified.  He becomes

19   qualified.  The reason for that is the section for insurance

20   purposes.  He does get certification but he's not - he's

21   qualified.

22   Q.   What kind of boats do you need A.B.S. certification

23   for?

24   A.   A.B.S. insured vessels.

25   Q.   Do I take it that all of the welders on A.B.S.

1    insured vessels need A.B.S. certification or qualification

2    or just a certain percentage?

3        A.    Only in certain areas.  Anything structural on a

4    A.B.S. vessel would need an A.B.S. welder or equal to.

5        Q.    Equal to.  Right now, do you know how many welders

6    that you have at Bradford in the Fort Lauderdale yard?

7        A.    Approximately fifteen.

8        Q.    Are they all A.B.S. qualified?

9        A.    No.

10       Q.    How many of the fifteen are A.B.S. qualified, if you

11   know?

12       A.    Five, I believe.

13       Q.    But if I understand your testimony, Bradford Marine

14   is A.B.S. certified?

15       A.    Because we carry insurance.  If we didn't have the

16   welders qualified by the test, we would not have an A.B.S.

17   welder.  But the company is certified because it has

18   insurance to cover any damages.

19       Q.    But you can't get that insurance unless you have

20   some of your welders--

21       A.    No, the company automatically carries this

22   insurance.  They automatically have protection again damage

23   on boats and everything else.

24             If you're welding on the outside and you were to go

25   and you wanted to be certified, you would go take a test,

```
 1    the test would qualify you.

 2           You would not need to be certified until you bought

 3    insurance on whatever you were welding on, the value of that

 4    insurance would cover it and then you would become

 5    certified.    Insurance makes you certified.    The test makes

 6    you qualified.

 7        Q.    And you currently have five A.B.S. qualified

 8    welders?

 9        A.    That's correct.

10        Q.    How long does the test take?

11        A.    It can be done in an hour.

12        Q.    Does somebody come in and actually give the test?

13        A.    Yes or we send them out; either or.

14        Q.    In Mr. Naranjo's case, do you know if he became

15    A.B.S. certified?

16        A.    No.

17        Q.    Or qualified?

18        A.    No.

19        Q.    Who comes in to actually give the test?

20        A.    At present?

21        Q.    Right.

22        A.    Vocational schools locally here helps hand cap.

23           MR. KALLEN:    Lindsey Hoffman?

24    BY MR. WEBER:

25        Q.    If you know?
```

1      A.    That's a person that teaches at a school that's, I

2    guess, certified by the State to give the test.

3      Q.    And sometimes you send people out to take the test?

4      A.    We send them to the classroom, yes.

5      Q.    Some vocational school?

6          MR. KALLEN:   Sheridan Vo-Tech.

7          THE WITNESS:  Not Sheridan, no.

8          MR. KALLEN:   You're familiar with Sheridan?

9          THE WITNESS:  I am, yes.

10   BY MR. WEBER:

11     Q.    So let me follow up then.

12          Going back to the hypothetical:  A person starts as

13   a welder at Bradford and you told me they have no formal

14   training; is that correct?

15     A.    That's correct.

16     Q.    There won't be any written tests that person would

17   have to take in order to get employed?

18     A.    No.

19     Q.    There won't be any written tests for that person to

20   maintain his employment at Bradford, am I correct?

21     A.    That's correct.

22     Q.    And becoming A.B.S. qualified is not a requirement

23   to obtain employment at Bradford?

24     A.    That's correct.

25     Q.    Nor is it a requirement to keep one employed at

1    Bradford as a welder; am I correct?

2        A.    That's correct.

3        Q.    Are there any requirements for a welder to maintain

4    their employment at Bradford that you're aware of, other

5    than to do adequate work, according to the foreman?

6        A.    There's nothing but that, right.

7        Q.    So, for example, the welders are not given any type

8    of exam, let's say, on O.S.H.A. standards?

9        A.    No.

10       Q.    My statement is correct, they are not?

11       A.    They are not.

12       Q.    And is there any session whereby, let's say,

13   O.S.H.A. standards are verbally or orally communicated to

14   the welders that you're aware of?

15       A.    Yes, they are.

16       Q.    How are they done?  How is that done?

17       A.    As you said, verbally.  We would discuss safety

18   factors, do's and don't's, of O.S.H.A. rules.

19            Like, don't burn the other side of a bulkhead

20   without knowing what's on other side of a bulkhead.   You

21   don't cut a hole without having a firewatch.

22            It's all basically done verbally and individually,

23   almost daily, on every job.   It doesn't review the whole

24   safety O.S.H.A. regulations, but it does touch on areas,

25   what's being done at the time.

1    Q.    Are welders sent to, let's say, seminars, in-company

2    seminars on welding?

3    A.    On welding, no.

4    Q.    When you say somebody would communicate the do's and

5    don't's, generally with a welder, who would do that?

6    A.    A foreman.

7    Q.    Is there a period of time, Sir, before a welder will

8    be allowed to work by himself?

9    A.    Yes.

10    Q.    And what is that period of time?

11    A.    There is no particular period of time, it's set by

12    an individual himself; his abilities, his responsibilities,

13    how he accepts responsibility.

14    Q.    Who makes that determination?

15    A.    The foreman.

16    Q.    So if a welder reports to work on day one, would

17    that welder be working under the wing of a foreman

18    initially?

19    A.    Oh, yes.

20    Q.    And that foreman would basically size up that

21    particular employee and make a determination as to how

22    versed that person is?

23    A.    He would probably do that before he hired him; but

24    under the daily observation, yes, he would make a better and

25    stronger opinion.

1    Q.    Are records kept, at all, with respect to this whole

2  process of determining when a welder can work by himself?

3    A.    No.

4    Q.    Are there any checklists or any type of documents at

5  all that would reflect which O.S.H.A. rules had been

6  explained to welders?

7    A.    No -- to answer your question, no.

8    Q.    I take it those things would just come up on a

9  day-to-day basis whenever they were appropriate?

10    A.    That's correct.

11    Q.    And there's no way for us to go back and actually

12  look, today for example, as to what particular O.S.H.A.

13  standards that were reviewed as to any particular welder on

14  any particular day?

15    A.    No.

16    Q.    My statement is correct?

17    A.    That's correct.

18    Q.    Sir, I'm handing you what's been marked as Exhibit

19  Five for purposes of this deposition.

20        Let me represent to you that that's just one

21  document among many that were produced by Bradford Marine in

22  connection with the work that it did on the vessel,

23  Souvenir.

24        I just had some questions about that document.  Over

25  on the left-hand margin of this particular document, Exhibit

1    Number Five, there's number that's repeated, it's 081; do

2    you see that?

3        A.    Yes.

4        Q.    What's that, if you know?

5        A.    That's an item number.

6        Q.    What's the item number?

7        A.    It identifies the job to be done so with that number

8    you can purchase and charge your time to Item 081, which

9    would go to pressure testing the tech.

10       Q.    Is that different from the Work Number?

11       A.    That is the Work Number or Job Number.

12             The job number would you both numbers for business.

13   On the right-hand, top corner that identifies both, 081

14   identifies the particular job you're doing on that vessel.

15       Q.    All right.  Earlier we talked about the whole

16   process, how a work order gets produced; do you recall that?

17       A.    Yes.

18       Q.    And you said at some point in time a Job Number or

19   Work Number gets assigned to that work order?

20       A.    That's correct.

21       Q.    In this particular case, on Exhibit Number Five, the

22   Job or Work Number would be 081?

23       A.    That's correct.

24       Q.    Looking at that document, can you tell from looking

25   at that document what that job was?

1    A.    Yes.

2    Q.    What is it?

3    A.    It's Pressure Testing Fuel Tanks, active fuel tanks.

4    Q.    Does that document, Exhibit Number Five, tell us who

5    was working on that job?

6    A.    Yes.

7    Q.    And how does it do that?

8    A.    By an employee identification number.

9    Q.    Which is where, Sir?

10    A.    Which is after the date.  You have the items in

11    sequence.  You have dates in sequence and then you have

12    employee identification numbers.

13    Q.    So if we go up to the very first - the very top

14    entry here (indicating).

15    A.    It's a different item.

16    Q.    That's 080?

17    A.    Uh-huh.

18    Q.    That's a yes?

19    A.    Yes.

20    Q.    Can you tell in looking at that what 080, what job

21    that was?

22    A.    No.

23    Q.    So let's go then to 081.  Actually, it identifies,

24    it says, "Pressure Test Fuel Tanks"?

25    A.    That's correct.

1    Q.    6/13/'97 has a number:   03708?

2    A.    That's an employee number.

3    Q.    That number contains   ---

4    A.    Any employee by that number, if it had a card do

5    that.  So or a ticket number to buy that number won't be

6    contract should be changed as you see changing if somebody

7    else bought something.

8    Q.    No.  What I mean is  - my question wasn't clear.

9         It was bad.  03708, does a particular employee have

10   that number?

11   A.    That's correct.

12   Q.    And that particular employee always carries that

13   number?

14   A.    That's correct.

15   Q.    So we can go to your records and find out who that

16   was?

17   A.    That's correct.

18   Q.    Do you know sitting here today who it was?

19   A.    I know it was machinist.  I do not know which

20   machinist.

21   Q.    How is it you know it's machinists?

22   A.    Because it's a three-thousand number.

23   Q.    I take it machinists have three-thousand numbers?

24   A.    That's correct.

25   Q.    Then we go on from 6/13 of '97; it says it again:

1    The employee number and then it says "Teflon tape"?

2            Do I take it that that employee bought Teflon tape?

3    A.    That's correct.

4    Q.    This particular exhibit is also broken down further,

5    is it not?

6    A.    That's correct.

7    Q.    It's broken down into entries under the heading,

8    "material"?

9    A.    That's correct.

10    Q.    Then in the middle page is:  "Purchases"?

11    A.    That's correct.

12    Q.    Then on the bottom is: "Labor"?

13    A.    That's correct.

14    Q.    If we go to the Labor section.   It appears that

15    various employees were involved in testing of the field

16    tanks?

17    A.    That's correct.

18    Q.    Would we have to speak with these employees as to

19    what they did or do you know sitting here today?

20    A.    That's a broad statement.  It's too broad to answer

21    because I can tell you they worked own a tank, but there's

22    F-, fuel tanks, means the more than one.  Which tank they

23    worked on, which part of the testing they were doing, no.

24            Yes, you would have to ask them if they would

25    remember.

1    Q.    Do you know sitting here today why they were working

2    on the F-fuel tanks?

3    A.    Apparently to test for leaks.

4    Q.    Do you know if there had been a problem with leaking

5    fuel?

6    A.    No.

7    Q.    You don't know or there wasn't?

8    A.    I don't know.

9    Q.    Okay.   Somewhere there would be a work order though

10   that would tell us?

11   A.    If there was a leak there would be a work order that

12   would say, repair leak in fuel tank.

13   Q.    Well, we do know they were working on the F-fuel

14   tanks in late June and early July 1997, correct?

15   A.    Not by that ticket, I can't tell that.

16   Q.    You can't?

17   A.    The only thing that tells me is there were pressure

18   tests done on that the tank.

19   Q.    There's a leak test?

20   A.    That's correct.

21   Q.    They were at least doing pressure tests on the fall

22   system?

23   A.    That's correct.

24   Q.    In order to determine why they were doing that we

25   could go somewhere and look at a work order?

1    A.   You should be able to find one number, that's a

2   whole sheet that you have there.   If somewhere in there

3   this there was a leak, it would be there.

4         MR. KALLEN:   Can I see that document?

5   BY MR. WEBER:

6    Q.   Again in the packet of materials was produced by

7   Bradford, maybe we didn't ask a question that's entirely

8   proper.

9         Why don't you look through here and see if you can

10  find any work orders.

11   A.   Any work orders?   These are all work orders.

12   Q.   They are?

13   A.   They all establish their item.   One was the

14  original, the first item given to the yard to do as a work

15  order or a contract.

16        If it's a contract, it would have a date, like

17  modify cabin and an item number.

18   Q.   Let me stop you right there though.

19        Going back to Exhibit Five.

20   A.   Uh-huh.

21   Q.   Are you with me?

22   A.   Uh-huh.

23   Q.   Is that a yes?

24   A.   Yes.   I'm sorry.

25   Q.   Are you telling me that if and of itself is a work

1    order?

2       A.    That's correct.

3       Q.    That's what you were talking about earlier,

4    something that comes from either the captain or the owner?

5       A.    The captain or owner requests that the fuel tanks be

6    tested for some reason.

7            I don't know yet.

8            MR. KALLEN:  This is the typed work order generated

9       from  the handwritten one?

10           THE WITNESS:  No.  No.  No.  I'm sorry.

11    BY MR. WEBER:

12      Q.    Is this a -- one rule I forgot to tell you about.

13    It's my fault.  She can only take down one person talking at

14    a time.  In everyday speech, we interrupt each other all the

15    time.  I'm really bad at it, ask my wife.

16           But for our purposes today, try to wait for me to

17    finish.  I'll try to do the same with you, okay?

18      A.    Okay.

19      Q.    This thing that's been marked Exhibit Five, I would

20    guess at least you, tell me if I'm wrong, really not the

21    work order itself, but basically it's a summary, perhaps a

22    chronology of work orders?

23      A.    You're absolutely right.

24      Q.    And now I would like to you take a minute and look

25    at a document that we received from Bradford and tell me if

1    you can find any work orders in there, Sir?

2         MR. KALLEN:  Individual work orders which make up

3      the chronology.

4         THE WITNESS:  Yes.

5         This would be a work order.

6    BY MR. WEBER:

7      Q.   This is what a work order would look like?

8         Let me just -- well, while we're still on the

9    record, why don't you look through here and tell me if you

10   can find any work orders from the pressure fuel testing of

11   the fuel tanks that are he depicted on Exhibit Five.

12     A.   The only one you're going to find is 081, that

13   particular one is the only one you're going to find, 081.

14        This work order is going to be this pressure tests

15   of the fuel tanks.

16     Q.   This is (indicating)?

17     A.   And that's 80.

18     Q.   Let's pull that out then.

19        MR. KALLEN:  Let me see that.  Where do you see

20      that?

21        THE WITNESS:  (The witness indicates.)

22   BY MR. WEBER:

23     Q.   I'm showing you now what's been marked as Exhibit

24   --

25     A.   Let me look back here for a second because you have

1    too many pages.  It's not a work order this.

2         MR. WEBER:  Let's go off the record for a second.

3         (Whereupon, the following conversation was held off

4      the record.)

5    BY MR. WEBER:

6    Q.    Sir, we've been off the record taking about the

7    issue of work orders.  I want to go back briefly to Exhibit

8    Five, do you see that?

9    A.    Yes, I do.

10   Q.    Sir, all Exhibit Five shows are a work orders of 81;

11   is that correct?

12   A.    That's correct.

13   Q.    That 81 is the job of the pressure tests on the

14   F-fuel tanks, am I correct?

15   A.    That's correct.

16   Q.    Do I take it it doesn't matter what day that anyone

17   would work on that particular job, it would always come out

18   with 81?

19   A.    That's correct.

20   Q.    If they were going to test a fuel line somewhere

21   else on the boat, would it have a different number?

22   A.    That's correct.

23   Q.    Or do some other type of job, it would have a

24   different number?

25   A.    That's correct.

1    Q.    But so long as they're  testing the fuel tanks,

2    regardless of the day, it would carry the Number 81?

3    A.    That's correct.

4    Q.    And it would show on here, Exhibit Five, the day on

5    which they performed the work?

6    A.    That's correct.

7    Q.    And it would always show the employees that worked

8    on that job?

9    A.    That's correct.

10    Q.    Do I take it then that Exhibit Five doesn't reflect,

11    let's say, when the materials were ordered necessarily, or

12    when the labor was ordered, but when it was actually

13    performed; the work was actually performed?

14    A.    The work was performed on the date that the

15    employee's number shows against that date.

16    Q.    So for instance, if we look at Exhibit Five, the

17    very first entry under the labor, it shows that on June 13th

18    of 1997, employee 03758 did a leak test on the tank?

19    A.    That would be correct.

20    Q.    And employee 03758 actually performed that work on

21    June 13th of 1997, am I correct?

22    A.    That's correct.

23         MR. KALLEN:  Do you mind if follow-up really quick?

24                        DIRECT EXAMINATION

25    BY MR. KALLEN:

1    Q.    Just continuing along on Exhibit Five one of the

2    columns makes reference to the letter "R" or "O".

3          Would that be regular time as opposed to overtime?

4    A.    That's correct.

5    Q.    Then the column over these letters designates

6    various numbers; those numbers would refer to what?

7    A.    To money; dollars.

8    Q.    Well, no.  For example 1, 30?

9    A.    Hours worked.

10   Q.    Hours worked on that job on that day?

11   A.    Yes.

12   Q.    Then the last column, of course, would be the

13   dollars?

14   A.    That's correct.

15   Q.    Now, I want to go to Exhibit Number 6.

16         This is something that we had marked because you

17   initially thought it was work order but do I understand,

18   after looking at it further, you concluded that it's not

19   really a work order?

20   A.    That's correct.

21   Q.    What is it?

22   A.    A bill.

23   Q.    You know that because why?

24   A.    Because there's money values on it.

25   Q.    And you said something off the record, that a work

1    order would never have a dollar value?

2        A.    That's correct.

3        Q.    So that's how you know that Exhibit Six is not a

4    work order?

5        A.    That's correct.

6        Q.    When you say Exhibit Six is a bill, is this

7    something that would actually get generated and sent to the

8    owner?

9        A.    That's correct.

10       Q.    Something that looks identical to Exhibit Six?

11       A.    Yes.

12       Q.    Now, I'm showing you what has been marked as Exhibit

13   Seven; what is that?

14       A.    That would be a work order.

15       Q.    We talked about that, the process of generating work

16   orders, do you recall that?

17       A.    Yes.

18       Q.    This is the typewritten version that you talked

19   about earlier?

20       A.    That's correct.

21       Q.    And Exhibit Seven actually reflects or contains Work

22   Order Number 81; does it not?

23       A.    Yes, it does.

24       Q.    It simply says, "pressure test F-Fuel tanks"?

25       A.    That's correct.

1    Q.    This doesn't show, at least from my looking at it,

2  why that particular work is being done, does it?

3    A.    No, it doesn't.

4    Q.    Would the written work order from which this was

5  typed show why that work was being done?

6    A.    No, it would not.

7    Q.    When I say, "why it was being done", I mean why

8  either the captain or owner requested that work be done?

9    A.    There would be no written reason for that, off of

10  that item, no.

11    Q.    Is there records anywhere which would show why that

12  test was being done, why the owner or captain requested it?

13    A.    No.

14    Q.    So that isn't something that's done or contained in

15  that written work order that's initially made?

16    A.    No.  If I may?

17        There may be something or prior to that that caused

18  this to be done.

19    Q.    Explain.

20    A.    A tank, a fuel tank has outlets.  Suppose we say we

21  can't today change one of those outlets and it was requested

22  to change an outlet and we did; after we change that outlet,

23  that tank may have to be tested to check the weld on that

24  outlet to see if it's leaking or not.

25    Q.    That's asking you, you would be known in the

```
 1    industry as a repair shop?

 2         A.    You would be known as what?

 3         Q.    I'm sorry.  That's something that wouldn't have been

 4    requested, necessarily, by the owner?

 5         A.    The owner would have requested that outlet be

 6    renewed, yes.  It would be in the work order.  It would be

 7    in the billing.

 8         Q.    What I'm getting at is sometimes in the course of

 9    doing a job, you understand that a certain order work needs

10    to be done?

11         A.    Or has been done, yes.

12         Q.    And you would still generate a work order for that

13    particular job?

14         A.    That's correct.

15         Q.    Even though it wasn't specifically requested for by

16    the owner or the captain?

17         A.    That's correct.

18         Q.    The owner or captain may have asked to do something

19    else which necessitated the subsequent job?

20         A.    That's correct.

21         Q.    But let's go back to -- strike that.

22               Do you know in looking at Exhibit 7 what kind of job

23    81 was; whether there was something specifically requested

24    by the captain or owner or is that was something you knew

25    internally that you had to do?
```

1    A.    If I did know.  Internally it had to be done.  At a

2    certain point the owner would have known it also or the

3    captain and they also would sign a work order to do it.

4    Q.    All right.  So in all cases the captain or owner

5    will sign a work order?

6    A.    In all cases they would sign a work order.

7    Q.    So do these work orders ever reflect why the work is

8    being requested?

9    A.    Occasionally, yes, to describe something else, yes.

10    Q.    Can you look through the stack of materials again,

11    Sir, that we received from Bradford and tell me if there are

12    any handwritten work orders that you can observe?

13    A.    I can.

14        That's not the work order that's a bid.  A bid for a

15    contract.

16        MR. KALLEN:  It looks like Page 26 of a multi-page

17        bid.

18        THE WITNESS:  That's as bid for a contract.

19    BY MR. WEBER:

20    Q.    Let's not use it.

21        Let me -- Sir, you've had a chance to look at the

22    Bradford file just briefly that we received from Bradford?

23    A.    Yes.

24    Q.    Did you see any handwritten work orders in there?

25    A.    No.

1    Q.    You told me, though, these are kept somewhere at

2    Bradford, am I correct?

3    A.    Yes.

4    Q.    Okay.    And so if we wanted get those, we would have

5    to specifically request somebody to copy these; is that a

6    fair statement?

7    A.    Yes, if they still have them.

8    Q.    Fair enough.    You don't know how long they keep

9    them?

10   A.    No, I don't.

11   Q.    Earlier you said that you knew worker - 03708 is

12   their worker number was a machinist?

13   A.    Yes, that's the number of a machinist.

14   Q.    You knew it was a machinist because machinists carry

15   certain numbers?

16   A.    Yes.

17   Q.    Can you tell me, do welders and or fabricators carry

18   a certain number?

19   A.    Yes, they do.

20   Q.    What's that number?

21   A.    The nine thousand series.

22         MR. KALLEN:  Nine thousand?

23         THE WITNESS: That's correct.

24   BY MR. WEBER:

25   Q.    Do you know sitting here today what work number Mr.

1    Naranjo was working on at the time of the this accident?

2        A.    I'm afraid that I don't.

3        Q.    Is there a way for to you tell me that from looking

4    at the file?

5        A.    No, I don't know.

6        Q.    Why not?

7        A.    It doesn't have his name next to his number.

8        Q.    No?

9        A.    No, I could not tell you.

10            MR. KALLEN:   Could we get it by a phone call

11        perhaps?

12            THE WITNESS:  Yes.

13            MR. WEBER:   Why don't we do that.

14            (Whereupon, a phone call was made off the record.)

15    BY MR. WEBER:

16        Q.    We're back on the record.

17            You just made a call off the record to find out Mr.

18    Naranjo or what Mr. Naranjo's work number is.

19        A.    That's correct.

20        Q.    And what is it?

21        A.    9002.

22        Q.    All right. With that information handled, can you

23    look at this file and tell me what work number he was

24    working on at the time of this accident?

25        A.    I could probably find it, yes.  If you could tell me

1    the date of the accident.

2        Q.    The date of the accident was July 7th, I believe, of

3    it 1997?

4        A.    Okay.

5        Q.    Why don't you take a minute, Sir, take a minute to

6    look at that.

7            Before we start, let me ask you this:  Are these

8    records broken down in chronology that we talked about

9    earlier part of which is marked as Exhibit Number Five.

10           Is it broken down between welders and painters and

11   machinists in that way as well?

12       A.    Not in all cases, no.  In some cases they overlap

13   each other and there may be welders and painters or welders

14   and carpenters; welders and hydraulics working together on

15   the same item.

16       Q.    Why don't you take a minute and look at those

17   documents and tell me if you can identify the work number

18   that Mr. Naranjo was working on at the time of the accident.

19       A.    What's the date again?

20       Q.    July 7th.  Why don't we go back and move this thing

21   along.

22           Mr. Henderson, we're now back on the record.

23           Let me ask you first:  Before I ask you some

24   additional questions about the documents, does Bradford keep

25   separate files on particular vessels that they're worked on?

```
1      A.   Yes.

2      Q.   For instance, if we were to make request for

3   documents pertaining to the Souvenir, somebody could go to

4   the place, at Bradford, and pull out a file pertaining to

5   work that Bradford has done to the Souvenir?

6      A.   Again, depending on how long they kept it, yes.   If

7   I may again?

8           This they can print out for you (indicating), the

9   same thing.

10     Q.   In the chronology that we've been taking about?

11     A.   Yes.

12     Q.   So that's in your computer system?

13     A.   That's correct.

14     Q.   So that would tell us really - it would give us

15  chronology of the days that people from Bradford worked on

16  both?

17     A.   That's correct.

18     Q.   It will tell us when the employees worked on the

19  boat?

20     A.   That's correct.

21     Q.   It will tell us what they did?

22     A.   Yes.

23     Q.   And their identification numbers?

24     A.   Item numbers, job numbers; yes.

25     Q.   Is there any -- and the cost?
```

1     A.    Yes.

2     Q.    You've had a chance to go look through this file to

3  determine, to try to determine the work number that Mr.

4  Naranjo was working on July 7th of 1997, were you able to

5  pinpoint a work number?

6     A.    No, I was not.

7     Q.    It's been suggested that obviously Mr. Naranjo was

8  taken out of the yard before quitting time, might that be a

9  reason why there is no record, at least in these documents,

10 of the work number that he was working on?

11    A.    It's a possibility.

12    Q.    Do you know of any way, sitting here today, that we

13 can determine the work number that he was working on at the

14 time of the accident?

15    A.    I would feel there would be a way, yes.

16    Q.    And how would we do that?

17    A.    I, again, would ask for printout, as you have here,

18 with the missing numbers that you do not have.

19        MR. FAMULARI:  Can we go off the record for a

20     second?  I might be able to help you.

21        MR. WEBER:  We're off.

22        (Whereupon, a conversation was held off the record.)

23 BY MR. WEBER:

24    Q.    Mr. Henderson, there are documents in the file that

25 were produced to us that you had a chance to review, that

1   depicts or reflects repairs done as a result of the

2   explosion; is that correct?

3       A.   Yes.

4       Q.   Based on your review of the documents that I have

5   given you today, do you believe that these documents are

6   complete?

7       A.   No.

8       Q.   Why not?

9       A.   There are numbers missing.  Numbers from 81 to 127.

10  As I sit on the table here, are non-existent.

11      Q.   The numbers you're talking about are work numbers?

12      A.   Job identification numbers, yes.

13      Q.   There are job identification numbers between 1 and

14  81?

15      A.   That's correct.

16      Q.   There are none, at least in the documents produced

17  to us, between 81 and is 127?

18      A.   In these piles, there is none.  There is on his.

19           MR. HILL:  This is another part of that set here?

20           THE WITNESS:  You had them.

21           MR. HILL:  So it looks like there's additional

22        documents here.

23  BY MR. WEBER:

24      Q.   All I'm trying to do is determine the work number he

25  was working on.   One of the problem is nothing is in

1    sequence here.  You have double copies of this?

2       A.   July 7th is '97, 902, brackets for a tool box.

3    Item 99

4       Q.   I'm showing you what's been marked for this

5    deposition as Number - Exhibit Number Eight?

6            What is that, Sir?

7       A.   It identifies the job that Henry was working on July

8    7th of '97.

9       Q.   What job was he working on?

10      A.   The item number was 99; fabricate and install

11   brackets for tool box as directed.

12      Q.   Install fabricate brackets?

13      A.   For tool box as directed.

14      Q.   That would indicate that description that somebody

15   directed him to do that?

16      A.   That's correct.

17      Q.   Do you know who?

18      A.   No.

19      Q.   Is there a way to find out?

20      A.   There would be one of two people or three people

21   that would have told him to do it.

22      Q.   Who would they be?

23      A.   Mark Tortora, the welding foreman at the time.

24   Like I said, I'm not sure who it was.   And the captain.

25      Q.   Is there a job order in this packet of materials

1      that would correspond to Number 99?

2          A.    I'm sure there is.

3              MR. KALLEN:  Can I see that Exhibit, Exhibit?

4      BY MR. WEBER:

5          Q.    Sir, I'm now showing what's been marked as Exhibit

6      Number Nine.  What is that?

7          A.    That's a typed copy of the work order.

8          Q.    That would indicate, about three-quarters of the way

9      down, 99; it says fabricate and install tool box as

10     directed?

11         A.    That's correct.

12         Q.    Do you know if somewhere at Bradford there's the

13     written or handwritten work order for Job Number 99?

14         A.    I do not know if it's there or not.

15         Q.    Who would we ask to find that out, if you know that?

16         A.    Thelma, I do not know her last name.

17         Q.    We would ask Thelma?

18         A.    That's correct.

19         Q.    Who's Thelma?

20         A.    She's in personnel.

21         Q.    She's in the personnel department?

22         A.    That's correct.

23         Q.    If we wanted to get Mr. Naranjo's personnel file,

24     would we ask Thelma?

25         A.    That's correct.

1   Q.   If we wanted get his personal file, would we ask

2   Thelma?

3   A.   That's correct.

4   Q.   Let's go back to this:   An employee who reports to

5   work on any given day, I'm just talking in a general sense,

6   I'm talking about a non-project manager or a non-foreman,

7   all right?

8   A.   Yes.

9   Q.   Let's take a welder or fabricator?

10   A.   Yes.

11   Q.   What's the first thing that employee does, does he

12   usually report to his foreman?

13   A.   At 7:30, when the whistle blows, yes, he reports to

14   the foreman, which is the  --

15   Q.   Will the foreman direct that particular person to a

16   particular job number?

17   A.   If it's a new job to him.

18   Q.   Is there any way for us to tell if 99 was a new job

19   on July 7th of 1997?

20   A.   You can tell if he worked on a job prior to that

21   date, yes.

22   Q.   How can you tell that?

23   A.   The job began on the 27th of June, the tool box

24   bracket, he apparently worked on it on the 27th for five

25   hours.

1          Somebody else also fabricated -- because they broke

2      for tool box on remaining date, they took material and broke

3      it on a machine.

4          He also worked on it the 3rd of July of '97.  He

5      fabricated and installed the bracket.  In other words, he

6      started working on that date, he started to install it on

7      that date.

8          On the 7th, apparently he went back and worked two

9      more hours.

10     Q.    You're referring now to Exhibit Number Eight,

11     correct?

12     A.    That's correct.

13     Q.    We now know job 99, on June 27th of '97, is when it

14     started?

15     A.    That's correct.

16     Q.    Because on Exhibit Eight, we see job 98?

17     A.    Ninety eight has no relationship to ninety nine.

18     Q.    I understand that, but what I'm saying  --

19     A.    It's subsequent to; it came after 98.

20     Q.    There won't be any previous pages pertaining to 99,

21     would there?

22     A.    No.

23     Q.    In other words, Exhibit Eight reflects all the work

24     done on job 99?

25     A.    That's correct.

1    Q.   So because it's in chronological order.  We know

2    that was the first job, as we just said, the first work was

3    done on June 27th of '97?

4    A.   That's correct.

5    Q.   It looks like Mr. Naranjo himself worked on that

6    job?

7    A.   There was another employee that was worked on and

8    was billed to the job.

9    Q.   Well, Mr. Naranjo is 09002, right?

10   A.   That's correct.

11   Q.   So he actually worked on the job first?

12   A.   That's correct.

13   Q.   On the "material" section, what does that tell you

14   about material that he did?

15   A.   He bought -- he had stainless steel bolts and

16   screws.  Some aluminum angle and some flathead screws.

17   Q.   Not on the 27th of June?

18   A.   On the 27th of June he bought it, he had screws and

19   bolts.

20   Q.   Then on the 30th of June, 1997, what did he buy?

21   A.   Roundhead, stainless steel machine screws.

22   Q.   What about the 7th of July?

23   A.   1" by 1" by 3", aluminum and  --

24   Q.   And also on that date he bought more things?

25   A.   Flathead stainless steel machine screws.

```
 1        Q.    What does it tell about the labor that Mr. Naranjo
 2   did on the 27th of June?
 3        A.    He was doing something with the tool box bracket.
 4        Q.    Do you know what?
 5        A.    Not particularly, no.
 6        Q.    Does this give you insight as to whether he was
 7   fabricating anything?
 8        A.    No.
 9        Q.    That was June 27th.
10              Then on July 3th it appears he performed more labor?
11        A.    No -- yes, it does.  Him and someone else.
12        Q.    All right.  What does it show?
13        A.     It shows that they were shaping something for the
14   box, bending plating.   "Break for the tool box" means that
15   they broke something in a machine to form it to a shape and
16   it also says fabricate and install.
17        Q.    Fabricate and install bracket?
18        A.    That's correct.
19        Q.    This is on July 3rd f 1997?
20        A.    That's correct.
21        Q.    That's under Mr. Naranjo's number?
22        A.    Yes.
23        Q.    Then on the 7th of July of '97, it shows Mr.
24   Naranjo's number, correct?
25        A.    That's correct.
```

1     Q.    And it says bracket for tool box?

2     A.    That's correct.

3     Q.    What does that tell you, if anything?

4     A.    He was still on that same job.

5     Q.    And then it appears that on July 30th, which is some

6     three weeks later, that's the last entry?

7     A.    That's correct.

8     Q.    What does that say?

9     A.    Make bracket for tool box.

10    Q.    9009 is the worker number on that?

11    A.    That's correct.

12    Q.    Do I take it then this particular job ended on July

13    30th of 1997?

14    A.    That's correct.

15    Q.    So backing up, when Mr. Naranjo reported to work on

16    July 7th of 1997, this wasn't a new job?

17    A.    Not to him, no.

18    Q.    Would it be your experience that he would have,

19    based on your experience in working in this particular yard,

20    would it be your best estimate that Mr. Naranjo would have

21    reported to his foreman on that day?

22    A.    Yes.

23    Q.    How come?

24    A.    Because job assignments change daily.

25    Q.    So is it fair to state that employees almost always

1    report to their foreman?

2        A.    Yes.

3        Q.    Right away, in the morning?

4        A.    Yes.

5        Q.    When they report to work, when whistle blows?

6        A.    Yes, the whistle blows at 7:30.

7        Q.    And you don't know sitting here today who his

8    foreman was?

9        A.    I do not, no.

10       Q.    Would it be the customary practice that the foreman

11   would tell him what to do?

12       A.    That's correct.

13       Q.    Would it be customary, in your experience - in your

14   experience that in the middle of a job that working, like

15   Mr. Naranjo, that he would have any contact with the captain

16   or the owner?   Do you understand my question?

17       A.    Not really --

18       Q.    Let me try it this way:  If I understand your

19   testimony, Sir, it's not uncommon for an owner or captain to

20   tell somebody, a foreman or a project manager, about

21   something that he might want done initially; is that

22   correct?

23       A.    That's correct.

24       Q.    But once that job is started, is it common, in your

25   experience, for either the foreman or any of the workers to

1    have any contact with the captain or the owner?

2        A.    The foreman, yes.  The worker, no.

3        Q.    So if we look at Job Number 99, by July 7th they're

4    already a couple of weeks into this job, correct?

5        A.    As far as time goes, yes.

6        Q.    Would it be common, in your experience for example,

7    for Mr. Naranjo to have any direct contact with either the

8    owner or the captain, let's say, on July 7th?

9        A.    No.

10       Q.    That would not be common?

11       A.    No.

12       Q.    My statement is correct?

13       A.    That's correct.

14       Q.    Would it be common for somebody like Mr. Naranjo to

15   have any direct contact with the captain or the owner back

16   on June 27th of 1997?

17       A.    It's not common, no.

18       Q.    But if a worker, such as Mr. Naranjo, was going to

19   have any contact with the captain, it would probably be

20   earlier in the job rather than later; is that a fair

21   statement?

22       A.    No.

23       Q.    That's not at fair statement?

24       A.    No.

25       Q.    Do I take your testimony to be that it's simply not

1    common at all for a worker, such as Mr. Naranjo, who's a

2    welder or fabricator to have any direct contact with the

3    owner or captain?

4        A.    It's not common.

5        Q.    Is it the responsibility of the foreman in the

6    welding department to make sure that all of the welders and

7    or fabricators are at their job and working?

8        A.    Yes.

9        Q.    Is it the responsibility of the welding foreman to

10   make sure that the workers understand the job that they're

11   to do?

12       A.    Yes.

13       Q.    That they understand the work order?

14       A.    Yes.

15       Q.    That's information that's passed from the foreman to

16   the worker?

17       A.    That's correct.

18       Q.    So the worker knows how to keep track of his time?

19       A.    That's correct.

20       Q.    And when a worker is done with his job, then he does

21   what; does he fill out a slip?

22       A.    When a worker is done, if he's a good employee,

23   he'll come directly to the foreman and tell him he's done.

24   He'll fill a sheet out at the end of the time, the time

25   sheet for whatever time he's done on that job.

1    Q.    The worker will do that?

2    A.    That's correct.

3    Q.    Then the worker submits that sheet to somebody?

4    A.    Yes, the foreman.

5    Q.    Then it will be up to the foreman to sign another

6    job to that person?

7    A.    That's correct.

8    Q.    And I take it that the foreman gets his direction

9    from you?

10    A.    The project manager or myself, yes.

11    Q.    Are all these things that we've been taking about in

12    terms of work orders and workers understanding their jobs

13    and reporting to a foreman; are there written policies at

14    Bradford that instructs employees what to do?

15    A.    No.

16    Q.    This is something they learn hands-on?

17    A.    Yes.

18    Q.    They're told that when they start to work initially?

19    A.    They're explained the system, yes.

20    Q.    Are there any policies and procedures, I'm talking

21    about written policies and procedures, governing the conduct

22    of - governing a welder's conduct; the welders at Bradford?

23    A.    Conduct meaning?

24    Q.    It's a vague word.

25          Let's suppose a welder's going to weld in a

1    particular area.  Are there any written policies and

2    procedures which would govern how the welder works in any

3    given area?

4        A.    There's O.S.H.A. procedures.

5        Q.    Other than O.S.H.A. procedures, does Bradford Marine

6    have any written policies and procedures?

7              Do you know if Bradford Marine had any written

8    policies and procedures back in July of 1997?

9        A.    No, I do not know.

10       Q.    You do not know?

11       A.    No.

12       Q.    Have you ever seen any written policies and

13   procedures dating back to that time?

14       A.    No.

15       Q.    Have you talked to anybody as to whether there were

16   written policies and procedures dating back to that time?

17       A.    No.

18       Q.    Who would we ask to determine that?

19       A.    Mark Tortora.

20       Q.    The O.S.H.A. procedures that you've been talking

21   about, what specifically have you been taking about?

22       A.    O.S.H.A. covers every safety factor in all

23   industries in a vague, wide area of how you're supposed to

24   be check before burning; how you're supposed to walk up a

25   ladder and enter a boat and everything; so you have it right

1    there.

2        Q.    Now, you already told me that you don't test your

3    employees on any particular regulations; isn't that correct?

4        A.    That's correct.

5        Q.    That would include O.S.H.A. regulations, is that

6    correct?

7        A.    That's correct.

8        Q.    And do you test your project managers on O.S.H.A

9    regulations?

10       A.    No, we do not.

11       Q.    You, as Superintendent of the yard, have you ever

12   been tested on O.S.H.A. regulations?

13       A.    Tested, no.

14       Q.    Do you have any seminars why were you sitting with

15   fabricators or welders and teach them O.S.H.A. regulations?

16       A.    No.

17       Q.    That's something, again, they simply pick up by

18   experience, by working in the yard?

19       A.    Yes.

20       Q.    You don't have testing of them from time to time to

21   figure which O.S.H.A. rules they know and which O.S.H.A.

22   rules they don't know?

23       A.    No, we do not.

24       Q.    Do you know what the O.S.H.A. regulations call for

25   in terms of venting a space before welding?

1    A.    Word for word, no.

2    Q.    Do you know generally?

3    A.    Yes.

4    Q.    What is that?

5    A.    Venting? Ventilation?

6    Q.    What are the regulations?  What do the regulations

7    call for?

8    A.    What type of area are we talking about?

9    Q.    We're talking about an area like the kind of area

10   that Mr. Naranjo was working in at the time of this

11   accident.

12   A.    The venting of the area, that area would be minimal,

13   it was on open area.  The requirement for that area would

14   be to make sure there was oxygen in the space, oxygen in the

15   space, the lazarette.

16   Q.    It would be your testimony here today when a welder

17   would be - before welding in a space such as the space that

18   Mr. Naranjo was working in just prior to this accident, that

19   no venting would be required?

20   A.    Only for exhaust to eliminate smoke build up.

21   Q.    There would be no necessity of venting for any type

22   for toxic, flammable or combustible gases?

23   A.    There was none known at the time.

24   Q.    I understand that.  My question is not whether any

25   were known at the time.

1          My question is this:  Do you know of any O.S.H.A.

2     regulations that would require venting of a space, such as

3     the one occupied by Mr. Naranjo, just prior to this accident

4     for any toxic, flammable or combustible gases?

5          A.   No, I don't know any rules that require a space to

6     be ventilated.

7          Q.   If there were such a regulation, whose

8     responsibility would it be to vent that area?

9          A.   It would be --

10              MR. FAMULARI:  Object to the form.  Go ahead.

11    BY MR WEBER:

12         Q.   You may answer.

13         A.   Could you repeat the question again, please.

14         Q.   Who's responsibility would it be to vent the ara, in

15    the event that O.S.H.A. regulations called for the venting

16    of an area, who's responsibility would it be?

17         A.   It would be the employee.

18         Q.   That would be, in this case, Mr. Naranjo?

19         A.   That's correct.

20         Q.   The welder or fabricator?

21         A.   That's correct.

22         Q.   Would it be up to the foreman to give any input in

23    that circumstance in your opinion, Sir?

24         A.   He would make a determination if it needed to be,

25    yes.

1    Q.    All right.    So let me make sure I understand your

2    answer.

3         Let's use the situation that we have here, where

4    somebody is welding in the lazarette area, where this

5    particular explosion occurred, or this accident occurred.

6         Is it your testimony that the welding foreman would

7    make the initial determination as to whether any venting for

8    any flammable or combustible gases.

9    A.    It would be his determination at first, initially,

10   to determine whether venting would be required.

11   Q.    How about testing?

12   A.    In that area, no.

13   Q.    Is there any requirement, to your knowledge, for

14   testing for the presence of such gases?

15   A.    In that area, no.

16   Q.    Why not?

17   A.    Because it's an open area.

18   Q.    Is it your testimony today then that testing is only

19   required for --

20   A.    Enclosed spaces.

21   Q.    If testing was required - let's say, it was an

22   enclosed space, is that the foreman's duty to test it or the

23   welder's duty, or both?

24   A.    It would be a competent person's duty to do so.

25   Q.    Pardon me?

1    A.    It would be up to a competent person.  A person who

2    has been trained by a marine chemist, to certify that it's

3    for entry or safe for fire, meaning hot work.

4    Q.    Do you have such competent people at your yard?

5    A.    Yes.

6    Q.    I heard the term "shipyard competent person"; have

7    you heard that term?

8    A.    Yes.

9    Q.    What does that mean to you?

10    A.    Exactly that, a person has been trained by a marine

11    chemist to certify it safe for fire, safe for entry.

12    Q.    And "entry", means what?

13    A.    Meaning that the space would have oxygen to support

14    life.

15    Q.    Well, what about "safe for welding"?

16    A.    That's safe for fire, that's it.

17    Q.    Who's a shipyard competent person at Bradford Marine

18    today?

19    A.    Mike Garillo.

20    Q.    Can you spell his name?

21    A.    I don't know his last name.

22    Q.    Garillo?

23    A.    Garillo.

24    Q.    Is he the only one?

25    A.    No,  -- here we go again. Dale Rampersad,

1    R-A-M-P-E-R-S-A-D.

2        Q.    He's the welding foreman?

3        A.    No, Dale is not.  Dale's a welder fabricator, he

4    happens to be Harry's brother.

5        Q.    Any other shipyard competent person's?

6        A.    Myself, I have been qualified in the past.

7        Mark Tortora has been qualified in the past.

8        Q.    How do you become a shipyard competent person?

9        A.    Classes are given by a marine chemist to explain the

10   rules.

11       Q.    What rules?

12       A.    O.S.H.A.

13       Q.    When did you take your classes?

14       A.    '76.  '83 and '92, I believe.

15       Q.    Let me make sure I've got this straight:  We have

16   Mark Tortora, Mark Grillo , Dale Rampersad, and yourself.

17       Are there any other shipyard competent person's in

18   the yard?

19       A.    Not to my knowledge.

20       Q.    Do you know if you had any shipyard competent

21   person's at Bradford Marine on July 7th of 1997?

22       A.    Mark Tortora and myself.

23       Q.    Those are the only two?

24       A.    Yes.  That I know of, yes.

25       Q.    Just so  -- I want to make sure I understand what

1    your understanding is.

2         Your understanding is you don't need to test for

3    flammable or toxic gases unless you're in an enclosed area

4    or known area that contains flammable gases?

5    A.   Yes.

6    Q.   Is it your opinion that no such testing was required

7    here before Mr. Naranjo began his work?

8    A.   I do not know that.

9    Q.   You don't have an opinion one way or the other?

10   A.   I really don't know the situation or the condition

11   of the area except that it's a lazarette.

12   Q.   So you have never taken look at this area for the

13   purposes of determining whether any such testing should have

14   been done prior to Mr. Naranjo starting his work?

15   A.   No.

16   Q.   My statement is correct?

17   A.   That's correct.

18   Q.   And your of the opinion that no venting was required

19   unless you're in an enclosed area; is that correct?

20   A.   That's correct.

21   Q.   Again, this is your understanding of the O.S.H.A.

22   rules?

23   A.   Yes.

24   Q.   The O.S.H.A. regulations?

25   A.   Yes.

1    Q.   And have you made any independent investigation,

2    yourself, of the area to determine if any venting should

3    have been done prior to Mr. Naranjo starting his work?

4    A.   Yes.

5    Q.   And what was your conclusion?

6    A.   Venting wouldn't be required except for the removal

7    of the exhaust fumes or smoke.

8    Q.   Was there a mechanism to remove exhaust smoke before

9    Mr. Naranjo did his job?

10   A.   I believe there was.

11   Q.   What was that called?

12   A.   A blower.

13   Q.   Do you know what a "Multi-Gas Tester" is or a

14   "Sniffer" is?

15   A.   Yes.

16   Q.   What is it?

17   A.   It's a gauge that tells you the oxygen level and or

18   combustion reading of an area.

19   Q.   Do you have these devices at Bradford Marine today?

20   A.   Yes.

21   Q.   When did you get them?

22   A.   I don't recall.

23   Q.   Do you know if they were any on the premises at the

24   time this accident took place?

25   A.   I do not believe so.

```
 1        Q.    Do you know if you have these today because of this
 2   accident?
 3        A.    I believe it has a play in it, yes.
 4              MR. KALLEN:  It has what?  I'm sorry.
 5              MR. WEBER:  It has a direct relation to it?
 6              THE WITNESS:  Yes.
 7   BY MR. WEBER:
 8        Q.    It might not be the only reason but it was one of
 9   the factors?
10        A.    Correct.
11        Q.    How many do you have?
12        A.    One.
13        Q.    How much are they, do you know?
14        A.    A few hundred dollars.
15        Q.    Do you need to have any type of expertise to run one
16   of those?
17        A.    You have to be trained, yes.
18        Q.    Who's trained at the yard, currently, to run a
19   multi-gas tester?
20        A.    Mark Grillo, Dale Rampersad, myself and Mark
21   Tortora.
22        Q.    They're all shipyard competent person's?
23        A.    That's correct.
24        Q.    And do they take a lot - a long time to run?
25        A.    No.
```

1    Q.    For instance if you want to check a particular area,

2    how big -- strike that?

3         How big is this machine?

4    A.    Three by nine.

5    Q.    And you carry it in your hand?

6    A.    Yes.

7    Q.    And if you wanted to check, for instance, this room

8    that we're sitting in for this deposition, if you wanted to

9    check this room, how would you do it?

10   A.    Simply by turning the machine on and it would tell

11   me the oxygen again level in the room.

12   Q.    Would it tell you if there were any toxic gases

13   present?

14   A.    Only if I changed it to combustible.

15   Q.    If you did that, how long would it take to

16   determine, to determine if there was combustible gases in

17   the room?

18   A.    Probably 15 seconds.

19   Q.    It's pretty easy to operate?

20   A.    Yes.

21   Q.    It doesn't take long to the get the results?

22   A.    No.

23   Q.    My statement is correct?

24   A.    That's correct.

25   Q.    I just want to make sure, I don't want to belabor

1     this and I'll move on.

2          The determination whether to use the tester to get

3     the reading about the presence of toxic gases or combustible

4     gases, that the foreman's duty?

5     A.    Yes.

6     Q.    Is it the worker's duty, in your opinion?

7     A.    Yes.

8     Q.    It's both of their duties?

9     A.    Yes.

10          MR. FAMULARI:   Object to the form.

11    BY MR. WEBER:

12    Q.    That's part of the foreman's job description or job

13    -- I understand it's not written, but that's part of his job

14    duties?

15    A.    That's correct.

16    Q.    That's part of welder's duties too; isn't that

17    correct?

18    A.    That's correct.

19    Q.    If somebody were to tell a welder, somebody, not a

20    foreman, somebody not associated with the yard, that it's

21    okay to weld, in your experience should a welder just

22    believe that?

23    A.    No.

24    Q.    They should make an independent investigation,

25    shouldn't they?

1    A.    That's correct.

2    Q.    Have you given any written statements concerning

3    this particular accident to anybody?

4    A.    No.

5    Q.    I told you that we're here today to talk about this

6    accident that occurred on July 7th of 1997.

7         Where were you when this accident happened?

8    A.    In my office.

9    Q.    And your office is located where relative to where

10   the accident took place?

11   A.    It's approximately 50 yards east and 70 yards south.

12   Q.    So I take you did not witness the accident?

13   A.    I did not.

14   Q.    Everything that you have learned about how the

15   accident happened, you learned from other people?

16   A.    That's correct.

17   Q.    You said you were sitting in your office.

18        What happened?

19   A.    I heard an explosion.

20   Q.    What did you do then?

21   A.    I came out of my office to find the location.

22   Q.    Did you find the location?

23   A.    Yes.

24   Q.    Did you proceed to the cite?

25   A.    Not all the way, no.

1    Q.    Where did you go?

2    A.    I stopped outside the machine shop.

3    Q.    Why?

4    A.    There was too many people already there.

5    Q.    What happened then?

6    A.    I waited and found out what happened.

7    Q.    Who told you?

8    A.    I don't remember who it was.

9    Q.    Did you do anything further yourself?

10    A.    No.

11    Q.    Did you, by "you" I mean either you, personally, or

12    anybody at Bradford Marine, perform any independent

13    investigation as to how this accident occurred?

14    A.    I believe Mark Tortora did.

15    Q.    Did he write up any type of report?

16    A.    I believe he did.

17    Q.    Who was in charge of reporting these things to

18    Longshoreman's Carriers Insurance Company, things like that?

19    A.    I'm not sure.

20    Q.    It's not you?

21    A.    It's not me.

22    Q.    On the day of the accident, you waited outside the

23    machine shop, you found out what happened, did you back to

24    yourself then?

25    A.    Yes.

```
 1        Q.    Did you have any more involvement, yourself, with

 2   respect to this accident on the day of the accident?

 3        A.    Only the discussion with Mark Tortora.

 4        Q.    And when did you have this discussion?

 5        A.    After he was finished with his investigation that

 6   afternoon - that evening actually.

 7        Q.    What did he tell you?

 8        A.    His explanation was there was an explosion.  Henry

 9   got hurt.  We don't know why we had an explosion or what.

10        Q.    And he reported that to you that same day?

11        A.    We discussed it.  He didn't come to report anything,

12   we just had a discussion.

13        Q.    This accident happened at 3:00 or 3:30 in the

14   afternoon, is that right?

15        A.    I don't know.  I don't recall.

16        Q.    So you would have discussed this with Mr. Tortora on

17   the same day?

18        A.    The same day; that same evening.

19        Q.    Now, did you talk with anybody subsequent to that

20   day about the accident?

21        A.    That was all the discussion was that day, after

22   that.

23        Q.    What about the days or weeks after this accident,

24   did you learn anything more about how the accident happened?

25        A.    Yes.
```

1    Q.    What did you learn?

2    A.    I understand that there was a void area, what we

3    would call a "false bottom" in the lazarette that was

4    unknown to us at the time and apparently concrete was poured

5    underneath that false bottom and there was a void or space

6    between the concrete and that bottom.

7    Q.    Some sort of toxic gas or combustible gas got in

8    there, is that your understanding?

9    A.    That would explain how it exploded, yes.

10   Q.    Do you know what type of combustible gas got in

11   there?

12   A.    No.

13   Q.    Do you know today?

14   A.    No.

15   Q.    Do you have any idea at all?

16   A.    No.

17   Q.    Do you ever -- strike that.

18         Before going to Bradford, were you in the marine

19   business?

20   A.    Yes.

21   Q.    For how long?

22   A.    Before Bradford?    Twenty years.

23   Q.    Where did you work?

24   A.    Bethlehem Steel, Key Highway in Baltimore.    Precar

25   Marine, Port Everglades.

1    Q.    Have you ever encountered an experience, over the

2    years, an explosion like this?

3    A.    Yes.

4    Q.    You have?  Where?

5    A.    Bethlehem Steel.

6    Q.    Tell me about that.

7    A.    Which one?

8    Q.    I mean, I'm talking specifically on a vessel like

9    this?

10    A.    Specifically on a vessel?

11    Q.    Let me give you the parameters.

12         Where somebody is welding in a place on a boat and

13    something explodes, have you encountered that?

14    A.    Yes.

15    Q.    Give me the most recent example before this.

16    A.    Double bottom of a tanker.

17    Q.    Tell me about that.  What happened?

18    A.    Apparently the employee was welding a hole in the

19    tank top and the tank exploded.

20    Q.    Okay.  A tanker.  Tell me what a tanker is?

21    A.    A tanker carries bulk fuel or liquid cargo.

22    Q.    This is a boat?

23    A.    No, this is a ship.

24    Q.    And I do understand that the tanker -- the employee

25    was actually welding something on top of the tank itself?

1    A.    Yes.

2    Q.    And the tank exploded?

3    A.    Yes.

4    Q.    The tank carries fuel?

5    A.    The tanker carries fuel.

6    Q.    Did it have fuel in it at the time?

7    A.    No.

8    Q.    Have you ever encountered a situation where somebody

9    was welding on a floor, or a false floor of a vessel, where

10   the floor actually buckled up like this?

11   A.    No.

12   Q.    I mean, I understand that explosions happen when

13   people weld around things, whatever it might be.

14         In your experience, has anything like this happened

15   with a floor of a vessel?

16   A.    No.

17         MR. WEBER:  Why don't I pass it on.

18                        DIRECT EXAMINATION

19   BY MR. KALLEN:

20   Q.    I represent Stephen Smith who owned the vessel at

21   the time.  I'll try not to repeat the questions that were

22   already asked but it may be unavoidable.  Just to put

23   everything in perspective:  When this vessel, ship or boat

24   or however you want to classify it, first came into the yard

25   at Bradford, were you, at the time, were you the Yard

1    Superintendent?

2    A.    I don't believe so.

3    Q.    Were you involved in any way with putting together

4    the bid for the work to be done on this vessel?

5    A.    Some of it.

6    Q.    Did you meet with Stephen Smith?

7    A.    No.

8    Q.    Did you meet with the captain?

9    A.    Occasionally.

10    Q.    That was relative to putting the bid together?

11    A.    Yes.

12    Q.    And discussing the type of work to be done that the

13    owner wanted?

14    A.    Some of it, yes.

15    Q.    Does document that was presented to you today

16    contain the actual bid that was submitted to the owner?

17    A.    The bid.  Some of them.  I believe so.

18    Q.    Okay.  I'm more concerned with the initially?

19    Let me ask you this:  Going back to square one and

20    maybe we can generalize.  Maybe you can specify or tailor it

21    down to this particular situation.

22    The vessel owner contacts Bradford with a project to

23    be performed on the boat that everyone pretty much knows

24    will take a couple of months.  So it's maybe a routine job

25    to Bradford, but it obviously it involves extensive work,

1    retro fitting, replacement, structural changes; that type of

2    thing.  Do you follow me so far?

3        A.    Yes.

4        Q.    That's the type of work that Bradford does quite a

5    bit of?

6        A.    Yes.

7        Q.    At Bradford, personally whether it's you or some

8    other people involved in the bidding process, they will sit

9    with the owner and or his captain and discuss the nature of

10   the work that he wants to have done?

11       A.    That's correct.

12       Q.    And based upon the nature of the work that the owner

13   wants to have done, Bradford can then pretty much formulate

14   what it will cost the owner?

15       A.    That's correct.

16       Q.    And that formulation will take the form of some type

17   of contract, proposal or bid?

18       A.    That's correct.

19       Q.    And we have that in the file in front of us?

20       A.    You don't, no.  How many do you have?   I haven't

21   seen them all.

22       Q.    In this situation there may have been more than one

23   proposal?

24       A.    Oh, yes.

25       Q.    In other words, an initial proposal is made.  The

1    captain or owner makes the proposed changes, and Bradford

2    works with the owner and they modify the bid and submit it?

3         A.    They add to it, yes.

4         Q.    Or add to it.  Okay.

5              But ultimately, for example, in this case since we

6    know Bradford got the job, some type of final form or

7    contract was executed between the parties in order for

8    Bradford to get an authorization to proceed with the work?

9         A.    Oh, yes, definitely.

10        Q.    Do we have that in the file?

11        A.    You have a handwritten contracts or bids that were

12   offered to the captain.

13        Q.    Right?

14        A.    Or the owner with their price to do certain

15   particular jobs.

16        Q.    Okay.

17        A.    -- an overview.  I don't believe you have that.

18        Q.    Would the overview be somewhere in the Bradford

19   Marine file?

20        A.    If there is one.

21              If I may?  Most ships come into the yard to do

22   painting; that's the biggest part of the contract, that's

23   normally the first given contract.

24              An overview of everything is not done in one form or

25   paper.   Contracts would be done on individual forms, from

1    individual departments.

2        If the owner came in and sat with myself and Mr.

3    Mark Tortora and said, look, I want to change the plumbing,

4    modify the cockpit, I want to put the steps in, put the fly

5    bridge up and put a new mast; every one of these would have

6    been breaking down into a single item and given to him to

7    say --

8        Q.    And, of course, during the course of the work that

9    is performed, there's always add ons and changes?

10       A.    That's correct.

11       Q.    And that type of thing.   Given your involvement in

12   this project, I'm not saying it was extensive or limited,

13   I'm not characterizing it in any way, can you give us,

14   basically, a summary of what you believe an overall project

15   was for the Souvenir would have been; was it a large

16   project?

17       Basically, without obviously going into all the

18   details, because we have voluminous pages, what was done

19   basically, what was being done to the boat?

20       A.    The cockpit deck was modified.   The cabinetry in the

21   cockpit was modified.    The equipment was removed and

22   changed into the cockpit.

23       Windows were renewed.   I believe sliding doors were

24   done.   I believe the mast was modified.   Paint work was

25   done.   In general, yeah, overall that's basically a lot of

1    it.

2        Q.    It was a large project?

3        A.    Yes.

4        Q.    Just from your review of the paperwork in front of

5    you, or perhaps your independent recollection, can you give

6    me an idea of what the anticipated time involved was for

7    this project?

8            In other words, once you came in when it was

9    anticipated, how long was the project was expected to take?

10       A.    I don't have any recollection.

11       Q.    In other words, was it going to be a two-month

12   project, a three-month project, four months?

13       A.    I believe longer than - more than three months.

14       Q.    A good part of that time vessel would be out of dry

15   dock, out of the water?

16       A.    I don't believe so.  I believe most it have was done

17   in the water.

18       Q.    Now, before a project like this is done, especially

19   given the nature and scope of it, with the structural

20   changes that would have been done and this won't be the

21   first type of project that Bradford did; is that correct?

22       A.    That's correct.

23       Q.    Bradford has done many of these, correct?

24       A.    Correct.

25       Q.    Did Bradford, at the time, make it a practice to ask

1    for plans and blueprints of the both?

2        A.    Depending on what had to be done.

3        Q.    What about in this instance, based upon your

4    knowledge with what was being done and had to be done, do

5    you know whether Bradford did, did in fact, ask for

6    blueprints and plans?

7        A.    I don't know if they did and I don't know if there

8    would have been reason for one, separate from the windows.

9              What my knowledge of everything that was done was

10   discussed between the captain and Mark Tortora taking the

11   seating out and the seating - take out this hatch and change

12   this hatch and so on.

13       Q.    Okay.  Let me ask this:  In fact, did Bradford ask

14   for the plans and blueprints?

15       A.    I do not know that.

16       Q.    Who would know that?

17       A.    I believe Mark Tortora.

18       Q.    Was Mark Tortora the Project Manager for this work?

19       A.    Yes, he was.

20       Q.    In other words, he was the overall responsible

21   person to see that this work got done correctly and

22   satisfied the owner?

23       A.    Yes, he was.

24       Q.    And, of course, above Mark was you to make sure

25   basically to make doubly sure that everything got done?

```
 1      A.    That's correct.

 2      Q.    But Mark was the guy?

 3      A.    He was the on-line supervisor.

 4      Q.    Below Mark would be in contact with various foremen

 5   of the departments involved in the work?

 6      A.    That's correct.

 7      Q.    Whether it be welding, painting, machinery; they

 8   would all report to Mark?

 9      A.    That's correct.

10      Q.    And Mark, in turn, would report to you?

11      A.    That's correct.

12      Q.    Does Bradford pay a welder more because he is A.B.S.

13   Certified?

14      A.    No.

15      Q.    Have you ever worked as a welder?

16      A.    Yes.

17      Q.    Where?

18      A.    Bethlehem Steel, Key Highway.

19      Q.    And how many years ago; just give me an idea?

20      A.    How many years ago?

21      Q.    Yeah.

22      A.    Twenty five.

23      Q.    Okay.   I'm sorry, I know I asked you this:  Did you

24   discuss with Stephen Smith about this project?

25      A.    I did not speak with Stephen Smith.
```

1    Q.    But you did speak with the captain from time to

2    time?

3    A.    From time to time, yes.

4    Q.    At the outset and during the course of the project?

5    A.    Yes.

6    Q.    Now you made a comment before and I would like to

7    pick up on that.  During the course of the project, based

8    upon your experience, I'm sure this situation was no

9    different, either the captain or owner will come and want

10    something new, and say, hey, you, now let's do this, in

11    addition; is that a fair statement?

12    A.    Yes.

13    Q.    If that occurs, the captain -- if this occurs, I'm

14    sure they're told to contact Mark or someone at Bradford,

15    and say, look, if you have any changes, recommendations,

16    complaints; here's the guy that you see, is that basically

17    the way it works?

18    A.    That's correct.  Right.

19    Q.    In this case, the project manager would be Mark, so

20    the captain would have been told if you want something else

21    done, go talk to Mark?

22    A.    That's correct.

23    Q.    Maybe from time to time if Mark's not around, he

24    might make mention to the foreman, chief of the particular

25    department, who'll pass it on to Mark?

1    A.    That's correct.

2    Q.    Is that fair to say?

3    A.    That's correct.

4    Q.    But under no circumstances would the captain tell a

5    worker what to do?

6    A.    You're exactly right in your statement.  Did it

7    happen?  I don't know if it happened or didn't.

8    Q.    But your workers are also told by their supervisors:

9    You don't take orders from the owners or captains?

10         If you are told or asked to do something by the

11    owner or captain, you go speak to your foreman because

12    you've got to fill out a work order.

13         MR. FAMULARI:  Object to the form.

14    BY MR KALLEN:

15    Q.    Is that fair to say?

16    A.    It's fair to say.

17         MR. SIOLI:  Just to interject really quick.

18         Off the record.

19         (Whereupon, a conversation was held off the record.)

20    BY MR. KALLEN:

21    Q.    Let me rush.

22         Was this a system or policy that Bradford had in

23    place with it's workers and foreman and supervisors that the

24    workers are not to have direct contact with the owners and

25    or captains as far as work to be done written anywhere?

1     A.    It's not written anywhere but it's well-known not to

2   do anything without their foreman's knowledge.

3     Q.    And there's a couple of reasons for that, I assume?

4     A.    Correct.

5     Q.    That's correct one of the reasons would be it would

6   not be in a known particular order, any work that's being

7   done, and Bradford certainly wants to bill for?

8     A.    No.  Accountability.

9     Q.    If the worker's spending time doing something for

10  the captain or owner, Bradford wants to make sure that this

11  gets paid for it?

12    A.    That's correct.

13    Q.    And there's a way of document that and making sure

14  that it's accomplished, which is, have the worker, have the

15  foreman of the department that's going to do the work or

16  have their worker's do the work and fill out a work order?

17    A.    That's correct.

18    Q.    Which is then passed on?

19    A.    That's correct.

20    Q.    And the form is in written form?

21    A.    That's correct.

22    Q.    So we have a paper trail to make sure that Bradford

23  can document everything; and say, look, this is the work

24  that was requested, that's why we're billing for it?

25    A.    That's correct.

1    Q.    Another reason for that policy, I would assume,

2    excuse me, it would be for safety reasons?

3    A.    That's correct.

4    Q.    There maybe a request made by the owner or captain

5    which may involve some risk to the worker, to the property

6    or premises?

7    A.    That's correct.

8    Q.    And that certainly is something that the foreman

9    needs to know about, and you, as the superintendent,

10   absolutely needs to know about?

11   A.    That's correct.

12   Q.    And when you say at the outset part of the yard

13   superintendent's job is to see that the work gets done in a

14   safe manner; that's what you're talking about?

15   A.    That's correct.

16   Q.    So it's not merely a ministerial function, as far as

17   the work order being written out and passed on to your desk,

18   typed out and to make sure that the work described is

19   correctly on it; there's some review involved to make sure

20   of that and you can say, okay, Number One, we can do this

21   work as requested.

22        Number two, here's what it's going to take to make

23   sure that work is done safely; is that fair to say?

24   A.    Yes.

25   Q.    Because I would assume, again, and correct me if I'm

1    wrong, that some work does involve some form of preparation

2    before the work is actually started, preparation in terms of

3    making sure whatever equipment is to be used in calibrating

4    and working properly; the worker is properly outfitted for

5    that particular job, whatever testing has to be done is

6    tested; that type of thing?

7        A.    That's correct.

8        Q.    And that's something that's reviewed as part of the

9    work request, both by the foreman of the department and by

10   you?

11       A.    Yes.

12       Q.    Let's talk about welding jobs in particular, which

13   obviously involved a great deal of risk to a person and

14   property, would you agree?

15       A.    Yes.

16       Q.    Hypothetically speaking, during the course of a job

17   the captain says, you know what, I would like to have this

18   done and that's going to involve some welding; so a work

19   order is proposed?

20       A.    That's correct.

21       Q.    I'm sorry?

22       A.    Yes.

23       Q.    Which is then passed on to you?

24       A.    That's correct.

25       Q.    Now, describe for me the process what is involved,

1    whether it's by another man initially or you subsequently or

2    by the both of you, as to the determination - as to what

3    determination is made for a welding job regarding safety

4    measures to be employed?

5    A.    I can only give you sample also because you're

6    talking about a large variance of things.

7    Q.    Sure.  Give me an example.

8    A.    Let's say you're welding a bracket in the engine

9    room for a pump.

10    Q.    You've got that work order in front of you?

11    A.    That's in front me.  I will look at that.  I will

12    verbally talk to my foreman.  I will say, how does the

13    engine room bilge look?  It's all clear?  Nothing to worry

14    about.  And then I sign off on it.

15        We're safe.  We're okay to go.  Another, for

16    instance, is:  We're going to cut a shelf plate out in the

17    master state room into a fuel tank.

18        If it's a fuel tank, it would be described that tank

19    would be gas-free'd and certified before any gutting of the

20    place.  That will be on the work order.

21        Of course, if it's not, I would obviously tell him

22    then at that point, you forgot something.  You've got to gas

23    free'd that tank and certify it and get a marine chemist in

24    here.  That happens in a second in reviewing these things.

25    Q.    All right.  So you just mentioned an example, which

1    obviously called for the intervention of a marine chemist.

2           So would you agree that certainly you as the

3    superintendent and perhaps to the same degree, the foreman,

4    should have a working knowledge of the O.S.H.A. regulations

5    that's required and the intervention of a chemist.

6    A.    Yes.

7    Q.    So when a particular job request comes in, you know,

8    whether a marine chemist is required or be able to request

9    it?

10   A.    Yes.

11   Q.    Are there instances where you're not sure whether,

12   for example, whether a marine chemist should come in or not?

13   A.    Yes.

14   Q.    What do you in that situation?

15   A.    First of all the question is asked where exactly is

16   the welding taking place?  My next question is:  What is in

17   that area; woodwork, panelling?  Things like that.

18          If that be the case, the marine chemist is not

19   necessary and not within the new regulations; if it's 25

20   feet away from any fuel tank, it doesn't need a marine

21   chemist but you need an inspection and safety for removal of

22   rugs, wood, things like that.

23   Q.    Who would do that inspection in that instance?

24   A.    The foreman.

25   Q.    Would he do that in conjunction with the welder

1    that's going to do the work?

2        A.    Not necessarily, no.

3        Q.    Are there gray areas where you're not sure whether a

4    marine chemist should become involved to do tests or not?

5        A.    If there's a gray area, that's only because of

6    regulations not because of what we see or know.  It's only

7    because of the regulations itself.

8            The regulation states 25 feet.  If I am 24 and a

9    half feet, do I do it or do I not?  The simple answer to

10    that is that we call in a marine chemist and ask his

11    opinion.

12                    CONTINUED DIRECT EXAMINATION

13    bY MR. WEBER:

14        Q.    I should have mentioned this before, but all my

15    questions, unless otherwise indicated, would relate to July

16    7th, 1997, okay?  Which was the accident date.

17            And specifically, my next question is:  Back at the

18    time, did Bradford utilize the services of one or more

19    particular marine chemist?

20        A.    Yes.

21        Q.    Do you know their names off hand?

22        A.    Pete Rumell.

23        Q.    Anyone else?

24        A.    No.

25        Q.    Prior to the date of this accident, July 7th, 1997,

1    had there every been a representation made to Bradford, as

2    far as you know, to purchase and utilize a multi-test gas

3    machine?

4        A.    I believe there was.

5        Q.    Do you know why that suggestion, or recommendation,

6    had not been acted upon prior to July 7th, 1997?

7        A.    No, I do not.

8        Q.    Who's decision would it have been to authorize the

9    purchase of that machine?

10       A.    At the time that I believe there was a request, it

11   would have been Mr. Engle or his prior, whoever was prior to

12   him.

13       Q.    Do you know who made that recommendation?

14       A.    I believe it was Mark Tortora.

15       Q.    Do you recall what the approximate date was in

16   relation to the July 7th, '97, the date that Mr. Tortora had

17   made that recommendation?

18       A.    It would have been some time before that, I believe.

19       Q.    When you say "some time", can you be more specific?

20       A.    A month.

21       Q.    Did he make that recommendation to you or someone

22   else?

23       A.    Someone else.

24       Q.    Were you aware of the representation?

25       A.    Not until after.

1    Q.    Okay.   Going back to '97, did Bradford Marine have

2    a safety department?

3    A.    Yes.

4    Q.    Who was in charge?

5    A.    Mark Tortora.

6    Q.    Who consisted of -- who was part of that safety

7    department?

8    A.    Just Mark Tortora.

9    Q.    And we might as well as refer to Mark Tortora about

10   the workings of the Safety Department, but basically what

11   was his function of the Safety Department?

12   A.    It was to make everybody aware of unsafe things

13   basically.   He has -- I don't know how to answer your

14   question really without a whole lot of explanation.

15        Mark has done a great job with the Safety

16   Department.   He's made big strides but he also had to work

17   to get it started.

18   Q.    When was it started?

19   A.    I believe when he took the position of a Project

20   Manager.

21   Q.    When was that approximately?

22   A.    Roughly, I would say, '95, maybe.   I'm guessing at

23   this.

24   Q.    Did Bradford Marine hold regular safety meetings for

25   its employees?

1       A.    I believe they did at the time.  Then it stopped and

2   picked up again.

3       Q.    What was the frequency of those meetings?

4       A.    I wasn't there at the time.

5       Q.    '97, I mean prior to the accident?

6       A.    I was only there a short time, myself, so I'm not

7   sure before the accident.

8       Q.    Shall we ask Mark?

9       A.    I think Mark would be the better one to ask.  I

10  don't know.

11      Q.    Again, maybe we would defer to Mark on the next

12  question also, but if you know, going back to '97, an

13  employee would be given some type of, when first hired,

14  would they be given any type of employment package, so to

15  speak; materials to review, employee manuals, anything like

16  that?

17      A.    Yes, I believe there was.

18      Q.    What did that consist of?

19      A.    My knowledge of it would be that disciplinary

20  actions as to:  No drinking, things like that.  I don't

21  remember anything of safety being in there, if that's the

22  question.

23      Q.    Yeah, that was going to be my next question,

24  obviously.

25            Has that employment package, I will call it, changed

1    in any way since '97?

2        A.    No.

3        Q.    Would we request what's her name --

4              MR. KALLEN:    Thelma.

5    BY MR. WEBER:

6        Q.    Thelma for a nice employment package?

7        A.    Yes, she would be it.

8        Q.    Okay.    Good.    Are you familiar with the initial

9    fire -- let me get the terms right initially:    National Fire

10   Protection Association?

11       A.    No.

12       Q.    Have you ever heard of it?

13       A.    No.

14       Q.    Down what N.F.P.A. is?

15       A.    I've seen it.

16       Q.    As part of your job?

17       A.    Right or reading some stuff.

18       Q.    Are you aware if any employees of Bradford being

19   members N.F.P.A.?

20       A.    No.

21       Q.    Have you ever seen any of their standards?

22       A.    No.

23       Q.    Do you know what their standards are?

24       A.    No.

25       Q.    As far as standards or regulations governing working

1    at the yard; basically your understanding is something it's

2    O.S.H.A?

3        A.    O.S.H.A., that's correct.

4        Q.    If Henry earlier testified that his boss, or the

5    chief welder as he called him, in this instance was Tony

6    Watson, would you have any reason to disagree with that?

7        A.    No.

8        Q.    Was there more than one foreman, welding foreman?

9        A.    No, it was always one.

10       Q.    There's always one foreman?

11       A.    One foreman and one assistant foreman.

12       Q.    So if it was Tony Watson, as Henry says it was; Tony

13   Watson and there was no other foreman at the time; would you

14   disagree with that?

15       A.    I wouldn't disagree with him, no.

16       Q.    Okay there's no three or four foremen per

17   departments, it's one foreman?

18       A.    One.

19       Q.    Did you know Henry well at all?

20       A.    No.

21       Q.    You wouldn't have daily contact with him, would you?

22       A.    Just --

23       Q.    From sight, like hi, how are you doing?

24       A.    Yeah.

25       Q.    So as far as what type of worker he was, you

1   wouldn't have any knowledge, would you?

2       A.   Only what people told me and what I've seen.

3       Q.   As far as the hiring and firing in the welding

4   department, who would that be, again back then?

5       A.   If it was Tony Watson, it would have been Tony

6   Watson.

7       Q.   If Tony Watson wanted to hire someone or fire

8   someone, would he have to run it by someone else?

9       A.   Yes.

10      Q.   Who?

11      A.   Me.

12      Q.   Do you recall Tony ever coming to you with any type

13  of complaint about Henry's job performance; anything like

14  that?

15      A.   No, just the opposite.

16      Q.   He felt Henry was a good employee?

17      A.   Well, if was Tony, and I'm not even sure it's Tony

18  --

19      Q.   Again, we're assuming it was Tony?

20      A.   All reports about Henry were he was a good welder

21  and worker.

22      Q.   Who's decision would it be, if a decision was made

23  to decide whether or not to make someone a foreman?

24      A.   Mine and the general manager's.

25      Q.   Sitting here today, without reviewing Mr. Naranjo's

1    personal file, do you have any knowledge or recollection as

2    to what Mr. Naranjo's potential would have been as far as

3    becoming the chief welder or foreman the welding department?

4        A.    I wouldn't even know.

5        Q.    If you looked at his personnel file, would you be in

6    a position to answer that?

7        A.    No.

8        Q.    It would be too speculative?

9        A.    Yes.

10        Q.    And I'm sorry, I know I asked you this:  Did, in

11    fact, Bradford request to see the blueprints or plans in

12    this case?

13        A.    I don't believe so.

14        Q.    We could ask Mark Tortora?

15        A.    Yes.

16        Q.    If they did, would it be fair to say copies were

17    made and kept in a Souvenir file, or no?

18        A.    Not necessarily.

19        Q.    This might be a stupid question: How does the

20    foreman know when a particular job is done?   For example

21    the job number, what's ours?   99?

22        A.    (The witness nods.)

23        Q.    How does a foreman know when job 99 is done?

24        A.    When he assigns a person to a job, he has an idea of

25    when the completion of that job is going to be done.   If

1    it's a single day job, of course, at the end of that day or

2    at the time that the employee, he would check; he walks

3    around and checks all of his jobs.

4           He'll look and see if it's done.

5    Q.   Who?

6    A.   The foreman.

7    Q.   That's part of his job?

8    A.   That's part of his job, yes.

9    Q.   For example, in this case, Job 99, which would

10   appear to be the lazarette job that we're concerned with,

11   which was started on June 27th and, I don't know whether it

12   was supposed to be finished on July 7th or not; but can you

13   tell from looking at the Exhibit?

14   A.   Five, I believe.

15   Q.   Eight?  Is it?

16   A.   Number 8 or 9, yeah.

17          MR KALLEN: Look at exhibit 8 or 9, maybe you could

18       tell us from looking at it.

19   BY MR. WEBER:

20   Q.   How long would that job should have taken; if that's

21   a fair question to ask you?

22   A.   I could not answer you.  I don't know how big the

23   tool box is.

24   Q.   Okay.   Fine.   The tool box.  When it says, "tool

25   box", is it literally a tool box or is it, in Bradford, is

1    that a generic term?

2    A.    That's a generic term for fabricate and install

3    brackets for the tool box.

4    Q.    Would that mean brackets for the lazarette?  I'm

5    just wondering.

6    A.    Yes, in a broad view you could be lead to believe

7    that it's something for the lazarette.

8    Q.    I'm asking you because it's Bradford's terminology.

9    A.    It was, I would believe, foundation or framing for a

10    tool box in Bradford's terminology.

11    Q.    An actual tool box?

12    A.    Foundation for a tool box.

13    Q.    Could it be a foundation for hydraulic pumps?

14    A.    You would be stretching it.

15    Q.    But it's possible, I suppose?

16    A.    Yeah, without a doubt.  Without a doubt.

17    Q.    I'm just curious as to how specific these things

18    usually are.  Okay.  In any event, sticking with job

19    Number 99, how is the foreman to know when this job is going

20    to be done or actually when it is done?

21    A.    When the foreman was writing the work order, he

22    describes what to do and what he was requested to do at the

23    time he was requested to do it.

24          He made an opinion of how much it would be,

25    monetarily, and how long it was going to take, time, for the

1    simple reason he needed to plan his manpower from that point

2    to get this job finished.

3        Q.   And can you tell from looking at either one of these

4    two exhibit how long the foreman anticipated the length of

5    time to do the job?

6        A.   Not what he anticipated, what he actually did.

7        Q.   In any event, assuming this explosion did not occur

8    on July 7th; Henry's there doing the welding job, okay?

9    Let's assume as far as he knows he's finished with this job.

10        Does Henry then tell his foreman, I finished the

11   job, is that basically the way it works?

12        A.   Yes.

13        Q.   Then is it the foreman's job to go on board to make

14   sure it was done correctly?

15        A.   Yes.

16        Q.   During the course of work between June 27th and July

17   7th, is it also the foreman's responsibility to periodically

18   go on board the boat and check the progress of these

19   particular jobs?

20        A.   Yes.

21        Q.   Does he check with the captain to see if he has any

22   problems with the way it's progressing?

23        A.   Not necessarily.  Normally the captain let's us

24   know.

25        Q.   To your knowledge, and maybe again we should ask Mr.

1    Tortora this, had there ever been an independent study done

2    and submitted to Bradford Marine prior this accident

3    concerning a safety plan or safety measures?

4        A.   To do the job on this particular boat?

5        Q.   No.  No.  For the yard?

6        A.   For a safety program?

7        Q.   Yeah.

8        A.   You would have to ask Mark.

9        Q.   Did you ever speak to the captain of the Souvenir

10   about what happened?

11       A.   No.

12       Q.   Did you ever see the report that was prepared by

13   Mark Tortora based upon his investigation?

14       A.   No.

15       Q.   Did you ask to see it?

16       A.   No.

17       Q.   In your discussion with Mark Tortora following the

18   explosion, was there any discussion concerning why there was

19   no testing for the presence of flammable gas or vapors?

20       A.   Originally the evening that we talked about Henry

21   getting hurt, we didn't know what the cause of the explosion

22   was.

23            That evening we didn't do anything.  I know later

24   there was some discussion of somebody making a statement

25   that it should have been tested.  If you didn't know it was

1    there, you couldn't test something that you didn't know of.

2    Q.    That's true.

3    A.    You're asking me what the discussion was.  That's

4    what the discussion was.

5    Q.    Without getting argumentative, but perhaps that's

6    unavoidable, isn't that the purpose of testing, to make sure

7    there's not something there that you can't detect?

8    A.    If you look at something and determine that it's the

9    bottom, if you think it's the bottom and there's nothing but

10   water beyond that, how could you know?

11   Q.    Were you ever on board this boat?

12   A.    Yes.

13   Q.    Before the explosion?

14   A.    Yes.

15   Q.    For what reason in particular?

16   A.    To look at the windows.  Just to look at the boat to

17   see what was going on.

18   Q.    Were you satisfied with the progress that it was

19   making?

20   A.    Yeah.

21   Q.    Did Mr. Smith ever express any displeasure prior to

22   the explosion, as far as progress of the work?

23   A.    I believe he was happy.

24   Q.    How about the captain, he was happy?

25   A.    The captain was happy.

1    Q.    He wasn't difficult?

2    A.    No.

3    Q.    Meaning every captain was?

4    A.    He was okay.

5    Q.    Comparatively speaking, he was one of the good

6    captains?

7    A.    Oh, yeah.  Oh, yeah.

8    Q.    Now, you mentioned before you had been in some

9    classes conducted by a marine chemist on three or four

10    occasions over the course of, I don't know, 10 years or 15

11    years.

12         Was there a certain period of time that you need to

13    return to class to get recompetentized?

14    A.    When you get certified as a marine chemist, it's

15    something that you can carry on; but it's better to have it

16    for each company that you work for, that you're certified

17    under their billing basically.

18    Q.    Sure.

19    A.    Of course it's a refresher course too, you know.

20    Q.    But you're not aware of any legal requirement that

21    requires you to go back every several years or so?

22    A.    I'm not.

23    Q.    When was the last time you did that?

24    A.    '92, I believe.

25    Q.    Do you know who the teacher was?

1       A.    Pete Rumell.

2       Q.    And maybe I missed this but, what's the purpose of

3   having a quote, competent person, end quote, at the yard?

4       A.    To double check -- a competent person, first of all,

5   can inspect the area to see if you do need a marine chemist,

6   if it's not obvious.

7            Once a marine chemist has certified there's nothing

8   in the yard, a competent person has to make daily check of

9   that area.

10      Q.    To make sure it remains gas free, for example?

11      A.    That's correct.

12      Q.    I take it in using this project as an example, the

13  difference between the vessel owner or captain and the yard,

14  that being Bradford, the responsibility for making sure that

15  the vessel is gas free, if it needs to be, is that of the

16  yard?

17      A.    That's correct.

18      Q.    Now you said in this case that the lazarette where

19  Henry was welding was open?

20      A.    That's correct.

21      Q.    Was it basically an open space as opposed to an

22  enclosed space?

23      A.    That's correct.

24      Q.    You say it is or was an open space because why?

25      A.    The hatches were removed off the top of the deck.  A

1    large three by two, three by two hatches were on each side

2    of the deck.

3        Q.    Whereas with the hatches in place, it would be an

4    enclosed space?  With the hatches off, it's now an open

5    space, is that the way you view it?

6        A.    That's the way I would view it, yeah.

7        Q.    Do you have any opinion one way or the other whether

8    Henry should have had a fire watch with him?

9        A.    In my opinion?

10       Q.    Yeah?

11       A.    It was not needed.

12       Q.    That's because why?

13       A.    There was nothing in the area that I even - that

14   would catch fire.

15       Q.    Well, you weren't there that day when the welding

16   was done?

17       A.    No.

18       Q.    Who should have made that determination as to

19   whether or not there was nothing there that would require a

20   fire watch?

21       A.    The foreman.

22       Q.    How about the welder?

23       A.    Yes, and the welder; yes, of course.

24       Q.    If the welder, in this case Henry, felt that

25   additional safety precautions were necessary, would you

1    agree he should not have begun the job without making sure

2    his concerns were addressed with the foreman?

3        A.    Yes, I agree with you.

4        Q.    Let me show you document and see if you have ever

5    seen something like it or similar to it.

6            Looking at 10 and 11; have you ever come across

7    these type of documents in your job?

8        A.    Yes.

9        Q.    Under what circumstance?

10       A.    With marine chemist services and follow-up sheets

11   for inspections.

12       Q.    Inspections?

13           And where would you see these once they're filled

14   out, or are copies given to you?

15       A.    Copies of these would be filed in both files.

16       Q.    They would?

17       A.    It would be both files if the marine chemist was

18   called or in there.   The other daily check log sheet would

19   be posted on the boat, where the entry to the boat is there,

20   so it can be seen, to see it was checked off on a daily

21   basis.

22       Q.    Would you agree with me that as far as a welder's

23   own responsibility is concerned, before he starts cutting or

24   burning, what have you; doing a welding job, should he

25   satisfy himself that there's one of these filled out, and

115

```
1     one of these documents on the boat allowing him to do it?

2         A.   It's his responsibility, yes.

3         Q.   I may not have any further questions?

4              Let me just to review my notes.  So I'll pass it on

5     to the next guy.

6                          DIRECT EXAMINATION

7     BY MR. FAMULARI:

8         Q.   A couple of quick questions.  I will be quick.

9              You stated earlier that this was a fairly involved

10    project on the yard, is that correct?

11        A.   Yes.

12        Q.   Is it unusual with a project like this for the owner

13    to have a representative on the boat just about every day?

14        A.   Yes.

15        Q.   In this particular case, do you know if Captain

16    Bredbeck was on the boat most every day?

17        A.   Yes.

18        Q.   Do you have any personal knowledge about any -- how

19    much involvement did Captain Bredbeck have with the workers

20    on the boat itself as they were doing their jobs?

21        A.   I think he was very much aware of what they were

22    doing.  I don't know if he got involved in a discussion

23    with them.

24        Q.   Do you know if Captain Bredbeck spent much time with

25    Henry Naranjo on various projects that they were doing?
```

1    A.    I don't know personally.

2         MR. FAMULARI:  I don't have anything else.

3                   CONTINUED REDIRECT EXAMINATION

4    BY MR. WEBER:

5    Q.    I just have a couple of follow-up questions, I'll be

6    as brief as I can.

7         You mentioned that Mr. Rumell was the chemist that

8    occasionally was employed, I should say hired by Bradford to

9    come out an inspect certain vessels?

10   A.    Yes.

11   Q.    Do you know if he actually inspected this vessel

12   prior to the accident in question?

13   A.    I don't recall.

14   Q.    So if he had issued some sort of certification --

15   well, strike that.

16        Are you aware of any type of certification that gets

17   posted actually on the boat?

18   A.    Yes.

19   Q.    Do you know if he did that for this particular

20   vessel before the accident?

21   A.    He doesn't do the posting.  We do the posting.

22   Q.    All right.  Do you know if he did that, inspected

23   this vessel?

24   A.    I don't know if he inspected it, no.

25   Q.    Do you recall if there was any postings?

117

1      A.    No, I don't.

2      Q.    Mr. Rumell, he was called out to the scene after the

3   accident, was he not?

4      A.    Do I know that?

5      Q.    Yes.  In his report dated July 8th of '97, have you

6   seen a copy of that?

7      A.    No, I have not.

8      Q.    The very first paragraph seems to indicate that he

9   was called to Bradford on the morning of the 8th of July,

10  1997 by Mr. Dave Henderson and Mr. Mark Tortora.

11          Do you recall actually calling him yourself?

12     A.    No, I don't.

13     Q.    That's all.   Thanks.

14          MR. KALLEN:  Nothing.  Okay.  Done.

15          (Whereupon, the following deposition was concluded.)

16

17

18

19

20

21

22

23

24

25

```
 1                           STIPULATION

 2          It is hereby certify and attested to that the

 3   reading, signing and notice of said deposition be, and the

 4   same are, hereby waived.

 5          And further deponent saith not.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                    CERTIFICATE

2    STATE OF FLORIDA  )

3                      )SS

4    COUNTY OF BROWARD )

5

6         I, DEBORAH PEARLMAN, a Notary Public in and for the

7    State of Florida at Large,

8         DO HEREBY CERTIFY that the foregoing deposition was

9    held before me at the time and place therein designated,

10        I FURTHER CERTIFY that I am not of the employ nor am

11   I financially interested in the outcome of the proceedings

12   and I further certify that the foregoing pages, 1 through

13   117 inclusive, is a true and correct copy of the proceedings

14   held.

15        WITNESS MY HAND on this the 22nd day of January, of

16   the year 2001, in the County of Broward, City of Fort

17   Lauderdale, State of Florida.

18

19

20

21

22

23

24

25
```