UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

HENRY NARANJO

        Plaintiff,

vs.

STEPHEN BYRON SMITH, and
PALMER JOHNSON, INC.

        Defendants,

_____/

PALMER JOHNSON, INC.

        Third Party Plaintiff,

vs.

TOM FEXAS YACHT DESIGN, INC.
        Third-Party Defendant.

_____/

## JOINT PRETRIAL STIPULATION

### I.    JOINT STATEMENT OF THE CASE

The plaintiff, Henry Naranjo, has sued Stephen B. Smith and Palmer Johnson for personal injuries he sustained in an accident occurring on July 7, 1997. At the time of the accident, Mr. Naranjo was a welder employed by Bradford Marine which is a yacht repair facility in Ft. Lauderdale. Mr. Naranjo was welding in the lazarette space of the yacht SOUVENIR located at Bradford Marine when an explosion occurred. The yacht was owned at that time by Stephen B. Smith and had been at Bradford Marine undergoing extensive repairs. The construction plans for the yacht were prepared by Tom Fexas Yacht Design, Inc. and the

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

yacht was built by Palmer Johnson, Inc. for a different owner a number of years earlier. The plaintiff contends in this lawsuit that both Stephen B. Smith and Palmer Johnson are liable for the accident and his resulting injuries. Both Stephen B. Smith and Palmer Johnson deny they are at fault or liable. Palmer Johnson also contends that Tom Fexas Yacht Design, Inc. is liable to Palmer Johnson. Tom Fexas Yacht Design, Inc. denies any fault or liability to Palmer Johnson.

## PLAINTIFF'S STATEMENT OF THE CASE

On Monday, July 7, 1997, Plaintiff, HENRY NARANJO, was an employee of Bradford Marine, Incorporated, working on the M/Y "SOUVENIER," located in Fort Lauderdale, Florida. On this date, a violent explosion occurred while he was welding in the rear of the motor yacht, seriously injuring him.

The motor yacht, "SOUVENIR," was manufactured by Palmer Johnson Incorporated, a Wisconsin corporation, in 1984. It was originally designed by Thomas Fexas Yacht Design, Inc., and was to be 72 feet in length and made completely of aluminum. At the end of the manufacturing process, it was decided that 10 feet would be added to the motor yacht in the form of a cockpit extension. This extension created additional buoyancy in the bow of the yacht requiring ballast to be added to the bottom of the cockpit extension at the back of the yacht.. Tomas Fexas, the motor yacht's engineer, recommended that lead be used for the ballast. Palmer Johnson, Inc., instead used concrete because it was cheaper, faster, and easier than lead and as recommended by Fexas. The concrete ballast was encased completely in aluminum. Palmer Johnson left a 3 ½ inch void space between the top of the cement ballast and the aluminum ballast cover. This void space was inaccessible, did not have any ventilation, and was not clearly

2

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

marked. This void space allowed a flammable gas to accumulate. The motor yacht was

purchased by Bruce Cohen, and launched in September 1984.

In February, 1997, Stephen Byron Smith purchased the motor yacht, whose name at that

time was the "CAPTIVATOR" and renamed it "SOUVENIR." In April, 1997, Stephen Byron

Smith ran the engines above the cruise speed to show his friends how fast the motor yacht would

go and blew the starboard engine. The motor yacht was then taken to Bradford Marine's repair

facilities in Fort Lauderdale, FL, for a complete retrofit of both engines. Stephen Byron Smith's

boat captain was John Bredbeck, who lived aboard the motor yacht while it was being repaired.

As part of the repairs, Plaintiff, HENRY NARANJO, was instructed by Captain John Bredbeck,

to do certain welding on the aluminum ballast cover in the cockpit extension. The captain

instructed Mr. Naranjo that it was safe to weld and that the cement ballast directly beneath the

aluminum cover was flush up against it. The captain also told Mr. Naranjo that there were no

fuel lines or fuel tanks, that it was safe to weld., and told him to proceed, as the captain was in

hurry.  While the Plaintiff, HENRY NARANJO, was welding, a violent explosion occurred

seriously injuring him, causing fractures of his spine and ribs, and necessitating surgery. His

medical bills are presently $109,994.24, and he will need a future second surgery. He has not

been able to return to work due to his injuries and disabilities.

### DEFENDANT, STEPHEN B. SMITH'S STATEMENT OF THE CASE

The defendant Stephen B. Smith neither owed nor breached any duty of care to the

plaintiff. As the owner of the yacht SOUVENIR which was at the premises of Bradford Marine

for the purpose of undergoing extensive repairs (by Bradford Marine), Smith's duty, if any, at the

3

time the yacht was brought into the yard (approximately two months before the subject incident) would have been to advise and inform Bradford Marine at that time of any hidden unsafe conditions of the yacht which were known to or should have been known to him and which were not otherwise discoverable by Bradford Marine.    However, with respect to the welding work that the plaintiff was engaged in at the time of the accident, Smith owed no duty of care because determining whether or not the space was safe to weld was the duty of Bradford Marine and or the plaintiff.    This was a necessary first step and a risk inherent in the welding work that Bradford Marine had agreed to undertake and perform.    Furthermore, the work was neither supervised nor under the control of Smith or his captain.    Accordingly, Smith had the right to rely on the expertise of Bradford Marine (and its employees) in safely and reasonably performing the work.

However, if there was a duty owed by Smith to the plaintiff, the duty was not breached. The evidence is clear that the plaintiff proceeded to weld, not because of anything Smith's captain did or did not tell him about the "void" space in the lazarette, but simply because the plaintiff himself determined it was safe to weld based on his own inspection of the space, his supervisor's inspection of the space, and having (erroneously) believed there was a gas-free certificate/hot-work permit posted on the yacht for this work. The space where the plaintiff was welding was not tested for the presence of flammable or ignitable fumes, gases, etc. although it should have been in accordance with OSHA regulations and simple prudence and common sense. The obligation to test the space, and call in the services of a marine chemist, if necessary,

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

was that of Bradford Marine, not the yacht owner.  Had the space been tested prior to the work commencing, it is clear the accident never would have occurred.

At no time did the captain tell the plaintiff that it was "safe to weld" or that the concrete ballast was "flush" up against the aluminum sub-floor in the lazarette.  That there was in fact a "void" space was a condition that was known or should have been known to the plaintiff given the thin layer of aluminum that served as the sub-floor and the fact that a number of holes had been drilled into the sub-floor in the exact same space where the plaintiff was welding.  It is undisputed that the captain did not know there was any flammable or ignitable gas or fumes below, he had no reason to know this, and certainly the plaintiff did not ask the captain about this.  Again, this was the duty, obligation and responsibility of Bradford Marine and the plaintiff to make sure the space was "gas-free" prior to welding.

Although the plaintiff was injured as a result of the explosion, the evidence reflects that he sustained no permanent impairment or disability with respect to any of his injuries except for the injury to his low back.  The plaintiff had a pre-existing, congenital condition known as a pars defect in his spine at the level of L5-S1.  The surgery that was subsequently performed was intended to correct this defect and according to the medical testimony the surgery was successful.  Although the plaintiff has continued to complain of disabling pain since the surgery, there has been no confirmed pathological basis disclosed for these complaints.  Experts in the field of pain care management have determined that the plaintiff has exhibited clear signs of "functional overlay" and exaggeration with respect to his complaints with all tests designed to disclose an objective basis for these complaints being normal.  Psychological testing has also

5

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

described the plaintiff as "bizarre" with probable mental deficits contributing to and confirming his "exaggerated" symptoms.

The plaintiff has been and continues to be capable of gainful employment but has chosen not to work. His claimed future loss of earning capacity based on his inability to work at all should therefore be considered not only suspect but lacking any competent factual support.

It is the position of the defendant Stephen B. Smith that he is not liable for the accident and resulting injuries, that the sole cause of the accident was the negligence of Bradford Marine and or the plaintiff, or alternatively, that plaintiff's negligence was a substantial contributing cause of the accident. Further, plaintiff's failure to mitigate his damages by working and by failing to follow-up with recommended medical care and testing precludes the plaintiff from recovery for those "damages" which could have been otherwise avoided and or minimized.

## DEFENDANT, PALMER JOHNSON, INC.'S STATEMENT OF THE CASE

Defendant, Palmer Johnson, is not liable for Mr. Naranjo's injuries, under either the negligence or strict liability theories alleged by the Plaintiff.

Palmer Johnson did indeed construct the vessel SOUVENIER, and its cockpit extension, in 1984, pursuant to the design and specifications of Tom Fexas Yacht Design, Inc. In fact, Palmer Johnson relied entirely on Tom Fexas Yacht Design with regard to the design and specifications of materials used in the construction of the cockpit extension. The incident herein occurred almost 14 years later, in 1997, when the Plaintiff was working for a marine repair facility, Bradford Marine. As part of his job duties as an employee of Bradford, Mr. Naranjo was injured by an explosion while welding in the cockpit extension.

6

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Although the Plaintiff hypothesizes that a void space allowed flammable hydrogen gas to accumulate in the hull in the area where Mr. Naranjo was welding, Defendant, Palmer Johnson, maintains that the vessel was designed and constructed according to the applicable maritime standards.

Moreover, the Plaintiff cannot provide any proof that hydrogen had been present or was a causative factor at the time of the incident, beyond mere conjecture.

Based on the fact that Mr. Naranjo and Bradford Marine did not properly inspect and test the area prior to commencing welding activities, the responsibility for damages rests with these persons, rather than Palmer Johnson.

However, in the event that Palmer Johnson is held responsible for Mr. Naranjo's injuries based on the design of the vessel, it maintains that it is entitled to indemnity from Tom Fexas Yacht Designs, Inc., as Palmer Johnson constructed the vessel pursuant to the specifications of Tom Fexas.

Although Mr. Naranjo was injured in the explosion, he was suffering from various pre-existing, non-related conditions of the lumbar spine, and even underwent surgery to correct those conditions. Even though he has continued to complain of pain since the surgery, there has been no objective correlation for his continued complaints. Furthermore, even though Dr. Scuderi and other physicians have opined that he can return to work, Mr. Naranjo has failed to do so, and therefore has failed to mitigate his economic damages.

7

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

## THIRD PARTY DEFENDANT, TOM FEXAS YACHT DESIGN, INC.'S STATEMENT OF THE CASE

Henry Naranjo was injured while performing welding tasks aboard a vessel owned by Stephen Byron Smith.  Naranjo claims that he was welding on an aluminum ballast cover of an aluminum ballast chamber which contained cement ballast.  He claims that the corrosion of aluminum caused by the presence of concrete produced hydrogen gas in the ballast chamber, which exploded when he welded the ballast cover.

It was a usual and customary practice at the time this vessel was constructed in 1994 to utilize concrete as a ballast in aluminum boats.  The ballast chamber was fully sealed, impervious to infusion of water, and there was no opportunity for the kind of corrosion which would produce the amount of hydrogen gas necessary to make the kind of explosion that injured Henry Naranjo.  There are no facts which support a theory that hydrogen gas was the explosive element.

Tom Fexas Yacht Design, Inc., was hired to draw the construction plans for the cockpit extension by Bruce Cohen, the owner at the time the boat was built.  Palmer Johnson and Cohen's representative prepared preliminary sketches of the cockpit extension and prepared three sets of specifications for the cockpit extension.  These were sent to Fexas.  Before final plans were drawn, Fexas spoke with Palmer Johnson representatives and indicated a preference for lead instead of concrete for ballasts.  Palmer Johnson opted to us concrete.  Fexas then prepared construction plans in accord with the preliminary sketches and the specifications provided by Palmer Johnson.

8

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Fexas billed Cohen for preliminary work on the construction plans, and, when the plans were done, sent a final bill to Cohen for the plans. Palmer Johnson accepted the Fexas plans and, after review of the plans, built the boat in accord with the plans. Palmer Johnson made all decisions with respect to the ways and means that the plans were turned into the final product, including the decision regarding the type of concrete, any additives in the concrete, void space in the chamber as a result of the pouring of the concrete, and the manner in which the ballast chamber was welded and sealed.

If any water entered the ballast chamber and caused corrosion of the aluminum and the resultant production of hydrogen gas, it could only be because Palmer Johnson failed to properly weld tight the ballast chamber, and allowed water to enter the chamber.

Fexas had no contract with Palmer Johnson and had no obligation to indemnify Palmer Johnson. Fexas did not provide any material specifications. Fexas was not responsible for inspecting the welding to ensure that the ballast chambers were watertight. Fexas therefore cannot be either an indemnitor or a joint tortfeasor subject to contribution.

## II.     BASIS OF FEDERAL JURISDICTION

Admiralty and maritime jurisdiction pursuant to 28 USCA 1333, Longshore and Harborworkers Compensation Act, 33 USCA 905. Plaintiff, in its response to the Motion to Strike Demand for Jury Trial, has requested leave to invoke subject matter jurisdiction pursuant to 28 USCA 1332 (Diversity Jurisdiction).

## III.    PLEADINGS RAISING THE ISSUES

1.      Plaintiff's Amended Complaint

9

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

    2.      Answer of Defendant, Smith, to Plaintiff's Amended Complaint

    3.      Answer of Defendant, Palmer Johnson, to Plaintiff's Amended Complaint

    4.      Third Party Complaint of Palmer Johnson against Tom Fexas

    5.      Answer of Third-Party Defendant, Tom Fexas, to Palmer Johnson's Third Party Complaint

## IV.  LIST OF UNDISPOSED OF MOTIONS

    1.      Defendant Smith's Motion for Summary Judgment

    2.      Defendant, Palmer Johnson's Motion to Strike Jury Trial

    3.      Defendant, Palmer Johnson's Motion for Sanctions against Plaintiff

    4.      Plaintiff's Motion for Protective Order re Expert Depositions

    5.      Third Party Defendant, Fexas' Motion for Continuance To Extend Fact Discovery

    6.      Defendant, Palmer Johnson's Motion to Extend Expert and Fact Witness Discovery

    7.      Defendant, Palmer Johnson's Motion to Strike Plaintiff's Amended Expert Witness Disclosure

    8.      Plaintiff's Motion to Strike Palmer Johnson's Amended Expert Witness Disclosure

    9.      Fexas Motion for Summary Judgment against Palmer Johnson

    10.    Parties Motions in Limine

    11.    Motion(s) for Rule 11 Sanctions, served but not filed, by Fexas and Palmer Johnson

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

12.　　Third Party Defendant, Fexas' Motion to Continue Settlement Conference set for

October 18, 2001

## V.　STATEMENT OF UNCONTESTED FACTS WHICH REQUIRE NO PROOF AT TRIAL

1.　　The plaintiff was injured on Monday July 7, 1997 as a result of an explosion that

occurred underneath the lazarette space of the yacht SOUVENIER.

2.　　At the time of the accident, plaintiff was employed as a welder for Bradford

Marine in Fort Lauderdale, Florida.

3.　　At the time of the accident, plaintiff was working on board the yacht SOUVENIR

4.　　The yacht was owned by defendant Stephen B. Smith

5.　　The yacht was built by defendant Palmer Johnson

6.　　Palmer Johnson was engaged in the business of constructing, building, and

manufacturing motor yachts such as the SOUVENIR

7.　　At the time of the accident, John Bredbeck was the captain of the yacht employed

by defendant Stephen B. Smith.

## VI.　ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

1.　　Whether defendant Smith was negligent, by and through the actions and/or

omissions of his captain in failing to warn the plaintiff of the existence of a void

space in the lazarette of the yacht.

2.　　Was the void space an unreasonably dangerous condition of the yacht.

11

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

3.    Whether Palmer Johnson was negligent in building the cockpit extension with concrete ballast.

4.    Whether Palmer Johnson was negligent in building the cockpit extension with a void space.

5.    Whether Palmer Johnson was negligent in failing to warn of the existence of the void space and the concrete ballast.

6.    Whether Palmer Johnson is strictly liable for building a yacht with an unreasonably dangerous condition.

7.    Whether Palmer Johnson was negligent in its design of the cockpit extension.

8.    Whether Palmer Johnson was negligent in its creation of specifications for the cockpit extension.

9.    Whether Palmer Johnson was negligent in rejecting Fexas' recommendation of lead for the cockpit extension ballast.

10.    Whether Palmer Johnson's claim is barred by the applicable statute of limitations.

11.    Whether common law liability exists between Palmer Johnson and Fexas.

12.    Whether the plaintiff was negligent in the ways and means he employed to perform the welding which initiated the explosion (Subject to Motion in Limine).

13.    Whether Bradford Marine was negligent in its policies, procedures and supervision and in the ways and means employed to perform the welding which initiated the explosion (Subject to Motion in Limine).

14.    Whether plaintiff has failed to mitigate his damages.

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

15.    Nature and extent of damages recoverable by the plaintiff

16.    Whether the plaintiff relied on what the captain told him about the lazarette space
and whether this reliance was reasonable.

17.    Whether the existence of a void space was known to, or should have been known
to, plaintiff.

18.    Whether Fexas was negligent in designing the cockpit extension with a void
space. (Fexas does not agree that this in an issue.)

19.    Whether Fexas was negligent in recommending concrete ballast in designing the
cockpit extension. (Fexas does not agree that this is an issue.)

20.    Whether Bradford Marine's negligence was the superceding intervening cause of
Mr. Naranjo's injuries.

21.    Whether the Plaintiff's back surgery was reasonable and necessary as a result of
injuries from this accident, or whether the surgery attempted to correct an
unrelated, developmental or congenital condition.

22.    Whether Fexas communicated any specification of lead as ballast in his dealings
with Palmer Johnson regarding the construction of the cockpit extension. (Fexas
does not agree that this is an issue.)

23.    Whether the Plaintiff was negligent in failing to determine whether there was a
void space below the lazarette before commencing welding.

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

24.    Whether the plaintiff was negligent in failing to request a multi-gas tester be employed to determine what was in the area below the lazarette before commencing welding.

25.    Whether Bradford Marine was negligent in failing to use a multi-gas tester in the area below the lazarette before allowing the plaintiff to commence welding; and if so, whether their negligence rises to the degree of an independent superceding cause which breaks the chain of causation.

26.    Whether the plaintiff was negligent in failing to see a hole(s) drilled through the deck of the lazarette while setting up to weld.

27.    Whether the plaintiff was negligent by failing to determine that there was a void space below the lazarette.

28.    Whether hydrogen gas, if any, would have dissipated through the hole(s) in the lazarette deck in the hours before the plaintiff commenced welding.

29.    Whether the space below the lazarette was air tight and water tight on the date of the accident.

30.    Whether the condition of the lazarette in the 14 years prior to this accident rules out any other cause of the explosion other than hydrogen.

## VII.    ISSUES OF LAW ON WHICH THERE IS AGREEMENT

General maritime law and LHWCA applies to govern the rights and liabilities of the plaintiff, defendant Smith and defendant Palmer Johnson. General maritime law applies as to the third party action between Palmer Johnson and Fexas.

14

## VIII.  ISSUES OF LAW WHICH REMAIN FOR DETERMINATION

1.  Duty of care, if any, owed by Defendant Smith to the plaintiff, to warn of the existence of a void space.

2.  Whether Defendant Smith breached a duty of care to plaintiff, and if so, whether it was a legal cause of the accident.

3.  Whether Palmer Johnson was negligent, and if so, whether such negligence was a legal cause of the accident.

4.  Whether Palmer Johnson can be strictly liable for the accident.

5.  Whether the plaintiff was negligent and if so, whether such negligence was a legal cause of the accident (Subject to Motion in Limine).

6.  Whether the negligence of Bradford Marine, if any, was a legal cause of the accident (Subject to Motion in Limine).

7.  Whether the negligence of Bradford Marine can be considered to reduce the respective percentages of fault of the parties to this cause (Subject to Motion in Limine).

8.  Whether Palmer Johnson has stated a claim against Fexas for negligently causing the injuries of the plaintiff.

9.  Damages.

10.  Right of indemnity and/or contribution of Palmer Johnson against Fexas.

11.  Whether Fexas was contractually required to indemnify Palm Johnson.

12.  Whether the Maritime "active-passive tort" indemnity doctrine is applicable as between Fexas and Palmer Johnson.

13.  Whether the Palmer Johnson claim against Fexas is barred by laches.

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

14.    Whether this claim arises out of the Admiralty and Maritime jurisdiction of the

Court; and if so, is the Plaintiff entitled to a jury trial.

**IX.    LIST OF TRIAL EXHIBITS**

See Attached.

**X.    LIST OF TRIAL WITNESSES**

See Attached.

**XI.    ESTIMATED TRIAL TIME**

14 days - jury
10 days - non/jury

**XII.    ATTORNEYS FEES**

Not applicable.

DATED this 11th day of October, 2001.

16

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

BLANCK & PERRY, P.A.
**Co-Counsel for Plaintiff**
5730 S.W. 74th Street, Suite 700
Miami, Florida 33143
Tel:  305/663-0177; Fax: 305/663-0146

BY: _____
          F. DAVID FAMULARI, ESQUIRE
          FLA. BAR NO. 0860506

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

BADIAK, WILL & KALLEN
**Counsel for Stephen Byron Smith**
17071 West Dixie Highway
North Miami Beach, FL 33160
Tel: 305/945-1851; Fax: 305/944-8780

BY: _____
       JOHN D. KALLEN, ESQUIRE
       FLA. BAR NO.: 277428

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

MANNIKKO & BARIS
**Counsel for Tom Fexas Yacht Design, Inc.**
870 S.W. Martin Downs Boulevard, Suite 1
Palm City, Florida 34990
Tel: 561/283-0084; Fax: 561/283-1084

BY: _____
JOSEPH L. MANNIKKO, ESQUIRE
FLA. BAR NO.: 383120

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

# PLAINTIFF, HENRY NARANJO'S,
# TRIAL WITNESS LIST AND TRIAL EXHIBIT LIST

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6022-CIV-LENARD
HENRY NARANJO                          MAGISTRATE JUDGE TURNOFF

       Plaintiff,

vs.

STEPHEN BYRON SMITH, and
PALMER JOHNSON, INC.

       Defendants,
_____/

PALMER JOHNSON, INC.

       Third Party Plaintiff,

vs.

TOM FEXAS YACHT DESIGN, INC.

       Third-Party Defendant.
_____/

## PLAINTIFF'S TRIAL WITNESS LIST

1.  Henry Naranjo, Plaintiff (live testimony);

2.  Tony A. Watson (live testimony); 610 N.W. N. River Drive, Miami, FL;

3.  Peter Rimmel, chemist (live testimony); 3710 N.W. 94th Avenue, Hollywood, FL;

4.  John Bredbeck, captain (live testimony); 1126 S. Federal Highway, Apt. 110, Ft.
    Lauderdale, FL;

5.  Stephen Byron Smith, owner (live testimony); 1121 Gulfshore Boulevard North, Unit 10,
    Naples, FL, or, in the alternative:  360 Old Sutton Road, Barrington, Illinois;

6.  Brian Mink (live testimony); 1910 S.W. 56th Avenue, Plantation, FL;

7.  Thomas Fexas (live testimony); 1320 S. Federal Highway, Suite 104, Stuart, FL;

8.  Mark Tortora (live testimony); Bradford Marine, Fort Lauderdale, FL;

9.  Paul Engle (live testimony); Bradford Marine, Fort Lauderdale, FL;

10. David Henderson (live testimony); Bradford Marine , Fort Lauderdale, FL;

11. Donald Kasten (deposition transcript); 1765 City TKU, Sturgeon Bay, Wisconsin;

12. Bjorn Johansen (deposition transcript); 3863 North Bay Shore Drive, Sturgeon Bay,
    Wisconsin;

13. Hugo Escobar (live testimony); Bradford Marine, Fort Lauderdale, FL;

14. Robert A. Connell – Patton Marine, Inc. (live testimony); 2120 S. Bayshore Drive,
    Coconut Grove, FL;

15. Albert Williams (live testimony); Bradford Marine, Fort Lauderdale, FL;

16. Broward General Hospital Records Custodian (live testimony); Fort Lauderdale, FL;

17. Dr. Gaetano Scuderi (live testimony); 1380 N.E. Miami gardens Drive, Suite 210, Miami,
    FL;

18. Dr. Anthony Hall (live testimony); 16800 N.W. 2ndd Avenue, Suite 501, North Miami
    Beach, FL;

19. Dr. Ronald DeMeo (live testimony); 1435 West 49th Place, Suite 500, Hialeah, FL;

20. Records Custodian-Bradford Marine (live testimony); Fort Lauderdale, FL;

21. Records Custodian-Palmer Johnson, Inc.;

22. Records Custodian-Thomas Fexas Yacht Design, Inc.

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

## PLAINTIFF'S LIST OF OTHER POSSIBLE TRIAL WITNESSES

1. Bruce Cohen (live testimony); 2376 August Way, Highland Park, Illinois;

2. David Jansen (live testimony); unknown address at this time;

3. Robert Baker (live testimony); Fort Lauderdale Director Yachts, Fort Lauderdale, FL;

4. Douglas Pierce (live testimony); Telephone No. 954/485-7917, Ft. Lauderdale, FL;

5. Dr. Gail Ballweg (live testimony); 7150 West 20th Avenue, Suite 604, Hialeah, FL;

## PLAINTIFF'S EXPERT TRIAL WITNESSES

1. Robert J. Camuccio, USCG (Ret.) (live testimony); 56 Snapper Avenue, Key Largo, FL.

Mr. Camuccio is an expert Naval Architect and Marine Engineer.

Opinions: (a) It is not good marine practice to encase cement in direct contact with aluminum in a moist environment; (b) It is not good marine practice to have a void space that is inaccessible and/or has no venting as it is foreseeable that welding work will be performed in this area; (c) Mr. Camuccio has determined that the cockpit extension was constructed in such a manner to create a void space between the floor of the lazarrette and the outer hull of the vessel. This void space was partially filled with cement and was completely sealed making it air and watertight. Creating this void space with no access was not good marine practice. The void space should have been vented or had a removable inspection plate in order to allow access to the void space. The cockpit extension was manufactured in an unreasonably dangerous and defective condition.

3

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

2.  Dr. Burch Stewart, Chemist (live testimony); 9500 N.W. 77th Avenue, Suite 5, Miami,

FL.

Opinions:  (a) Aluminum in contact with concrete, moisture and air, will cause hydrogen gas

to form in a confined space and will ignite and explode from an electric welding

torch as hydrogen gas is extremely volatile; (b) This explosion within reasonable

degree of scientific probability/certainty, was caused by a hydrogen gas

explosion; (c) If lead had been used instead of concrete, no explosion would have

occurred; or, (d) If the concrete had been properly isolated from contact with the

aluminum, no hydrogen gas would have been generated and no explosion would

have occurred.

3.  Frederick a. Raffa, Ph.D., Raffa Consulting Economists, Inc. (live testimony); 17 South

Osceola Avenue, Suite 200, Orlando, FL.

Opinions:  (a) Henry Naranjo's loss or diminution of his future earning capacity, his loss of

past earnings and the cost of household assistance, reduced to present money

value is $978,731.00, as of the date of August 17, 2001.

4.  Richard Celestino, RPC Rehabilitation Placement Consultants, Inc., (live testimony);

Mizner City Center, Suite 143, 1700 North Dryre Highway, Boca Raton, FL.

Opinions:

Mr. Celestino is a rehabilitation consultant and vocational evaluator.

4

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

He is of the opinion that Henry Naranjo is not employable in the relevant job market due to his education, vocational experience, physical injuries and disabilities sustained in the yacht explosion of July 7, 1997.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6022-CIV-LENARD
HENRY NARANJO                                MAGISTRATE JUDGE TURNOFF

      Plaintiff,

vs.

STEPHEN BYRON SMITH, and
PALMER JOHNSON, INC.

      Defendants,
_____/

PALMER JOHNSON, INC.

      Third Party Plaintiff,

vs.

TOM FEXAS YACHT DESIGN, INC.

      Third-Party Defendant.
_____/

## PLAINTIFF'S TRIAL EXHIBIT LIST

1.    Certificate of Ownership for the motor yacht "SOUVENIR," dated May 20, 1997,

    I.D. Witness: Stephen Byron Smith.

        Admit:      _____

        Deny:       _____

        Additional Witness: John Bredbeck

2.    Patton Marine, Inc., Survey, dated 2-18-97, I.D. Witness: Stephen Byron Smith

        Admit:      _____

        Deny:       _____

        Additional Witness: John Bredbeck

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

3.    Dockage and Repair Contract for the motor yacht "Souvenir"dated 4-7-97, I.D.
       Witness: John Bredbeck

            Admit:            _____

            Deny:            _____

            Additional Witness:  Stephen Byron Smith

4.    Work Order "SOUVENIR," dated 7-8-97, I.D. Witness:  David Henderson

            Admit:            _____

            Deny:            _____

            Additional Witness:  Records Custodian Bradford Marine, Inc.

5.    Marine Chemist & Testing Co., Inc.  Letter on Gas Free Certificate No. H16687, for

       M/V "SOUVENIR," dated 10-18-2000, I.D. Witness:  Peter Rimmel

            Admit:            _____

            Deny:            _____

            Additional Witness:  Mark Tortora

6.    Mounted Blue Prints of Lazarette of the motor yacht, dated 7-23-84, I.D. Witness:

       Thomas Fexas

            Admit:            _____

            Deny:            _____

            Additional Witness:  Stephen Byron Smith, Donald Kasten

2

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

7.     Sketch or Blue Print of "CAPTIVATOR" (rear), dated 7-13-84, I.D. Witness:

Thomas Fexas

     Admit:        _____

     Deny:         _____

     Additional Witness:  Records Custodian Palmer Johnson, Inc.

8.     Enlargement of Exhibit "7"

     Admit:        _____

     Deny:         _____

9.     Mounted & Enlarged Diagram of motor yacht before extension was added, dated 5-

12-83, I.D. Witness:  Thomas Fexas

     Admit:        _____

     Deny:         _____

     Additional Witness:  Records Custodian Palmer Johnson, Inc.

10.    Mounted and Enlarged Diagram of motor yacht after extension was added, dated 6-

20-83, I.D. Witness:  Thomas Fexas

     Admit:        _____

     Deny:         _____

     Additional Witness:  Records Custodian Palmer Johnson, Inc.

3

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

11.    Thomas Fexas Yacht Design Specifications for motor yacht, dated 9-26-83, I.D.

Witness: Thomas Fexas

Admit: _____

Deny: _____

Additional Witness: Records Custodian Palmer Johnson, Inc.

12.    Contract for Yacht Construction, dated 7-8-83, I.D. Witness: Donald Kasten

Admit: _____

Deny: _____

Additional Witness: Bruce Cohen

13.    Palmer Johnson, Inc. Purchase Order for Concrete, dated 8-14-84, I.D. Witness:

Donald Kasten

Admit: _____

Deny: _____

Additional Witness: _____

14.    Material Safety Data Sheet (MSDS) for Portland Cement, dated FAX 12-7-2000, I.D.

Witness: Donald Kasten

Admit: _____

Deny: _____

Additional Witness: _____

4

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

15.  Operator's Manual, Palmer Johnson, "CAPTIVATOR," dated 7-8-83, I.D. Witness:

Donald Kasten

Admit:              _____

Deny:               _____

Additional Witness:  _____

16.  Photograph of Air Blower, dated 7-7-97, I.D. Witness:  Tony Watson

Admit:              _____

Deny:               _____

Additional Witness:  John Bredbeck and Henry Naranjo

17.  Photograph of Electric-Arch Welding Machine, dated 7-7-97, I.D. Witness:  Henry
Naranjo

Admit:              _____

Deny:               _____

Additional Witness:  John Bredbeck, Tony Watson

18.  Photograph of Rear Cockpit View (Rimmel), dated 7-7-97, I.D. Witness:  Peter
Rimmel

Admit:              _____

Deny:               _____

Additional Witness:  John Bredbeck, Tony Watson

19.  Photograph of View of Plate and Screws, dated 7-7-97, I.D. witness:  Peter Rimmel

Admit:              _____

Deny:               _____

5

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Additional Witness:  John Bredbeck, Tony Watson

20.    Photograph of Second View of Plate and Screws, dated 7-7-97, I.D. Witness:  Peter Rimmel

    Admit:         _____

    Deny:          _____

    Additional Witness:  John Bredbeck, Tony Watson

21.    Photograph of Damaged Pump Compressor, dated 7-7-97, I.D. Witness:  Peter Rimmel

    Admit:         _____

    Deny:          _____

    Additional Witness:  John Bredbeck, Tony Watson

22.    Photograph of Damaged Aluminum Plate, dated 7-7-97, I.D. Witness:  Peter Rimmel

    Admit:         _____

    Deny:          _____

    Additional Witness:  John Bredbeck, Tony Watson

23.    Photograph of Cement Ballast and Bent Aluminum Plate, dated 7-7-97, I.D. Witness:  Peter Rimmel

    Admit:         _____

    Deny:          _____

    Additional Witness:  John Bredbeck, Tony Watson

6

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

24.    Photograph of Rear Deck after Repairs and Boat, dated _____, I.D. Witness:
Robert J. Camuccio

Admit:            _____

Deny:             _____

Additional Witness:  Tony Watson, Peter Rimmel, John Bredbeck

25.    Photograph of Rear Deck after Repairs (closed), dated _____, I.D. Witness: Robert
J. Camuccio

Admit:            _____

Deny:             _____

Additional Witness: Tony Watson, Peter Rimmel, John Bredbeck

26.    Photograph of Rear Deck Doors (open), dated _____, I.D. Witness: Robert J.
Camuccio

Admit:            _____

Deny:             _____

Additional Witness:  Tony Watson, Peter Rimmel, John Bredbeck

27.    Photograph of Rear Deck Plates (off), dated _____, I.D. Witness:  Robert J.
Camuccio

Admit:            _____

Deny:             _____

Additional Witness:  Tony Watson, Peter Rimmel, John Bredbeck

7

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

28.   Photograph Rear Deck Plates, dated _____, I.D. Witness:  Robert J. Camuccio

Admit:           _____

Deny:            _____

Additional Witness: Tony Watson, Peter Rimmel, John Bredbeck

29.   Photograph of Rear Deck Open Plates, dated _____, I.D. Witness:  Robert J.
Camuccio

Admit:           _____

Deny:            _____

Additional Witness:  Tony Watson, Peter Rimmel, John Bredbeck

30.   Photograph of Rear Deck & Tape Measure, dated _____, I.D  Witness:  Robert J.
Camuccio

Admit:           _____

Deny:            _____

Additional Witness:  Tony Watson, Peter Rimmel, John Bredbeck

31.   Photograph of Replaced Rear Deck Interior, dated _____, I.D. Witness:  Robert J.
Camuccio

Admit:           _____

Deny:            _____

Additional Witness:  Tony Watson, Peter Rimmel, John Bredbeck

32.   Photograph of Rear Deck Interior, dated         , I.D. Witness: Robert J Camuccio

Admit:  _____

Deny _____

8

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Additional Witnesses: Tony Watson, Peter Rimmel, John Bredbeck

33.    Plaintiff's Income Tax Records, Dated _____, I.D. Henry Naranjo

Admit: _____

Deny: _____

Additional Witnesses: None

34.    Plaintiff's Medical Bills, dated 7/7/97 to the present, I.D. Witness: Henry Naranjo

Admit: _____

Deny:_____

Additional witnesses: Various medical providers

35.    Dr. Gaetano Scuderi's medical records and x-ray films of Henry Naranjo's spine, I.D. witness: Dr. Scuderi

Admit _____

Deny_____

Additional witnesses: None

36.    Henry Naranjo's medical prescriptions dated 7/7/97 to the present, I.D. witness: Henry Naranjo

Admit_____

Deny_____

Additional Witnesses: None

37.    Mortality Tables I.D. Witness: Judicial Notice

Admit_____

9

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Deny_____

Additional Witness: None

38.    Henry Naranjo's United States Certificate of Citizenship, I.D Witness: Henry Naranjo

Admit: _____

Deny: _____

Additional Witnesses: Judicial Notice

39.    Henry Naranjo's TENS Unit, I.D. Witness: Henry Naranjo

Admit:_____

Deny:_____

Additional Witnesses: Gaetano Scuderi, M.D., Miriam Feliz, M.D.

40.    Photographs of the Motor Yacht "Captivator" taken by Palmer Johnson, dated
       September 1984, I.D. Witness: Donald Kasten

Admit_____

Deny_____

Additional Witnesses: Bruce Cohen

41.    Employment Records and Benefit Records From Bradford Marine for Henry Naranjo,
       dated 1992 through 1999 I.D. Witness, Bradford marine Record's Custodian

Admit:_____

Deny:_____

Additional Witnesses: Henry Naranjo, Frederick Raffa

42.    Plaintiff's Experts Curriculum Vita : Dr. Scuderi, Dr. Stewart Burch, Frederick Raffa,
       Robert J. Camuccio, Richard Celestino, Dr. Anthony Hall, Dr. Gail Ballweg to be
       Identified by each Expert

10

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

Admit:_____

Deny:_____

Additional Witnesses: None

43. All Blue Prints of the Motor Yacht "Captivator" obtained from Palmer Johnson and Tom Fexas, I.D. Witness: Tom Fexas, Donald Kasten

Admit: _____

Deny: _____

Additional Witnesses: None

44. Defendant Smith's Response to Plaintiff's Request for Admissions I.D. Witness: Stephen Smith

Admit: _____

Deny: _____

Additional witnesses: none

45. Defendant Smith's response to Plaintiff's Initial Request for Production, I.D. : Stephen Smith and John Bredbeck.

Admit: _____

Deny:_____

Additional Witnesses: None

46. Business Records From Tom Fexas Yacht Designs, Inc. I.D. Witness: Tom Fexas

Admit:_____

Deny:_____

Additional Witnesses: None

11

RPC - REHABILITATION / PLACEMENT CONSULTANTS, INC.
P.O. Box 272979  Boca Raton, Florida 33427-2979
Main Office:
855 South Federal Highway, Suite 113
561-395-8045
rpc@airface.com

## EDUCATION

Family Mediation Training
FLORIDA ATLANTIC UNIVERSITY, 1996
Boca Raton, Florida

Post-Graduate Course - Assessment of Intelligence
MIAMI INSTITUTE OF PSYCHOLOGY, 1991
Caribbean Center for Advanced Studies
Miami, Florida

Master of Arts, Counseling Psychology
NIAGARA UNIVERSITY, 1978
Niagara Falls, New York

Bachelor of Arts, Political Science/Sociology
STATE UNIVERSITY OF NEW YORK AT FREDONIA, 1973
Fredonia, New York

## PROFESSIONAL EXPERIENCE

7/83 to Present        RPC - REHABILITATION / PLACEMENT CONSULTANTS, INC.
Boca Raton, Florida
**Rehabilitation Consultant/Vocational Evaluator**
Provides Clinical and Forensic Services to: Medical Facilities, Clinics,
Rehabilitation Agencies, Law Firms, Insurance Carriers, Corporations, Employers,
the Federal Government, and Private Individuals.
Evaluate new and existing programs (Medical, Rehabilitation, Personnel, Vocational)
for system design, dynamics, effectiveness, team cohesion and results. Identify
barriers and provide realistic solutions to meet organizational objectives.
Develop system strategies for targeted programs, identifying markets, developing
clinical strategies for service delivery, address special concerns, recommend
staffing.
Modify and enhance facility mission statement, treatment manuals, policy and
procedures, report formats and content presentation.
Prepare staff and facility for accreditation surveys (CARF/CORF).
Evaluate employment practices relating to hiring practices, job descriptions/job tasks
analysis, accessibility, ergonomic job analysis, advancement, out-placement and
compliance with the Americans with Disability Act (ADA).
Conduct rehabilitation and vocational evaluations; provides rehabilitation case
management; labor market surveys; career strategy planning; resume and career
strategy development and presentations; skills transfer analysis; vocational profile
development; job analysis; aptitude, interest and academic testing, and job
development/placement planning and execution.

1

**FACULTY APPOINTMENTS**

11/98 to Present  FLORIDA ATLANTIC UNIVERSITY
Boca Raton, Florida
**Adjunct Professor**
College of Education
Department of Counselor Education
    MHS 4434 **Occupational Information for Job Placement**
Department of Educational Technology and Research
    EDF 3430 **Educational Measurement and Evaluation**

**RPC CONSULTATIVE ASSIGNMENTS / PRIVILEGES**

9/88 to 2/94  NEUROLOGICAL REHABILITATION CENTER, INC
Tamarac, Florida
**Program Director** (3/91 to 3/93)
**Director, Vocational/Rehabilitation Counseling** (9/88 to 2/94)
Responsible for program development and management of an interdisciplinary
    outpatient rehabilitation medicine/chronic pain management program.
Modify and enhance facility mission statement, treatment manuals, policy and
    procedures, report formats and content presentation.
Prepare staff and facility for accreditation surveys (CARF/CORF).
Conduct rehabilitation and vocational evaluations, provides rehabilitation case
    management; individual and group rehabilitation counseling.
Develop and deliver education program addressing rehabilitation issues. Coordinate
    discharge plans with outside rehabilitation providers and insurance carriers.
Facilitate and chairs team evaluation conferences and weekly patient staffing, to
    develop and prepare rehabilitation plans.
    Coordinate professional services to meet set team and individual goals.

1/85 to 9/88  JOHN F. KENNEDY MEDICAL CENTER
CENTER FOR COMPREHENSIVE PAIN MANAGEMENT
Lantana, Florida
**Director, Vocational/ Rehabilitation Services (8/85 to 9/88)**
**Program Consultant (1/85 to 8/85)**
Founding member of a Interdisciplinary rehabilitation medicine program, providing
    case management; psychometric testing with patients; individual and group
    rehabilitation counseling; daily and weekly team conference and patient staffing,
    reentry planning and vocational/avocational services.
Provide rehabilitation counseling services to other hospital departments.
Provided technical assistance in the development of   a interdisciplinary
    rehabilitation medicine/pain management treatment program for a target population
    of chronic pain patients.
Provided research assistance; team makeup development; philosophical construct;
    treatment approach; physical plant layout; budget development; market strategy;
    team selection and orientation.
 Developed within team members the facility mission statement, treatment manuals,
    policy and procedures, report formats and content presentation.
Prepare staff and facility for accreditation surveys (CARF/JCAHO).

2

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 12/82 to 7/83 | **REHABILITATION COUNSELING SERVICES, INC.**<br>Fort Lauderdale, Florida<br>**Vocational Specialist**<br>Provided rehabilitation and vocational evaluations; rehabilitation case management; labor market surveys; career strategy planning; resume and career strategy development and presentations; skills transfer analysis; vocational profile development; job analysis; aptitude, interest and academic testing, and job development/placement. |
| 2/82 to 8/82 | **SALES CONSULTANTS OF FORT LAUDERDALE, INC./ PROFESSIONAL DIVISION**<br>Fort Lauderdale, Florida<br>**Account Executive**<br>Developed professional staff identification program for South Florida Corporations.<br>Screened applicants, matching credentials and expertise with employer requests.<br>Provided resume development and interview preparation services to applicants.<br>Identified potential employees to fill vacancies; Coordinated interview schedules. |
| 12/78 to 1/82 | **ACTION FOR EMPLOYMENT, INC.**<br>Buffalo, New York<br>**Director**<br>Developed and managed a comprehensive work experience program for the physically, developmentally and emotionally challenged. Developed, wrote, negotiated and administered Federal, State, County and City contracts for employment screening, training and placement programs.<br>Responsibilities included: case management, staff supervision, contract negotiations, evaluations, development of individual training programs and private sector placement and follow-up, as well as physical plant management.<br>Supervising personnel including interviewing, hiring, training, motivating, evaluating, and terminating. Staff included seven professional staff and 150 employees with an operating budget in excess of $500,000 per year. |
| 8/77 to 12/78 | **LINWOOD-OXFORD ASSOCIATION**<br>Buffalo, New York<br>**Coordinator, Elderly Services**<br>Position included development of a service delivery program for older adults including a self governing council and a self supporting transportation systems designed to meet the special needs of the older adult.<br>Purchased utilized and maintained transportation system for scheduled services provided within the community on a daily basis. |

3

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1/76 to 9/76 | **ERIE COUNTY NARCOTICS GUIDANCE COUNCIL**<br>Buffalo, New York<br>**Drug Abuse Coordinator**<br>Position included the development and coordination of drug prevention educations programs on a county wide basis. Public and Private Schools (K-College), prevention education programs developed and provided. Speakers Bureau of community religious leaders, law enforcement and drug treatment counselors utilized extensively.<br>Monthly information magazine edited and distributed county wide. |
| 1/75 to 6/75 | **STATE YOUTH DEVELOPMENT CENTER**<br>Atlanta, Georgia<br>**Recreational Instructor**<br>Position included developing and implementing a comprehensive swimming program to test and teach basic swimming skills., as well as other recreational programs for youth. |
| 7/73 to 1/75 | **EMERGENCY DRUG ABUSE SERVICES/DEPARTMENT OF PSYCHIATRY, UNIVERSITY OF BUFFALO MEDICAL SCHOOL, ERIE COUNTY MEDICAL CENTER**<br>Buffalo, New York<br>**Assistant to the Director; Supervisor Drug Abuse Counselors**<br>Position included supervising a professional counseling staff for the county's only drug detoxification program.<br>Provided psychotherapy with individuals and groups; development of individual treatment plans for substance abusers (narcotics, psychotropic, barbiturates, amphetamines addicts).<br>Liaison with the county psychiatric emergency room; providing on site initial screening and treatment recommendations.<br>Participated in major drug research study, and assisted in the training of medical interns assigned to service.<br>Coordinated the county drug screening program of professional counselors. |

## PUBLICATIONS

Thesis: 'Rotters' Internal/External Locus of Control Matrix and the Marathon Runner', 1978.

Celestino, R., Tapp J., and Brummet, M.E., 'Locus of Control Correlates with Marathon Performance'. Perceptual and Motor Skills, June 1979, 48 (2), 1249-1250.

4

RPC - REHABILITATION / PLACEMENT CONSULTANTS, INC.

## PROFESSIONAL CERTIFICATIONS/LICENSES

Florida Supreme Court Certified Family Mediator, **C.F.M**, State of Florida
  Certificate #: 7778F
Certified Rehabilitation Counselor, **C. R. C.** (National).
  Certificate #: 17969
Certified Rehabilitation Counselor, **OWCP**, U.S. Department of Labor
  Certificate #: 6-214
Certified Vocational Evaluator, **C. V. E.** (National).
  Certificate #: 582
Certified Disability Management Specialist, **C. D. M. S.** (National). Certificate#:
  03460
Certified Case Manager, **C. C. M** (National).
  Certificate #: 1366
Diplomat, American Board of Vocational Experts, **A. B. V. E.** (National).
  Certificate #: 00084
Licensed Rehabilitation Provider/Vocational Evaluator, State of Florida.
  License #: WC 1000128

## PROFESSIONAL AFFILIATIONS

Society for Human Resource Management-Professional Member
Personnel Association of Palm Beach County-Professional Member
Association of Broward County Mediators - Professional Member
National Rehabilitation Association
  Job Placement Division
National Rehabilitation Counselor Association
Vocational Evaluation and Work Adjustment Association
Florida Rehabilitation Association
National Association of Rehabilitation Professionals in the Private Sector
  President-Elect, Florida Chapter, 2001-2002
  President , South East Florida District,1988, 1989,1999, 2000,2001
  Board of Directors, 1986-1996, 1998- till present
  Chairman, Training and Education Committee
  Chairperson, Ethic
American Board of Vocational Experts
 United States Coast Guard Auxiliary, Commander, 1997, 1998
  Division Operations Officer, 1995, 1996
  Flotilla Staff Officer, Communications/Operations, 1999
  Flotilla 36, Division 3, 7th Coast Guard District
 School Advisory Council
  Addison Mizner Elementary School, Boca Raton, Florida,
  Chairperson,1998-99
  Co-Chair, 1999-2000
  Council Member, 1997-present
Pack Leader, Pack 333, Boy Scouts of America
  Boca Raton, Florida 2000-2001
Assistant Den Leader, Pack 333, Boy Scouts of America
  Boca Raton, Florida, 1998-2000
Rotary International District 6930, District Representative, 1991-92
Rotary Club of Boca Raton Sunrise, President, 1990-91
Rotary Club of Boca Raton Sunrise, Member since 1986

5

### *CURICULUM VITAE*                     Condensed, 2000

**Name:**  Burch B. Stewart, Ph.D., President/CEO
APPLIED CONSUMER SERVICES, INC.
9500 N.W. 77th Avenue, Bay 5
Hialeah Gardens, Florida   33016
Ph: (305) 821-1677   Fax: (305) 821-0155   E-Mail: AC1677@aol.com

**Education:**  Ph.D., 1959, Physical Chemistry, Univ. of Tenn. (U.T.), Knoxville.
M.S., 1957, Organic Chemistry, U.T., Knoxville.
B.S. in Chem., 1955, Analytical Chem., U.T., Knoxville.
Graduate, 1960 - Western Electric Engineering School, N.Y.C.

**Professional:**  ACS (American Chemical Society)/ASTM/AOAC/ACIL/AWWA/
Society of Sigma Xi/ Univ. of Miami Friends of Physics (Pres. 94-98)

**Employment:**  June 1986 to Present - President and Technical Director
APPLIED CONSUMER SERVICES, INC., providing analytical and
forensic testing of all types of products, eg., foods, herbs, cosmetics,
pharmaceuticals, paints, concrete, stucco, soaps, metals, textiles.
Also product formulation, deformulation, and invention services.
June 1973 to June 1986 - Director of Chemistry Laboratory.
APPLIED RESEARCH LABORATORIES, INC., Miami, Florida.
Sept. 1968 to Jan. 1973 - Manager, Central Analytical Dept.
CIBA-GEIGY CHEMICAL CO., Ardsley, N.Y.
1960 to Sept. 1968 - NMR Spectroscopist,
ALLIED CHEMICAL CORP., Morristown, N.J.
June 1959 to Sept. 1960 - Senior Engineer,
WESTERN ELECTRIC ENGINEERING CENTER, Princeton, N.J.

**Publications:**  9 papers on nuclear magnetic resonance, NMR.
2 papers on carbonium ion investigations
2 papers on sampling methods/1 paper on chemical kinetics
1 paper on high energy turbine/1 patent, disc calculator.

**Honors:**  Who's Who in America, 1995/Who's Who Worldwide, 1994
Who's Who Registry of Business Leaders, 1994
Who's Who in Technology/Who's Who in Consulting, 1988.
Who's Who in the South and Southwest, 1995
American Men and Women in Science, 1959
Freshman Scholarship, U.T., 1947
Honorable Mention in Westinghouse Science Talent Search, 1947
Merck Index Student Award, U.T., 1955
ACS Local Award, U.T.,1955.

# CURRICULUM VITAE

# FREDERICK A. RAFFA

**17 South Osceola Avenue, Suite 200**
**Orlando, Florida 32801**

**Telephone: 407/648-5141**                                        **Telecopy: 407/649-8601**


## EDUCATION

Degrees:         B.S.     (Business Administration), Florida State University, 1965
                 M.B.A.   (Finance), Florida State University, 1966
                 Ph.D.    (Economics), Florida State University, 1969

Dissertation:    An Analysis of the Determinants of Labor Migration in the State of Florida, by
                 County, 1960-65.

Honors:          National Science Foundation, Summer Trainee, Summer 1968; Omicron Delta
                 Epsilon, National Economics Honorary.


## EMPLOYMENT        Consulting Economist

Raffa Consulting Economists, Inc.
17 South Osceola Avenue, Suite 200
Orlando, Florida 32801
1997-Present

Frederick A. Raffa, Ph.D.
Consulting Economist
1971-97

University Professor

University of Central Florida
Department of Economics
P.O. Box 161400
Orlando, Florida 32816-1400

Professor Emeritus, 1998-Present
Professor, 1984-98
Associate Professor, 1974-84
Assistant Professor, 1969-74
Department Chair, 1976-80

Florida State University
Department of Economics
Tallahassee, Florida 32306-2045

Instructor, 1968-69

CONSULTING EXPERIENCE

**Litigation Support/Damages Analysis:**

– Personal Injury and Wrongful Death: Including Large Multi-Case Claims
– Commercial Litigation: Including Contract Disputes, Tortious Interference, Anti-Trust, Physician-Rights, Dealership/Franchise Disputes
– Punitive Damage Claims
– Crop Damage Assessments
– Employment Disputes, Including Discrimination and FLSA Matters
– Disability Insurance Disputes

**Other Consulting:**

– Economic Forecasting
– Economic Feasibility Analysis
– Economic Impact Analysis

OTHER ACTIVITIES

Board of Directors, Kennergy Corporation, 1982-90.
Board of Directors, National Bank of Commerce, 1985-2000.
Consultant to various government agencies, including East Central Florida Regional Planning Council, 1970-71, 1975-76; and the U.S. Department of Health, Education and Welfare, Project RETRO, 1971.
Easter Seal Society of Orange, Seminole and Osceola County, 1978-80, President 1978-79.
Florida Citrus Sports Authority (formerly Tangerine Sports Authority), Orlando, Florida: N.C.A.A. Representative, 1976-1989; Associate Board Member, 1989-95.
Florida Clergy Economic Education Foundation, Director, 1970-74.
Florida Department of Commerce Input-Output Technical Advisory Council, 1973.

CONFERENCE PROCEEDINGS

"Economic Value in a Judeo-Christian Society," Selected Papers of the Ninth Florida Clergy Economic Education Conference, 1972.
"Scarcity: The Economic Problem," Selected Papers of the Tenth Florida Clergy Economic Education Conference, 1973.
"A Note on Soviet Economic Aid to the Lesser Developed Countries," Rivista Internazionale Di Scienze Economiche E Commerciali, November 1974, with W.J. Klages.
"A Brief Comment on Florida's Input-Output Model," Proceedings of the American Chamber of Commerce Research Directors Conference, 1975.
"Trade or Aid: The Soviet Union and the L.D.C.'s," (abstract) in Atlantic Economic Journal, 1975.
"Scarcity in Abundance," Papers and Proceedings of the Twelfth Florida Clergy Economic Education Conference, 1975.
"CETA Title II: An Analysis of Participant Impact." Southwestern Journal of Economic Abstracts, Vol. 2, No. 1, 1981.

## JOURNAL ARTICLES

"Indirect Measurement of Economic Development," Mercurio, July 1972, with W.J. Klages.
"The Impact of a PSE Program on Employment and Participants." Growth and Change, October 1983, with C.A. Haulman.
"The Use of the Economist as Expert Witness in Personal Injury and Wrongful Death: The Economist's View." Trial, January, 1984, with C.A. Haulman.
"Assessing the Labor Market Intermediary Role of the Job Service." Growth and Change, Vol. 18, No. 1, Winter 1987, with C. Haulman and B. Rungeling.
"The Effects of Group Productivity on Individual Productivity: The Case of Migrant Citrus Harvesters." Mid-Atlantic Journal of Business, Graduate School of Business, Seton Hall University, 1990, with W. McHone.

## BOOKS

Co-editor, Economics: Myth, Method or Madness, McCutchan Publishing Co., 1971; with R.E. Hicks and W.J. Klages.
Co-author, Damages in Tort Actions, Matthew Bender and Co., December 1982, with annual supplements, 1983-1997; with Paul M. Deutsch.
Co-editor, U.S. Employment and Training Programs: A Selected Annotated Bibliography, Greenwood Press, 1983; with C.A. Haulman and D.A. Hosni.

## SOFTWARE

P.I. Valuator, Matthew Bender and Company, 1992.
CompCalc, Liberty Financial Group, 1993, 1996.

## SPONSORED RESEARCH GRANTS

"The Incidence and Rationale of Unionism in the Orlando SMSA." National Science Foundation, FTU Institutional Grant, April 1974.
"The Development of an Interindustry (Input/Output) Model for the State of Florida." Star Grant/Florida State Department of Commerce and Florida Energy Committee, October 1974.
"An Examination of the Feasibility of Establishing a Real Estate Recovery Fund as Part of the Florida Real Estate License Law." Star Grant/Florida Real Estate Commission, September 1975.
"The Development and Implementation of an Economic Base Model for the East Central Florida Region." East Central Florida Regional Planning Council, October 1975.
"The Construction of a Business Barometer for the Orlando SMSA." Sun First National Bank of Orlando, November 1975.
"An Assessment of the Need for Registration of Business Brokers." Florida Real Estate Commission, August 1977.
"The Development and Implementation of an Economic Impact Model for CETA Programs in the State of Florida." Florida Department of Community Affairs, Office of Manpower Planning, May 1979.

SPONSORED RESEARCH GRANTS (continued)

"Public Service Employment: An Impact Assessment of the State of Florida." Florida State Department of Labor and Employment Security, June 1, 1980.

"A Survey-Based Assessment of Employer and Employee Impressions of the Florida State Employment Service and the Employment Security Program." Star Grant/Florida State Department of Labor and Employment Security, July 1981.

"The Development of a System for Monitoring and Coordinating the Delivery of Employment and Training Programs in the State of Florida." Star Grant/Office of the Governor, August 1983.


PROGRAM APPEARANCES

"Demographic Indicators of Economic Growth in the USSR," presented at the Southwestern Social Science Association Annual Convention, March, 1971.

"Economic Value in a Judeo-Christian Society," Ninth Annual Florida Clergy Economic Education Conference, April 1972.

"Scarcity: The Economic Problem," Tenth Annual Florida Clergy Economic Education Conference, May 1973.

"The Political Economy of Soviet Aid to the L.D.C.'s: Conflicts and Strategies," presented at Rocky Mountain Social Science Association Annual Conference, April 25-27, 1974.

"What Sacrifice Economic Growth?" with W.J. Klages, presented at ASEE 82nd Annual Conference, Rensselaer Polytechnic Institute, Troy, New York, June 27-30, 1974, with G.R. Thompson.

"Economics of Unemployment," discussant, Inaugural Convention of the Eastern Economic Association, Albany, N.Y., October 25-27, 1974.

"Florida's Economic Growth: What's Next?" Florida Bankers Association Commercial Lending Workshop, March 1975.

"Florida's Input-Output Model," American Chamber of Commerce Research Directors Conference, June 1975.

"Trade or Aid: The Soviet Union and the L.D.C.'s" with W.J. Klages, and Chairman, Macro Theory Session, Atlantic Economic Conference, September 12-13, 1975.

"Economic Development and Soviet Aid: Political Burden or Economic Strategy," and Chairman, Economics of Energy Session, Atlantic Economic Conference, October 13-16, 1976.

"The Future Challenge of Funding the Religious Press," National Editorial Conference, Southern Regional Convention, Catholic Press Association, November 3-4, 1976.

"The Economist as an Expert Witness," Panelist, Florida Academy of Trial Lawyers, Orlando, Florida, April 16, 1979.

"Characteristic of the CETA Migrant," presented at Western Economic Association Annual Conference, San Diego, California, June 18, 1980, with C.A. Haulman.

"Earnings of Migrants As a Result of Job Search," discussant, Western Economic Association Annual Meeting, San Diego, California, June 12, 1980.

"The Impact of CETA Public Service Employment Programs," discussant, Southern Economic Association Annual Meeting, November 1980.

"CETA Title II: An Assessment of Participant Impact," presented at Southwestern Social Science Association Annual Meeting, Dallas, Texas, March 1981.

"Evaluating the Impact of Public Service Employment Programs: The Florida Experience," presented at Southern Economic Association Annual Meeting, New Orleans, Louisiana, November 1981, with C.A. Haulman.

PROGRAM APPEARANCES (continued)

"The Public Employment Service: Prescription for Improvement," presented at Atlantic Economic Association Annual Meeting, Miami, Florida, October 1982, with C.A. Haulman.
"A Study of Timing and Spacing of Childbearing," discussant, Southern Economic Association Annual Meeting, Atlanta, Georgia, November 1982.
"The Public Employment Service As An Effective Labor Market Clearinghouse," presented at Western Economic Association Annual Meeting, Seattle, Washington, July 1983, with C.A. Haulman and B. Rungeling.
"Unionization and Wages," Discussant at Southern Economic Association Annual Meeting, Washington, D.C., November 1983.
"Assessing the Role of the Job Service as an Unrestricted Access Labor Market Intermediary," presented at Western Economic Association Annual Meeting, Las Vegas, Nevada, June 1984, with C.A. Haulman and B. Rungeling.
"JTPA: Old CETA Wine in New Bottles," presented at Southern Economic Association Annual Meeting, Atlanta, Georgia, November 1984, with C.A. Haulman.
"Measuring Damages in Wrongful Death, Direct and Cross Examination of the Economist," Academy of Florida Trial Lawyers Annual Convention, November, 1989.
"Cross Examining the Well Prepared Expert," for the Orange County Bar Association Federal and State Trial Practice Committee, August 15, 1991.
"The Economist As An Expert Witness," for the Alachua County Chapter of the American Inns of Court, April 10, 1992.


WORKSHOPS, SEMINARS, ETC., CONDUCTED

"An Overview of the Central Florida Economy," Leadership Orlando Program of UCF Management Institute for Orlando Area Chamber of Commerce.
"Impact Evaluation Study: Effect of CETA on Participants and the Local Economy," Florida Department of Labor and Employment Security, Labor Market Information Workshop, March 24, 1980.
"Program Linkage Development Among Employment, Training and Education Resources," sponsored by Program Development Association in conjunction with CETA Special Grant for Educational Linkage, May 22, 1980.
"The Expert in Litigation," presented to FSU Law School Alumni, December 3, 1982.
"The Relationship of Economics to the Litigation Process," presented to the Florida Shorthand Reporters Association Spring Convention, 1988.
"The Catastrophic Injury: A Case Study," National Structured Settlements Trade Association Annual Meeting, May 1989.
"The Role of the Economist in Evaluating Personal Injury Claims," for Professional Education Systems, Inc., May 8-10, 1991; July 21-23, 1992; and November 20-22, 1996.
"Responding to the Challenges of the 90's," for the Central Florida District, Florida Association of Rehabilitation Professionals in the Private Sector, March 27, 1992.
"Evaluating Wrongful Death Claims," for the National Institute of Trial Advocacy, Advanced Trial Seminar, June 1995.
"The Role of The Economist in Evaluating Life Care Plans," University of Florida, Rehabilitation Training Institute, Life Care Planning for Catastrophic Case Management Conference, January 1997.
"Economic Analysis of Life Care Needs," University of Florida, 4th Annual Life Care Planning Conference, November 1999.


AFFILIATIONS

American Economic Association.
Southern Economic Association.

## ROBERT J. CAMUCCIO, USCG Retired

56 Snapper Ave.
Key Largo, Florida 33037
Phone: 305 453-0636    bcamuccio@Yahoo.com

**QUALIFICATIONS**     Twenty Years Coast Guard Experience,  Ship Design, Construction,
Repair, Damage Control, Stability, Marine Engineer, Officer of the Deck

**EDUCATION**   **Bachelor of Science**, US Coast Guard Academy, New London, CT                    1971

**M.S.E. Naval Architecture & Marine Engineering**, University of Michigan, Ann Arbor, MI  1978

**M.S.E. Mechanical Engineering**, University of Michigan, Ann Arbor, MI                    1978

**M.S.E. Engineering Management**, The Catholic University of America, Washington, DC   1986

**Advanced Professional Training & Professional Societies:**
Configuration Management (Logistics Support) , George Washington University
Program Managers Course, American Graduate University
Member: SNAME, ASNE, & ABYC

**EXPERIENCE**  **Maritime Consultant, Master Marine of South Florida, Inc.**                    **1991 - Present**
Provide consulting services and expert witness testimony in admiralty cases.  Services have
been retained in personal injury, seamanship, Rules of the Road, salvage operations, marine
accidents, naval architecture, marine engineering, collision damage, and   shipyard repair
litigation.  Provide professional opinions to assist attorneys, court testimony, depositions, and
affidavits.  Have always been excepted by the court as an expert .  Have been very successful
explaining complex naval engineering and nautical concepts to the court.  As part of the judge's
decision in a  salvage case the judge wrote, "The court credits the testimony of the salvor's
expert witness, Mr. Camuccio, that the [vessel] would have sunk without [salvor's] assistance."
(A list of clients provided upon request.)

**Marine Inspector, USCG Marine Safety Office, Miami Florida**                    **1989 - 1991**
Surveyed commercial ships and boats for compliance with federal regulations regarding
construction, repair, safe operation, manning, and equipment installations.  Vessels surveyed
range from 26 to 800 feet in length and include "sub-chapter-T" boats, Ocean Cargo Carriers,
and Cruise Ships.  Conducted dry-dock surveys and sea trials.  Specified engineering repair
requirements and determined adequacy of repairs for hull, deck machinery, propulsion
machinery, electrical generating systems, steering systems, and safety equipment.  Established
MSO Miami, foreign cruise ship fire-fighting evaluation criteria.  Surveyed foreign flag passenger
ships for compliance with the Safety Of Life At Sea International conventions.  Performed
calculations to remove grounded vessel in Florida Keys.

**USCG New Ship Construction Deputy Project Manager, USCG Headquarters**    **1988 - 1989**
Provided project management and engineering direction for Coast Guard's billion dollar new ship
construction program.  Setup long range logistics support plan.  Defined operational research
and development goals to establish naval engineering and naval architectural design
requirements.  Evaluated impact of various engineering options and coordinated ship operational
requirements with expected construction and operational cost.

**Chief Technical Support Branch, USCG Headquarters**                    **1987 - 1988**
Provided naval engineering support for ship acquisition projects greater than $20 million.
Developed processes necessary to make effective engineering and management decisions from
Concept Development Phase and Logistics Support through the life cycle of the vessel.
Provided design parameters for new ship and ship renovations projects.  Implemented Systems
Engineering, Value Engineering, Cost/Schedule Control and Measurement processes.

### Design & Construction Project Officer, USCG Headquarters          1982- 1987
Managed the Design and Construction Phases of the Coast Guard 378' High Endurance Cutter Fleet Renovation and Modernization (FRAM) project for all 12 cutters. The FRAM project was the most complex ship renovation project ever accomplished by the Coast Guard. Total program cost was over one billion dollars. Responsible for the development of the Configuration Management and the Long Range Logistics Support Plan. Managed all aspects of the design and headed a 40 person design team. Responsible for all design aspects including propulsion, hull, interior arrangements, electrical, electronic, steering, stability, and damage control systems. Contracting Officer's Technical Representative for construction. Awarded USCG Commendation Medal.

### Chief Maintenance & Repair Section, Miami Florida, 7th CG District          1978 - 1982
Planned and managed the maintenance and repair for all 27 cutters in the Coast Guard's 7th District. Directed the actions of 25 people, and the allocation of four million dollars per year. Planned and managed all long range repairs and dry-dock work. Made technical/financial decisions as to how repairs and modifications would be accomplished. Implemented casualty repair as needed for all cutters. Planned and negotiated shipyard contracts. Qualified Officer of the Deck.

### Engineer Officer, CGC VALIANT, Galveston Texas          1974 - 1976
Chief Engineer onboard 210' Medium Endurance Cutter. Responsible for the over all, maintenance, repair and damage control of the ship's hull, electrical, mechanical and propulsion equipment. Directed all engineering personnel. Planned and executed training and logistics support for the engineering department. On-scene leader for major marine incidents involving fires and collision emergency repairs. Qualified Officer of the Deck. Awarded USCG Commendation Medal.

### Assistant Engineer Officer, CGC GALLATIN, Governors Island, NY          1972 - 1974
Responsible for the Damage Control readiness of 378' High Endurance Cutter. Senior Engineering Watch Officer. Propulsion systems were both diesel and gas-turbine reduction. Performed duties as Damage Control Officer, Electrical Officer and Boiler Officer.

### Student Engineer, CGC PONTCHARTRAIN, Wilmington, North Carolina          1971 - 1972
Introduction to Shipboard Engineering on 255' High Endurance Cutter with 600 psi. steam, electric propulsion plant. Responsible for various major machinery operation, maintenance and repair. Qualified Engineering Watch Officer. Qualified Officer of the Deck.

## MISCELLANEOUS

### United States Coast Guard JROTC Instructor          1991-1993    1998-Present
Selected by the US Coast Guard and Dade County Public School Board to develop and teach the first U. S. Coast Guard JROTC program in the nation. The Coast Guard JROTC program was established at the Maritime and Science Academy in Miami, Florida. Taught seamanship, navigation, maritime law enforcement, shiphandling, ship and boat construction, and leadership. Over 200 cadets took part in my program. Awarded University of Miami Chapter of Phi Delta Kappa, Educator of the Year Award.

### Special Projects Design Manager, Dade County School System          1993 - 1998
Manage designated "Special Project" engineering and architectural designs and construction projects. Have access to 14 engineering/architectural companies to develop designs. Insure all engineering designs meet  very stringent design codes issued by the State of Florida, Department of Education. Negotiate construction cost with General Contractor. Oversee construction to confirm compliance with the approved design. Managing multiple engineering design and construction projects in the mechanical, electrical, and architectural disciplines.

### Adjunct Professor, Broward & Monroe County  Community Colleges          1990 - 1996
Over numerous semesters, I have taught College Algebra, and Probability and Statistics courses.

CASE NO.: 00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

# DEFENDANT, STEPHEN BYRON SMITH'S,
# TRIAL WITNESS LIST AND TRIAL EXHIBIT LIST

## WITNESS LIST OF STEPHEN B. SMITH

1.      Stephen B. Smith
        360 Old Sutton Road
        Barrington, IL

2.      John Bredbeck
        Vancouver, British Colombia
        Canada

3.      Paul Engle
        c/o Bradford Marine
        3051 State Road 84
        Fort Lauderdale, Fl

4.      David Henderson
        c/o Bradford Marine

5.      Mark Tortura
        c/o Bradford Marine

6.      Tony Watson
        c/o Bradford Marine

7.      Peter Rimmel
        3701 NW 94th Avenue
        Hollywood, Fl

8.      Henry Pliske
        c/o Patten Marine, Inc.
        2120 S. Bayshore Drive
        Miami, Fl

9.      Robert Connell
        c/o Patten Marine, Inc.

10.     Bruce Atkinson
        c/o Kaiwahine Marine Services, Inc.
        4641 SW 42nd Terrace
        Ft. Lauderdale, Fl

11.   Brian Mink
      1910 SW 56th Avenue
      Plantation, Fl

12.   Dr. Miriam Feliz
      18285 NW 68th Avenue
      Miami, Fl

      CV attached. Opinion testimony regarding her findings on examinations of the
      plaintiff and basis for his complaints of pain

13.   Dr. Gail Ballweg
      7150 W. 20th Avenue
      Hialeah, Fl

      CV attached.  Opinion testimony regarding her findings on examinations of the
      plaintiff and impairment/disability, if any, from a neurological standpoint.

14.   Dr. Gary Schwartz
      4310 Sheridan Street
      Hollywood, Fl

      CV attached.  Opinion testimony regarding his findings on examinations of the
          plaintiff and nature, cause and extent of his injuries, impairment/disability, if any,
      from an orthopedic standpoint.

15.   Theodore Bilski
      708 Kingston Court
      Apollo Beach, Fl

      CV attached. Opinion testimony regarding plaintiff's ability to work in the past and
      in the future, description of jobs available to the plaintiff, earnings capability and
      potential.

16.   Manfred Ledford
      Dept. of Finance, University of Miami
      Coral Gables, Fl

      CV attached. Opinion testimony regarding plaintiff's past and future economic loss.

17.    John Francis McCaughey
       700 Catherine
       Virginia Beach, Va.

       CV attached. Opinion testimony regarding the duties of the captain, and by extension
       the vessel owner in circumstances where the vessel is at a repair facility undergoing
       repair work/renovation and whether any such duties in this case were breached.
   Cause of the accident was not due to any fault or want of due care on the part of the
   captain/owner. Federal regulations and industry standards applicable to welding.

18.    Henry Naranjo - Plaintiff
       Portions of Mr. Naranjo's deposition(s) may be read to the court. Page and line
       designation will be provided to counsel and the court.

19.    Marlene Ramirez
       Portions of Ms. Ramirez's deposition may be read to the court. Page and line
       designation will be provided to counsel and the court.

20.    Witnesses listed by the plaintiff and Palmer Johnson.

## EXHIBIT LIST OF STEPHEN B. SMITH

| EX. NO. | DESCRIPTION | DATE | WITNESS | A | D | OBJECTIONS |
|---------|-------------|------|---------|---|---|------------|
| 1. | Patten Marine Survey | 2/18/97 | Pliske | | | |
| 2. | Bradford Marine work orders/invoices | 7/7/97 | Henderson | | | |
| 3. | Photos of lazarette | Post-acc. | Bredbeck | | | |
| 4. | Rimmel letter/report | 7/8/97 | Rimmel | | | |
| 5. | OSHA regulations | - | Rimmel/ McCaughey | | | |
| 6. | NFPA 51B standards | - | Rimmel/ McCaughey | | | |
| 7. | Broward General Radiology report of lumbar spine | 7/7/97 | Schwartz | | | |
| 8. | CMI Lumbar Spine MRI | 8/21/97 | Schwartz | | | |
| 9. | Functional Capacity Asses. | 12/5/97 | Schwartz | | | |
| 10. | Discharge Summary Health South Workable | 2/17/98 | Schwartz | | | |
| 11. | MMPI-2 report | 1/18/98 | Feliz | | | |
| 12. | Plaintiff's answers to interrogatories | | Naranjo | | | |
| 13. | CV of expert John Francis McCaughey | | McCaughey | | | |
| 14. | CV of expert Dr. Feliz | | Feliz | | | |
| 15. | CV of expert Dr. Ballweg | | Ballweg | | | |
| 16. | CV of expert Dr, Schwartz | | Schwartz | | | |

9. *Plaintiff Objects*
10. *Plaintiff Objects.*

CASE NO.:  00-6022-CIV-LENARD
MAGISTRATE JUDGE TURNOFF

# THIRD PARTY DEFENDANT,
# TOM FEXAS YACHT DESIGN, INC.'S,
# TRIAL WITNESS LIST AND TRIAL EXHIBIT LIST

## TOM FEXAS YACHT DESIGN, INC.'S WITNESS LIST

1.   Tom Fexas                                    Live
     Tom Fexas Yacht Design, Inc.
     c/o Mannikko & Baris
     870 SW Martin Downs Boulevard, Suite 1
     Palm City, FL  34990

2.   Henry Naranjo                                Live
     c/o F. David Famulari, Esquire
     Blanck & Perry, P.A.
     5730 SW 74th Street, Suite 700
     Miami, FL  33143

3.   Marlene Ramirez                             Live
     c/o F. David Famulari, Esquire
     Blanck & Perry, P.A.
     5730 SW 74th Street, Suite 700
     Miami, FL  33143

4.   Stephen Byron Smith                         Live
     c/o John D. Kallen, Esquire
     Badiak, Will & Kallen
     17071 West Dixie Highway
     North Miami Beach, FL  33160

5.   Palmer Johnson, Inc.                        Live
     c/o Laurence F. Valle, Esquire and
     Frank J. Sioli, Esquire
     Valle & Craig, P.A.
     Dadeland Centre, Suite 1000
     9155 S. Dadeland Blvd.
     Miami, FL  33156

6.  B. J. Johansen                              By Deposition    1.0 hours
    c/o David L. Weber, Esquire
    Pinkert Law Firm LLP
    454 Kentucky Street
    Sturgeon Bay, WI  54235-0089

    Will testify as to construction of vessel.

7.  Donald Kasten                               By Deposition    1.0 hours
    Palmer Johnson, Inc.
    c/o Laurence F. Valle, Esquire and
    Frank J. Sioli, Esquire
    Valle & Craig, P.A.
    Dadeland Centre, Suite 1000
    9155 S. Dadeland Blvd.
    Miami, FL  33156

    Will testify as to construction of vessel; relationship of Palmer Johnson and Fexas.

8.  Robert Bohler                               Live
    7340 SW 13th St.
    Plantation, FL  33317

    Will testify as to Palmer Johnson's dealings with Fexas.

9.  Bruno Alia                                  By Video Deposition    1.0 hours
    Address Currently Unknown

    Expert in vessel construction.

10. John Bredbeck                               Live
    1126 S. Federal Highway, Apt. 110
    Fort Lauderdale, FL  33316

    Will testify as to repairs to vessel.

11.  Brian Mink                                By Deposition        1.0 hours
     1910 SW 56th Avenue
     Plantation, FL  33316

     Will testify as to condition of cockpit extension.

12.  Roger W. Staehle                          By Video Deposition    1.0 hours
     22 Red Fox Rd.
     North Oaks, MN

     Expert in corrosion.

13.  Mark Tortora                              Live
     2780 S. Oakland Forest Dr., # 1603
     Oakland Park, FL  33309

     Expert in welding safety and techniques.

14.  Peter Rimmel                             Live
     3710 Nw 94th Ave.
     Hollywood, FL

     Expert in safety precautions for welders.

15.  All witnesses listed by all other parties without waiving any objection thereto.

16.  Tom Fexas Yacht Design, Inc. reserves the right to amend its Witness List pursuant
     to the Court's Pretrial Order.

F:\FEXAS\PTS Witness List.wpd

Naranjo v. Smith, et al.
Case No.: 00-6022-CIV-LENARD
Joint Pretrial Stipulation
Tom Fexas Yacht Design, Inc.'s List of Other Possible Witnesses
page 1

## TOM FEXAS YACHT DESIGN, INC.'S LIST OF OTHER POSSIBLE WITNESSES

1.  Bruce Cohen                                    Live
    Address Currently Unknown

    Will testify as to contract with Fexas for extension plane.

2.  Eric Haberly                                   Live
    Address Currently Unknown

    Will testify as to construction of the vessel.

3.  Clyde Hasinjager                               Live
    c/o Berger Boats
    Manitowak, WI

    Will testify as to construction of the vessel.

4.  All witnesses listed by all other parties without waiving any objection thereto.

5.  Tom Fexas Yacht Design, Inc. reserves the right to amend its List of Other Possible
    Witnesses pursuant to the Court's Pretrial Order.

F:\FEXAS\PTS Witness List Other Possible.wpd

## FEXAS' TRIAL EXHIBITS

| Presiding Judge: Joan A. Lenard<br>Magistrate William C. Turnoff | Plaintiff Attorneys:<br>Manuel Valdez<br>John Burke<br>F. David Famulari<br><br>Defendant Attorneys:<br>John Kallan<br>Laurence Valle | Defendant/Third Party Plaintiff<br>Attorneys: Laurence F. Valle<br><br>Third Party Defendant Attorney:<br>Joseph L Mannikko |
|---|---|---|
| Trial Date:<br>November 12, 2001 @ 8:45 a.m. | Court Reporter: | Courtroom Deputy: |

| Def.<br>No. | Plf.<br>No. | Objection | Marked | Admitted | Description |
|---|---|---|---|---|---|
| | 1 | | | | Notes on Palmer Johnson trip June 24, 1984 |
| | 2 | | | | Palmer Johnson's letter to Bruce Cohen, Dated July 13, 1984 |
| | 3 | | | | Handwritten notes of fishing cockpit addition, undated |
| | 4 | | | | Palmer Johnson's hand drawn sketches of cockpit extension with Fexas' handwritten notations from early July, 1984 |
| | 5 | | | | Preliminary specifications for cockpit extension |
| | 6 | | | | Additional cockpit specifications, date July 13, 1984 |
| | 7 | | | | Palmer Johnson change Order # 77 for addition of cockpit, dated July 23, 1984 |
| | 8 | | | | Fexas Invoice to Bruce Cohen for preliminary design for cockpit extension of Captivator, dated July 9, 1984 |
| | 9 | | | | Fexas construction drawings for cockpit extension July 23, 1984 |
| | 10 | | | | Fexas Invoice to Bruce Cohen for final design and engineering for cockpit extension of Captivator, dated July 22, 1984 |
| | 11 | | | | ABS Standards for concrete ballast in aluminum hulls |
| | 12 | | | | Fexas letter to Palmer Johnson, dated October 19, 1984 |
| | 13 | | | | Fexas transmittal to Palmer Johnson of 3 sets of blueprints for Captivator dated October 19, 1984 |
| | 14 | | | | Palmer Johnson letter to Bruce Cohen dated January 5 ,1984 (first page only) |
| | 15 | | | | Fexas letter to Palmer Johnson, Inc of March 14, 1984 |
| | 16 | | | | Palmer Johnson letter to Fexas dated March 22, 1984 |
| | 17 | | | | Fexas letter to Palmer Johnson dated April 5, 1984 |
| | 18 | | | | Palmer Johnson letter to Fexas, dated July 25, 1984 |
| | 19 | | | | Profile of Captivator |
| | 20 | | | | Photos of completed Captivator |

| Def.<br>No. | Plf.<br>No. | Objection | Marked | Admitted | Description |
|---|---|---|---|---|---|
|  | 21 |  |  |  | Video of Captivator |
|  | 22 |  |  |  | Interrogatory answers -all parties |
|  | 23 |  |  |  | Blow ups of selected exhibits |
|  | 24 |  |  |  | Summaries, graphs, and charts |
|  | 25 |  |  |  | Time line of events |

F:\FEXAS\PTS.Exhibit List .wpd

## FEXAS' LIST OF OTHER POSSIBLE EXHIBITS

| Presiding Judge: Joan A. Lenard<br>Magistrate William C.Turnoff | Plaintiff Attorneys:<br>Manuel Valdez<br>John Burke<br>F. David Famulari<br><br>Defendant Attorneys:<br>John Kallan<br>Laurence Valle | Defendant/Third Party Plaintiff<br>Attorneys:  Laurence F. Valle<br><br>Third Party Defendant Attorney:<br>Joseph L Mannikko |
|---|---|---|
| Trial Date:<br>November 12, 2001 @ 8:45 a.m. | Court Reporter: | Courtroom Deputy: |

| Def.<br>No. | Plf.<br>No. | Objection | Marked | Admitted | Description |
|---|---|---|---|---|---|
| | 1 | | | | Bradford Marine records |
| | 2 | | | | Henry Naranjo medical records |
| | 3 | | | | Palmer Johnson's records |
| | 4 | | | | Steven Smith's records |
| | 5 | ⌒ | | | Long Shore investigation file |
| | 6 | | | | Fexas Yacht Design, Inc. records |
| | 7 | | | | Henry Naranjo earnings records |
| | 8 | ⌒ | | | Henry Naranjo's Workers Compensation records |

F:\FEXAS\PTS.Exhibit List Other Possible.wpd